UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) CASE NO. CR18-162-JLR |
| v. | ) SEATTLE, WASHINGTON |
| | ) January 31, 2019 |
| HANY VELETANLIC, Defendant. | ) EVIDENTIARY HEARING |

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES L. ROBART
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: MATTHEW D. DIGGS
MARIE M. DALTON
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101

For the Defendant: JOHN HENRY BROWNE
CRAIG DAVID SUFFIAN
Law Offices of John Henry Browne
801 Second Avenue, Suite 800
Seattle, WA 98104

Reported by: NANCY L. BAUER, CCR, RPR
Federal Court Reporter
700 Stewart Street, Suite 17205
Seattle, WA 98101
(206) 370-8506
nancy_bauer@wawd.uscourts.gov

January 31, 2019 10:00 a.m.

PROCEEDINGS

THE CLERK: Case No. CR18-162, United States v. Hany Veletanlic.

Counsel, please make your appearances for the record.

MR. DIGGS: Good morning, Your Honor. Matthew Diggs and Marie Dalton for the United States.

MR. BROWNE: Good morning, Your Honor. John Henry Browne and Craig Suffian on behalf of Hany Veletanlic. There are some hard-to-pronounce names in this case.

THE COURT: Thank you. Please be seated.

Counsel, we are here for the hearing on the motion to suppress evidence obtained during illegal, warrantless searches, found in the docket in this matter at 52.

I guess the one bit of advice that I would give each of you is, the dimensions of the motion to suppress are relatively limited. They are the two suppressors, as well as any statements made subsequent to the agents' alleged unconstitutional and warrantless search of the safe, and my notes suggest that that occurred on July 25, 2017.

So let's try and stay on point, since that's what this motion is about, and it's not going to turn into a general discussion of the merits of the case.

The government has the burden on this matter, so, Mr. Diggs, if you'd like to proceed.

MR. DIGGS: Your Honor, unless the court would like to hear some opening remarks, the government will call its first witness, ATF Special Agent Claudia Grigore.

THE COURT: Thank you.

THE CLERK: Please come forward, and raise your right hand.

CLAUDIA GRIGORE, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state your name for the record, and spell it for the court reporter.

THE WITNESS: Claudia Ligiana Grigore; C-l-a-u-d-i-a; L-i-g-i-a-n-a; G-r-i-g-o-r-e.

THE COURT: May I ask that you put the microphone closer to your mouth? You have a relatively soft voice.

You may inquire.

DIRECT EXAMINATION

MR. DIGGS:

Q Good morning, Special Agent Grigore.

A Good morning.

Q What do you do for work?

A I'm a criminal investigator, special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

Q And how long have you held that position?

A Since March of 2014.

Q Do you work out of the Seattle office?

A Yes, sir.
Q And have you been in the Seattle office your whole career?
A No, sir.
Q Where did you start?
A Spokane, Washington.
Q Are you one of the case agents assigned to the investigation involving the defendant, Mr. Hany Veletanlic?
A Yes, sir.
Q Can you just briefly tell us how you learned about the matter involving Mr. Veletanlic?
A I was contacted by Special Agent Karabeika in the beginning of March in regards to information coming from overseas, from Sweden.
Q That being March of 2017?
A Yes, sir.
That the Swedish authorities had seized some packages coming from the state of Washington, and Special Agent Karabeika asked my help in tracing some firearms.
Q Okay. And did you, with Special Agent Karabeika, follow up on those seizures?
A Yes, sir.
Q As part of that, did you interview an individual, Mr. Nguyen?
A Yes, sir.
Q Okay. Approximately when did that occur?

A That probably occurred on May 30th of 2017.
Q What happened --
A Yes, it occurred on May 30th, 2017. Sorry.
Q What happened the next day?
A The next day, Mr. Nguyen called me and told me that the defendant here contacted him, and he wanted to talk to us.
Q Okay. Were you also contacted by Mr. Veletanlic?
A No.
Q Was Special Agent Karabeika, to your knowledge?
A Yes.
Q Did you arrange an interview with Mr. Veletanlic that day?
A Yes, sir.
Q Where did that take place?
A It took place outside a cafe in Everett, downtown Everett, Washington.
Q And before Mr. Veletanlic was interviewed that day, was he provided his Miranda warnings?
A Yes, sir.
Q Did he sign a consent form waiving those warnings?
A Yes, sir.
Q Would you just take a look at the binder in front of you? It should have tabs. If you'd turn to Tab 1.
A Yes, sir.
Q Is that the consent form from that day?
A Yes.

MR. DIGGS: Government offers Exhibit 1 for purposes of this hearing.

MR. BROWNE: No objection, Your Honor.

THE COURT: Exhibit 1 is admitted.

(Exhibit 1 admitted.)

Q (By Mr. Diggs) After he signed the consent form, did you and Special Agent Karabeika interview Mr. Veletanlic?
A Yes.
Q Approximately how long did that interview last?
A Less than an hour.
Q What did he tell you about his firearms exports?
A He told us that he sent firearms parts and frames to Sweden.
Q Okay. And did he tell you that -- how he had labeled these parts when he sent them?
A He was very evasive about it.
Q Did he say that he labeled them as "firearms parts"?
A No.
Q Okay. The firearms themselves, did he say whether he'd done anything to them before he sent them?
A Yeah. He told us that he took them apart.
Q Okay. And what about the serial numbers?
A Removed serial numbers.
Q Would you turn to Exhibit 2 in the binder in front of you?
Did you ask Mr. Veletanlic -- or did you and

Mr. Karabeika ask Mr. Veletanlic for consent to conduct some searches that day on May 31st?
A Yes, sir.
Q Is Exhibit 2 his signed consent on May 31st?
A Yes, sir.
MR. DIGGS: The government offers Exhibit 2 for purposes of this hearing.
MR. BROWNE: No objection, Your Honor.
THE COURT: Exhibit 2 is admitted.
(Exhibit 2 admitted.)
Q (By Mr. Diggs) Special Agent, when did the prospect of Mr. Veletanlic cooperating with ATF come up?
A During that interview on May 31st.
Q How did it come up?
A So he was talking about a shady crew that he knows that traffics firearms, and then I asked him if he's willing to work with us, and his reply was that he actually was going to suggest that he's going to work with us in exchange for him not going to be arrested.
Q The days following that meeting on May 31st, did you actually meet with Mr. Veletanlic to go over an actual formal cooperation -- excuse me -- informant agreement with the ATF?
A Yes, sir.
Q Okay. Would you turn to Exhibit 20 of the binder in front of you?

A Yes, sir.
Q Is this a blank form of the informant agreement that you went over with Mr. Veletanlic?
A Yes.
Q How did you go over it with him?
A I believe I -- I read to him every single line, and I asked him whether he understood what was written there, and I had him initial every single paragraph.
Q Where did that meeting take place?
A I think it was in the parking lot at Dick's Burgers in Edmonds.
Q Can you give an estimate as to how long you went over the agreement with him?
A Around a half an hour.
Q Did you offer Mr. Veletanlic a copy of the agreement when he left?
A I did, but he didn't want one.

MR. DIGGS: Your Honor, I offer Exhibit 20 for purposes of this hearing.

MR. BROWNE: Your Honor, may I briefly voir dire on that matter?

THE COURT: Yes.

MR. BROWNE: Should I do it from here, or the podium?

THE COURT: You can do it from there.

VOIR DIRE EXAMINATION

BY MR. BROWNE:
Q Good morning, Special Agent. I met you briefly, right?
A Yes.
Q Okay. Exhibit 20 is a blank form?
A That's correct.
Q Do you have the original form that involved my client?
A Your firm took notes.
Q Sorry?
A Your law firm took notes. They were able to examine the form. My in-house counsel was against providing the actual form.
Q Okay. I think my question -- maybe I didn't make it clear.
Do you have the form that was signed by my client?
A Not with me here, no.
Q You don't have that with you?
A No.
Q Is there some reason why you're using a blank form rather than the form that my client signed?
A I -- I -- I don't know how to answer that question. I did not provide you this form.
THE COURT: It may be better to ask the government that, since she, obviously, didn't decide what exhibits to use, counsel.
MR. BROWNE: I'm just trying to make a record, Your

Honor. I've talked to the government about this issue.

MR. DIGGS: Let me -- sorry, go ahead.

MR. BROWNE: No, I don't want to interrupt anybody.

THE COURT: Are you finished?

MR. BROWNE: Yes. I object to Exhibit 20.

THE COURT: Response, counsel?

MR. DIGGS: One question.

CROSS VOIR DIRE

BY MR. DIGGS:

Q Special Agent Grigore, have you examined Exhibit 20 and compared it to the form the defendant signed?

A Yes, sir.

Q Are they identical in all of the typed provisions?

A Yes.

MR. DIGGS: Your Honor, we'd offer Exhibit 20 for purposes of this hearing.

THE COURT: I'm going to admit it for illustrative purposes. I don't believe it has any significance until we see if he signed it, and there are other writings on the document. But for illustrative purposes, yes, I'll admit it.

(Exhibit 20 admitted.)

DIRECT EXAMINATION (continued)

BY MR. DIGGS:

Q Special Agent Grigore, if you'd take a look at Exhibit 19, this was Exhibit B to the defendant's motion.

Is that the typed content -- not the actual form but the typed content of the agreement signed by Mr. Veletanlic?

A Well, it is missing the first paragraph, the line 1.

Q Okay. So other than line 1 that says, "The ATF has asked me to assist in an official investigation," and the remainder of that paragraph, is the Exhibit 19 the same as the agreement signed by Mr. Veletanlic?

A Yes.

MR. BROWNE: Sorry, Your Honor. May I inquire something of counsel?

THE COURT: Yes.

MR. BROWNE: Mr. Diggs, are you talking about line 1 on Exhibit 19?

MR. DIGGS: On Exhibit 20.

MR. BROWNE: Oh, I see. Okay. I understand what you're saying. Thank you. Thank you, Mr. Diggs.

MR. DIGGS: Your Honor, I think we're fine with illustrative purposes to 19, but I would offer what's been filed as B to defendant's motion, which we've marked as Exhibit 19 for purposes of this hearing.

MR. BROWNE: Your Honor, I think the same ruling would be appropriate. It should be admitted for illustrative purposes only, because there's nothing in the memo from Ms. Scanlan, who I think you know from my office, that

indicates that it was signed or anything. So I have no objection to it being admitted for illustrative purposes, Your Honor.

MR. DIGGS: Your Honor, the second page of Exhibit 19 actually says "signed and dated 6/5/17."

MR. BROWNE: That's correct, Your Honor.

THE COURT: I will admit the exhibit.

(Exhibit 19 admitted.)

Q (By Mr. Diggs) Let's move forward, Special Agent Grigore, to June 15th, 2017, okay, so a couple of weeks after this initial contact. Did you come in contact with Mr. Veletanlic again on that day?
A Yes, sir.
Q How did that meeting come about?
A He contacted me saying that he has two stolen firearms that he previously purchased from Ryan Kunkel.
Q Okay. And what --
A And he wanted to give them to me.
Q Where did you arrange to meet him that day?
A At his residence.
Q Who did you go there with? Did you go with another agent?
A I went with another agent, yes. I don't remember the agent's name.
Q How long did that meeting last?
A Not too long.

Q Did you -- did he provide you the firearms that day?
A Yes, sir.
Q If you'd turn to Exhibit 5 in the binder in front of you. Is that the receipt for the two firearms he provided you on June 15th?
A Yes, sir.
MR. DIGGS: Government offers Exhibit 5 for purposes of this hearing.
MR. BROWNE: No objection, Your Honor.
THE COURT: Exhibit 5 is admitted.
(Exhibit 5 admitted.)
Q (By Mr. Diggs) If you could turn to Exhibit 13, Special Agent Grigore, which will also be on the screen.
A Yes, sir.
Q Is this an email that you received from the defendant that was sent on July 4th of 2017?
A Yes, sir.
MR. DIGGS: Government offers Exhibit 13 for purposes of this hearing.
MR. BROWNE: I think there should be a better foundation for that. I object on foundation grounds. I anticipate it will be admitted at some point, but I think there needs to be a foundation.
THE COURT: I'm going to overrule the objection and admit the exhibit.

(Exhibit 13 admitted.)

Q (By Mr. Diggs) Do you see where Mr. Veletanlic writes that he'd like to start from the beginning, without leaving out any details? And my question for you: At the time you received this exhibit, did you have concerns that Mr. Veletanlic had not been truthful with you and Special Agent Karabeika in your initial meetings?

A Yes, sir.

Q Okay. And what were those concerns, if you could describe them?

A Well, he -- initially he told us that he just sent a few packages, but now he's -- he's telling us that he -- he sent significantly more packages.

Q So the highlighted portion where he says, "There have been 15 to 20 small packages, and they've requested as many Glock 17 barrels, I've sent about five or six of them," is that a greater number than he'd initially indicated to you he'd sent?

A Yes, sir.

Q Did you and Mr. Veletanlic exchange text messages during this period?

A Yes, sir.

Q And if you'd take a look at Exhibit 4 in the binder. Are these copies of the text messages between you and Mr. Veletanlic dating from June 7th of 2017 through August

2nd of 2017?
A Yes, sir.
MR. DIGGS: Government offers Exhibit 4 for purposes of this hearing.
MR. BROWNE: No objection, Your Honor.
THE COURT: Exhibit 4 is admitted.
(Exhibit 4 admitted.)
Q (By Mr. Diggs) If you'd turn to the eighth page of Exhibit 4.
Special Agent Grigore, do you see the text message dated Monday, July 24th?
THE COURT: Why don't you wait until we all get there. Mr. Browne, do you see that?
MR. BROWNE: Yes, Your Honor. Thank you.
THE COURT: Okay.
Q (By Mr. Diggs) What is Mr. Veletanlic sending you a picture here of on July 24th, 2017?
A A lower receiver for a rifle.
Q Okay. And had you asked him to send you --
A No.
Q -- photographs?
A No.
Q You tell him you'll run it and let you know if we need it. What are you referring to there?
A Well, he was trying to check to see whether this specific

firearm was a stolen firearm. So I told him that I was running clear to make sure that that was not reported as a stolen firearm.
Q And then you say, "Can we meet in Edmonds tomorrow at 2:30?" Is that the meeting that ultimately ended up occurring at Mr. Veletanlic's residence?
A That's correct.
Q So later that day, you write to him that you and Glenn will meet at your house --
A Yes.
Q -- is that correct?
The next day, July 25th, 2017, what was the purpose in your going to Mr. Veletanlic's residence?
A Well, we wanted to discuss with Mr. Veletanlic his -- his cooperation agreement with us. Obviously, through his texts and other information that I had received, I discovered that he was not fully truthful with us.
Q Where did you end up first meeting him? Did you meet at the house, or did you meet somewhere else and then go to the house?
A We met him directly at his house.
Q And where does he live?
A He lives in Tulalip, Washington.
Q Can you generally describe the residence? Large? Small?
A It is a small residence. It is a trailer house.

Q When you arrived, did he invite you inside?
A Yes.
Q Where did you begin to talk to him in the residence?
A Right as we entered. It's an open area. It was, I assume, his living room, and his desk is right to the left, so we, usually when we met him, we sat there.
Q Did he offer you a seat?
A Yes.
Q Who were you there with that day?
A Special Agent Karabeika.
Q Were you armed that day?
A Yes.
Q Where did you holster your firearm?
A Usually I holster inside my trousers, in the lower back of my -- in my lower back.
Q Do you make any effort to cover the firearm?
A Absolutely.
Q Okay. To the best of your recollection, was it covered that day?
A Yes.
Q When you sat down with him, what did you begin to talk about?
A We talked about him being truthful about his firearms -- him sending firearms overseas, and he came forward and told us that he -- aside from sending firearms to Sweden, he also

sent firearms to other countries.
Q Such as?
A Such as Germany and Russia.
Q Okay. Did he talk to you about any firearms that had been sent to Brazil?
A Yes.
Q Had he mentioned any of these countries -- sending firearms to these countries in any initial interactions you'd had with him?
A No.
Q Ultimately, did you come around to discuss firearms sent to France?
A He told us he received two suppressors -- two firearms from France, and in exchange he sent firearms -- firearms parts to France, yeah.
Q And I'm saying "firearms," but some of this discussion involved parts of firearms as well; is that accurate?
A That's accurate.
Q Who was the individual in France to whom Mr. Veletanlic indicated he had sent firearms and from whom he'd received silencers?
A He only called him by his first name, "Bruno."
Q Did you ask Mr. Veletanlic as to what happened with these silencers?
A Yes, and he -- I did.

Q What did he say?
A He said that he destroyed them.
Q Were the silencers --
MR. BROWNE: Sorry, Your Honor. I couldn't hear the witness's response.
A He said that he destroyed them.
MR. BROWNE: Thank you. Thank you, Your Honor.
Q (By Mr. Diggs) Were the silencers an item that were of interest to you?
A Yes.
Q Why?
A Because silencers are regulated by ATF.
Q Okay. What does that mean?
A It means that a person, in order to lawfully possess them in the United States, they need to register them with the national registry.
Q At any point during this discussion of additional firearms exports, did you raise your voice to Mr. Veletanlic?
A No.
Q Did Special Agent Karabeika?
A I don't remember, no.
Q Did you ever threaten to arrest him for these exports he was telling you about?
A No.
Q Did you confront him with the fact that he hadn't

disclosed these to you previously?
A I did.
Q Through the course of this discussion, did he give you the impression that he wanted to continue to cooperate with your investigation?
A Can you repeat that? Sorry.
Q Through the course of this discussion, did he give you the impression that he wanted to continue to cooperate with your investigation?
A Yes.
Q Can you give an estimate as to how long you talked to him there in the kitchen?
A I don't know. Half an hour, an hour.
Q What happened next after he told you about the silencers he'd received from Bruno?
A We -- we followed him into his bedroom, where he opened the safe and let us look at his firearms.
Q Why did he go into the bedroom to open the safe?
A I believe that he wanted to show us that he had nothing to hide.
Q Did you ask him to look in his safe at that point?
A I -- I don't remember. I knew that there was a safe in the house, but I don't remember that I specifically asked to look into his safe.
Q Okay. When he -- did he lead you to the bedroom, or did

you lead him?
A He led us.
Q Okay. Did he have any question as to what you were following him into the bedroom for?
A No.
Q Describe the bedroom. Is it connected to the kitchen?
A Yes.
Q Describe the size of this firearm safe.
A It's quite large. I would say five feet by three feet.
Q Was it locked?
A Yes.
Q Who opened it?
A Mr. Veletanlic.
Q Were you present while he opened it?
A Yes.
Q Was there -- how was the locking mechanism?
A I think there was a dial.
Q A code?
A A code, yes.
Q After he opened this safe, what happened next?
A Mr. Veletanlic, I believe, started to reach into the safe, and I -- I -- I told him that I was not comfortable with him reaching out for firearms, and so we told him to step aside.
Q Why did you tell him you weren't comfortable with him pulling the firearms out of the safe?

A Because I know that Mr. Veletanlic is an avid shooter and a quick shooter, so I didn't want to be placed in a situation that my safety was at risk.
Q Did you feel like you were following the protocols by not having Mr. Veletanlic pull the firearms out of the safe?
A Absolutely, yes.
Q Did he object to you asking him to step aside?
A No.
Q What did you do after you asked him to step aside?
A I proceeded to take one firearm at a time and record the serial numbers, and then placed them on the floor in front of us and the safe.
Q Where was Mr. Veletanlic while you were doing this?
A Very close to us. I -- I was -- I was preoccupied with the firearms and recording the firearms. I relied on Special Agent Karabeika to actually watch Mr. Veletanlic or make sure that he doesn't have any swift movements or, you know, try to do something unsafe.
Q Did he, during the time you were doing this?
A No.
Q I'm sorry if I already asked this, but approximately how big is this safe?
A It's large. It contained quite a significant amount of firearms. Five feet by three feet.
Q Okay. And then about how deep did it go?

A Three feet.
Q Was Mr. Veletanlic restrained in any way while you were cataloging and photographing these firearms?
A No.
Q What did you do as you took them out of the safe?
A Well, some of the firearms were stored with a magazine inside, so I made sure that I secured them. So I removed the magazines out of the firearms and opened the breech and made sure that there was no ammunition, so they would be safe, to render them safe.
Q Is that part of your standard protocol?
A Yes.
Q Did Mr. Veletanlic assist you in telling you how to unload any of the firearms?
A I believe he -- he helped me open the breach of one firearm because I was not familiar with it and he knew what he was doing, but I removed all the magazines prior to that.
Q If you would take a look at what's marked as Exhibit 11 in the binder in front of you?
Do you see those photographs, Special Agent Grigore?
A Yes, sir.
Q Are those photographs that you took of the firearms and parts that were removed from the safe that day?
A Yes, sir.
MR. DIGGS: Government offers Exhibit 11 for purposes

of this hearing, Your Honor.

MR. BROWNE: Your Honor, keeping in mind your admonition this morning, limiting this inquiry to the validity of the warrantless search, I'm not certain of the relevancy of these photographs.

THE COURT: As I understand the facts, since they're in the same safe as the suppressor -- I'm not sure if we call it a "silencer" or a "suppressor" -- I'll overrule the objection and allow the photograph.

(Exhibit 11 admitted.)

Q (By Mr. Diggs) So turning to the fourth photograph.

THE COURT: When you move the admission of 11, it has multiple pages.

MR. DIGGS: Moving for the admission of all the photographs, Your Honor.

MR. BROWNE: Same objection, Your Honor.

THE COURT: All right. Then the same ruling.

MR. DIGGS: This is the fourth page, 11-04.

MR. BROWNE: Thank you.

Q (By Mr. Diggs) Do you see the item in the Ziploc bag there?

A Yes, sir.

Q What is that?

A That's the suppressor.

Q Where did you find the suppressor?

A So the safe had some shelves on the top, and it was in a bag on the shelf.
Q Was the bag locked in any way?
A No.
Q When you opened that bag that the suppressor was in, was it immediately evident to you what it was?
A Yes.
Q At any period while you're cataloging these firearms and the suppressor, did Mr. Veletanlic ask you to stop looking through his safe?
A No.
Q Did he ever tell you you needed to leave his residence?
A No.
Q Did you ever threaten him that he would be arrested if he didn't let you look through his safe?
A No.
Q Did you ever threaten that you would go to the court and get a search warrant for his safe if he refused to allow you to look through it?
A No.
Q When you left Mr. Veletanlic's residence that day, what items from the safe did you take with you?
A The items that actually are displayed on this photograph.
Q Okay. So the the four items --
A Yes.

Q -- in Exhibit 11, page 4?
So why did you take the three firearms with you?
A At that time, I was suspecting those three firearms to be short-barrelled rifles, just the fact that I was not familiar with the stock. Later on, I consulted the firearms expert at our branch in Virginia, and he advised me that those actually are accepted by ATF as arm braces.
Q Why did you take the silencer with you?
A The silencer I took because I knew it was illegal to possess, and Mr. Veletanlic previously has told me that he does not have suppressors.
Q Which was inconsistent --
A Inconsistent.
Q -- with you finding one in the safe?
A That is correct.
Q Did you make it clear to Mr. Veletanlic that day that you were taking these items with you?
A Yes.
Q Did he protest you taking the items?
A No.
Q We've seen in the file, on occasion, you have a property receipt form. Why didn't you have Mr. Veletanlic sign a property receipt form for these items on July 25th?
A Unfortunately, I did not have them with me. I was not prepared to seize anything.

Q Turning to Exhibit 4, which has been admitted, and the 11th page.
A Sorry. Which exhibit?
Q Exhibit 4, and why don't we first look at the 10th page.
MR. BROWNE: Is that the 11th page?
MR. DIGGS: This is the 10th.
Q (By Mr. Diggs) So Special Agent Grigore, we're turning back to the text messages between you and Mr. Veletanlic, and there's one from him to you on July 25th at 7:04 p.m. Do you see that?
A Yes, sir.
Q And that would be after you left his residence that day?
A Yes, sir.
Q Do you recall where you were when you received this text message?
A I was driving home.
Q Were you driving home from the interaction at his residence?
A No. I stopped. From his home, I went to the office, dropped the firearms, and then I went home.
Q Okay. So he reaches out to you at 7:04 p.m., and then if we look at the continuation of that message -- or, actually, your response to his message, you write, "I appreciate you letting me take them and to have them looked over."
In response to this message to Mr. Veletanlic, did he

ever communicate to you that, in fact, he hadn't allowed you to take the items?
A No.
Q He, in fact, provides the name "Jacob Nelson." Did you follow up and determine anything about this Mr. Nelson?
A Yes.
Q Okay. And who was he?
A So Mr. Veletanlic told me that one of the air pistols Mr. Nelson possessed, and so I made sure that Mr. Nelson was a person that could legally possess firearms.
Q Okay. Let's look now at the 17th page of that same exhibit.
Are these messages still coming from Mr. Veletanlic the same night, the night of July 25th?
A Yes, sir.
Q And in this message shown on page 17, he refers to cutting up one suppressor from Bruno?
A Yes.
Q Had he told you about that additional suppressor that he'd cut up the day prior; that he'd cut up a suppressor?
A The same day, when I met him, he told me that he received two suppressors from Bruno, and then, obviously, I discovered one in his safe, and then he sent me a text saying, "Hey, the second one I cut up."
Q Had he offered, when you were there earlier that day, to

provide you the cut-up parts of that second suppressor?
A No.
Q Had you asked him for cut-up parts of the other suppressor?
A No.
Q Let's turn to the 21st page of that same exhibit.
A Twenty-first?
Q Correct.
He tells you that -- and I'm quoting -- "This is where my half-assed bullshitting comes from, and as you can see, I'm not good at lying."
Had you accused Mr. Veletanlic of lying to you that day at his house?
A I wouldn't say I accused him, but I confronted him for lying, yes.
Q When he sent you this message, what lie did you believe him to be referencing?
A Well, a lot of them. First of all, he misconstrued to us that he sent more than he initially told us, more packages to different countries rather than just one to Sweden. And then he also told us about him receiving suppressors, and then destroying them, and then having one and then having another one. He also --
Q Did you -- oh --
A That's all right.

Q Did you return to his residence the next day, July 26th?
A Yes, sir.
Q And again, were you with another agent?
A Yes, sir.
Q But not Special Agent Karabeika this time, correct?
A That's correct.
Q The next day, did you provide him a receipt for the silencer and the short-barrel rifles you'd taken the previous day?
A Yes, sir.
Q Directing your attention to Exhibit 6, do you recognize this as the signed receipt for those items?
A Yes.
MR. BROWNE: Mr. Diggs, if you could slow down a bit. Thank you. I'm there.
MR. DIGGS: Government offers Exhibit 6 for purposes of this hearing.
MR. BROWNE: No objection, Your Honor.
THE COURT: Exhibit 6 is admitted.
(Exhibit 6 admitted.)
Q (By Mr. Diggs) Would you turn to Exhibit 7, Special Agent Grigore? Did you present him with a consent to forfeiture or destruction with regard to the silencer that you'd seized the day prior?
A Yes, sir.

Q Did he sign that form?
A Yes, sir.
Q Is that Exhibit 7?
A Yes, sir.
MR. DIGGS: Government offers Exhibit 7 for purpose of this hearing.
MR. BROWNE: No objection.
THE COURT: Exhibit 7 is admitted.
(Exhibit 7 admitted.)
Q (By Mr. Diggs) Finally, did you present him also a consent for forfeiture or destruction for the ten pieces of destroyed silencer that's at Exhibit 8?
A Yes, sir.
Q And did he sign this form on July 26th?
A Yes, sir.
MR. DIGGS: Government offers Exhibit 8 for purposes of this hearing.
MR. BROWNE: No objection.
THE COURT: Exhibit 8 is admitted.
(Exhibit 8 admitted.)
Q (By Mr. Diggs) Did Mr. Veletanlic express to you any objection with signing any of these forms on the next day, the 26th?
A No.
Q When you were at his house on the 26th, did you have any

discussion with him with regard to the silencer that you'd taken the day prior?
A Yes.
Q What did you ask -- what did you discuss with him?
A I think I asked him if he registered it.
Q What did he say?
A He did not.
Q So he didn't have a license for that silencer?
A No.
Q Would you turn to what's marked as Exhibit 9, Agent Grigore?
A Yes.
Q Have you compared Exhibit 9 to the audio recording of an interview you conducted of Hany Veletanlic on July 26th, 2017?
A Yes.
Q Is it an accurate transcription?
A Yes.
MR. DIGGS: Government offers Exhibit 9 for purposes of this hearing.
MR. BROWNE: One second, Your Honor, please.
No objection.
THE COURT: Exhibit 9 is admitted.
(Exhibit 9 admitted.)
Q (By Mr. Diggs) I'm going to direct your attention to the

17th page of that transcript, Special Agent.

MR. BROWNE: Seventeen?

MR. DIGGS: Seventeen.

MR. BROWNE: Thank you.

Q (By Mr. Diggs) Do you see the highlighted text, Special Agent Grigore?

A Yes.

Q When you say, "Anything that I missed," what's the purpose of asking that question here in the interview?

A I normally end my interviews with anyone by asking if I missed anything, if they wanted to tell me more.

Q Had you essentially concluded the questions that you wanted to ask that day?

A Yes.

Q And what does Mr. Veletanlic go on to say after you say, "Anything that I missed?"

A Well, he's volunteering the suppressor that he cut up, and then he's also telling me that the suppressor he received from Bruno, actually, it's not destroyed but he has it somewhere buried.

Q So this is actually a third suppressor?

A No. It's a second suppressor that came from France, but it is a third suppressor because the other one is in pieces, yeah. So he disclosed to me that there was a third suppressor that day, on the 26th, and it was cut into pieces,

and then he also disclosed to me that the second suppressor that he initially told me he didn't have or destroyed, now it's buried somewhere.

Q Okay. So before he disclosed this to you --

A Yes.

Q -- were you aware that there was a second intact suppressor that he had control of?

A No, I was not.

Q And after he disclosed it to you, did you ask him to provide it to you?

A Yes.

Q And if we go back and look at Exhibit 4 now, and this is the text message, page 26, five days later --

THE COURT: Let's slow down, counsel. Mr. Browne, are you with him?

MR. BROWNE: Yes, Your Honor.

THE COURT: All right. You may proceed.

Q (By Mr. Diggs) This is Mr. Veletanlic texting you, asking you whether you want him to bring the suppressor when you next meet.

A So which page? Twenty-seven?

Q Twenty-six, and it should be on your screen as well.

A Yes.

Q And did you suggest a location for that meeting to occur?

A Yes.

Q Where?
A Dick's Burgers in Edmonds.
Q If you would turn to Exhibit 10, and this is a two-page exhibit. Are you there, Agent?
A Yes, sir.
Q Do you recognize the first page as the consent for the forfeiture of that second suppressor?
A Yes, sir.
Q And the second page as the receipt for that second suppressor?
A Yes, sir.
MR. BROWNE: Could you post that, counsel? My book is not organized very well.
Thank you. I got it.
Q (By Mr. Diggs) Did Mr. Veletanlic sign both of these forms on August 1st, 2017?
A Yes, he did.
MR. DIGGS: Government offers Exhibit 10, two pages, Your Honor.
MR. BROWNE: No objection, Your Honor.
THE COURT: Exhibit 10 is admitted.
(Exhibit 10 admitted.)
Q (By Mr. Diggs) How long did you talk to him on August 10th -- or excuse me -- August 1st, 2017, when you received the silencer?

A Twenty minutes at the most.
Q During that meeting, did he express any negative feelings about the interactions that had occurred at his house a week prior on July 25th and July 26th, 2017?
A No.
Q Did he complain about any of the actions you or Special Agent Karabeika had taken?
A No.
Q When you met him at his house on July 26th, 2017, did he complain about any of the actions you and Special Agent Karabeika had taken the day prior?
A No. On the 26th, Agent Smith was with me, not --
Q But did the defendant complain about any actions you and Agent Karabeika had taken?
A No.
MR. DIGGS: If I may have a moment, Your Honor?
No further questions, Your Honor.
THE COURT: Thank you. Mr. Browne?
MR. BROWNE: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BROWNE:
Q Good morning, Special Agent.
A Good morning.
Q I'm going to go back to Exhibit No. 20, which is a blank contract between the ATF and cooperating individuals. Do you

want to take a look at that?
A Yes, sir.
Q Do you recall -- you do not have the original that Mr. Veletanlic signed with you, correct?
A Correct.
Q Okay. Do you know specifically, from your memory only at this point, what was filled in in these blanks?
A Yes.
Q Sorry?
A Yes, I do.
Q You do? You know the exact words?
A Yes.
Q Can you tell us about Exhibit 20 that's been admitted for illustrative purposes only at this point?
A Information regarding --
Q The first line is not numbered, right?
A That's -- this -- you mean the first line, "This confirms the agreement entered"?
Q Correct.
A Okay. No.
Q And what did that blank read?
A You mean the first line, correct?
Q Uh-huh.
A "Hany Veletanlic."
Q Okay. What did Paragraph No. 1 read?

A "ATF has asked me to assist in an official investigation in furtherance of this official investigation. I voluntarily agree to describe activity," and then parentheses, "describe activities that the informant or cooperating witness or subject will be doing for ATF," and I believe I wrote down information regarding firearms trafficking.
Q Okay. Did you have a discussion with Mr. Hany Veletanlic about an individual named Ryan Kunkel?
A Yes.
Q Did you know at the time Ryan Kunkel had been a cooperating witness?
MR. DIGGS: Objection as to relevance, Your Honor.
THE COURT: I think you know where this is going to go, so I'm going to permit some foundation for it.
MR. BROWNE: Sure.
Q (By Mr. Browne) Was one of the purposes of -- let's start with the beginning.
This contract or the original of this contract indicated Mr. Veletanlic was willing to cooperate with the government, correct?
A Correct.
Q Okay. And there was a specific individual mentioned during the discussions?
A Yes.
Q And that individual was Ryan Kunkel?

A Excuse me?
Q Ryan Kunkel?
A Yes.
Q Did you know at the time that Mr. Kunkel was a cooperating witness for the government?
MR. DIGGS: Objection as to relevance.
THE COURT: Overruled.
Q (By Mr. Browne) Did you know that?
A Not initially when he mentioned Ryan Kunkel.
Q Okay. You didn't know at the time?
A I did not know at the time.
Q Okay.
A When he first mentioned Mr. Kunkel as a potential target, no.
Q Okay. So let's go on to paragraph 2. What was filled in in those blanks?
A "ATF has assigned Special Agent Grigore to serve as the controlling agent in this investigation. It is imperative that I maintain contact with Special Agent Grigore and advise him or her of my activities and abide by his or her instructions."
Q Okay. Then there's just some signature places on the bottom, right?
A My signature, his signature, and the witnessing agent.
Q No, I was just acknowledging there is a signature line

below?
A Yes.
Q Correct?
A Yes.
Q Okay. Can you point out in this form agreement any place where it indicates that Mr. Veletanlic, or from your memory from reading the original one, consented to the search of his property or person at any time? Is that in this contract?
A No.
Q So the contract doesn't give the government authority to search him or his property without a warrant or consent, correct?
A Without consent, no.
Q Sorry?
A No, it does not give --
Q The document doesn't say that?
A The document doesn't say that.
Q All right.
I'm curious, and I probably know the answer to this, but anyway, I'm curious that there's no mention in your reports anywhere that this cooperation agreement was entered into with Mr. Veletanlic, correct?
A Correct.
Q Okay. Is that for security reasons?
A It's to protect my confidential informant, yes.

Q Okay. But after it was determined that you were going to arrest him, did you think it would be important to put in your reports that at one point he was a cooperating witness?
A No.
Q Did you think it was important -- did you mention that to the grand jury at all?
A Yes. I mentioned -- I don't remember if I mentioned it to the grand jury, but I -- the AUSA at the time was aware that Mr. Veletanlic was a cooperating witness.
Q But you never put that in any of your reports anywhere?
A Not when the investigation is for investigating Mr. Veletanlic, no.
Q Well, after his arrest, you didn't put it in any of your reports, did you?
A No.
Q And specifically in your first interactions with Mr. Veletanlic, he told you that he had stolen firearms that came from Ryan Kunkel, correct?
A That's correct.
Q Okay. And he produced some firearms that supposedly came from Ryan Kunkel, correct?
A He produced two firearms on June 15, yes.
Q If we can refer to Exhibit No. 13. I'll give everybody a chance to get there.
A Is that the government folder, or your folder?

Q The government folder. Do you see that?
A I see that.
Q One, two, three -- the fourth paragraph there indicates -- by the way, this is an email from my client to you?
A That's correct.
Q And he says, "There has been about 15 or 20 small packages of parts in total. They also requested as many Box 17 barrels as possible. I've sent them about five or six of them. There's also been another G17," meaning Glock 17, "frame and slide," right?
A That's correct.
Q Did you have discussions with my client that he needed to come up with a number of how many transactions he engaged in involving these parts?
A Can you repeat that question?
Q Sure.
Did you have, during your contact with my client, any discussion with him that he had to come up with a number, in other words, indicating how many times he had sent parts of firearms to other countries? Did you tell him he needed to come up with a number of how many times he did that?
A We asked him how many shipments he has sent.
Q Okay. And was this the response, as far as you know, that's in Exhibit 13?
A One of his responses, yes.

Q I'm sure the judge knows this already, but just to make everything clear for the record: Mr. Veletanlic never, as far as you know, sent an actual firearm anywhere, correct?
A Incorrect. He -- he said he sent frames. Frames, by definition, are firearms.
Q So I think that was a "yes" to my question.
A No, it was not.
Q Okay.
THE COURT: She disagreed with your question.
MR. BROWNE: I know. I was just trying to make it quicker.
Q (By Mr. Browne) Under the regulations of the United States government, parts of firearms can be magically turned into firearms, right?
MR. DIGGS: Your Honor, I'm just going to object on relevance. This is about the suppression of two silencers.
MR. BROWNE: I'm just trying to get across -- I'm sorry, Your Honor.
THE COURT: I was going to object to "magically," so let's not be quite so flamboyant, counsel.
MR. BROWNE: Oh.
THE COURT: Where is this going?
MR. BROWNE: Just from the standpoint of his cooperation and how he was continuing to cooperate, and there's some other exhibits that have been admitted where

he's saying, "I'm concerned about being arrested, I don't know what to do." So it's going to his state of mind, basically.

THE COURT: Is state of mind an element in a suppression hearing?

MR. BROWNE: I think it would be from the standpoint of whether you could determine from the totality of the circumstances whether there was consent, which, of course, would require the analysis of his state of mind as well as the agent's.

THE COURT: Why don't you wrap this up, and then we'll move on?

MR. BROWNE: Sure. Let me figure out where I am.

Q (By Mr. Browne) Exhibit 13 is still in front of you?

A The email? Yes.

Q And that's dated July 4th, 2017, correct?

A Correct.

Q Going to Exhibit 4, page 8, which counsel asked you about -- and I'll give everybody time to get there.

A The July 24th text?

Q Yes. It's page 8.

A Yes.

Q The plain frames there that aren't green are communications from my client, right?

A Yes.

Q The green ones are you?
A Yes.
Q So he's volunteering information to you at that point, right?
A Yes.
Q All right.
You said, during your testimony concerning this exhibit, that you were concerned about him being truthful. What specifically were you concerned about on July 24th about whether he's being truthful or not? What specifically were you referring to?
A In regards to this text?
Q Sorry?
A In regards to the text?
Q Yeah.
A Are you asking me about this text?
Q I believe that was the context of what the U.S. attorney was asking you. That's when you started talking about you wanted to make sure that he was being truthful, so I'm wondering what you thought he was being untruthful about.
A In this text, he's just sending me a frame that he wanted me to check whether it was stolen or not. So I -- I believe my statement was not related to this specific text.
Q Okay. Do you remember testifying this morning that you were concerned about his truthfulness at some point? Do you

remember that?
A Uh-huh.
THE COURT: You have to say "yes" or "no."
THE WITNESS: "Yes."
MR. BROWNE: Thank you.
Q (By Mr. Browne) When did you first become concerned about his truthfulness?
A Well, between the last time I met him on the 15th of June, until the 24th of July, he -- he sent us more information that first he did not make it available to us.
Q On July 25th, did you read my client Miranda rights?
A No, I did not.
Q There's a number of exhibits. Just to cut to the chase, as the judge suggested, and it makes sense, there were a number of exhibits admitted into this case about forfeiting weapons to the ATF, correct, or parts of weapons?
A Correct.
Q And those documents -- I can bring to your attention, of course, if either one desires -- indicate those forms are for the forfeiture and destruction of weapons, correct? Would you like an example?
A Yeah, please.
Q Huh?
A Yes.
Q Okay. How about Exhibit No. 7? I'm not sure that's been

admitted or not.

THE COURT: Seven has been admitted.

A Yes.

Q (By Mr. Browne) So Exhibit 7 is the forfeiture or destruction of property and waiver of notice, right?

A That's correct.

Q It doesn't say anything about consenting to searches, or even seizures, does it?

A It says consent to forfeiture, yeah.

Q That's my point.

A Uh-huh.

Q It says consent to forfeiture or destruction. It doesn't say anything about consent to take them, does it?

A No, because he gave me the consent verbally.

Q When you were at his house on the 25th -- you had previously been to his house, correct?

A Yes.

Q Okay. So you knew there was a rather large gun safe in his bedroom?

A I did not physically see it, but I was aware of one.

Q Okay. And do you recall when you were meeting with him in the living room on the 25th, you saying to him and pointing into his bedroom, "What will we find in that safe?" Do you recall saying that?

A I do not remember.

Q Well, how did the subject of the safe come up, then, if you didn't say that?
A (Shrugs.)
Q Don't know, huh?
A Through our conversation, I guess, I was aware of. So I do not recall exactly what I said word by word, but...
Q Okay. Regardless, Mr. Veletanlic did not give you the combination to the safe, did he?
A He did not.
Q Okay. And just to refresh your recollection, you were aware that the safe actually has a digital dial on it, not a turn dial?
A I did not remember the -- the -- the mechanism, the locking mechanism.
Q Do you recall Mr. Veletanlic actually blocking your view when he was opening the safe so you wouldn't know what the combination was?
A I probably instinctively looked away because I wanted to offer him privacy.
Q That's your best memory?
A Yes.
Q And when Mr. Veletanlic handed the first weapon to you, you told him, "Stop." Did you actually take the first one from him?
A I don't remember, but possibly.

Q Okay. And do you recall at that point telling him -- at some point you removed your coat in the bedroom, right?
A Possibly.
Q And that would make your firearm visible?
A No. I had another layer of clothing that probably concealed it.
Q Do you carry a 9mm?
A At that time, I was carrying a .40 caliber.
Q And you did remove your coat at some point?
A I don't remember, but I don't disagree with that.
Q Okay. Do you recall telling him when he handed you the first weapon to step aside and, actually, told him to stand against the wall?
A Probably I told him to step aside, but not against the wall.
Q And there were two agents in this bedroom, correct?
A Myself and Special Agent Karabeika, correct.
Q And the other agent was armed also?
A Yes.
Q And my client offered to take all of the things in the safe out, didn't he?
A Yes.
Q And that would have included the suppressor, correct?
A Yes.
Q Okay. Then you placed -- according to the exhibits, you

placed the firearms on the floor?
A That's correct.
Q Is that a safe way of handling firearms?
A After I clear them, yes.
Q And at some point during your examination, you actually got some assistance from my client as to how to clear one of the weapons?
A That's correct.
Q One of the weapons, or more than one?
A I don't remember, but at least one, yes.
Q And in two of the exhibits that have been admitted -- and I'll go to them if you need, but you probably don't need -- there was some emails that have been admitted into evidence here where Mr. Veletanlic says to you and other agents, "I never know whether you're going to arrest me or not, and I'm fearful." Do you remember those?
A Can you point me to the email, please?
Q Sure. Exhibit 4, page 17. Do you see the bottom of page 17 in Exhibit 4?
A Yes.
Q And it says, "It's hard for me to talk openly about this stuff" --
THE COURT: Counsel, why don't we look at page 18? I think it's the same, but it's the entire paragraph.
MR. BROWNE: Thank you, Your Honor. Yes, I get

confused.
Q (By Mr. Browne) So it would be page 18, Special Agent. "It's hard for me to talk openly about this stuff with you two because I don't know if I will be arrested at any point by being honest about this stuff." Correct?
A Correct.
Q So that was one time when he indicated he had a fear of arrest, correct?
A Correct.
Q Let's go to page 21 of Exhibit 4. If you need to review it -- are you on page 21, Special Agent?
A Yes.
Q Sorry?
A Yes.
Q Okay. The middle paragraph. In the middle of the middle paragraph, "It's hard to say anything when you two may turn on a dime and arrest me," correct?
A Correct, that's his words.
Q So I asked you, before we went to this exhibit, whether my client had indicated to you he had a fear of arrest during this process on a number of occasions. You said you didn't know. Now I brought these to your attention, so clearly he did say he had a fear of arrest; as a matter of fact, that you might turn on a dime and arrest him, right?
A Those are texts after my visit on the 25th, yes.

Q Okay. And what was the date of these emails?
A This is the evening of the 25th of July 2017.
Q That's what I thought. Thank you.
A Uh-huh.
Q So that was after you had taken these items from his house?
A That's right.
Q Did you ever have the ATF laboratory examine what was claimed to be the destroyed suppressor to see if, indeed, it was a suppressor? Did you have the laboratory do that?
A No.
Q Are you aware that it was actually spark plugs?
A No.
Q Exhibit 9, page 17, which counsel had you refer to, are you there?
A Yes.
Q Okay. Exhibit 9 talks about the bag that he gave you, correct, on line 16?
A Yes.
Q And then on line 18, my client says, "Suppressor parts; probably want to ask me do I have anything else suppressor related." He said that, right, on line 18?
A One second, sir.
Q It is Exhibit 9, line 18?
A Yes.

Q And then you said, "Do you? Correct?
A Yes.
Q And then he said, "Yes" --
A Um --
Q I'm sorry. I don't want to talk over you.
A I'm trying to follow you. Sorry.
Q It's all right.
And on line 21, in response to your saying, "Do you," he says, "Yes," correct?
A Yes.
Q Okay. This conversation, which is Exhibit 9, occurred on July 26th, 2017, correct?
A Correct.
Q So that was after he had indicated at least two times in texts or emails that he had a fear of arrest at any moment?
A Uh-huh.
THE COURT: "Yes" or "no."
THE WITNESS: "Yes."
MR. BROWNE: That's all I have. Thank you, Your Honor.
THE COURT: All right. Redirect?

REDIRECT EXAMINATION

BY MR. DIGGS:
Q When you came back on July 26th, could you describe Mr. Veletanlic's demeanor that day?

A Calm.
Q Was that the case throughout the interaction on July 26th?
A Yes.
Q When you arrived at his house on July 25th, did you have an intent to arrest him that day?
A No.
Q Did you have any authority to arrest him that day? Did you have an arrest warrant?
A No.
Q And, in fact, when was he, in fact, arrested in this matter?
A In 2018.
Q Was it May of 2018?
A 2018, yes.
Q So about ten months later?
A Yes.
Q If we just turn briefly to Exhibit 20, the blank agreement, and paragraph 15 of that agreement.
A Yes.
Q Direct your attention to where it says, "ATF will advise the prosecuting offices of the nature and extent of my cooperation."
A Yes.
Q Were you the person who would be deciding whether and when to arrest Mr. Veletanlic?

A No.

MR. BROWNE: Your Honor, I object. That's outside the scope.

THE COURT: Overruled.

MR. DIGGS: Nothing further, Your Honor.

THE COURT: Recross?

MR. BROWNE: Sorry, Your Honor?

THE COURT: Any recross?

MR. BROWNE: It would be very brief.

RECROSS-EXAMINATION

BY MR. BROWNE:

Q How long have you been a special agent?

A Since March of 2014.

Q Okay. You can arrest people for probable cause?

A That's correct.

Q You don't need a warrant?

A That's correct.

Q And nowhere in these exhibits, anywhere, is there an actual form giving the government consent to search Mr. Veletanlic's house or his person? There's no form, right?

A In exhibits -- can you repeat that question? I don't understand.

Q There's no consent. I mean, you've seen consent forms, I assume, right?

A Yes.
Q All right. So there is a form that the ATF and most law enforcement agencies have that says, "I consent to a search." You have those forms, right?
A That's correct.
Q And there's none in this case, are there?
A No.
MR. BROWNE: Thank you. That's all I have.
A Excuse me. Not ATF forms, but we do have Homeland Security consent forms when he signed them on May 31st.
Q (By Mr. Browne) Consent to forfeiture and destruction.
A No, consent to search. He --
THE COURT: Counsel, it's Exhibit 2 that the witness is referring to, and it's in connection with the May 31 initial meeting.
MR. BROWNE: Okay. Thank you.
THE COURT: Counsel, this is also outside the scope.
MR. BROWNE: Okay. Thank you, Your Honor. Thank you, Special Agent.
THE COURT: Any further, Mr. Diggs?
MR. DIGGS: No, Your Honor, not with this witness.
THE COURT: Counsel, give me a moment to look at my notes.
MR. BROWNE: Your Honor, has Exhibit 2 been admitted?
THE COURT: Yes.

You may step down.

MR. BROWNE: Your Honor, I was just trying to establish that Exhibit 2 just relates to phones and computers, but you know that because it's in the exhibit.

THE COURT: Yes.

MR. BROWNE: All right.

MS. DALTON: Thank you, Your Honor. We'd like to call Special Agent Karabeika next.

THE CLERK: Please come forward and raise your right hand.

GLENN KARABEIKA, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state your name for the record, and spell your last name for the court reporter.

THE WITNESS: My name is Glenn Karabeika; K-a-r-a-b-e-i-k-a.

THE COURT: You may inquire.

DIRECT EXAMINATION

MS. DALTON:

Q Good morning.

A Good morning.

Q Where are you employed?

A I'm a special agent with Homeland Security Investigations here in Seattle, Washington.

Q And how long have you been employed by Homeland Security

Investigations?
A By HSI and its predecessor agency, over 30 years.
Q What type of cases do you investigate?
A I investigate exportation cases. A lot of my cases deal with exportation -- the illegal exportation of firearms from the United States to other countries.
Q Are you one of the case agents that's been assigned to the investigation of Mr. Veletanlic?
A Yes, I am.
Q When did you first meet Mr. Veletanlic?
A On May 31st of 2017.
Q And how did that meeting come about?
A We had learned about an exportation from the United States of firearms that were seized in Sweden, and on May 30th, we interviewed a Mr. Nguyen and -- who one of the firearms had been traced to, and from that we -- we had known about Mr. Veletanlic through our investigation, and we asked -- or Mr. Nguyen stated that he was friends with Mr. Veletanlic and had traded guns back and forth with him and sold some guns over the course of a couple of years. And then on May 31st, Mr. Veletanlic called me, and he wanted to speak.
Q Where did Mr. Veletanlic want to speak to you at?
A At his residence, and I suggested some place more neutral, not at his residence, and I believe he said he was going to be in downtown Everett, Washington, and I suggested we meet

at a coffee shop that I randomly pulled off the Internet, and I texted him the address per his request.
Q And you interviewed Mr. Veletanlic on May 31st, 2017?
A Yes, I did.
Q That interview was recorded?
A Yes, it was.
Q At the beginning of that interview, did you provide him with Miranda rights?
A Yes, I did.
Q Did you tell Mr. Veletanlic anything about whether or not that interview was voluntary?
A Absolutely. It was a voluntary interview. He had come to us, and we were willing to listen.
Q Did you make any promises on that date to Mr. Veletanlic in exchange for him talking to you?
A We did not.
Q What did you tell him?
A We told him that we are gathering the facts, and we'll present the facts and his cooperation to the United States Attorney's Office, and they'll make the decision on whether to charge Mr. Veletanlic or not on any particular crime.
Q During that first meeting, what was Mr. Veletanlic's demeanor like?
A His demeanor was kind of hyper, if you will. He was very willing to give information. He was -- we spoke about an

hour. He wanted to do anything he could to assist, once we kind of got through the initial facts of the exportation of the firearms that we had initially contacted him on.
Q After that first meeting, did Mr. Veletanlic provide you with information?
A Yes, he did. Over the course of the next several weeks, Mr. Veletanlic emailed myself and Special Agent Grigore numerous times, well over a dozen times, and I compiled those into a report of the investigation, and it was totaling about 16 pages of information back and forth, and some of it was my reply, but my replies were generally pretty short. And he was very, very enthusiastic to provide any and all information that he could come up with that would help us.
Q You have a binder in front of you there. I'd like to show you what's been premarked as Government's Exhibit 3.
A Yes.
Q Do you recognize that document or those pages?
A Yes. It's copies of the emails that were back and forth between myself and Mr. Veletanlic.
MS. DALTON: The government offers Exhibit 3 for purposes of this hearing.
MR. BROWNE: No objection, Your Honor.
THE COURT: Exhibit 3 is admitted.
(Exhibit 3 admitted.)
Q (By Ms. Dalton) I'd like to point you to page 4 of

Exhibit 3. There's an email there dated June 18, 2017. Do you recognize that email?
A Yes, I do.
Q The highlighted text there says, "If this is true, I will do absolutely anything I possibly can to help with your investigation. Let me know if there's anything I can do."
A Yes.
Q Is this consistent with the type of cooperation that Mr. Veletanlic sought to provide?
A Absolutely. Yeah, in my 30 years' experience of dealing with --
MR. BROWNE: Objection, Your Honor. This isn't responsive now.
THE COURT: Why don't you rephrase your question, counsel?
Q (By Ms. Dalton) How would you characterize the level of cooperation that Mr. Veletanlic was providing?
A Very high and very enthusiastic.
Q Did there come a time when you believed that Mr. Veletanlic was not providing you with truthful information?
A Yes.
Q That he was not providing you with all of the knowledge that he had?
A Yes.

Q Was one of those times on July 25th?
A Of 2017, correct.
Q Did you meet with Mr. Veletanlic on that day?
A Yes.
Q Where did you meet?
A At Mr. Veletanlic's residence in Tulalip, Washington.
Q Who else was there with you?
A My co-investigator, Special Agent Claudia Grigore of ATF.
Q So you went to Mr. Veletanlic's residence. Did he invite you inside?
A Yes, he did.
Q And once you went inside, what happened?
A Well, we sat down in his living room area, the three of us kind of in a triangular formation. It was kind of sparsely furnished, and we were sitting at chairs.
Q When you went to this meeting, were you armed?
A Yes, I was.
Q Was your firearm visible?
A No, it was not.
Q How was it concealed?
A It is -- it was concealed on my right hip, underneath an out-tucked -- or an untucked shirt.
Q And what was Mr. Veletanlic's demeanor at that particular meeting?
A About the same as the other conversations that we had with

him, pretty talkative and he was not agitated, just like he'd been on our previous meetings.

Q What did Mr. Veletanlic tell you during that meeting?

A During that meeting, he told us about some additional individuals that he had sent firearms to that we did not talk about on the previous meeting. One was another set of individuals in Sweden. There were also some firearms that he sent to an individual in Russia and another individual in Brazil. And then the fourth person was a man that he called "Bruno," who was in France, that he sent magazines to, but in exchange, he received silencers. And this is the first that Mr. Veletanlic had told us about receiving any silencers.

Q When you first spoke to Mr. Veletanlic on May 31st, 2017, did you ask him, "Did you ship other products to places other than Sweden?"

A Yes, I did.

Q I'd like to draw your attention to what has been premarked as Government's Exhibit 21. Do you recognize that exhibit?

A Yes, I do. It is an exhibit -- or a transcript of the recorded conversation that Special Agent Grigore and I had with Mr. Veletanlic on May 31st, 2017.

Q Did you have a chance before this hearing to listen to the audio of that particular meeting?

A I did.

Q And then compare it to this transcript?

A I did.
Q Is this transcript an accurate record of what was said between you and Mr. Veletanlic during that meeting?
A Yes.
MS. DALTON: Offering Exhibit 21 for purposes of this hearing.
THE COURT: Any objection?
MR. BROWNE: Just one second, Your Honor. I'm sorry. No.
THE COURT: The exhibit is admitted.
(Exhibit 21 admitted.)
Q (By Ms. Dalton) Do you see the highlighted portion there? Did you ask Mr. Veletanlic about these gun parts and whether they'd been shipped anywhere else?
A Yes, I did.
Q Can you read that?
A Yes. Line 13 on page 24, "SA Karabeika: Very good. Have you -- other than Sven, have you sold any other gun parts to anyone else overseas?"
The response by Mr. Veletanlic: "Just on eBay. Whatever. You know, not anything like a slide. A magazine here and there, that's what I can remember. That's what I can remember."
Q So the information he provided you on May 31st, 2017, was that different than the information that he then provided you

on July 25th?
A Yes.
Q On July 25th, he told you about additional shipments?
A Correct.
Q Did you confront Mr. Veletanlic about the fact that he had not previously told you about these shipments?
A During -- yeah. During the course of the interview, we asked him why he had lied to us or how come he hadn't said anything about these before, and, yeah.
Q When you were having that conversation, were your voices raised?
A No. No, we were -- I was disappointed, maybe a little annoyed that he hadn't told us before, but it wasn't raised or yelling or anything like that.
Q Did you make any threats to Mr. Veletanlic, like you were going to arrest him or terminate your agreement?
A I don't remember making any statements like that.
Q At some point during that meeting, you-all go towards and open the gun safe.
A Correct.
Q Can you tell me how that happened?
A Yes.
So at that point, we realized that Mr. Veletanlic had lied about the other individuals that he had sent information to, the silencers that he said he had received from Bruno,

and we asked if we could look in the safe to see if there were any other things that were either stolen or illegal. He had previously furnished two stolen firearms to us.
Q And what was the defendant's response?
A He agreed.
Q Who led you into -- first, where is the safe located?
A It was located in the bedroom of his residence.
Q Who led you into the bedroom?
A I believe Mr. Veletanlic led us into the bedroom, which was only a couple of feet away.
Q Can you describe how large that bedroom is?
A Oh, approximately 15 by 15, maybe less than that. Not a -- not a large bedroom. Not a super small bedroom, and it was sparsely furnished with a bed, maybe a dresser, and then a large safe, combination safe.
Q Where was the safe located?
A It was located against one of the walls in the bedroom.
Q Was that safe locked when you entered the bedroom?
A Yes.
Q Who unlocked it?
A Mr. Veletanlic unlocked the safe with a digital combination.
Q After Mr. Veletanlic unlocked the safe, what happened next?
A Doors opened, and at that point he went to retrieve some

of the firearms or contents of the safe, and when the safe was opened, myself and Special Agent Grigore, we saw a large number of guns, which was inconsistent with what he had told us before during the interview on May 31st. At one point, he stated he had one gun, and at another point I think he said he had five guns, and so the safe had a lot more than that.

He went to retrieve one of these, and we told him to step back for our own officer safety, because Mr. Veletanlic had a lot of guns. We had heard that he is an avid shooter, by his own admission, by others, and we were just exercising officer safety.

Q So after Mr. Veletanlic stepped back, first did you -- did you tell him to go to a particular area of the room?

A No, just to step away from the safe so he couldn't retrieve one of the firearms and cause any harm to myself or Special Agent Grigore.

Q Who ultimately removed the guns from the safe?

A Special Agent Grigore removed the guns from the safe and noted the serial numbers.

Q While she was removing the guns from the safe, what were you doing?

A I was just making sure -- because her back was towards the rest of us, to Mr. Veletanlic and myself, just made sure Mr. Veletanlic didn't make my lunges towards the safe, and made sure no harm came to us.

Q While Special Agent Grigore was unloading the safe, was the defendant walking about the room?
A Yeah. I mean, like, the room wasn't that big. He was moving back and forth. He wasn't restrained with any physical means or anything like that. Kind of moving back and forth a little bit.
Q Did he saying anything to you or Agent Grigore while you were unloading the safe?
A I believe he offered some advice on how to handle some of the firearms.
Q At some point, Agent Grigore finds a silencer inside the safe?
A Right.
Q Did that surprise you?
A A little bit, considering that he said he had destroyed it before -- just moments before when we were speaking in the living room.
Q While Special Agent Grigore was unloading the safe, at any point in time did you or her point a weapon at the defendant?
A No.
Q At any point during the meeting did the defendant ask you to leave?
A He did not.
Q Did he ask you to stop touching the guns?
A He did not.

Q At the end of unloading the safe, did you take any weapons with you?
A Yes. Special Agent Grigore and I, we took three modified pistols. They had longer stocks on them, and we detained them to see if they were legal or not. And Mr. Veletanlic stated that they were legal within ATF regulations. So we took that and the silencer.
Q Did you tell Mr. Veletanlic that you were taking these items with you?
A Yes.
Q Did he protest about you taking them?
A He did not. We gave him a receipt.
Q The last part, you said you gave him a receipt?
A A receipt.
Q Did that happen on the day of the event, or the following day?
A I don't recall if it was that day or the following day.
Q While you were in the house, at any point did you threaten Mr. Veletanlic with securing an arrest warrant?
A No, I don't believe we would do that.
Q Did you threaten to terminate his cooperation agreement?
A I don't think so.
Q Did you ever say, "We're going to go get a search warrant if you don't let us into your safe"?
A No.

Q Was there anything that happened during the day that led you to believe that you did not have consent to either take his weapons or search his safe?
A No.
Q The safe that's in the bedroom, can you describe how those doors open?
A Well, after the combination is put in, a handle will turn, and it was open -- I'm not sure if it was left to right or right to left, but a large -- one door -- I believe it was one door that opened up.
MS. DALTON: Okay. No further questions. Thank you.
THE COURT: Mr. Browne?
MR. BROWNE: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BROWNE:
Q Good morning, Special Agent.
A Good morning.
Q Homeland Security has special agents, too, right?
A Yes.
Q And where are you before? I know HSI was created since 9/11, I think. What were you before?
A Special agent with U.S. Customs Service.
Q Okay. Thank you.
So the first contact that you had with my client was when he called you?

A Correct.
Q I'm going to go quickly on this so we can get everything done, hopefully.
Let's go to Exhibit No. 2. Do you have the government's exhibit book in front of you? That's it. Exhibit No. 2, which has been admitted, do you see that?
A Yes.
Q Is your signature on that?
A Yes.
Q Okay. Which one is it?
A Top one.
Q The top one. Okay. It's hard to see it's your name.
That's a consent form, correct?
A Correct.
Q A consent to search.
So you, regularly in your business for so many years, know what a consent form is, correct?
A Yes.
Q And you have access to consent forms, right?
A Correct.
Q This consent form, Exhibit No. 2, was signed on May 31st, '17?
A Yes.
Q And it basically authorizes you and your co-investigating agent and other ATF agents to search the residence for

documents, computer, PayPal, eBay, personal cell phone, correct?
A Correct.
Q Nothing about consent to searching his house, correct?
A Well, these items would be in the house.
Q Well, it says, actually, "residence," but it's for those items, right?
A That's what was put on that form.
Q Okay. Nothing about -- and once again, that's in May, right?
A Yes.
Q Do you have such a form for your interactions with him in July?
A No.
Q Okay.
Do you recall, when you went back to the safe on the 25th, that my client said, "I'll open the safe and read you the serial numbers, and then you can run them to see if there's anything stolen." Do you recall that?
A Not specifically.
Q Something like that?
A Probably, but we were not going to let him handle the firearms for safety reasons, our safety reasons.
Q Did you ever discuss with him his right not to consent to a search?

A No.
Q During your interactions with my client, was it apparent that he was concerned about being arrested?
A I don't know what his concerns would be.
Q Okay.
Go to Government's Exhibit No. 4, page 17. You've seen this before, I assume? I think it was pointed out directly by the court. If we go to 18.
A Sorry? Page 17 or 18?
Q Eighteen is the more entire context.
A Okay.
Q Do you recall reading this before?
A I believe this is between Mr. Veletanlic and Special Agent Grigore.
Q That wasn't my question.
Do you recall seeing this or reading this before?
A I don't recall seeing this particular part before.
Q Well, he was afraid of being arrested, right?
MR. DIGGS: Sorry. I didn't hear the question.
Q (By Mr. Browne) It clearly indicates he was afraid of being arrested.
A I haven't seen this before.
Q Sorry?
A You asked me if I'd seen this before, and I said I did not see this before.

Q Okay. Have you read the entire case file in this matter?
A I don't recall reading this part.
Q Okay. How about page 21 of Exhibit 4?
A I see it.
Q Do you see it?
A I see it right now.
Q It's already been in evidence that this is from communications that were after the seizure of the items that were taken from the safe. Okay? I'm just putting it in context.
A Okay.
Q Do you recall ever seeing this in the case file, where he says, "I'm concerned because you may turn on a dime and arrest me"?
A Well, these texts were been Special Agent Grigore and Mr. Veletanlic.
Q I think my question was do you recall seeing this in the file.
A I'm seeing it now. I don't recall seeing it before.
Q Okay.
Did you discuss with my client, during the course of his cooperation with the United States government, his fear of being deported back to a country which he was a refugee from?
A I don't recall ever having a conversation with any kind of

deportation connotations or talking about that.
Q You knew, however -- have you read the report in this case?
A Pardon me?
Q The entire report, have you read the entire report?
A I've read all the reports I have written.
Q And your co-agent, did you read her reports?
A I've read those reports also.
Q Okay. So you knew my client was a refugee from Croatia?
A Of course, yes.
Q You knew he was not a citizen?
A Yes, I knew he was a green-card holder, absolutely. But we never had that discussion. I never had the discussion with your client about deportation or any kind of action regarding deportation.
Q Thank you.
Exhibit No. 21, line 13.
A "Page 2" on it?
Q Yes.
A Okay.
Q I believe you talked about this on your direct testimony. You say, on line 13, "Have you -- other than Sven, have you sold any other gun parts to anyone else overseas?" Right?
A Yes.
Q You didn't ask him whether he received anything from

overseas, did you.

A No, I did not.

MR. BROWNE: Thank you. That's all I have, Your Honor.

MS. DALTON: We have no further questions. Thank you.

THE COURT: All right. You may step down.

Does the government wish to call any further witnesses?

MR. DIGGS: No, Your Honor.

THE COURT: All right. Mr. Browne, do you wish to call any witnesses?

MR. BROWNE: Yes. We would call our client, and Mr. Suffian will do the questioning.

THE COURT: All right. Please come forward, sir.

MR. BROWNE: Mr. Suffian needs a quick break to go to the restroom. Is that possible?

THE COURT: Yes.

THE CLERK: Please come forward.

(Brief pause in proceedings.)

HANY VELETANLIC, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

MR. SUFFIAN: Thank you, Your Honor, for the break.

CROSS-EXAMINATION

BY MR. SUFFIAN:

Q Good morning, Mr. Veletanlic. So can you please give us a

little background about yourself?

A I moved to the States in '98. I've been living here ever since.

MR. SUFFIAN: Speak closer to the microphone, sir.

A I've lived in the U.S. since '98; went to school in San Diego; moved around; never been back to the old country. I'm an avid shooter, a gunsmith, a competitive shooter, and I've owned my own business for many years.

Q Have you ever been previously arrested before?

A No.

Q And what is your immigration status?

A I'm a legal resident.

Q Let's go to May 31st, 2017. Did you contact agents that day?

A Yes, I have.

Q And why so?

A I heard from a friend of mine that there were agents asking about me.

Q Did you consent to a search of limited property at that time?

A Yes.

Q And what was the extent of your consent?

A To computer and some documents, phone.

Q And was that limited in timeframe?

A Yeah, for that -- for that afternoon.

Q Just for that day.

All right. And then did you agree at some point to cooperate with the government?

A Yes.

Q And did you enter into an agreement to do so?

A Yes.

Q What's your understanding of your duty under that agreement?

A I had to assist the agents with their -- with their investigations overseas and domestic, and provide -- provide information and be forthcoming, be -- the information be truthful, and provide information. That was specifically what...

Q So was it your understanding that you would have to comply with the agents' requests?

A Yes.

Q And let's move on to June 15th, 2017. Did you again meet with agents that day?

A Yes, I have.

Q And why so?

A I wanted to turn over two guns I suspected were likely stolen guns that I hesitated to take to -- on consignment.

Q Did you?

A No, I was figuring they were stolen, so I --

Q I'm sorry. Did you turn the firearms over to the agents?

A Oh, yes, I had.
Q And did you receive any paperwork that day when you did so?
A Yes.
Q And did you continue to make regular contact with the agents?
A Yes.
Q Through what means?
A Text messages, email, and sometimes phone.
Q Did the agents ask you to provide additional information?
A I don't understand. In terms of...?
Q During your numerous texts and emails, were the agents asking for information? Were they asking --
A Yes.
Q What was the nature of the communications?
A So they were -- I believe they were tasks, like, small assignments.
Q Did they ask you for photos?
A Of?
Q Of any property or anything.
A No, I don't think so.
Q Okay. Let's move on to July 25th, 2017.
A Okay.
Q What was the circumstances of your meeting with agents that day?

A I had -- I had a follow-up to provide some information to some of my findings, and --
Q And where did you meet?
THE COURT: Counsel, you're interrupting his answers.
MR. SUFFIAN: Sorry.
THE COURT: Don't do it.
A The 25th, yes. I had to -- I had some findings I wanted to turn over to the agents, and, yeah, go from there. Just -- we were just going to go from there in regards to the case.
Q (By Mr. Suffian ) And where was the meeting with the agents that day?
A My house.
Q And where is your home located?
A Tulalip -- Tulalip/Marysville.
Q And can you describe the layout of where you met and where you subsequently met?
A So my large living room, slash, office was empty. It was free of furniture because it's also where I pack parachutes, so it's an empty place with office chairs and a computer.
Q Did the agents provide you with your Miranda rights?
A No.
Q And then how did the meeting proceed?
A We -- we talked about -- general about the case, but -- so I provided information about the suppressors. That's where

the agents really turned --
Q Let's specifically talk about that.
THE COURT: Counsel, you just did it again. Let him finish his answer.
A So the tone changed -- changed drastically the moment I mentioned suppressors, and the agents became agitated, and that's when Claudia tried to arrest me, even made hand gestures, and immediately they followed up with where those suppressor were, so -- so that's when I told them that I destroyed them.
Q (By Mr. Suffian) So what do you mean by "agitated"?
A They were -- they were very unhappy. They were -- they were -- they weren't calm. They weren't what I would expect to be in an interview.
Q Did they threaten you in any manner?
A Well, yeah, with arrest.
Q With anything else?
A Well, it's -- if I -- if I don't -- if I'm no good as a CI, then -- then there will be consequences, and then I will likely be charged -- you know, I wouldn't be working as a CI and then --
Q What about any -- any mention of immigration or deportation status?
A Well, that's -- not at that time. That was prior.
Q Okay. So you mentioned suppressors, you said?

A Yes.
Q And then what happened?
A So the agents demanded to see them. It's just that the tone has already changed, and I -- I just told them I destroyed them, just to -- just to try to avoid this.
Q I'm sorry. Could you clarify why you told the agents that you had destroyed the suppressors?
A Well, because the tone had changed so drastically, so hostile, that I just wanted -- I just wanted a way out, so -- so I --
Q Were you fearful?
A Yeah.
THE COURT: Counsel, you just did it again. Let him answer. I'm not going to tolerate it anymore. Next time you're going to sit down. If he's speaking, you need to wait until he finishes.
MR. SUFFIAN: Yes, sir, Your Honor.
A Can you repeat, just the last...?
Q (By Mr. Suffian) I'm not sure if I can. I think I was asking about why you misrepresented about the suppressors and what the circumstances were, but we can move on.
So what type of safe is it?
A It's a closet safe.
Q And so let's go back. I'm sorry.
You mentioned the suppressors.

A Yes.
Q Then you mentioned that you destroyed them. What did the agents say at that point?
A They -- they were agitated, so now the whole meeting changed to where agents were now demanding -- so Claudia wanted to see, so she would tell me she's -- she wonders how many more stolen guns I may have over there, pointing at the safe. And they'd seen the safe from the June 5th meeting. So since I didn't have any stolen firearms, I wanted to give them serial numbers of everything I have, since she's already done the search on those two firearms which I turned over earlier, so she has the capability of finding out whether something is stolen or not, so I wanted to provide the serial numbers.
Q Did either agent ask to search your safe?
A No.
Q Did either agent ask for access to your safe?
A No.
Q Where were the agents when you opened the safe?
A They were standing a few feet on each side of me.
Q Do you think they could see you enter the combination?
A No.
Q What type of -- was it a dial? Was it a pad?
A It was a pad, a digital pad.
Q And did you take any precautions to make sure the agents

could not see you enter the combination?
A Generally, I always stand close enough, but as I put my hand over, it's just a habit of doing it, so -- so as I'm typing, you really couldn't see it. My hand would be covering the pad.
Q And then what happened right after you opened the safe?
A So I opened the safe. Claudia was ready with her notebook. And so as I grabbed one of the first -- first small rifle to lift it up -- I was going to do the whole clearing and then reading off the serial number. So as I tried to lift it up, that's when Claudia grabbed me by the arm, put it down, and she ordered me to step back. So the wall is only less than four feet away from the safe. So meaning "step back," that's as far as I could go up against that wall.
Q What did the agents do then?
A Then they started going through the safe.
Q Did the agents tell you that you had the right to refuse consent?
A No, no. At this point, they were -- the tone and attitude of how this went was I no longer had a say in this, this is now forceful.
Q How were you feeling?
A Ah, I'd never been robbed at gunpoint, but if I have to say -- describe it, it's more like a hostage. It's I did not

have a say in my own house, and if I did say something, then I was -- that would likely escalate to whatever that I'm already not in control of. So I just had to maintain, as bad -- hostile of a situation it was, at least I'll try to maintain and be quiet.

Q Did you feel free to leave?

A No.

Q How did you feel about the way the agents handled your property?

A So that's another issue; that Claudia would -- there was a lot of guns in the safe, and so Claudia was putting them on the ground. It's just that she ran out of carpet space. Now she was throwing them on top of each other.

Q Can you describe to us what the term "flagging" means?

A So -- so during the -- so every firearm should be treated as loaded at all times. So anyone handling any gun should what's called "clear it" in a safe -- in a safe direction, meaning pointing it in a safe direction.

So Claudia was doing this as much as she could, but since there were so many guns, and myself standing in between -- in between the safe and the wall -- over by the wall, so some of the time as she would clear the guns, she would point the muzzle at me.

So "flagging" is not being aware where your muzzle is pointing. So it's not pointing the gun in a safe direction

to unload. And since she was doing this, she was rushing and going fast, then came to the point where she didn't even clear some of these guns, and she would just pull them out, look, flip them over, looking for a serial number, and move on. So flagging happened several times. There were 29 guns in there.
Q Did Agent Grigore remove her jacket previously?
A Yes.
Q Did you notice anything then?
A Yes. She was clearing at six o'clock in the waistband.
Q What is that?
A It's a small -- in the small of her back.
Q Where in the safe was the suppressor located?
A So I had a shelf, a top shelf in which I kept my pistols in hard cases, stacked, and there was a soft case behind the hard cases, stacked.
Q What type of soft case?
A It was a generic, nondescript soft case, square.
Q Was it see-through?
A No, no; a padded, soft case.
Q Could you see the suppressor when you opened the safe?
A No.
Q Could you see the bag in which the suppressor was located when you opened the safe?
A No.

Q You would have to search -- would you have to search through the safe in order to find the suppressor?
A Yes, you would have to -- as soon as you moved the cases, stacked, that would expose the bag.
Q At some point did you mention the suppressor to the agents?
A Yes.
Q Can you tell us how -- why you did that and the circumstances of that?
A So as Claudia was just going at it -- how can I say -- when she was throwing these guns on top of each other, I asked her if it would be possible, the ones she was done with, to move them to off to the side. So she was still agitated. And these are expensive guns. They were getting dinged up. So I told them, well, if it will make them calm down, if it will make this whole ordeal calm down, what if I give her one of those suppressors that she was so agitated about.
Q So did you tell her where it was located, or how --
A Yeah. Then I pointed up on the shelf and into the case. But it didn't really do much good. She just said, "Yeah, like I wasn't going to find it anyway."
Q How did the meeting that day conclude?
A Excuse me?
Q How did the meeting that day conclude?

A So she took -- she took these guns. She said, "I'm taking these guns. I'm taking them with me." It wasn't a matter -- it wasn't a question or consent. It was an order. She was taking them to her headquarters.
Q So she never asked you?
A No, no, no.
Q Did you sign any paperwork?
A No, there was no paperwork.
And she told me to -- if -- so I was worried about the way she was just piling them and taking them out, so I asked her if I could give her a bag so they don't get scratched up, and that's when she says, "Well, if you don't want them to get scratched up, then, sure, give me the bags."
Q Were you worried about the agents' seizure of the suppressor?
A It's -- well, yeah. I mean, I was -- I was worried about the whole thing, because this is the first time that I've seen this, you know, change in -- change in attitude, change, you know.
Q If you could please refer to Government's Exhibit 4, and let's go to page -- I'm sorry. Let's go to page 15.
Can you please read your top text to Special Agent Grigore?
A Page what?
Q It should be Exhibit 4, page 15. It should be the text

chain between you and Special Agent Grigore.
A Okay. Page 15, yes, I see it.
Q Can you tell us what you told the agent?
A "The reason why I was always hesitant to talk to you two is because you kept telling me that you aren't promising me anything, and at any point you could turn on me. That's where the hesitation came from."
Q And I sorry. Can you tell us what date this was? That would be on page 10.
Do you recall texting with the agents after the incident on July 25th, 2017?
A Yes.
Q Are these texts from that evening?
A Yes.
Q How did you express your feelings about the meeting that day?
A Well, I was -- I was trying to be -- well, they were kind of showing -- so during that -- during that forceful search, you know, they were looking at some of my own builds, my project guns, and they were just making comments. Just -- just -- I don't know why -- why disrespectful. So this is me trying to explain that what you saw was real, and I'm -- that's what I'm going through, these text messages, and telling them, and where I bought it and stuff that could be confirmed.

Q Did you call the meeting that day any particular word?
A Yeah, a "disaster."
Q Thank you. Turn to the same exhibit, page 18, and read the first entry.
A First entry.
"It's hard for me to talk openly about this stuff with you two because I don't know if I will be arrested at any point by being honest about this stuff."
Q And then, finally, same exhibit, page 21, the middle entry.
A "I would gladly tell you about all my shady stuff, which were all from my personal use to satisfy my curiosity, but it's hard to say anything when you two may turn on a dime and arrest me. This is where all my half-assed bullshitting comes from, and as you can see, I'm not good at lying."
Q So when did you next meet with the agents?
A This was the 25th, so that would be the 26th.
Q And where was that meeting?
A At my house.
Q And what happened during that meeting?
A It was a recorded meeting. Claudia made sure to remind me of what's expected of me as a C I. She requested a polygraph and reminded me that I need to be forthcoming and truthful again and transparent.
Q Was that a constant theme with the agents?

A Yes.
Q I'm sorry. To clarify. What exactly did they --
A So it's -- it's that I have to -- I have to -- I have to present a good -- I have to be of value as a CI, and I have to be truthful and I have to answer their requests. I have to do -- I have to do what's asked of me. And I have to produce, and if I fail, then, you know, I wouldn't work -- you know, I would no longer be a CI, and, you know, the charges and everything else would follow, charges with consequences. In my case, immigration and so on and so forth.
Q And did you sign any paperwork that day?
A This is the 26th? Yes.
Q Had you signed any paperwork the previous day when you actually gave them a suppressor?
A No.
Q If we could turn to Exhibit 9 in the government's book, and in the middle of page 2, Agent Grigore advises you of something. Can you tell us what that was, starting with, "All right"?
A So Claudia says, "All right. All right. So I hope that yesterday was a wake-up call for you; that this situation we expect -- Glenn and I expect full cooperation from you, and full transparency. Now when we ask you a question, I want you to be fully truthful, and do not protect people that you

think are innocent or not."

Q And in the same exhibit, if you could go to the bottom of page 13, please. It's the last entry by Special Agent Grigore.

A "So let me explain to you our position. So we are two teams here. It's the prosecutor's office, and Glenn and I. We are the investigators, but the prosecutor is ultimately the decision-maker."

MR. DIGGS: Your Honor, which page are we on there?

MR. SUFFIAN: It's No. 13.

MR. DIGGS: Of Exhibit 9?

MR. SUFFIAN: Yes.

Q (By Mr. Suffian) Sorry. I missed where you left off.

A "So let me explain to you our position. So we are two teams here. It's the prosecutor's office, and Glenn and I. We are the investigators, but the prosecutor is ultimately the decision-maker on," and I'm assuming those -- well, "decision-maker on this investigation, and now we need to show the prosecutor that you're still truthful."

Q And then did you discuss taking a polygraph at that point?

A Yes.

Q Did you address any concerns about your personal situation or personal characteristics in taking a polygraph?

A Yes.

Q What kind of things?

A Well, I --
Q Just generally; nothing too personal.
A Well, I have lifelong PTSD, severe PTSD, so I just wanted to make sure that if I do engage in a polygraph, that that be taken into account, and I was dealing with lead poisoning at the time, and I had open hernias that we were waiting for the next year. So I was in bad shape, so I just wanted to show why I sometimes may be agitated, or the way I was, so...
Q And what occurred at the end of the interview on the 26th?
A So I told Claudia about the second suppressor. I had to tell her, you know, because now she just had me at another reminder of what's expected of me, so I had to demonstrate, and that's -- that's pretty much it. As she was leaving, she made sure that -- right at the door, that, "You make sure you give me that suppressor," and that's it. I didn't...
Q So why did you tell her about the suppressor? Why did you tell the agents about the suppressor?
A Excuse me. Did you say "why"?
Q Yes.
A Well, we just had another recorded, you know, reminder to me of what they expected -- what they're expecting of me as a CI, so...
Q Did you think you had a duty to produce it with respect to the cooperation agreement?
A Well, it's either I produce good conduct as a CI, or the

consequences that we've been talking about for months prior. So to answer your question, yes, I guess I did have a duty.

Q And did you eventually turn over the suppressor?

A Yes.

Q Do you remember the circumstances of that?

A Yes. I texted Claudia, and I was just wondering when she was planning to set up this polygraph, and I was wondering if I could bring it in at the same time.

Q What did she say?

A "No." She wanted it sooner.

Q And then you met, and then did you eventually give it to her sooner?

A Yes.

Q Do you remember when that was?

A That was, I believe, early August, August 1st, perhaps.

Q And did you sign any paperwork that day?

A Yes.

MR. SUFFIAN: Thank you, Mr. Veletanlic.

THE COURT: Counsel, it is ten minutes after 12:00. There's going to be cross-examination, and then I'd like to hear closing arguments. It seems to me it may be appropriate to take a break at this time. So why don't we agree to be back at 1:15? That will give everybody an hour for lunch. At that point, Mr. Diggs, you'll do your cross-examination. We'll have any redirect, if there is any.

Are you going to have more witnesses, Mr. Browne?

MR. BROWNE: No.

THE COURT: Then I'll hear ten minutes of argument, and if I can get my materials organized, I'll rule from the bench.

We'll be in recess.

(Court in recess.)

THE COURT: Mr. Diggs, you're up.

CROSS-EXAMINATION

BY MR. DIGGS:

Q Good afternoon, Mr. Veletanlic. My name is Matt Diggs. I'm one of the Assistant United States Attorneys. You and I haven't met before today, have we?

A No, I don't think so.

Q I want to go through a couple of things that you mentioned on your direct examination, and the first is that I understood you to say that you believed, as a result of your cooperation with ATF, you were required to be forthcoming and truthful; is that correct?

A Yes.

Q So when you told the agents that you destroyed both of the silencers from Bruno, your understanding was you had to be forthcoming and truthful; is that correct?

A Yes.

Q When you told the agents in your initial meeting that you

only had five firearms in your house, you understood that you had to be forthcoming and truthful; is that correct?
A I was not working with them at that time.
Q But you did tell them in that initial meeting that you had five firearms in your house?
A Yes.
Q And that wasn't true, was it?
A No.
Q When you minimized the number of packages that you had sent to Sweden containing firearm parts, you understood that you had to be forthcoming and truthful; isn't that correct?
A No.
Q You did not have that understanding?
A No. The number of packages was never satisfying with the number they wanted, so it came to the point where I asked them to simply tell me whatever number they're interested in, and I'll agree to it.
Q Okay. So when you wrote in the email that's Exhibit 3 -- excuse me, not Exhibit 3. It's Exhibit 13 -- that there has been about 15 small packages, and in terms of Glocks, you've sent about five or six of them, you wrote that because that was the number the agents told you that you had to tell them?
A That was the number -- that was the greater number, hoping it would be satisfying, and it wasn't.
Q Let's talk about July 25th at your house.

When the agents had this conversation with you, you mentioned -- and the tone changed, you testified; is that correct?
A Yes, they threatened to arrest me.
Q Did you say they threatened or tried?
A Threatened.
Q And you testified there was a hand gesture?
A Yes.
Q And which agent made that hand gesture?
A Claudia.
Q What did she say when she made that hand gesture?
MR. BROWNE: Your Honor, I'm not sure you saw that hand gesture.
THE COURT: Yes, I did, in his direct testimony.
MR. BROWNE: Thank you.
A That I could be arrested based off of these kinds of things.
Q (By Mr. Diggs) She didn't put you in handcuffs that day?
A No.
Q She didn't come back the next day, on the 26th, and put you in handcuffs?
A No.
Q And even after the agent recovered the silencers, which you said you destroyed, she didn't put you in handcuffs?
A No.

Q During the time the agents are looking in your safe, was it your testimony that you were against the wall in that room?
A Yes.
Q Isn't it true that you actually gave instructions on how to unload one of the firearms?
A Yes.
Q Isn't it true that you were actually standing right next to where the firearms were being unloaded while the photographs were being taken?
A Yes. The wall is less than four feet from the safe.
Q So, in fact, you could have reached down and touched any of those firearms, but you were standing against the wall?
A Yes. I was ordered to get back, and as far back as I could was the wall less than four feet away.
Q While you were standing next to the wall, did any of the agents have their hands on you?
A No, but Claudia's gesture, clearly, for me to get back, in such a tone that it wasn't a request, it was an order, and there was nothing to negotiate.
Q Okay. Let's look at Exhibit 11, which has been admitted, and page 6. Do you see that one on your screen, Mr. Veletanlic?
A Yes.
Q And is this your foot here shown in the bottom-right

corner of Exhibit 11, page 6?
A Yes.
Q So that's the proximity that you were in to the firearms being taken out of the safe?
A Yes. Now, notice this is after I asked Claudia to start moving them off to the side because the pile directly in front of the safe was too big, one on top of the other, so she went and moved some of the firearms off to the side.
Q So she complied with your order?
A I asked her.
Q She complied with your request?
A Yes.
Q And at no point you requested to her that she to stop removing the firearms from your safe?
A No, I did not have that choice.
Q And at no point did you ask the agents to leave your home?
A I did not have that choice, either.
Q Isn't it true, Mr. Veletanlic, that you told the agents that you destroyed the silencers because you knew that you could not legally possess a silencer?
A No. I told them that I destroyed them because they're changing in their tone. I wouldn't -- I wouldn't have had a problem giving them the suppressors per the contract, per my agreement, for being forthcoming and truthful, which I've tried to do. And then I was met with threat of being

arrested, so that's why I was confused. I was trying to be honest, and now I'm being threatened, so that's where that came from. That's where my, you know, statement of destroying them came from.

Q But you are aware, are you not, sir, that you require a license to possess a silencer?

A Yes.

Q And you did not have any such license?

A No. No, I was waiting for the Hearing Protection Act to go through, which never did.

Q When the agents left that day with the three firearms that they suspected might be short-barrelled rifles and the silencer, you testified that you actually gave them bags to carry those items away; is that correct?

A Only if I didn't want them to get damaged. She was going to take them regardless. It wasn't a choice. I did not have a say in it. She was taking the firearms, and she was going to take them however she wants. If I didn't want them to get scratched, then it's up to me to provide the cases, but she was going to take them anyway.

Q So you never told her that she could not take the silencer and the three rifles?

A Correct.

Q And, in fact, you provided her bags to take the items home in -- or excuse me -- back to the office in?

A Provided the cases for the items not to get damaged.

MR. DIGGS: One moment, Your Honor.

Q (By Mr. Diggs) I'm going to pull up Exhibit 9, which is the transcript of the interview on the next day, July 26th. And if we look at the bottom of page 2, that's a question from Special Agent Grigore to you where she says, "I hope that both Glenn and I showed you that we could be trusted and are professional with your dealing. Do you agree with that?" And your response was, "Yes." Do you see that?

A Yes.

Q So on that day, about 24 hours after the items had been removed from your house, you agreed with Special Agent Grigore that she and Special Agent Karabeika had been professional and respectful in their dealings with you; is that correct?

A Yes, but, no, I did not trust them.

MR. DIGGS: No further questions, Your Honor.

THE COURT: Counsel?

REDIRECT EXAMINATION

BY MR. SUFFIAN:

Q Just a few follow-up questions.

Government counsel was just talking about your -- where you were standing while the agents were searching the safe.

What was Special Agent Karabeika doing while Special Agent Grigore was searching?

A He was watching over me.
Q And were any of the firearms in the safe loaded?
A No.
Q What's the first -- or what are the four main rules regarding gun safety?
A It's treat all guns as loaded at all times.
Q Was that what you were referring to in your prior testimony?
A Yes, yes. So anyone handling any gun out of the safe should mind its muzzle and clear it, clear it to absolutely make sure that the gun is empty. Clear it in a safe direction, and that's -- that's what agents failed to do, yeah.
Q And, finally, if you could turn to be Exhibit 4, page 16.
In the green bubble, what did Special Agent Grigore tell you?
A "Let's move forward. I hope you understand what is expected of you and that both Glenn and I displayed the kind of transparency and professionalism we expect from you."
Q And what did you respond?
A "Okay. I'm willing to put this behind me and be up front about absolutely everything shady I've done. The only things I have imported were the suppressor from Bruno, and in the past I have experimented with some homemade solvent trap suppressors that I've cut up."

Q Was this, again, part of a constant refrain on the agents' parts stressing their professionalism and such, trying to get you to adhere to the terms of your cooperation agreement?

THE COURT: Counsel, that one even pushes it beyond the rules of evidence. Let's rephrase it.

MR. SUFFIAN: Agreed, Your Honor.

Q (By Mr. Suffian) Is this something you heard from the agents frequently?

A Yes, yeah.

MR. SUFFIAN: Thank you.

THE COURT: Anything further?

MR. DIGGS: No, Your Honor.

THE COURT: All right. You may step down, sir.

Any rebuttal?

MR. DIGGS: No, Your Honor.

THE COURT: All right.

Mr. Diggs, you get to go first. Oh, I guess I take that back. This is your motion.

MR. BROWNE: I certainly will follow the court's direction on this. When it's their burden, I think they go first, and then we go, and then they get a second chance.

THE COURT: However you would like to do it. It's basically your burden, but it's his motion.

MR. DIGGS: I'm happy to go, Your Honor.

THE COURT: All right.

GOVERNMENT'S CLOSING ARGUMENT

MR. DIGGS: May it please the court.

The government's position in this matter is that there has been no evidence that the defendant's will to consent to the search of his gun safe was overborne and that the consent was voluntary under the totality of the circumstances, both for consenting to the search of the firearm safe and then providing both the silencers, which defendant seeks to suppress.

Just to summarize some of what the court has heard today from Special Agent Karabeika, and I'm only going to focus, initially, Your Honor, on the day of the search, July 25th.

From Special Agent Karabeika, the testimony was that the agents asked the defendant and that he opened the safe.

THE COURT: Mr. Diggs, let me stop you for a moment.

Mr. Browne, in your pleadings, you keep referring to "June 25th." Am I correct in assuming that you're referring to July 25th?

MR. BROWNE: Absolutely, Your Honor. I take responsibility for that. I apologize.

THE COURT: It's fine. I just want to make sure my notes didn't miss something.

MR. BROWNE: I've been rushed in the office. It's my fault.

THE COURT: Thank you.

Continue, Mr. Diggs.

MR. DIGGS: What the credible testimony was, from both agents, was that Mr. Veletanlic led the agents from the room they were sitting in to the bedroom where the safe was located, that he unlocked the safe with a combination, and that once the process started of taking firearms out of the safe, he advised, on at least one occasion, the agents on how to clear these firearms.

Other uncontradicted testimony is that Mr. Veletanlic never objected, never protested to the agents looking in his safe. He had volunteered to give the agents every serial number of the firearms inside that safe, and after the suppressor and the three suspected short-barrelled rifles were discovered, he volunteered to give the agents bags to take those items home.

Now, what he has testified, Mr. Veletanlic, is that the agents told him he needed to be truthful and transparent, to be a cooperator. If this was such an overbearing, coercive request, why did Mr. Veletanlic, time and time again, lie to the agents about the number of suppressors, that he had destroyed the suppressors, the number of firearms, and the number of firearm packages?

Your Honor, we urge the court to view the consent in this case not only from the facts of July 25th, but also through the prism of the defendant's preexisting relationship with

these two specific law enforcement officers. From the outset of their relationship, Mr. Veletanlic had enthusiastically sought to provide information, he had consented to prior searches, he had waived his Miranda rights, he had actively emailed and sent text messages to both agents, all of which made clear that he was willing and enthusiastic to do what he could do for consideration in his own situation, which he himself put himself in, his own situation.

THE COURT: Take me through -- I think I understand the situation. Someone from Sweden calls. The agents here spring into operation. They determine that ultimately they can trace the guns back to the defendant.

MR. DIGGS: Correct.

THE COURT: And at least some of those have been altered. I'm going to call them "guns," "parts of guns," have been altered to remove the identification on them; is that correct?

MR. DIGGS: Correct.

THE COURT: Based on this record before me, what is the first time that the question of someone having a green-card immigration status and a violation of those particular laws is raised in this case?

MR. DIGGS: A violation of immigration laws?

THE COURT: Well, the fact that you're going to have to either plead or be found guilty to the gun charges.

MR. DIGGS: Okay. So the gun charges don't relate to the defendant having a green card.

THE COURT: I understand that. I want to know, though, because I hear this all the time --

MR. DIGGS: Uh-huh.

THE COURT: -- which is, there is going to be an immigration consequence of a conviction or a plea.

MR. DIGGS: So the first time it was expressed to the defendant that he may have some criminal exposure was when they met the defendant on May 31st, 2017.

As to the record before Your Honor, there's nothing in the record that I've seen as to whether immigration consequences of that criminal conduct were discussed at that meeting.

THE COURT: Well, in the cooperation agreement, the statement is made, "No promises or representations have been given to me regarding my alien status and/or my right to enter or remain in the United States."

MR. DIGGS: Well, you're right, Your Honor, and Special Agent Grigore did testify that she went over that with the defendant.

THE COURT: I mean, I'm attempting to understand, though. You portray and your agents portray the defendant as eager to cooperate, and the narrative that's in the emails that are before the court suggest that he was very eager to cooperate, in fact, was volunteering additional leads and

whatever.

Now I've heard testimony today that, you know, basically, "I was forced into doing something against my will," and I'm trying to reconcile those two positions.

MR. DIGGS: Your Honor, what I would suggest the evidence has been is that Special Agent Grigore went over this agreement with the defendant, which says there can be no promises about immigration status. It also says, in paragraph 15, that there can be no promises about his pending case and his own criminal charges. So I think --

THE COURT: It also says they're going to talk to you about the nature and extent of the cooperation.

MR. DIGGS: Yes, or that they will relay that to the U.S. Attorney's Office.

THE COURT: All right. Thank you.

MR. DIGGS: What I don't think there is any evidence in the record from Mr. Veletanlic that he was threatened with deportation or removal if he didn't consent to the search of his safe, if he didn't agree to do anything, that that was an explicit threat made by the agents.

So this enthusiastic cooperation, Your Honor, and this relationship between the agents and Mr. Veletanlic is the backdrop when they arrive at his residence on July 25th. He invites them into the house, and he provides a slew of new information that day, much of which he had not previously

disclosed, and some of it, particularly with regard to the suppressor, which is ultimately false.

It's is a professional conversation. Certainly the agents are frustrated that all of this is coming out, but it's professional. They don't raise their voices. They don't -- I think the more credible testimony is that he was not threatened with arrest at that point.

But the request to look into his gun safe is a logical extension of the agents' investigation that day, based on what Mr. Veletanlic has just disclosed to them.

They don't demand it. They don't threaten. They ask, and he leads them into the safe. It's undisputed that Mr. Veletanlic unlocks that safe for those two agents. And it's undisputed that the whole time they're in there cataloging firearms, he never objects, he never revokes his consent.

The court may analogize this to a trunk -- to the search of a trunk on the side of the road. Oftentimes in that situation an occupant of a vehicle will be sitting right next to the car while the agents are going through the trunk once consent has been obtained. Without an expressed revocation of that consent, the agents are under no obligation to stop their search.

The suppressor, it's undisputed, was found in an unlocked bag within that firearm safe. It was not a new search. That

suppressor could have been seized either based on the defendant's consent to search the safe, or on plain view, Your Honor.

In evaluating the question of consent, the court cannot only look to the prior communications with the agents but also to subsequent communications for context. What we see in the text messages with Special Agent Grigore subsequent to the meeting on July 25th is a continued desire to disclose information and to be enthusiastically cooperative.

Mr. Veletanlic signed, the next day, receipt forms for the silencer and the short-barrelled rifles. He signed a consent to forfeiture or destruction of the silencer, and, of course, he turns over a second silencer approximately a week later.

There's nothing about the facts of these subsequent communications or encounters that suggest any coercive conduct intended to or that, in fact, did overbear Mr. Veletanlic's will, and that's the critical inquiry on July 25th.

Now, the defendant argues that his cooperation agreement here taints -- essentially taints the entire voluntariness inquiry, and, Your Honor, that's simply not the law. This argument is strained from *United States v. David* case, and for the reasons we pointed out in our response, that case is inapt.

The fact the defendant was seeking a benefit based on his

own criminal conduct -- in consideration of his own criminal conduct, I should say, does not and cannot taint everything he does thereafter.

He was told to be truthful and forthcoming. That's not overbearing the defendant's will. There's nothing improper or unduly coercive about a promise to recommend leniency or to provide facts to the U.S. Attorney's Office that could potentially benefit him in his own case.

The line of cases that the defendant points to, that there was somehow a claim of lawful authority here that led to this consent, also don't fit here. These are cases where a police officer will knock on a door, "It's the police, open up," the defendant opens the door, bam, that's consent. We're not arguing that here.

The defendant took proactive steps to expressly consent to the search of his gun safe. These claims of lawful authority cases control the situation where a police officer might falsely state that he has a warrant, that's, obviously, not this case.

Your Honor, the defendant's primary thrust of his argument, that the cooperation agreement tainted everything thereafter and that somehow the agents relied on a claim of lawful authority when there wasn't one, both of those should be rejected, and for those reasons and the facts that the court heard today and for those argued in our opposition, we

urge the court to deny the defendant's motion and not suppress the two silencers.

THE COURT: All right. Thank you.

MR. DIGGS: Thank you.

DEFENDANT'S CLOSING ARGUMENT

MR. SUFFIAN: May it please the court.

This seems, to us, like a clear-cut case of mere compliance or a claim of unlawful authority, which, under the circumstances, is even heightened in light of the cooperation agreement.

As to the essential facts, the government's representation that there was somehow express consent is not to be found anywhere in the records. In fact, the agents' testimony is contradictory in terms of whether there was consent.

Special Agent Karabeika testified the defendant was asked if the agents could search the safe, and the defendant agreed. Agent Grigore testified that the agents did not ask for Mr. Veletanlic's consent, and that he did not consent. Based on this fundamental factual difference between the agents, it doesn't seem as if either of them is credible and that there was no consent here so that I'm not sure how you can revoke what was never there in the first place, and that the cases are legion; that mere acquiescence and mere inaction can't constitute consent.

I think there is a good quote from *United States v.*

*Bautista*. To do so, holding that to define consent based on inaction would justify entry by consent and consent by entry, which, obviously, the Fourth Amendment does not contemplate and does not sanction.

I'm not sure on what basis the government thinks that *United States v. David* is distinguishable. It seems like it's directly on point, where Mr. Veletanlic, like Mr. David, accessed his private, personal thing through a combination that he shielded intentionally from the agents. He did not want the agents to search his safe, especially in light of the fact that he had just lied to the agents, told them he had destroyed two suppressors, and then all of a sudden he's going to consent to entry and search of his safe where he has one of those suppressors? That just doesn't make any logical sense.

Moving on, it is true that Mr. Veletanlic, he volunteered to provide the serial numbers. That was the gist. They were speaking in the living room. Agent Grigore pointed over to the room where the safe was located, "What other stolen firearms do you have in there?" Mr. Veletanlic responded that he would verify that none of the firearms -- none of the unloaded firearms, that is, were stolen, by providing the agents with the serial numbers. Mr. Veletanlic did never contemplate that the agents would actually access his safe, let alone fully conduct a search of his safe.

THE COURT: Well, let me ask you the question, which seems to me to be fundamental in this, which is, Mr. Veletanlic has said the first rule is that a gun is always loaded. That was brought out again here.

I'm an agent. The defendant opens the safe, and the first thing that happens is they pull out a gun, which I am to assume is always loaded. How were they supposed to respond in that situation?

MR. SUFFIAN: They should talk to him about it and try to obtain his consent. They did not advise him that he had the right to refuse consent. Instead, they exhorted him to be truthful and produce, threatened him with arrest. This was not a consensual search.

THE COURT: Counsel, you're not answering my question. Let's try again.

Your defendant testified here in court the guns are always loaded, that's what you are to assume. He opens up the safe. Two officers are standing there. He pulls out a gun. At that point, isn't the appropriate thing for a police officer to do is to say, Put it down, step aside, I'll take them out, we 're looking for ID numbers on them, or registration numbers, as opposed to having someone who we now know has 25 guns in there. When he was arrested, ultimately, in August, he has a mountain of ammunition. And there's a dispute about who's upset on that day, but he knows that, you know,

they're -- he just had to admit to them that, yes, I've been receiving packages from foreign countries.

I'm not sure that I find their behavior to be that surprising in that circumstance.

MR. SUFFIAN: The agents pointed to the safe, asked him if there are any stolen firearms in there, and he volunteered to verify that there were not. He did not volunteer for them to search his safe.

THE COURT: Well, help me with the distinction between verify, which requires you to remove the firearms, and --

MR. SUFFIAN: He -- I'm sorry, Your Honor.

THE COURT: Don't do it to me particularly.

MR. SUFFIAN: Sorry.

THE COURT: He's going to remove the firearms, and in some manner -- I don't know if you call these registration numbers or manufacturer numbers, something. I'm left with my fundamental question here, which is, I've got a safe full of guns. I'm told everyone who deals in this area, the assumption is they're loaded until they're proven to be not loaded, and do I really want to have this person, who, in the course of the prior half hour or hour, has disclosed or admitted that, Well, I said they were being sent to Sweden but really it was Brazil, Russia, some other places, and, Oh, by the way, I received back from France suppressors, which I

think I just heard it was established it would be a violation of the law unless you have a license for them. Am I really going to say, Oh, it's okay for you to unload these 25 guns -- or withdraw these 25 guns, or am I going to step up in order to protect myself?

The police photographs there, your client is not that far away. He's not restrained or in handcuffs or anything. He's standing right there, and, in fact, he's offering them suggestions on how to do this in a better manner.

MR. SUFFIAN: Was there -- was there a question? I guess I understand what the court is saying, but --

THE COURT: The question I started asking a long time ago was, what were they supposed to do? And your answer was, Well, let him pull the guns out of the safe.

MR. SUFFIAN: Or not search his safe without a warrant or without actual, specific express consent or implied consent.

THE COURT: The record is going to have determined, and I'm going to when I make my ruling, over the conflicting testimony about consent, so save me on that one.

What I want to know is if once that -- if he didn't want to open the safe, he didn't have to open the safe. You're arguing that his cooperation agreement required him to open the safe. That argument doesn't fly, because if you think about the ramifications of it, every informant now has a free

pass on their behavior. "I do whatever the police tell me to do," that's just not the law.

I'm really trying to help you here, counsel, because you need to persuade me on something, and that is, is it reasonable for an agent to have someone reaching into his safe and pulling out gun after gun after gun, which they're doing either voluntarily or not voluntarily. Let's just set that question aside for a moment. How should they have dealt with that? And if your answer is they should have stopped, closed the safe, gone down and got a warrant, okay, that's your answer, but that, then, leaves open the question of consent.

MR. SUFFIAN: I would think that the proper course in that situation would be to actually talk about it before Mr. Veletanlic actually opened the safe. Because the way you're describing it, it sounds like the agents were, essentially, setting up their right to conduct a warrantless search, which would seem equally egregious.

THE COURT: All right. I'm sorry to take up some of your time. Please continue.

MR. SUFFIAN: If the situation was such that Mr. Veletanlic never opened his -- so I guess Your Honor is seeming to convey that once he opened the safe, that for exigent circumstances or for officer safety, that they were allowed to seize his firearms and search his safe. That just

doesn't seem like that is fundamentally fair, given the circumstances where they point to the room, "What else do you have in there that's stolen?" Him honoring his cooperation agreement, he decides to be -- he's being totally truthful and wants to actually demonstrate that to them instead of just assuring them verbally that, "I don't have anything else stolen," that, yes, he wants to cooperate. Yes, he had also just told the agents that he had destroyed two suppressors. So it doesn't make much sense that he would consent for them to search his safe in which one of those suppressors is located.

I understand your reasoning, but it just should never have gotten that far, if that's the reasoning that we're going to go on. It seems to me, at least. There was no warrant. They're asking, "What's in there, what else do we need to know about?" And that, by virtue of the cooperation agreement, even though he didn't consent, he was honoring his obligation to be truthful, honoring what the agents were saying that he had to do, notwithstanding their threats of arrest and possible deportation.

THE COURT: All right. Please continue.

MR. SUFFIAN: I'm not sure if I have anything else to go for.

Basically, there's no consent. There's no consent to revoke, if there is consent. The case law is pretty

straightforward about inaction and lack of objection; that the agents -- "Get back." Special Agent Karabeika was monitoring him. So even if he wasn't in physical restraints, there are two armed agents in the room. He saw Agent Grigore's firearm when she removed her jacket. It's a small room. He's got nowhere to go. He's not free to leave. There's two agents between him. He feels like he's a hostage in his own home, and all he is doing is complying with agents' demands.

So if by virtue of his compliance with agents' demands that leads to an officer- or agent-safety issue, then that's just a situation that should have been avoided entirely and never should have happened, because the end result seems to be an illegal, warrantless search.

THE COURT: All right. Counsel, let me ask you one final question, since you raised the issue.

This is going to come down to an issue of credibility, and the defendant's credibility seems to be subject to some pretty significant question here. I have at least four times where he appears to have, basically, lied. One was the number of firearms in the house; only packages went to Sweden. It turns out, no, they went to a number of different countries . The revelation that he's receiving weapons -- and I'll call a suppressor a weapon, I don't know what you call a gun, part of a gun -- from France, and they don't know

yet but we know that, "Oh, I destroyed the suppressors" is another lie. It strikes me that those are very serious questions about credibility.

What do you have to say about the officers' credibility that would counter and have me find in favor of the defendant on that question?

MR. SUFFIAN: That on the most basic, essential, fundamental fact here about whether the agents actually asked him to open his safe and whether he actually consented, the agents disagree. That doesn't seem like that that's a recollection matter. Agent Grigore said they did not ask him and he did not consent. Agent Karabeika testified the agents asked him and he did consent.

I don't know how two agents can be at the same place at the same time and think that totally opposite things happened. So one of them, obviously, is wrong. They can't both be right. So I think that that would be -- and that's their testimony under oath before this court.

So one of them is -- I won't -- one of them has credibility issues, or, better yet, since they can't agree, that the benefit should go to the defendant.

THE COURT: Well, they have the burden of proof.

MR. SUFFIAN: They do.

THE COURT: I agree, the preponderance of the evidence, but, you know, if we credit the testimony that you

want me to believe, which is they never asked, why did your client get up, go in the other room, and open the safe?

MR. SUFFIAN: Agent Grigore pointed to the other room, "What else do you have in there? There's more stolen firearms in there."

THE COURT: That's not what she said, counsel.

MR. SUFFIAN: That's what Mr. Veletanlic testified that she said.

THE COURT: I understand --

MR. SUFFIAN: Agent Grigore also said she didn't ask him to open the safe. Agent Karabeika said they did ask him to open the safe. So the agent's testimony is not consistent with the other agent's testimony. There's a credibility issue amongst the agents.

THE COURT: "Grigore then demanded that I verify that the guns located in my gun safe were not stolen, providing the serial." That, I think, is out of your client's declaration. That's different in some regards to the way you're portraying it today, but it's certainly dramatic, you know.

MR. SUFFIAN: That's the way Mr. Veletanlic felt at that time, and given the agents' constant harping on his duty to be truthful --

THE COURT: Counsel, what's going on?

MR. BROWNE: This is my investigator, Your Honor.

THE COURT: You don't pass notes up from the gallery.

MR. BROWNE: Okay. Thank you.

THE COURT: And have you read them. All right.

MR. BROWNE: Do you want --

THE COURT: Well, I just don't have people stand up and start handing things over the railing. Mr. Browne, you've been at this long enough to know that that's not kosher.

MR. BROWNE: Some judges allow it; some don't. I apologize.

THE COURT: All right. Anything else, sir?

MR. SUFFIAN: So in *United States v. David*, it said that given the circumstances, that the standard consent analysis was inapt, I would posit that that would be the same here. And even if it was, which I don't think is appropriate, but if the court wants to imply that, he was, essentially, seized in his own home, he never received Miranda warnings, he never received any advisement that he had the right to refuse consent, and he was basically just complying with the lawful demand for them -- "Show us that these are not stolen firearms."

And the government's plain-view argument just doesn't fit under the facts. The suppressor being in a case on a shelf behind other firearms that had to be removed for it to be seen in plain view, that's just not even -- I'm sorry I even

mentioned it.

THE COURT: Let's just ask each other about that. What I understood was there were pistols in boxes or cases. They're looking at every gun, so that shelf is going to be empty. There's going to be one remaining item up there, and that's the suppressor. How can you say they're never going to find it because it's blocked? Plain view has a number of meanings, but one of which is the police are entitled to move stuff around, and if they see something, then that becomes plain view.

MR. SUFFIAN: There are only -- maybe I'm incorrect, but my understanding of the law is that they can only move things around if they actually have a legal right to be there.

THE COURT: Or it was consented. Your client said, you know, Pull the guns out, I'll show you none of them are stolen. They're going to be out. I just don't understand how -- you keep saying "plain view." If you're implying the pure notion of was it visible from when the door opened, then I understand your argument, but you have been suggesting more than that, which is somehow when these guns are removed and it's the only thing there, that's not in plain view. Maybe I'm putting words in your mouth.

MR. SUFFIAN: You're misunderstanding my argument. I'm saying that the agents had no right to access the safe.

He never consented to it. He never agreed to it. They did it without a warrant and without his consent.

Lacking a proper basis to be in the safe, they can't move things around. They would actually need to have some sort of ground, some sort of exception to the warrant requirement, which, in their briefing, they relied upon express consent. Now it seems they're trying to shift tack and proffer another argument. But their express consent argument, well, Mr. Veletanlic didn't consent. The agents aren't even sure he consented. One says he did; one says he didn't. So if they didn't have the right to be in the safe, they didn't have the right to manipulate anything in the safe, so the suppressor could not have been in plain view under those circumstances.

THE COURT: Okay. I understand your argument. Thank you.

MR. SUFFIAN: All right. I don't think I have anything more, Your Honor.

THE COURT: Mr. Diggs?

GOVERNMENT'S REBUTTAL ARGUMENT

MR. DIGGS: Your Honor, I'm just going to touch on a few points.

First, with regard to the court's question about deportation, after consulting with my co-counsel, she reminded that me there was testimony from Agent Karabeika

that there were no discussion or threats of any deportation issues on July 25th, 2017. So that is in the record.

Defense counsel's argument that, well, why would the defendant consent to the search of the safe if he knew there was a suppressor in there that he hasn't disclosed? Your Honor, I know you've been at this a long time, and I know Mr. Browne has, and I'm starting to get there. Individuals do the darnedest things when -- especially individuals who may be hiding things.

We get consent-search cases all the time. So the fact that he thought something was in there and may have thought he could have garnered some favor by consenting, simply that argument, that he couldn't have possibly consented because of what's in there, should carry no weight.

With regard to the question of credibility on what we acknowledge is a central question as to whether the agents asked for consent, what our notes of Special Agent Grigore's testimony was, was that she could not explicitly remember whether they asked Mr. Veletanlic or not whether they could search the safe. But what she was clear on is that she did something and asked something that caused him, Mr. Veletanlic, to lead both agents to the safe and to unlock it. And, of course, Agent Karabeika was clear that they did ask and they he did allow them to access the safe.

So those two recollections are not in direct conflict, as

defense counsel suggests. In fact, they both suggest that there was express or what we call express but through action, consent through action, and I'm not sure if that's express or implied, but it's certainly there's evidence of both in this case, Your Honor.

And, finally, just to touch on the plain-view argument. The court is right. The agents have the right to be looking in the safe and to be moving things around.

The testimony was clear that this suppressor wasn't in a locked bag, it wasn't in a locked -- a separate, locked compartment. It's similar, again, to the search of a trunk of a car. You can't consent to the search of a car and then say, Well, but you can't look in this grocery bag or that grocery bag. So the plain-view argument as well as the consent argument should cover the seizure of the first silencer.

Finally, Your Honor, there's been, essentially, no argument about the second silencer. We would just reiterate our argument in the opposition that this was wholly prompted by the defendant's own volunteering of the second silencer. It occurred a week later at a meeting he arranged. The turning over that occurred a week later at a meeting that he arranged with Special Agent Grigore. So there's been absolutely no basis even presented through facts or argument for the suppression of that silencer.

Thank you, Your Honor.

THE COURT: All right.

(The court ruled and proceedings concluded at 2:10 p.m.)

C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 13th day of FEBRUARY 2019.

/S/ Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter