UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) CASE NO. CR18-162JLR |
| Plaintiff, | ) |
| | ) SEATTLE, WASHINGTON |
| v. | ) February 25, 2019 |
| | ) |
| HANY VELETANLIC, | ) 9:00 a.m. |
| | ) |
| Defendant. | ) JURY TRIAL |
| | ) Vol. 1 of 3 |

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES L. ROBART
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: MATTHEW DIGGS
MARIE DALTON
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101

For the Defendant: JOHN HENRY BROWNE
Law Offices of John Henry Browne
801 Second Avenue, Suite 800
Seattle WA 98104

Reported by: NANCY L. BAUER, CCR, RPR
Federal Court Reporter
700 Stewart Street, Suite 17205
Seattle, WA 98101
(206) 370-8506
nancy_bauer@wawd.uscourts.gov

JURY VOIR DIRE......................................page 19

EXAMINATION INDEX


| EXAMINATION OF | | PAGE |
|---|---|---|
| JOYNI HYTTINEN | DIRECT EXAMINATION BY MS. DALTON | 118 |
| | CROSS-EXAMINATION BY MR. BROWNE | 126 |
| ERIK SESONE | DIRECT EXAMINATION BY MR. DIGGS | 128 |
| | CROSS-EXAMINATION MR. BROWNE | 133 |
| | REDIRECT EXAMINATION BY MR. DIGGS | 134 |
| JOAKIM HENRIKSEN | DIRECT EXAMINATION BY MS. DALTON | 135 |
| | CROSS-EXAMINATION BY MR. BROWNE | 145 |
| PATRIC MALMBERG | DIRECT EXAMINATION BY MR. DIGGS | 149 |
| MATTHEW CHEN | DIRECT EXAMINATION BY MR. DIGGS | 162 |
| | CROSS-EXAMINATION BY MR. BROWNE | 175 |
| PATRIC MALMBERG | CROSS-EXAMINATION CONTINUED BY MR. BROWNE | 176 |
| NHOH NGUYEN | DIRECT EXAMINATION BY MR. DIGGS | 181 |

GOVERNMENT'S OPENING STATEMENT 104

EXHIBIT INDEX


| EXHIBITS ADMITTED | PAGE |
|---|---|
| 1A | 121 |
| 1A-2 | 123 |
| 1B | 125 |
| 10A | 153 |
| 10B | 153 |
| 10B (AGAIN) | 156 |
| 10C | 153 |
| 10D | 154 |
| 10E | 154 |
| 11 | 156 |
| 12A | 159 |
| 12B | 159 |
| 12C | 159 |
| 13 | 173 |
| 15 | 185 |
| 29 | 160 |
| 47 (DEMONSTRATIVE) | 165 |

PROCEEDINGS

THE FOLLOWING PROCEEDINGS WERE HELD
OUTSIDE THE PRESENCE OF THE JURY:

THE CLERK: Case No. CR18-162, United States v. Hany Veletanlic.

Counsel, please make your appearances for the record.

MR. DIGGS: Good morning, Your Honor. Matthew Diggs and Marie Dalton for the United States. With us at counsel table is Special Agent Glenn Karabeika, special agent with Homeland Security Investigations.

THE COURT: Thank you.

MR. BROWNE: Good morning, Your Honor. John Henry Browne on behalf of Mr. Veletanlic.

THE COURT: Gentlemen. Welcome.

Counsel, let me tell you what my plan for the day is, and then we can get started.

I owe you rulings on defendant's motions in limine, and I propose to do that first. Included in that is the government's, more or less, cross-motion in regards to RK.

Secondly, we have jury instructions available for you. Miraculously, we received stipulated instructions from all of you, which rarely, if ever, happens, and that certainly makes our life immensely easier. We've made some serious alterations in them; for example, changing "State Department"

to "Department of State." So I think that you'll see most of them are fine. We did add two potential instructions for use during the trial that I usually keep up here just in case we need them.

And then, finally, we'll get started on voir dire after we get the jury up.

Does everyone have the juror questionnaires?

MR. DIGGS: Yes, Your Honor.

MR. BROWNE: Yes, Your Honor.

THE COURT: Okay. I know you have asked me to read the inherent bias instruction, and I'm happy to do so. They will have already seen the inherent bias video downstairs, and that instruction will have been read to them downstairs.

You've asked that I read it to the entire jury pool, which, in terms of temporal scope, will be very close. It's also included in the preliminary instructions. So it's up to you. If you'd like me to read it, I'm happy to do so. If you think they've heard it and twice is enough, that's also...

Mr. Diggs?

MR. DIGGS: Your Honor, I think twice is enough for us.

MR. BROWNE: I would agree.

THE COURT: Okay. Then let's turn to the question of motions in limine.

I'm going to set aside No. 1 and No. 2 because they're most substantive.

In terms of Motion 3, exclude the government summary exhibit, I'm going to take that one under reservation. I now have your exhibits. I want to take a look at the underlying documents, and once I do that, then I'll be able to rule.

My standard in doing that, basically, is, if I think it's going to help the jury, I'll do it. If I think it's just a matter of not a tremendous amount of assistance to the jury, then I'll probably grant it. But I need to look at that first.

Number 4 was implement special procedures for hybrid lay expert testimony of Officer Grigore. I'm granting that. I'm putting the burden on you to tell me when she's going to testify so I can find that instruction and read it.

Number 5, excluding officers from giving an opinion on Veletanlic's guilt. I'm going to grant that in part. I'm also going to deny it in part.

If there were some statement as to conveying his own knowledge, "he" being Mr. Veletanlic, that, I would permit, but I'm not going to permit an officer from giving an opinion on the question of guilt or innocence.

Number 6 is exclude testimony and evidence concerning the course of investigation.

I'm going to deny that motion but use a limiting

instruction. Ninth Circuit case law supports the admission of this type of evidence. It's not hearsay because it's offered to show the impact on the listener, and not for the truth of the matter asserted. And there is an instruction that, basically, sets that out and protects the *Crawford* testimonial hearsay privilege.

So once again, I'm going to put the burden on you. I assume that comes in through the Swedish -- it could come in through the agents, I suppose, or also through the Swedish individuals. So you need to tell me before that subject comes up so that I can make sure we have that instruction at the ready.

Counsel, I'll also apologize in advance. I seem to have a cold that won't go away, and so you'll find me coughing throughout the trial.

And we're moving on from triple-soothing-action to cherry-flavored.

Number 7, exclude prosecutorial vouching. That's, obviously, a court rule. It needs a context to be applied to. So I'll reserve ruling on specific questions until they come up.

Exclude testimony or reference related to Veletanlic's non-testimonial demeanor. That's granted.

Exclude witnesses. That's granted.

Prohibit witnesses from discussing the testimony. That's

granted.

And that takes me back, then, to the two motions that I said I'd take up last.

The first is permit Mr. Veletanlic to call firearms expert Grant Walsh. I'm going to allow that and allow Mr. Walsh to testify.

The question that this boiled down to, for me, was, would an expert readily recognize the alteration of the recess on the pistol as an obliteration of the serial number, and, as such, that's part of Mr. Veletanlic's case. Therefore, I find it is relevant, notwithstanding the government's argument to the contrary.

Rule 704 allows expert testimony on a defendant's mental state so long as the expert does not draw the ultimate inference or conclusion. That's the *Finley* case out of the Ninth Circuit at 301 F.3d 1000.

The case law that follows that is very fact-specific. Sometimes it's allowed; sometimes it's not. It seems to me that, in this instance, I will permit Mr. Grant to testify that the number has been obliterated and it is possible that a person would not be aware of that, and he can discuss his expert opinion that a person may not be aware of that. He may not, however, testify as to Mr. Veletanlic's state of mind or state of knowledge, because I think that crosses the line and gives him testimony regarding an ultimate inference

or conclusion, which the jury needs to draw and not the expert. So that's the parameters of Mr. Walsh.

The last one and the one that we spent the most amount of time dealing with is calling RK as a witness. And I'll read you my notes in lieu of writing a written order on this.

The court finds that RK has value as a witness to Mr. Veletanlic in that the proffered testimony as set out in the briefing is that he previously owned the gun in question, provided it to Veletanlic and did not know that the serial number had been removed, due to its unique location. These facts would support Mr. Veletanlic's arguments; therefore, I will permit him to testify concerning his personal knowledge about the gun in question, its transfer to Mr. Veletanlic, but no further.

He has not been disclosed or qualified as an expert witness, and I'm not going to allow him to testify as an expert witness, but he can provide his personal knowledge.

In regards to the proposal that the defense be allowed to impeach him, I'm going to prohibit that. The areas of proposed impeachment seem to be nothing more than an effort to get into the areas that I've already excluded, specifically evidence or argument related to Mr. Veletanlic's cooperation against RK, a government informant.

As I said then, the arguments concerning the government's alleged improper conduct towards Mr. Veletanlic during the

investigation are questions of law that should be addressed to the court and not for the jury to decide.

When a party attempts to impeach its own witness with substantive evidence that would otherwise be inadmissible, the evidence's likely prejudicial impact often substantially outweighs its probative value because the jury may ignore the judge's limiting instruction for considering the, quote, impeachment, unquote, testimony for substantive purposes.

I find that the probative value of the impeachment evidence is negligible. Nowhere has the defense explained how it bolsters Mr. Veletanlic's case, except present a legal if not factual issue to the jury.

So, lastly, I will say that if RK testifies, I will appoint a CJA counsel for him so that he understands his Fifth Amendment rights. Prior to calling RK, which I'll refer to as part of defendant's case, I would like a proffer outside the presence of the jury so that that can be used by RK's counsel in advising him regarding his Fifth Amendment rights.

What worries me is that, as I understand the testimony that I would be permitting, it would, in effect, expose him to criminal charges in regards to the transaction at issue here.

So he can testify. He can testify that he owned the gun, his familiarity with it, and his knowledge in regards to

obliteration of the serial number. Other than that, I'm going to exclude his testimony, but it's important to permit it in regards to the role he plays in Mr. Veletanlic's defense.

So, counsel, any questions in regards to the court's rulings? Mr. Browne?

MR. BROWNE: Good morning, Your Honor.

THE COURT: You leapt to your feet first, so go ahead.

MR. BROWNE: Oh, no, no. Maybe I was premature.

I just have one question about the course-of-investigation ruling, and would you be giving an instruction every time that issue came up, or just one instruction?

THE COURT: I would normally give it before it comes up, and then if we know that it's going to come up repeatedly with different witnesses, I'll simply remind the jury that they've heard it or sometimes even reread it.

MR. BROWNE: Okay. Thank you.

THE COURT: Remember, you know what these witnesses are going to say, and I don't, so somebody has to prompt me that this is going to come up again.

MR. BROWNE: Right. I'll make an objection, and go from there.

THE COURT: You don't need to make an objection. Just tell me the question is coming up again.

MR. BROWNE: Mr. Kunkel, RK, was here this morning. His mom is having brain surgery tomorrow, and so I told him we would not need him till Wednesday. I just wanted everybody to know that. So he'll be on-call, more or less.

THE COURT: Okay.

MR. BROWNE: May I retrieve a box of Kleenex from there?

THE COURT: If we have one.

MR. BROWNE: There is. I think you and I may have the same issue with health.

THE COURT: Mr. Browne, I'm more worried that you're getting that box, because the only people who ever use it are the criminal defendants who are being sentenced.

MR. BROWNE: I probably need a bigger box.

Your Honor, one question, and whatever you rule on this is acceptable.

You may notice that there's just one defense counsel. Mr. Suffian is no longer with my office. And Mr. Walsh, who is an investigator, ex-law enforcement, I was hoping he could sit in the courtroom and assist me, but he's also going to be testifying, so if you feel that's improper, I'll just leave him out in the room.

THE COURT: If he's going to testify?

MR. BROWNE: Yes, he's the expert you mentioned.

THE COURT: No, he needs to be excluded.

MR. BROWNE: I think you mentioned another name. It's Greg Walsh. So would you prefer that he not to be at counsel table? I mean, I can handle it by myself.

THE COURT: Yes. If he's going to be a witness, he's excluded until he testifies.

MR. BROWNE: Thank you.

MS. DALTON: We just have one other thing, Your Honor.

I know Your Honor told us last week that we should exchange PowerPoints in advance of openings today. We did send our PowerPoint over to the defense, and we didn't receive anything, so I assume defense isn't going to use a visual.

MR. BROWNE: The last time I saw a PowerPoint was a stockbroker trying to sell me Exxon. So I don't use PowerPoints. I'm kind of old-school. And I want to alert everybody that we may reserve our opening. I won't know until the government is finished, but I just thought I'd let everyone know that.

THE COURT: All right. Anything else in terms of motions in limine?

MR. DIGGS: No.

THE COURT: You either have or you will soon have some jury instructions. In terms of Preliminary Instruction No. 2, just a very substantive change. We use the phrase

"Department of State" as opposed to "State Department," which is what you used.

By the way, counsel, I appreciated you doing a good job on Instruction No. 2. It turns out, in my talking to the juries, they attach significance to it perhaps more than we do because they don't know anything about the case, so they're looking for some way to get some structure. I consider that to be an important instruction.

In terms of the course-of-trial instructions you provided for them, a cautionary instruction for first recess, a bench conference instruction, an instruction for the transcript recording in English, and a foreign-language testimony instruction.

We've added, in keeping with my rulings on the motions in limine, an instruction on the dual role of Special Agent Grigore. I did so because Mr. Veletanlic asked the court to implement those procedures.

Secondly, we have an instruction that we're going to use, which is a limited-purpose instruction on Agent Karabeika's testimony concerning the information he received from the Swedish law enforcement officers. I added this one because the government suggested the court use it in response to Mr. Veletanlic's motion in limine to exclude the evidence.

I took the structure from the Ninth Circuit Model Instruction 4.16.

MR. BROWNE: Which instruction are you referring to, Your Honor?

THE COURT: This is one in regards to Agent Karabeika.

So just know those are in there. If you have any objection to them, you should let me know at some point before we get into the trial.

In terms of your final instructions, No. 3, we set that up as an A or B, depending on if Mr. Veletanlic testifies or not.

No. 8, that's the implicit bias instruction. I didn't see any problems with that, and it will render the final instruction on witness credibility consistent with Preliminary Jury Instruction No. 7. So know that that's slightly modified from what you submitted.

Seventeen is charts and summaries. Since we haven't had a definitive ruling on that, it's in there, but it just simply is a placeholder until we know.

And 18 is charts and summaries that were admitted into evidence. Same question, and it's simply there as a placeholder until we know what happens.

Instructions 19 through 20, those are the instructions for Count 1. You proposed joint instructions, 43 and 44. As I said, I have a preference for model instructions, but since the Ninth Circuit doesn't have model instructions and yours

seem to be correct, we're going to be giving those.

And then only a change, which an English major would enjoy. You modified two instructions, but as my clerk explains, it inexplicable converted the last element into passive voice. I can't tell you the difference between passive and active voice, but all those English majors can, so we've converted it back to active voice.

And then, finally, in Instruction 26, there is an optional clause forbidding influence by anyone's orientation. You included that in Instruction No. 1 but not in Instruction 26, and since we think the two instructions ought to be consistent, we included that language from your instruction into Instruction 26, where you had deleted it.

So I think in the copies that we've given you, we tried to flag those changes. We don't have the ability to do a red line, to highlight them. So know those are the instruction changes we've made.

Anything else we should take up before we bring the jury up?

MR. DIGGS: Not from the government, Your Honor.

MR. BROWNE: Your Honor, the final jury instructions packet that you went through, and I just saw, has the citations in it. I assume that won't be the case --

THE COURT: That's for you. That's not how the jury gets them.

MR. BROWNE: Thank you.

THE COURT: Remember, we're going to do an informal convention, although we may not need one, and we want you to have the instruction citations for that.

MR. BROWNE: Yeah, and I think the government did a very fair job on proposing the instructions. That's why you find the agreement you don't normally find.

THE COURT: Well, it makes my life easier, so thank you.

Madame Clerk, please bring the jury up. I'll have everybody move over to my left side of the courtroom because there's going to be an spillover to the right side.

MR. BROWNE: Would you allow a challenge for each alternate?

THE COURT: You have two alternates.

MR. BROWNE: You said two earlier, but one will be sufficient.

THE COURT: Why take the chance? It's a criminal case. They won't be seated.

MR. BROWNE: So that will give us a total of?

THE COURT: Whatever is in the rules these days, Rule 24. One or two alternatates receives one additional peremptory challenge.

MR. BROWNE: That's what I thought. I couldn't remember.

THE COURT: Rule 24(c)(4)(A).

MR. BROWNE: Thank you, Your Honor.

We were just handed the juror numbers and questionnaires ten minutes ago. Would it be appropriate to ask for a ten-minute recess so I can review the actual substantive comments?

THE COURT: It will take them a little bit of time to get up here. I want to get going before the jury pool gets drained down.

MR. BROWNE: May I start looking at them now?

THE COURT: Yes, by all means.

MR. BROWNE: Your Honor, I notice Juror No. 3 is previously the elected prosecutor in Snohomish County, who I know quite well, in a respectful way, I think. So I thought everybody should know that.

THE COURT: Well, I'm extremely pleased that they agreed to serve. You said No. 3?

MR. BROWNE: That's correct.

THE COURT: It will provide an interesting dilemma for you, counsel.

MR. BROWNE: I think we've had a very good relationship. I'm not sure how that will work out today.

THE COURT: Well, I'm sure the government will be happy to stipulate to her dismissal. Why would they want a prosecutor on the jury?

THE FOLLOWING PROCEEDINGS WERE HELD
IN THE PRESENCE OF THE JURY POOL:

THE COURT: Good morning, ladies and gentlemen. My name is Judge Robart, and welcome to the United States District Court for the Western District of Washington. I appreciate you-all being here, dragging you down bright and early on a Monday morning.

Some of you have experience in this process; some of you don't. Some of you have previously served as jurors; some of you haven't. So as we go along, I will try and explain what's happening so you have a better sense of how we do this.

We're going to be picking the jury. One of the things that you'll find out is that lawyers have their own name for nearly everything. We have a process whereby counsel sit down with a witness and ask questions. Everyone would normally say that would either be a conversation, or it would be questions and answers. Heavens no. We call it a deposition. And the process you're about to participate in is called voir dire, which literally translated would mean picking the jury.

Now, why do we do that in the particular way that we do it? The lawyers, the parties don't know anything about you. They have your juror questionnaires. That's it. And if you were going to be involved in a proceeding here in court, you

would want to know a little bit about who the jurors are and find out if there is anyone who is absolutely in your favor or absolutely opposed to you before you ever got started. So that's what we're going to do.

It will probably take us to around the lunch hour. If we don't get done, we'll take a break for lunch, and then come back at 1:30.

People periodically ask, "Well, why are they asking these questions and prying into my personal life?" The answer to that is, no, that's not what our intention is; on the other hand, it's important that you honestly answer the questions.

There are places, for example, the Eastern District of Washington, where, as part of your jury questionnaire, you have to write what bumper stickers you have on your car and such things as that. We don't do that. The lawyers have already been told that, no, they can't ask what your favorite television show is or what did you think of the Oscar awards last night. We want to keep this on the level of things that would relate to the case that you're about to hear.

So this is a criminal case. I'll tell you a little bit more about it here in a bit, but at this time, I would ask you all to stand all be sworn in.

(The jury pool is duly sworn.)

THE COURT: The second most important thing that you need to know is that each of you should have a number. Since

we're going to practice, would everyone hold their number up, and if you don't have one, let us know? Congratulations. You all passed.

You're in federal court, and judges in the federal system have lifetime tenure; however, I'm only given one set of numbers. So for those of you who are not selected to serve, we'll be collecting those numbers as you leave; otherwise, those numbers are your best friend because that's how we'll refer to you until we get the jury picked, and then we'll renumber you to correspond to what seat you're sitting in.

With that said, let me tell you a little bit about this case.

This is a criminal case brought by the United States government. The government charges the defendant with violation of the Arms Export Control Act, Count 1; possession of unregistered firearms, Counts 2 and 3; and possession of a firearm with an obliterated serial number, Count 4.

The charges against the defendant are contained in the indictment. The indictment simply describes the charges the government brings against the defendant. The indictment is not evidence and does not prove anything.

The defendant has pleaded not guilty to the charges and is presumed innocent unless and until the government proves the defendant guilty beyond a reasonable doubt. In addition, the defendant has the right to remain silent and never has to

prove innocence or to present any evidence.

In order to help you follow the evidence, I will now give you a brief summary of the elements of the crimes, which the government must prove to make its case.

The first count alleges that the defendant violated the Arms Export Control Act. As to this count, the government must prove that the defendant exported a part of a gun, a Glock lower receiver, to Sweden. The government must prove that this receiver was listed on the United States Munitions List at the time it was exported; that the defendant exported this receiver without obtaining a license from the State Department; and that the defendant was aware that it was unlawful to export that receiver from the United States.

The second count alleges the defendant possessed an unregistered firearm. As to this charge, the government must prove that on or about July 25, 2017, the defendant possessed a B&T AG Switzerland Tiger silencer; that the defendant was aware that the silencer was a device for silencing, muffling, or diminishing the report of a portable firearm; and that the defendant had not registered that silencer with the National Firearms Registration and Transfer Record.

The third count also alleges that the defendant possessed a second unregistered firearm. As to this count, the government must prove that on or about August 1, 2017, the defendant possessed a Vortex silencer; that the defendant was

aware that the silencer was a device for silencing, muffling, or diminishing the report of a portable firearm; and that the defendant had not registered that silencer with the National Firearms Registration and Transfer Record.

Lastly, the fourth count alleges that the defendant possessed a firearm with an obliterated serial number. As to this charge, the government must prove that on or about May 3, 2018, the defendant knew that he possessed a Sturm, Ruger & Co. pistol, Model LCP .38 caliber that had been shipped and transported from one state to another. The government must also prove that the serial number on that pistol had been removed, obliterated, or altered, and that the defendant knew that this serial number had been removed, obliterated, or altered.

Those are the, sort of, bare bones of the case, and we're now going to begin the process of asking you some questions. For many of you, the question that you probably want to know most is how long is this going to take. Well, this is a criminal trial. If it were a civil trial, I could tell you to the minute because most cases are what we call "on the clock," meaning each side has been given a certain amount of time to try the case.

In criminal cases, that's not true. Both the government and the defense has a right to put on the case that they think is important, and, obviously, these are very

significant questions.

You will hear me from time to time saying, "Counsel, let's move it along." If they don't, then they both get B's for their trial performance.

As best we can tell from looking at the trial order, which contains a lot of information, looking at the witness list, looking at the exhibit lists, this case should probably take four or five days.

The unknown quantity in that is under your control, which is your deliberations. I don't put time limits on those, obviously, and it's up to you to deliberate and come back when you're ready to come back. So in our original estimate, we sort of assume some time for your deliberations, but we can't really predict how long it's going to take you, nor would we try.

So with your numbers at the ready, I'm going to ask you a question, and if the answer to that question is "yes," please raise your number. The clerk will then say, for example, "No. 5," "No. 11," whatever, and I write that down, and I will come back after all of these questions and talk to you about that particular question, why you answered yes.

Most of the questions are pretty straightforward. Sometimes I use terms like "immediate family." I try to be more specific than that. If you have a partner or a spouse, if you have children, if it's your parents, those are your

immediate family. If it's a brother and a sister or whoever, and you think it's important that we know about it, I would ask you to include them also.

So let me start.

I just read you the instruction about the background of this case.

Is there anyone on the jury who thinks that they have read or heard anything about this case?

Counsel, I see no numbers.

The next question is one of my favorites. I'm going to ask the government to introduce itself. Obviously, its client is the United States of America, but there are people who are both working for the U.S. Attorney and some of the government agencies that are involved in this.

And then they're going to list for you the witnesses that are possible. Keyword there, "possible," not "probable," not "will testify." If they don't disclose a witness, then they won't be testifying, so they tend to be overly inclusive. Sometimes it sounds like the phone book. They may add, for example, officer so-and-so, or John Smith, member of the Alcohol, Tobacco, and Firearms. That's because there is more than one John Smith, and we're trying to narrow it down to people who you might know, so if you hear that, that's where it comes from.

They're going to finish doing all of that, and then I'm

going to turn to the defense, I'm going to ask them to identify themselves, ask them to identify their potential witnesses, and when we finish with that, I'm going to ask you the question, "Do you think you know anyone who is involved in this case?"

So, Mr. Diggs?

MR. DIGGS: Good morning, ladies and gentlemen of the jury. My name is Matthew Diggs. I'm an assistant U.S. attorney here in Seattle, and with my co-counsel, Marie Dalton, we represent the United States in this matter. Also with us at counsel table is Special Agent Glenn Karabeika from Homeland Security investigations.

I'll read the government's proposed witness list. G. Daniel Bugel-Shunra, who is a German translator; Matt Chen; Claudia Grigore, a special agent with the Bureau of Alcohol, Tobacco, and Firearms; Brian Heishman; Joakim Henriksen, who lives in Sweden; Joyni Hyttinen, also a Swedish citizen; Glenn Karabeika; Patric Malmberg, a Swedish citizen; Nhoh Nguyen, and that's spelled N-h-o-h, last name N-g-u-y-e-n; Tania Pleasant; Erik Sesone, a Swedish citizen; and Wilbert Walker.

Thank you, Your Honor.

THE COURT: Thank you.

Mr. Browne?

MR. BROWNE: Good morning, Your Honor. Good morning,

everybody. My name is John Henry Browne. I'm an attorney. This is my client, Hany Veletanlic. And our proposed witnesses -- as the court informed you, we may or may not call witnesses. There are only two. One is a gentleman named Ryan Kunkel, and the other is a private investigator named Gregory Walsh.

That's it, Your Honor.

THE COURT: Thank you.

Ladies and gentlemen, you know what the question is going to be. Having heard the names of the lawyers, the names of the clients, the investigators and potential witnesses, do any of you know any of those individuals? If so, would you please raise your hand?

THE CLERK: Juror No. 3.

THE COURT: Anyone else?

All right. Thank you.

This is one of my most popular questions.

Have you ever served as a juror in a criminal or civil case or as a member of the grand jury in either federal or state court? And those of you who don't know what a grand jury is, if you've been on one, you would, so don't worry about knowing what it is.

So prior jury service, please raise your numbers.

THE CLERK: Juror No. 1, 2, 3, 6, 18, 24, 32, 33, 38, and 40.

THE COURT: Thank you.

Number 4, clearly -- no, I'm sorry, sir. This is Question 4. I'm trying to trick you there.

Question No. 4: As you know, this is a criminal case. Criminal cases usually involve law enforcement in some manner. So have you, any member of your immediate family, or any close friend ever been employed by a law enforcement agency?

THE CLERK: Juror Nos. 3, 9, 7, 23, 35, and 39.

THE COURT: Thank you.

The next question I'm going to ask has to do with criminal matters. If you respond affirmatively, it means I'm going to call on you later.

You should know that we have a procedure whereby if you don't want to talk about whatever that subject is in front of everyone else who is in the jury pool, you stand up and say, "Your Honor, I'd like to go to sidebar." "Sidebar" has nothing to do with alcoholic beverages. What it does have to do with is coming over in the corner where you can talk to the lawyers and to me without everyone else hearing what you have to say. And, clearly, if it's something that you don't want to share with everyone, we're trying to accommodate that. So know that is an option after we've identified you and then when we come back and start asking you individual questions.

The question is, have you ever been involved in any court in a criminal matter that concerned yourself, a member of your family as a defendant, a witness, or a victim? If so, please raise your numbers.

THE CLERK: Juror Nos. 3, 7, 9, and 13.

THE COURT: The American legal system is largely based on the English legal system, and the English legal system took a pretty significant turn when they signed the Magna Carta. It was just, a couple of years ago, the anniversary of the Magna Carta.

What the Magna Carta said was, in criminal cases you have to follow the law, and the king would give the law. Translated to present day, that makes me the king. However, the facts and the question of guilt or innocence was to be decided by your peers. Ladies and gentlemen, that's you, the jury. We have carried that system down throughout the United States, where I will instruct you as to what the law is. You don't get to make up the law. Even if you disagree with the law, you have to follow it . You, on the other hand, decide what the facts are. And you meet as a group and you talk about it and you make your decisions, and even if I disagreed with them, that's still your responsibility in the system.

So the question that I'm going to ask you is, if you are elected to sit on this case, will you be able to render a verdict solely on the evidence presented at the trial and in

the context of the law as I give it to you in my instructions, disregarding any other ideas, notions, or belief you have about the law?

So is there anyone who would be unable to accept that as their mission in this trial? If so, please raise your number.

I see no numbers, counsel.

Ladies and gentlemen, you're going to have to get used to my coughing because I've been unable to get rid of this cold, but my in-court deputy brought me my own cough drops today to help me get through this.

Instruction No. 7 has to do with any special disability or reason why you would be unable to serve as a juror in this matter. You don't need to tell me about it now, but is there anyone who either has a medical issue, plans, something that's come up at work that would prevent you from being a juror in this matter, with the approximate length of about a week for trial? If so, please raise your hands.

THE CLERK: Juror Nos. 8, 9, 15, 19, 34, 35, and 41.

THE COURT: Thank you.

Now I'm going to ask you some questions that are a bit more tailored to this case. Obviously, the plaintiff in this case is the United States government. So my question is, have any of you or your immediate relatives been involved in a lawsuit involving the federal government? If so, please

raise your numbers.

Counsel, I see no numbers.

Number 9 is somewhat redundant of the question I asked you earlier, which is, have you or any of your relatives been charged with or investigated for a criminal offense? If so, please raise your number.

THE CLERK: Juror Nos. 3, 4, 9.

THE COURT: All right. If you listen to what I read you at the time we were talking about what this case involves, it involves firearms, and that's something that will be part of your jury instructions. And so the question that I'm going to ask you is, do you have any belief or opinion on the subject of firearms or the laws that govern firearms that would affect your ability to be a fair and impartial juror in this matter, and, particularly, to follow my instructions as to the law? So, if so, please raise your numbers.

THE CLERK: Juror Nos. 4, 10, and 37.

THE COURT: Thank you.

That question asked about if you have views regarding firearms. To drill down on it a bit: Do any of you have any specialized knowledge about firearms or firearm safety? If so, please raise your number.

THE CLERK: Juror Nos. 9, 13, 14, 20, and 37.

THE COURT: We're about done here with me, other than

I'm going to go back to a question to jog your memory.

Having heard the questions that the court has asked, first, is there any answer that you should have raised your number for and you forgot or didn't understand that that might be what it is, or any other reason that you can think of why you should not sit on this jury or render a fair verdict based on the evidence presented to you in the context of the court's instructions on the law? Anyone who has any last thoughts about that?

Number 11. Anyone else?

THE CLERK: Number 13.

THE COURT: All right. Now you'll get to learn a whole lot about your fellow jurors, because I'm going to go back and talk to you individually.

Starting with Juror No. 3, [redacted], why don't you explain who you are, since we kind of have the same job, in a way.

JUROR NO. 3: I used to be a prosecutor for Snohomish County, and I'm retired.

THE COURT: All right. And the question that you answered was do you know anybody, and who do you know?

JUROR NO. 3: I know John Henry Browne.

THE COURT: Have you had cases against him?

JUROR NO. 3: We've had cases, but I don't think we've ever gone to trial.

MR. BROWNE: Good.

THE COURT: Did you get the answer?

MR. BROWNE: I did.

THE COURT: Anyone else know anyone who is in the court staff? I asked that question once; same sort of situation. There were a lot of people in that back row, and nobody raised their hand, and then I asked the question about does that remind anyone, and a woman raised her hand and said, "You didn't ask if anyone knew the judge." I was, obviously, not paying attention, because I said, "Do you know the judge?" And she looked up and said, "Yes. We dated."

In fairness to me, it was about 30 years later, and she had a different name. But it's remarkable who you can encounter if you hold this job long enough.

Prior jury service was the second question. Number 1, tell us about your prior jury service. What kind of case was it, how long ago, did you reach a verdict?

JUROR NO. 1: We reached a verdict.

THE COURT: Ma'am, I'm going to make you stand up. If you have a really soft voice or you're in that back area, you'll have to stand up.

JUROR NO. 1: Yes, we reached a verdict. It was a criminal case about breaking and entering into a home.

THE COURT: Okay. Anything about that experience that would cause you to question your ability to serve here?

JUROR NO. 1: No.

THE COURT: All right. Thank you, ma'am.

Number 2?

JUROR NO. 2: So I had a domestic violence case in a state court, and we were dismissed before -- we didn't have to reach a verdict because I guess they decided to reach a plea deal, or whatever you call it.

THE COURT: Okay. Anything about that experience that would cause you to question your ability to be a good juror here?

JUROR NO. 2: No.

THE COURT: "Fair and impartial." I should be more precise.

JUROR NO. 2: No.

THE COURT: All right. No. 3, I suspect you've been in court before.

JUROR NO. 3: Well, did you just want my jury service?

THE COURT: Yes.

JUROR NO. 3: I was on a criminal case, a home-invasion robbery, co-defendants -- two co-defendants. We reached a verdict on one, and we did not reach a verdict on the other.

THE COURT: All right. How long ago?

JUROR NO. 3: About 15 years.

THE COURT: Okay. Thank you.

Number 6?

JUROR NO. 6: It was a drunk driving case, and it was about five years ago.

THE COURT: Were you able to reach a verdict?

JUROR NO. 6: Yes, we did.

THE COURT: All right. Number 18?

JUROR NO. 18: I was on an armed robbery. We found a verdict. And I was an alternate on a child molestation, and a verdict was found in that one also.

THE COURT: State superior court?

JUROR NO. 18: Yes.

THE COURT: Here in the state of Washington?

JUROR NO. 18: Yes.

THE COURT: Number 24?

JUROR NO. 24: It was a civil case. It was an insurance company and a plaintiff, and we did reach a verdict.

THE COURT: How long ago?

JUROR NO. 24: About five or six years ago.

THE COURT: Okay. Number 32?

JUROR NO. 32: It was a DUI case, around eight years ago in the city of Lynnwood, and the case was dismissed.

THE COURT: All right. Thank you, sir.

Thirty-three?

JUROR NO. 33: Well, it was almost 40 years ago. It was here in Seattle, and it had to do with a car accident.

THE COURT: Do you remember what court it was?

JUROR NO. 33: No.

THE COURT: Superior court or municipal court?

JUROR NO. 33: Superior court, I believe.

THE COURT: Okay. Thank you.

Thirty-eight?

JUROR NO. 38: It was about four years ago. It was a rape case, and we did reach a verdict.

THE COURT: And in what court was that in, ma'am?

JUROR NO. 38: Criminal.

THE COURT: King County Superior Court?

JUROR NO. 38: Yes.

THE COURT: Thank you.

Number 40?

JUROR NO. 40: It was about three years ago. It was a domestic violence case here in Seattle, and we reached a verdict.

THE COURT: Thank you, sir.

The next question had to do with law enforcement.

Number 3, you probably know someone?

JUROR NO. 3: Yes. I don't have any relatives in law enforcement, but I know hundreds of officers in different agencies, federal and state.

THE COURT: All right.

Number 9?

JUROR NO. 9: I don't have any family members, but I am a law and justice student, so I have a lot of friends who are in the field.

THE COURT: You're in law school now?

JUROR NO. 9: Yes.

THE COURT: Okay. Where?

JUROR NO. 9: I just finished my BA at Seattle U.

THE COURT: Okay.

Number 7, we skipped over you.

JUROR NO. 7: Yes, Your Honor. I've had friends from high school that became officers. I've dated a girl whose father was a Seattle police officer, and currently my job, I have contact with Sno County officers pretty much every day.

THE COURT: So when you were dating the girl whose father is a police officer, how did that go?

JUROR NO. 7: He liked me a lot, but our relationship didn't work out. But I stayed close to her family for a while.

THE COURT: Thank you, sir.

Twenty-three?

JUROR NO. 23: So my grandfather who raised me from the time I was born until he died was the chief of police for the City of Cheyenne in Wyoming, the undersheriff and the

U.S. marshal for the state.

After law school, I started my application in security clearance with FBI but didn't finish it, and then as an assistant attorney general in Vancouver, I had direct contact with Washington Highway Patrol, Clark County Sheriffs, and Skamania County Sheriffs.

THE COURT: So let me ask you this: If you have all that background, grandfather and all that, do you think you can be fair and impartial in this trial?

JUROR NO. 23: Yes, Judge.

THE COURT: All right. My wife tells me it's bad to reason by sports analogies, but are we on a level playing field?

JUROR NO. 23: I don't think I understand the question, Your Honor.

THE COURT: All right. So the question is, does one side start with an advantage over the other side, or are they both equal?

JUROR NO. 23: For criminal cases, I believe the defense starts with a higher plane.

THE COURT: When you say "higher plane," what exactly do you mean?

JUROR NO. 23: The plaintiff has the burden. I level it out in my mind to have the plaintiff reach up to that to start with, and then go from there.

THE COURT: Thank you. Thoughtful answers.

Thirty-five?

JUROR NO. 35: I have multiple friends in various agencies: Sheriff, Seattle Police, Whatcom County, Bellingham, and friends in the FBI.

THE COURT: So I'm going to ask you the same question. Most of my friend are lawyers, so I've never been able to be fair to lawyers. That's why I have this job.

Does one side or the other start off with any advantage, in your mind?

JUROR NO. 35: No. I believe it starts off equal and is based on facts.

THE COURT: All right. Thank you, sir.

Thirty-nine?

JUROR NO. 39: My father was a chief of police and my sister was a dispatcher in Pierce County.

THE COURT: Did you talk to your dad about it?

JUROR NO. 39: Not anymore, but, yeah, we did.

THE COURT: Kind of sitting around the dinner table?

JUROR NO. 39: It was a small town. We had -- our dinner table was pretty much where the county officers wrote reports, and it was tight.

THE COURT: So same question, sir. I'm going to ask you to be fair and impartial. It's important that we give both sides an equal chance here.

How are you going to feel about this?

JUROR NO. 39: I believe I can fulfill my duty.

THE COURT: All right. Thank you, sir.

Court cases? Number 3?

JUROR NO. 3: I don't remember the specific question, Judge.

THE COURT: Well, the question had to do with prior experience with court cases, but is that in your role as a prosecutor?

JUROR NO. 3: In my job and being a juror.

THE COURT: All right.

Number 7?

JUROR NO. 7: Well, 35 years ago, I was a defendant on a DUI, but that was taken care of. And since then, I've testified in open court maybe a handful of times on either theft cases or drug-possession cases stemming from theft cases.

THE COURT: Since I know because I read your juror questionnaire, why don't you explain to everyone else that you're not just casually there, that you actually have some connection.

JUROR NO. 7: Yes. I mostly worked undercover loss prevention since the mid '80s, and I've worked for several companies. So usually I'm just detecting shoplifters, and then dealing with that, and also fraud cases and

investigation cases.

THE COURT: All right.

Number 9?

JUROR NO. 9: Was that the question about anyone participating in a case?

THE COURT: Number 9 had to do with court proceedings, specifically have you ever been -- you or your relatives -- charged with or investigated for a criminal offense.

JUROR NO. 9: Yes. My -- my mom was a witness to my uncles -- and I was there as well. It was several years ago. They were charged on the criminal level, both, but different occasions.

THE COURT: And she testified in the trial?

JUROR NO. 9: Yes, she testified in the trial.

THE COURT: All right. So we have a plaintiff, we have a defendant here. My job is to ensure that they get a fair trial. If I'm looking at you as a juror, I'm thinking, "Is she fair?" Tell me how you'll be fair.

JUROR NO. 9: Since I've been on both sides and a paralegal for six years and did defense and prosecution, I'm completely leveled. And I've seen both situations and both sides, and it's just all equal. It starts equal until evidence is presented and proven otherwise.

THE COURT: Where were you a legal assistant?

JUROR NO. 9: I started off at the Attorney General when I graduated with my associate's, and then continued on into private practice for personal injury, criminal, and family, and then moved on from there, and the last was GEICO staff counsel. I was there for about two years, for personal injury, but it involved also losses. So we dealt with that. But none of our cases made it to trial, and the ones -- the binders that we did prepare two days before the trial, they were just done and dismissed.

THE COURT: Okay.

Number 13?

JUROR NO. 13: I was a defendant in a case about -- I think it was in 2007.

THE COURT: What kind of case, sir?

JUROR NO. 13: I was in a shopping mall, and it was at the food court, and the food court had run out of chairs. So I sat on the floor at this food court. I was told by security to not be on the floor. I refused to get up, and I was arrested for trespassing.

THE COURT: All right. So you've had some encounters with -- I'm not sure trespassing is civil or criminal, probably civil. How did you feel about it at the time, besides pissed off?

JUROR NO. 13: I was with a group of 40, and everyone thought it was ridiculous. They were new to the job, and I

think I was the first stake.

THE COURT: So most of us would have some carryover from that. How do you feel about being a juror here?

JUROR NO. 13: I'd like to say that I have an open mind.

THE COURT: One of the things that you'll find out is that I always have to follow up when people say "I think," or words to that effect, because I need more than "I think." I need someone to say "yes" or "no," which is the only way that's really fair to these folks.

Do you think you're going to approach this case with an open mind, or is your prior experience going to influence you in some manner?

JUROR NO. 13: I think I can.

THE COURT: So we're still thinking about it, or do you know?

JUROR NO. 13: I can't say that I know.

THE COURT: All right. Thank you, sir.

Reasons not to serve. Now, I'm going to really -- after that snowstorm last week, anyone who says they're going to Hawaii is going to have to stay here. Probably the same is true for Mexico.

Juror No. 8?

JUROR NO. 8: Good morning. My circumstances are that I have a beautiful baby girl. She's seven weeks old. I

took about two weeks off in January for my job. I used my PTO time, and I'm just leaving it out there that, at this point, it's a little difficult for them to find coverage. And my wife is having a little bit of difficulty. I have a colicky baby. But it's a lot. That's my circumstance.

THE COURT: Do you think that during the course of this trial -- it's a pretty short trial -- you're going to have your mind somewhere else?

JUROR NO. 8: It's possible, both the job and the baby girl, but if I am selected, then, if need be, I will switch that, and, you know.

THE COURT: What do you do for employment?

JUROR NO. 8: I work at a physical therapy office.

THE COURT: Bless you. I go to physical therapy for my back, and I have an unqualified admiration for the person that puts up with me every week.

JUROR NO. 8: It's practice and patience.

THE COURT: How will they cover for you if you're here on jury duty?

JUROR NO. 8: They'll probably have to reduce the amount of patients coming to the office. There's four or five therapists, so they'll probably have to tailor the schedule so there's not patients every half an hour. That's probably what they'll have to do.

THE COURT: So this isn't an improved question, but

do you want to be here? Would you enjoy the experience?

JUROR NO. 8: You know, that's the funny part of me. Part of me is excited because I've never been picked before, and this would be an opportunity for something I've never experienced; however, the timing is challenging.

THE COURT: All right. Thank you, sir.

JUROR NO. 8: You're welcome.

THE COURT: Juror No. 9?

JUROR NO. 9: Even though I want to join, and this is an interesting experience, but I'm a single mom with a two-year-old at home, and my mom had a heart attack in the summer, and she's the one who usually takes care when I'm in school. But right now she is unable to. Today she is with my son. But, yeah.

THE COURT: So I'm going to ask you the same question I asked your colleague there. We need your full attention when you're here. We can't have you worried about your homework and your daughter and whatever. Are we able to get your full attention?

JUROR NO. 9: No, because I will be worried about my mom. She is recovering from a heart attack, and I'll be constantly wondering if she's okay.

THE COURT: Thank you.

No. 15, good morning, sir.

JUROR NO. 15: Good morning, Your Honor. There's two

items I'd like to bring up that are separate.

The first one is that my wife has metastatic breast cancer, Stage IV, and I'm her primary caregiver. She's home alone now. I have a neighbor who can look in on her today. I have two daughters who I've asked to get off work, but I haven't heard from them. That's the primary reason that I'd like to be excused from this.

But there is a secondary reason that you, actually, touched on. We've been planning a family vacation to Hawaii. It's next week, from the 5th to the 10th, and I don't know that my mind would be focused exclusively on this case.

We have two doctor appointments this week that my wife has to make, and I don't know that I can give this the due diligence it deserves.

THE COURT: All right. Thank you, sir. I appreciate it.

Where are you going in Hawaii?

JUROR NO. 15: Kauai.

THE COURT: It rains there.

JUROR NO. 15: Yes, but rain isn't bad. I've spent time in sunny climates, and rain is fine.

THE COURT: Okay. Thank you.

Number 17?

JUROR NO. 17: Good morning. I'm a superintendent for a construction company, and this week I have a lot of

things happening, which makes me, basically, a glorified babysitter for all of the subs that are doing work on the project, and I need to be there on a day-to-day basis to make sure everything goes right; otherwise, it's, basically, not good. That's my excuse.

THE COURT: What kind of construction?

JUROR NO. 17: An addition and remodel for a house in Ballard.

THE COURT: You've heard me ask this question of other people. One thing you need to bring, in addition to an open mind, is your full attention. Are you going to be able to pay attention, or are you going to be thinking about work?

JUROR NO. 17: Most likely, knowing me, I would be focused on what's happening in my job. But if I'm selected, I can probably put that out of my mind. I just would rather -- if it was next week, I know that I would be much better off.

THE COURT: Thank you, sir.

Thirty-four, good morning.

JUROR NO. 34: Good morning. I'm a manager for an office, and we're pretty close to laying off eight people, is the first reason.

The second reason: My daughter made it to state basketball finals, which their game is Wednesday at 10:30 in the morning, so I'd like to be there.

THE COURT: How many of you think we should keep him? What team does she play for?

JUROR NO. 34: Edmonds-Woodway.

THE COURT: I was born and raised in Richmond Beach. Is the Edmonds Bakery still open?

JUROR NO. 34: The last time I was there, yes.

THE COURT: I was there in the 1950s, so it's been around a long time.

Thank you, sir.

Number 35?

JUROR NO. 35: I broke my back about seven years ago, and I don't call it a hardship, but I have some nerve damage, or bathroom issues.

THE COURT: So our schedule is going to be that we start at 9:00. We take a break at 10:30. We come back at 10:45. We take a break at noon. You get an hour and a half off for lunch. We start at 1:30; go to 2:45; take a 15-minute break; have a hard stop at 4:30. How are you going to fare under that schedule?

JUROR NO. 35: With the breaks, pretty good.

THE COURT: I know how it is to sit with a bad back.

JUROR NO. 35: It is a lower-back break. I'm blessed for what I've recovered.

THE COURT: Tell me how you feel about serving as a juror.

JUROR NO. 35: I can do 100 percent. I'll do it.

THE COURT: All right. Thank you, sir.

Forty-one?

JUROR NO. 41: Good morning, Judge. I own a cafe, me and my wife operating it, but we're having a hard time this month because of the snow. And another reason: We cannot find the labor to substitute me, because I'm a cook and chief cashier and operator. But the third reason is, we have a cafe Downtown. They require us to keep it open to the community, the building.

THE COURT: So who do you usually use as your temporary help?

JUROR NO. 41: We don't. We keep open, or, like today, we closed it.

THE COURT: Okay. That's known to me as economic hardship, so that's what I'm going to write down, sir.

Juror No. 3, I'm going to skip you for criminal offenses, and go to No. 4. Sir, what can you tell us, the question about criminals and their crimes?

JUROR NO. 4: I've had a son that was in municipal court.

THE COURT: For what, sir?

JUROR NO. 4: Drug possession; selling.

THE COURT: Okay. That's not an issue here. So how do you feel about being fair here?

JUROR NO. 4: I am anti Second Amendment, and guns are the issue.

THE COURT: Well, you hadn't said yes on that one, so we'll deal with both of them at the same time.

I'm going to give you the law. I'm going to tell you what the Arms Export Act is about. The government is going to present its case. The defendant is going to present his case. I need you to start on that level playing field and not favor one or the other. Do you think that's something you'll be able to do?

JUROR NO. 4: Yes.

THE COURT: All right. Thank you, sir.

Juror No. 10, what would you like to tell us?

JUROR NO. 10: I'm with him. I'm not a big fan of guns. Sometimes the gun laws confuse me. I'm not opposed to certain people, I guess, having guns, but others, I think -- I don't know. But, once again, I could try to be -- not "try" -- I would be attentive.

THE COURT: Okay. You heard the question I asked that gentleman. Are you going to end up being fair?

JUROR NO. 10: Uh-huh.

THE COURT: Fair and impartial?

JUROR NO. 10: (Nods.)

THE COURT: I skipped No. 9 on criminal offenses. I think you raised your hand, correct?

JUROR NO. 9: Criminal offenses for my family members, was that the question?

THE COURT: Yes.

JUROR NO. 9: Yes, for my uncles.

THE COURT: We covered that one?

JUROR NO. 9: Correct.

THE COURT: All right.

Juror No. 37, views on firearms?

JUROR NO. 37: So I own guns, family members own guns, shotgun varieties, and I think that the court and the attorneys and the defendants involved should know that, for the middle count involving suppressors, I hold personal views that, frankly, it shouldn't be law, so I may be sympathetic towards the defendant.

THE COURT: All right. No, you don't get to sit down yet. I have to ask you about that.

You say you'd be sympathetic towards the defendant. Is that something you can overcome, or that's just your view of how it ought to be?

JUROR NO. 37: Well, watching that video about unconscious bias, it's one of those things where I think it needs to be brought to light for all parties involved.

THE COURT: All right.

So what did you think of the judge in that video? Did he look like Moses up on the rock?

JUROR NO. 37: A little bit.

THE COURT: Thank you, sir.

The judge that's in that video is Judge Coughenour, who is too cheap to buy coffee, so he comes into my chambers every morning at 6:00 a.m. and talks for about an hour and 15 minutes. He takes a fair amount of kidding over the fact that -- I think he shaved that day and practiced holding his jaw out. We get a lot of comments.

That video was done by this district, and it's now in use in 36 or 37 different states. So we're very proud of that.

The next question had to do with special experience with firearms.

Juror No. 9?

JUROR NO. 9: I have a permit and I also have a gun, and so I do go out shooting to the range and handle multiple guns.

THE COURT: Okay.

Number 13?

JUROR NO. 13: I have friends that own guns, and I'm aware what the purpose and use of a suppressor is, and I wasn't quite sure what you meant by "specialized knowledge."

THE COURT: Well, there are people who have never seen a gun, and there are people who have collections of them in a gun safe. I'm just trying to find out where on that spectrum people are.

JUROR NO. 13: I've also been to the range myself.

THE COURT: Anything about those experiences that's going to impact you as a juror here?

JUROR NO. 13: No.

THE COURT: All right.

Number 14?

JUROR NO. 14: I spent three years in the Army infantry, and then three years in the National Guard, so I have a broad experience on the weapons platform.

THE COURT: How might that impact you here as a juror?

JUROR NO. 14: I don't think I have any bias. I just have a lot of experience using firearms. I don't have any strong opinions on them.

THE COURT: Did you qualify for your marksmanship badge?

JUROR NO. 14: Yes, Your Honor.

THE COURT: Good. Congratulations.

Number 20?

JUROR NO. 20: I grew up in Wisconsin, so we had guns growing up, .22s; hunted with my father; owned guns, shotguns and rifles for hunting. So pretty extensive hunting experience.

And after being in Seattle, it's not really something I do anymore, but I still own firearms that I received after he

had died, that I inherited. So I have knowledge of hunting rifles and shotguns.

THE COURT: Anything about those experiences that would cause you to have views about what the outcome of this trial should be?

JUROR NO. 20: No.

THE COURT: All right.

Number 37?

JUROR NO. 37: I don't think I have anything else to add to my previous answer, Your Honor.

THE COURT: Thank you, sir. I appreciate your candor.

Any last-minute recollections of why people couldn't serve or whatever?

Number 11?

JUROR NO. 11: Yes, I was thinking immediate family, I have a cousin who is a judge in Snohomish County.

THE COURT: You should talk to No. 3.

JUROR NO. 11: Yeah, you might know her. Larson.

THE COURT: All right. Number 13.

JUROR NO. 13: I don't have anything else to add.

THE COURT: All right.

MR. BROWNE: Your Honor, I believe one of the jurors in the back was raising his card.

JUROR NO. 39: Actually, I do have something to say

about guns.

I've been shot at. I didn't do anything wrong, but I had the police point guns at me in a different case, and I have fired weapons and I do have weapons. But I don't believe that any of that -- again, I believe I can fulfill my duty.

THE COURT: All right. Thank you.

MR. DIGGS: Sorry. Can we get the number on that?

THE COURT: Thirty-nine.

Ladies and gentlemen, I'm going to do this. We normally would be taking a break right now, but instead I'm going to try and keep you here. But this is always a delicate question to ask.

If there was someone, for example, hypothetically, who needed to use the restroom, hypothetically, if they raised their number, it means I'd give you a five-minute break to attend to those things. I see at least one.

Ladies and gentlemen, why don't we take ten minutes? It's 10:40 right now.

These are very talented lawyers, as you'll find out because they're going to ask you questions next, but they don't know your names yet, and it's very important that we keep you in order.

You have to remember what number you are. Put your number down on the bench where you are sitting, and you'll know where to go back to. Other than that, we'll be in recess for

ten minutes.

MR. BROWNE: Your Honor, I have a question.

(The following was held at sidebar:)

MR. BROWNE: The people who have indicated they don't want to be here, are you going to release them before we do the questioning?

THE COURT: No, after.

MR. BROWNE: That's it.

THE COURT: There are several that I'm hoping you're going to get further answers. All I put down is a question mark, and there's a handful where they're out because of what they said. If they don't want to be here, we don't want them here.

MR. BROWNE: Exactly.

THE COURT: For example, the gentleman who's taking care of his wife with Stage IV cancer.

If we start up again at 10:50, I'd like to release the jury panel before lunch. So we'll probably get about 20 minutes or so. I'll give you as much time as I can. That way we can get done with peremptories, and we'll know who the jury is.

MR. DIGGS: Thank you.

MR. BROWNE: Thank you.

(End of sidebar.)

(Court in recess 10:41 to 10:56 a.m.)

THE COURT: Mr. Diggs, who is going to be doing voir dire?

MR. DIGGS: I will, Your Honor.

THE COURT: All right. You have 20 minutes.

MR. DIGGS: Good morning. I'm Matt Diggs, one of the prosecutors in the case. I'm going to be following up on some of Judge Robart's questions and picking on some of you who didn't raise their numbers, and I apologize, but I'm just getting to know you a little bit.

Juror No. 2, you had prior jury service. Did you find that experience something that was worthwhile?

JUROR NO. 2: Yeah. It would have been nicer if we got to deliberate and decide the verdict, but, yeah.

MR. DIGGS: What part did you stop deliberating? Did you get to deliberate at all?

JUROR NO. 2: We didn't get to deliberate at all.

MR. DIGGS: Juror No. 6, when you were a juror, did you find that to be a worthwhile experience?

JUROR NO. 6: It was a good experience, yes.

MR. DIGGS: Did you have any take-aways, feelings about working with your fellow jurors?

JUROR NO. 6: No. They were great.

MR. DIGGS: Did any of you have a difference in opinion in getting to an agreement?

JUROR NO. 6: We were all pretty much in agreement.

MR. DIGGS: Juror No. 5, a couple of questions for you. In your questionnaire, I saw your father was in the Army; is that correct?

JUROR NO. 5: Correct.

MR. DIGGS: Did he ever talk to you about his military service, guns, firearms, anything having to do with that?

JUROR NO. 5: He very, very rarely spoke about his service. He was in Vietnam for eight years, and we were forbidden to have guns or any type of weapon, knives, pocketknives.

MR. DIGGS: What do you like to do in your free time?

JUROR NO. 5: Snowboard and play video games with my kids a little bit.

MR. DIGGS: Juror 7, so you're in court often as a loss prevention manager?

JUROR NO. 7: I wouldn't say often. I've been subpoenaed a few times and have gone to court, but I've only had to testify a handful of times out of subpoenas that I received.

MR. DIGGS: Could you just tell me a little bit more about your job?

JUROR NO. 7: I work for Home Depot. It's called asset protection. We work undercover four days a week, looking for people stealing. And we work with employees in

the stores, educating them on how to be customer service people and prevent losses. We work with cashiers and go to staff meetings and do what we can to protect the assets of Home Depot.

MR. DIGGS: And in that job, you have interaction with law enforcement?

JUROR NO. 7: In our location, before I was there, we had onsite deputies six days a week because of the level of activity at Highway 99 and Airport Road. So they're not there all the time, but -- so we work with them quite a bit, but not always.

MR. DIGGS: Have those interactions been positive, negative?

JUROR NO. 7: Sure. I've worked on and off with law enforcement since the '80s, so I've had a lot of contact with police officers.

MR. DIGGS: Is there anything about that experience working with police officers that would make you more likely to believe a law enforcement officer, or less likely?

JUROR NO. 7: No. I take each officer individually.

MR. DIGGS: Thank you, sir.

Juror No. 10, you're not a fan of guns. Can you trace that from experience, or is that just a belief you have?

JUROR NO. 10: It's my belief. My father and uncles are from the Midwest, so I was not -- I was brought up around

guns. But my personal -- guns, I'd be afraid to use a gun. They make me nervous.

MR. DIGGS: Can you tell us a little bit about what you like to do in your free time?

JUROR NO. 10: I like to boat. We snowmobile as a family. We have a place in Eastern Washington; outdoorsy, nature.

MR. DIGGS: Thank you, ma'am.

Juror No. 11, your cousin is a Snohomish County judge?

JUROR NO. 11: Yeah.

MR. DIGGS: Do you talk to her regularly about her work?

JUROR NO. 11: No. I see her every couple of years, not a lot.

MR. DIGGS: What about you? What do you like to do in your free time?

JUROR NO. 11: I spend a lot of time taking care of my parents. They're getting older. I travel. I go to movies. I saw two movies this weekend because I was trying to see the Oscar-nominated movies. I forget what they were. I have seen all the Oscar movies.

MR. DIGGS: I saw almost none of them, the effect of having young children.

Juror No. 12, I didn't see you raise your number very often. What do you like to do in your free time?

JUROR NO. 12: Play golf and play poker.

MR. DIGGS: Do you have any strong feelings one way or another about firearms?

JUROR NO. 12: No.

MR. DIGGS: Okay. And, No. 12, where are you employed?

JUROR NO. 12: Uwajimaya.

MR. DIGGS: Juror No. 16, tell us a little bit about what you like to do in your free time, if you would.

JUROR NO. 16: I have a nine-month-old, so I don't have any free time. That's about it. When I didn't have him, golf -- golf and work, basically.

MR. DIGGS: What do you do for work?

JUROR NO. 16: I work at Costco.

MR. DIGGS: What kind of work do you do?

JUROR NO. 16: Buyer of sporting goods.

MR. BROWNE: Was that 15?

MR. DIGGS: Sixteen.

MR. BROWNE: Thank you.

MR. DIGGS: Number 17, can you tell us what you do in your free time?

JUROR NO. 17: I'm a music composer.

MR. DIGGS: What type of music?

JUROR NO. 17: Any type, all kinds. I tend to write for the piano.

MR. DIGGS: Does anyone feel they didn't rise to the strong feelings that have been discussed here, whether it's firearms or law enforcement, that make you concerned about being a juror in this case?

UNIDENTIFIED JUROR: No.

MR. DIGGS: Would you like to serve?

UNIDENTIFIED JUROR: I would be hoping to serve as a juror on this case.

MR. DIGGS: Juror No. 18, you served twice as a juror?

JUROR NO. 18: Correct, yes.

MR. DIGGS: How did you find those experiences?

JUROR NO. 18: I found justice is very slow. I thought the experience was really good. In each case, you know, we treated them -- one was child molestation, and you take that very seriously, because if it's a false charge, it brands somebody for life. And it's the other way, heinous, so the merits of the case and the evidence, that's what we did.

MR. DIGGS: Did you have any negative feelings about the experience of working with your fellow jurors?

JUROR NO. 18: No.

MR. DIGGS: Number 19, you mentioned you're a super for a construction company, and that may cause you some issues while you're here, that you might be thinking about

that.

Are there specific things that come up on a daily basis that you can tell us about that you need to be at the ready to answer?

JUROR NO. 19: Sure. So just this week, for example, I had two inspections before I can cover the walls with sheetrock. I have sheetrock being delivered to the house. There's a lot of logistics that I feel I need to be there for, because if things go wrong, things can really go wrong. And that's what I was hired for, to be a problem-solver and to make sure things stay on the job. The house gets locked up at night.

MR. DIGGS: Would it be practical for you to deal with those issues on breaks?

JUROR NO. 19: I could. It's not like I'm all alone in the company. But it's just my sense of responsibility, I'd feel like I'm the one that needs to be there, I'm responsible for the contract, that kind of thing.

MR. DIGGS: Juror 20, you referenced that you own some guns and received some from your relatives. Tell the jurors, do you have any strong feelings one way or the other about the Second Amendment and an individual's right to bear arms?

JUROR NO. 20: Not really. I grew up in Wisconsin, hunted with my dad. Once I went to college, I went to New

York and L.A., and it hadn't been a part of my life. The guns I have, I don't even have ammo in the house. It's more sentimental because it's important to our experience together.

MR. DIGGS: What do you do in your free time?

JUROR NO. 20: I have two fairly, you know -- kids, seven and eleven, so not to the extreme time taken that the younger age does, but playing cards with them, games, being outside. One plays soccer, so playing soccer with him, and the other plays ball, so sports related.

MR. DIGGS: Juror No. 12?

JUROR NO. 12: I have a wife and three daughters, so I spend a lot of time with them, and free time riding motorcycles and travel. And I just recently started at a new company, so I'm trying to help develop an area that they haven't done yet, of course.

MR. DIGGS: What company is that?

JUROR NO. 12: Performance Contracting up in Bellingham. I'm trying to get them into commercial and industrial painting.

MR. DIGGS: Juror No. 22, can you tell us about your free time?

JUROR NO. 22: I like to collect diecast cars, read, snowboarding, home renovation.

MR. DIGGS: Did you say diecast cars?

JUROR NO. 22: Yes. Little cars.

MR. DIGGS: Do you make them?

JUROR NO. 22: No, I just collect them.

MR. DIGGS: Juror 24, you have been on a jury before, and were able to reach a verdict? How did you find that experience?

JUROR NO. 24: I thought it was very interesting. I liked it.

MR. DIGGS: Any challenges that you remember in working with your fellow jurors?

JUROR NO. 24: No. There was one juror -- we all sort of felt the same way. There was one juror who didn't agree, but we talked and talked and talked, and then we came to a conclusion.

MR. DIGGS: Did you find that frustrating, looking back on it?

JUROR NO. 24: No, no. It was interesting in hearing his point of view.

MR. DIGGS: Could you tell me anything about your free time and what you like to do?

JUROR NO. 24: I recently started doing yoga. I have lots of pets. I read and crochet; write.

MR. DIGGS: Juror 25, what do you do in your free time?

JUROR NO. 25: I like to ride bike, swim, go to the

gym, do a little bit of cooking for fun.

MR. DIGGS: What do you do for employment?

JUROR NO. 25: Software engineer.

MR. DIGGS: Juror 26, you have a second granddaughter coming?

JUROR NO. 26: Possibly in not even two weeks.

MR. DIGGS: Are you confident you'll make it through the trial?

JUROR NO. 26: Yeah. I talked to her. She had an ultrasound today.

MR. DIGGS: And you help care for the one granddaughter that's there?

JUROR NO. 26: She's going to be 16 months on the 6th of March, so really close.

MR. DIGGS: Other than you caring for your one, and soon to be second, granddaughter, do you have any hobbies or things you can share?

JUROR NO. 26: Friends have a 36-foot Catalina sailboat, and we go out quite often. I like to sew and read and, recently, the Seattle rugby team.

MR. DIGGS: Juror No. 27, you didn't raise your card for any of the questions. Can you give us a little sense?

JUROR NO. 27: Me and my partner just bought a house, so we're trying to get that running and trying to get the courage to do DYI projects. We like to travel a lot, and

we're training for the half marathon coming up.

MR. DIGGS: Juror 28 at the end, what do you like to do on weekends?

JUROR NO. 28: I enjoy keeping my two-year-old busy and doing my nails, watching TV.

MR. DIGGS: Twenty-nine, tell us about your free time.

JUROR NO. 29: Bike ride, outdoor stuff, golf.

THE COURT: You have two minutes left, counsel.

MR. DIGGS: Thank you, Your Honor.

Juror No. 30, can you tell us about what you like to do in your free time?

JUROR NO. 30: I like to walk and hike, and I also do yoga every day.

MR. DIGGS: Thirty-one?

JUROR NO. 31: I sew, I do genealogy, I read, and I help with our eight grandchildren.

MR. DIGGS: Are they all local?

JUROR NO. 31: Yes.

MR. DIGGS: So you're busy?

JUROR NO. 31: Yes.

MR. DIGGS: Thirty-two, you were a juror previously?

JUROR NO. 32: Yes.

MR. DIGGS: Anything about that experience that makes you want to be a juror on this case or doesn't want to make

you be a juror?

JUROR NO. 32: I have no problem. I did my time on a jury. I felt it was not as glamorous as on TV. I thought it was a very good experience.

MR. DIGGS: Okay. Thank you.

Just a moment, Your Honor.

Number 36, sir, can you tell us a little bit about what you like to do in your free time?

JUROR NO. 36: I play golf and I have kids and I go to the gym.

MR. DIGGS: Two kids, ten and twelve, and go to the gym?

JUROR NO. 36: Yes.

MR. DIGGS: That's all the questions I have, Your Honor. Thank you. Thank you, ladies and gentlemen.

THE COURT: Mr. Browne?

MR. BROWNE: Thank you, Your Honor.

Good morning, everyone.

I don't know how long ago some of you sat on juries, but the method we use now of picking the jury actually used to be called the Donahue method, but since nobody remembers Phil Donahue, it's called the Oprah method, and it's called the Donahue method because of Judge Donohue in Spokane. He dropped this process.

The reason why this works is, in the past, we'd start with

Juror No. 1, and then I'd ask you a bunch questions; I'd go to No. 2 and as you a bunch of questions; then I'd go to three and ask them a bunch of questions; and by the time I got to No. 4, you'd know how to get out of the case.

The only reason this system really works, really -- and I can't stress this enough -- is you all need to participate. Okay?

Let's, for instance, say that Juror No. 5 -- just a hypothetical -- says, "Well, I don't believe in the presumption of innocence." Well, I would expect some of you to say, "Wait a minute," and then raise your card, and we'd start a dialogue.

So it really is important that every question I ask and every answer given, if you believe you need to say some more or something that's important to you, then you need to volunteer; otherwise, the system doesn't work.

So can I see the hands of the people who have sat on a criminal jury before?

Okay. Let's try No. 18, sir.

By the way, I apologize for using numbers rather than names, but it's for the court reporter, and that's why.

Juror No. 18, are you retired now?

JUROR NO. 18: Yes.

MR. BROWNE: Okay. That's why I had the blank.

Did you find that being on the jury required an effort to

apply proof beyond a reasonable doubt and the presumption of innocence?

JUROR NO. 18: Effort? I think I went in -- no, I don't "think." I know I went in with -- I took it very serious, and I think in a criminal case you're really affecting someone's life positively or negatively, and I think you have to make certain that you're listening to the evidence and then coming up with a conclusion that the evidence shows. I make every attempt to have no obvious biases, and just listened to what was said.

The two cases that I was involved in, the evidence was really clear, and we had no difficulty in coming up with a verdict. That may not always be the case, but that's my experience.

MR. BROWNE: It sounds to me like you said, yes, it does require an effort.

JUROR NO. 18: Yes, it does.

MR. BROWNE: Thank you, sir, very much.

And other people who have sat on a criminal case? Juror No. 2, it was a criminal case?

JUROR NO. 2: It was a domestic violence case, yes.

MR. BROWNE: Yes. I didn't take detailed notes, but did you think it required an effort to apply a presumption of innocence and proof beyond a reasonable doubt?

JUROR NO. 2: I mean, we didn't reach the end, so we

didn't get to see all the evidence that was presented.

But you're presumed -- he was innocent until the State had proven their case. They're the ones that have the burden of proof on that.

MR. BROWNE: Did you have a verdict in that case?

JUROR NO. 2: No. We didn't get to deliberate.

MR. BROWNE: Oh, I see.

Since I know Juror No. 3 fairly well, I'll avoid asking her questions because I know what her answers will be, and it would be the right answer.

Juror No. 4?

JUROR NO. 4: It was not a criminal. It was a DUI.

MR. BROWNE: Okay. That was criminal.

JUROR NO. 4: He was found guilty. It was 40 years ago that I recall this, yeah.

MR. BROWNE: Okay. Well, what I'm trying to get at here, some of you, and you may want to raise your cards, but someone, and I think nobody here but back there, the judge went through the questioning, which is one that I do also, and somebody who said, "Well, I think I can be fair," and I think a number of you said that, so if you can remember who you are, I'm addressing this to you.

Let's say I was married -- which I'm not -- but let's say I was married, and I went to my wife and I said, "Do you love me," and she said, "I think I do," I might have some

questions. Okay?

So for those of you who said "I think I can be fair," can I see you admit that by raising your card? Nobody is going to admit that?

The last question I'm going to ask you in my brief time here is, is there anything we need to know about you that would affect your ability to be fair and impartial?

Some of the jurors -- and I'll ask one of you back there to volunteer -- said that an even playing field -- I think a number of you said that -- but does everybody understand that under the law, for instance -- I know this sounds really trite -- sorry -- but if you had to vote right now, you'd have to vote not guilty, right? I see nodding heads. Does everybody understand that? Because the burden of proof is on the government, and there is a presumption of innocence, correct?

Juror No. 11, I see you nodding your head.

JUROR NO. 11: Yes.

MR. BROWNE: So you would agree with that proposition?

JUROR NO. 11: I don't know anything about the case, so I assume the person is innocent.

MR. BROWNE: Have you been a juror before?

JUROR NO. 11: No. I've been through jury selection, but I was way back in the room.

MR. BROWNE: So you didn't get that far?
JUROR NO. 11: No.
MR. BROWNE: Juror No. 10, you're an attorney? Not yet?
JUROR NO. 9: That's me. I'm in school.
MR. BROWNE: I believe your number is?
JUROR NO. 9: I'm in law school.
MR. BROWNE: What school?
JUROR NO. 9: Seattle U Law School.
MR. BROWNE: What year?
JUROR NO. 9: First year.
MR. BROWNE: Have you started yet?
JUROR NO. 9: I've taken only one class since my mom had a heart attack, so I had to put it on hold, but, yes.
MR. BROWNE: Do you have any area of the law that you're interested in?
JUROR NO. 9: Well, I did mainly criminal defense and plaintiff defense and prosecution, and -- but I want to do corporate litigation.
MR. BROWNE: What was that last part?
JUROR NO. 9: Corporate litigation.
MR. BROWNE: Oh. You want to be a litigator?
JUROR NO. 9: Yes.
MR. BROWNE: You might find this interesting, I hope.
So the reason I mentioned that about -- the last question

I'm going to ask is, is there anything we need to know about you? Let me give you an example: In Snohomish County, a few years ago, I asked that question, and there was -- and the last question that I asked -- which was the last question I'm going to ask you -- is there any reason why you don't think you can be fair, and this 30-year-old young man raised his hand and said, "Yes, I don't believe in the presumption of innocence."

Now, if he hadn't done that, we wouldn't have known, and I would assume you'd all agree that that's important to know. Correct?

Also, I know some of you had issues with the Second Amendment, and some people have very strong issues about the Second Amendment one way or the other, so I would assume that if anybody had really strong issues, basically what we would call an "antigun person," we need to know that. So let me ask that.

Does anybody have opinions that strong?

Juror No. 4, thank you for being honest. That's what we need to know.

Anyone else? Okay.

To illustrate how humble I can be at times, one person once raised their hand at the end when I asked if anyone had anything to tell me, and he said, "Yeah. I don't like you very much." That was pretty important to know also. I

certainly hope that's not the case here, but if that was the case, I'd like to hear about it.

Has anybody felt -- and this is where some honesty is really required. Has anybody felt that they've been in the crosshairs of the government? No?

Does anyone feel like the unlimited resources the government has makes starting out in this process very difficult for a defendant? Number 3?

JUROR NO. 3: Yes.

MR. BROWNE: Why?

JUROR NO. 3: This is a beautiful building.

MR. BROWNE: That's true. We know who designed it.

JUROR NO. 3: Right. And there is a judge and a staff and a prosecutor, and there's somebody from the agency with initials, and then there's this guy, and all he has is you being a shield around him, and it's scary. There's a lot going on here. And he doesn't live in this building, but everybody else does, and that's very scary.

MR. BROWNE: Did everybody hear that? Thank you very much.

Because some of you raised cards, too, I think, perhaps, you did -- hang on a second -- and then you did. This is going to sound a little silly, and I apologize right now, but I promise there is a point to it, okay? And that is the worst part of this metaphor is they have to all be lawyers.

That's the worst part. Just assume you have to be a lawyer. Okay?

And your options are you could be a judge, you could be a U.S. attorney or a prosecutor, or you can be defense lawyer, but those are your only options. I'm not writing this down, but how many would want to be the judge? That's good. Normal.

How many would want to be the prosecutor? That's understandable.

How many would want to be the defense lawyer? A few.

Okay. This is the point: How many would want to be that man, the defendant? Anybody?

Can I see your number, sir?

No. 29, why wouldn't you want to be Mr. Veletanlic?

JUROR NO. 29: I think part of what was already discussed, there is a lot of resources on the State's side to defend against, and I wouldn't want to be in his shoes.

MR. BROWNE: And I think the gentleman behind you, with the beard -- sir, 39, you seem to be following this closely. Would you want to be this man?

JUROR NO. 39: Well, I don't know you, but I know of you.

MR. BROWNE: Don't come to the wrong conclusions.

JUROR NO. 39: You're not a public defender, so that tells me there's some wherewithal to have you defending him.

There probably could be worse people that could be defending him, right? That's not a slam on you.

MR. BROWNE: I can benefit from any humble experience.

JUROR NO. 39: I wasn't trying to do that.

MR. BROWNE: The point is, really, somebody -- No. 8, do you have a response at all to that hypothetical why -- I assume you would not want to be a defendant in a criminal case, correct?

JUROR NO. 8: Correct.

MR. BROWNE: Why not?

You don't have to answer the question. I can choose somebody else.

JUROR NO. 8: I slightly agree with Juror No. 3. Just listening to what she had said. What is interesting is how it's just one counsel for the gentleman, and then there's three other people here, and what does everybody say? Is that just -- do they have enough resource -- what does that say? That is the question, really.

MR. BROWNE: Okay. Thank you.

I think -- and you can agree with me or not on this, but in our society now -- first of all, in my opinion, we have the best system ever devised for this process in the whole world. There are still countries where people are presumed guilty.

But I think, as a general matter, we all like to walk around thinking that the presumption of innocence is sacred, we think that, and that it's automatic and doesn't require effort.

You look very interested in this, sir. You're a lawyer, right?

JUROR NO. 23: Me? Yes.

MR. BROWNE: You're an attorney?

JUROR NO. 23: Yes.

MR. BROWNE: What is your field?

JUROR NO. 23: I feel it is not an even playing field to start because of the presumption of innocence, and the plaintiff -- in this case the government -- has to overcome that. Though I don't agree with the use of unlimited sources, as a humble attorney myself, I understand the same concern that Juror No. 3 had with the perception of unfairness, but in my mind, there is always the presumption of innocence unless proven beyond a reasonable doubt.

MR. BROWNE: Okay. What field are you in, sir?

JUROR NO. 23: Right now, workers' compensation.

MR. BROWNE: For the attorney general?

JUROR NO. 23: Yes.

MR. BROWNE: Okay. How long have you done that?

JUROR NO. 23: Workers' comp, six months; Attorney General's Office, three years.

MR. BROWNE: Okay. So let me play off of that with everybody else. Okay. Remember to volunteer, please. It will help me.

Most of you are too young to remember, but in 1985, in Seattle, there was what's called the Wah Mee Massacre. Does anybody remember that?

Now you're showing your age.

Thirteen Asian folks were killed in a gambling establishment. The next day -- there were two newspapers in those days, which we don't have anymore -- the next day, they had a picture of two people who were arrested for that offense.

Now, when you saw that when you opened up the newspaper, would you go, "Oh, I'm going to presume them innocent"? Somebody be honest here. Can I see the hands of people?

Yes, Juror No. 4, what would you think?

JUROR NO. 4: Circumstances, circumstantial. I mean, they were arrested. But -- I don't recall, but you would have to assume they were innocent until proven guilty.

MR. BROWNE: Well, that makes you one in a million, and I'm proud of you.

Yes, Juror No. 3?

JUROR NO. 3: Sorry. I just think that if you're not in a jury, the presumption of innocence doesn't apply. It's a legal concept that happens in here.

So when we all walk in and we see a guy there, and we think he must have done something, or he wouldn't be here, right? That's where the presumption of innocence comes in.

You have to back off and say no. I have to wipe that out of my mind and start over and give him the presumption of innocence.

MR. BROWNE: Basically, what you're saying is, what I've asked earlier, is applying the presumption of innocence and proof beyond a reasonable doubt does require an effort, right? I see a lot of heads nodding. Okay.

Thank you --

JUROR NO. 3: You're welcome.

MR. BROWNE: -- everybody.

There are certain procedural matters that I want to talk to you about briefly, and that is, the law says that an accused individual, like Mr. Veletanlic, his lawyer may decide to give an opening statement, which is, basically, an overview of the case.

By the way, let me remind you now, what we say is not evidence. Please keep in mind, what attorneys say is not evidence. But an opening statement is kind of a summary of what we think will happen.

The law allows the defendant to not make an opening statement until the conclusion of the government's case. Would anybody think that means that we don't have a case?

Would everybody accept that as the law? Can I see some nodding heads, please? Okay.

I'm going to cut it short, and the judge will be happy because I'm 15 minutes early.

Anything I need to know about you at all -- thank you, sir, about your position on the Second Amendment. Anything I need to know or we need to know?

Thank you very much, Your Honor.

THE COURT: Ladies and gentlemen, this is my favorite part of the case. I get to talk to the attorneys outside of your presence, and in order to keep you occupied in your seats, I hereby order you to introduce yourself to the person seated on the other side, and talk amongst yourselves.

Counsel, I'll see you at sidebar.

(The following was held at sidebar:)

THE COURT: Counsel, I'll tell you who it is that I would delete for cause, and I'll ask if you have an opinion on those, and then I'll ask if you have anyone you think goes for cause, and then we'll go back out and have you do your peremptories, where you can actually see who is out there.

Number 4 said that he was no fan of the Second Amendment but further indicated that he could be fair, so I'm not going to take him off for cause on that basis.

Number 8 is the baby girl, physical therapist. He struck me as someone who didn't want to be here, so I would ask your

opinions on taking him off for cause.

MR. BROWNE: Agreed.

MR. DIGGS: No objection.

THE COURT: All right. Number 8 is gone.

Number 9's first answer was she has a baby at home and wouldn't pay attention.

MR. BROWNE: No objection.

MR. DIGGS: No objection.

THE COURT: She thought the case would be interesting, though.

Number 13, the gentleman in the back row, flat-out said he didn't think he could keep an open mind, so any objection?

MR. DIGGS: No objection.

MR. BROWNE: No, Your Honor.

THE COURT: We're going to excuse 15, if you want him to go or not, because he's the one whose wife has Stage IV cancer.

MR. BROWNE: Absolutely.

MR. DIGGS: Yes.

THE COURT: We'll let him go off on his vacation.

The next is 19, the construction supervisor. He kind of softened his answer the second time around. The first time he was adamant that he needed to be there, and then I guess he got more interested. I can go either way.

MR. BROWNE: I think he's wishy-washy. I can tell

you I'm not going to keep him, so no matter what you do is fine with me.

MR. DIGGS: I don't think he should be stricken for cause.

THE COURT: Okay. Thirty-four is another one the judge is going to rule on. He's going to his daughter's basketball game. Any objection?

MR. DIGGS: No.

MR. BROWNE: That sounds good.

THE COURT: I don't particularly believe 37. He said first that he liked guns and that he could be fair, and then he kind of contradicted himself and said that he really loves silencers.

MR. BROWNE: He loves them?

THE COURT: Yeah, that was his statement, that he was very fond of them. He was mumbling at the time, but that's what I think I heard. I'm not going to take him off, because he said he could be fair, but I'll --

MR. DIGGS: Can we make an argument?

THE COURT: Sure.

MR. DIGGS: What I heard him say was suppression of suppressors should not be against the law. I think he has that specific opinion about two of the counts in this case. And then he also referenced the court's unconscious bias video as actually being a conscious bias for him. So I made

a note that we would make a -- and I move to get him off for cause.

MR. BROWNE: I think he did say he would follow the law, so whatever you decide on, I'll defer to you, Your Honor.

THE COURT: I'm going to leave him on, but he's close. He's going to stay on. You can take care of him.

Thirty-nine had that remarkable "I was shot at." Really? You look like my grandfather.

MR. BROWNE: I think he said by the police.

MS. DALTON: Yes. Although he didn't respond when you asked has anybody been in the crosshairs of the law.

THE COURT: I don't have enough to take him off, but that was a surprising answer, and 41 was the restaurant owner, and I'll release him.

MR. BROWNE: He had to close for the day, which is sad.

THE COURT: Yes. So the court is taking off, for cause, Juror Nos. 8, 9, 13, and 15.

MR. BROWNE: Your Honor, was it 12 or 13?

MR. DIGGS: Thirteen.

THE COURT: Thirteen.

MR. BROWNE: Okay.

THE COURT: Also 34 and 41.

MR. BROWNE: I had my notes wrong, Your Honor. So 12

is staying?

THE COURT: Yes.

Does the government have anyone else they'd like to propose for cause?

MR. DIGGS: No, Your Honor.

THE COURT: Mr. Browne?

MR. BROWNE: No.

THE COURT: The form will start with you. You have 11 peremptories. We're leaving the alternates on until we get there.

MR. BROWNE: I thought 12, but I'm not going to use them all.

THE COURT: If it says one, one or two alternates.

MR. BROWNE: Okay.

THE COURT: It would be nice if we could get them out of here by noon.

MR. BROWNE: I don't see any problem with that.

THE COURT: All right. Thank you, counsel.

MR. BROWNE: How do you do the perempts? Orally?

THE COURT: No, a form.

(End of sidebar.)

THE COURT: Ladies and gentlemen, the attorneys are given a certain number of peremptories challenges to remove somebody. In the meantime, the chart starts with Mr. Browne. He does one person, and then it goes back to the plaintiffs;

they do one; it goes back and forth. When they're finished with their peremptory challenges, it comes up to me, and I figure out who is on the jury. So please continue to visit. Make yourself at home. If you brought the morning newspaper, I'm not sure there's any sporting news, but make yourself at home. This usually takes around ten minutes, so it's a little bit of time. Thank you.

(Brief pause in proceedings.)

THE COURT: Ladies and gentlemen, two things to tell you before I announce who has been selected to serve as the jury in this matter. One, I'm often asked on what basis do the lawyers exercise their peremptory challenges. It is a very scientific question. When I was starting out in practice, a man who I worked for mostly told me never take a left-handed juror, and secondly, absolutely under no circumstances should you ever take anyone who has those tinted glasses that get darker as it gets lighter. There's some irony in the fact that when he turned 60, he got tinted glasses. That's sort of a long story to explain to you that there are a lot of reasons why people get selected or deselected from the jury. If you ever want to know why, you won't know, so don't worry about it. It may be an answer you gave or that you're left-handed.

I carefully scrutinize this for the purpose of making sure that it's not one of the reasons that they can't exercise a

peremptory challenge.

The second thing that I have to say is, we're going to impanel 14 people as the jury. So every seat is going to be filled. And you're going to say, "Well, Judge, how can you do that because it is a 12-person jury?" At the end of the trial, we will select the two most important people in the world. They are the alternates. They get to go home, but they're not off the hook. If something happens to one of the 12 jurors who has been selected, we bring back one of those alternates. So from my point of view, those are the most important people in the world because it means I won't have to try this case again.

Consequently, other than that, I would like to say thank you to all for coming. I'll try not to take your whole day, and we'll try to get you out of here by noon.

I'll announce, by juror number, those people who have been selected for the jury.

The following jurors have been selected as the jurors in this matter. If everyone will wait until I finish, then you can stand up and leave if you haven't been selected. If you have been selected, just stay where you are, and we'll get you repositioned.

Selected for the jury: One, four, five, six, seven, fourteen, seventeen, eighteen, twenty, twenty-one, twenty-two, twenty-four, twenty-five, and twenty-six.

The rest of you are discharged to go back downstairs. Thank you for your attention. It's been a fun jury to pick.

Mr. Diggs, does the government accept the jury as constituted?

MR. DIGGS: We do, Your Honor. Thank you.

THE COURT: Mr. Browne, does the defense accept the jury as constituted?

MR. BROWNE: Yes, Your Honor.

THE COURT: All right. Ladies and gentlemen, I'm going to release you back to the jury room, which is behind that door, and then you can go to lunch. I'd ask you to be back by about 1:20 or so. We'll get you back out here to get started at 1:30, but sometimes it takes us a little bit of time to get started the first time you do all of this.

You're going to hear me say over and over and over again that you're not to discuss this case among yourselves or with anyone else. You're not to do any research, those sorts of things. That will be tough to do because you don't know anything about it yet, but it's important that you decide this case based on what you hear here in the courtroom.

I know it's going to be shocking to you, but some of the stuff you find on the Internet isn't accurate. Consequently, we ask you not to do outside research. We're not trying to hide anything, the government isn't trying to hide anything, Mr. Veletanlic isn't trying to hide anything. The

information that's presented to you has been carefully reviewed to make sure there is a basis for it, and then it's up to you to attach any importance to it.

You get to have lunch on your own for the time this trial is going on. When you do your deliberations, you'll get at least one free box lunch from us, which should convince you that you probably don't want to stick around for many more. In the meantime, enjoy your lunch.

This has been a very fun panel to pick. The lawyers did a very nice job. People were engaged. That makes my job a lot easier.

Ladies and gentlemen, please rise for the jury.

MR. BROWNE: Your Honor, may I ask one question? I hope the jury understands we can't acknowledge them or say hi, and we're not being rude.

THE COURT: If the attorneys say something to you, regardless of how innocent it is, if it's seen by someone else, all they know is one of the lawyers is talking to a juror. So if you end up in the same elevator, they're going to look like a stone statue. They're not being rude, they don't dislike you. They just know they'll get in trouble with me if they say anything.

THE FOLLOWING PROCEEDINGS WERE HELD
OUTSIDE THE PRESENCE OF THE JURY:

THE COURT: Counsel, thank you for your assistance in

picking the jury this morning. I don't have anything else to do up here, other than look at the jury questionnaires. It is remarkable to me how educated these juries have become in the last decade. I think I stopped counting at eight or nine software engineers.

MR. BROWNE: It's a new world.

Your Honor, we will be reserving our opening.

THE COURT: Okay. That's fine.

Take a look at the preliminary instructions. If you see something that's troublesome, like the change from "State Department" to "Department of State," know that they will get used. The government will be doing its opening statement, and then we'll go to our first witness, who will be?

MR. DIGGS: Joyni Hyttinen.

MS. DALTON: Yes. So we have four Swedish citizens who are coming in. They're going to be our first four witnesses. Our Swedish citizens all speak very good English, but we do have a Swedish interpreter on standby. She'll come in beforehand. And I think the first witness may be relying upon her for a couple of words, but I don't think she'll be used predominantly by the remainder. We're going to have them testify in English, and then use her if they don't understand a word or a question.

THE COURT: Any questions, Mr. Browne?

MR. BROWNE: No. My mother was born in Sweden, so I

know a little bit of Swedish, but not much.

THE COURT: My wife was born in Sweden and speaks fluent Swedish, and I know all of the curse words.

We will be in recess until 1:30.

(Court in recess 12:10 to 1:30 p.m.)

THE COURT: Counsel, before we bring the jury in, I want to clarify one matter.

This morning, Mr. Browne referred to RK by his name here in court. The government has also filed pleadings listing him by name, which are not sealed, so I'm assuming at this point all bets are off in regards to the use of RK's actual name.

Mr. Diggs, is that correct?

MR. DIGGS: That's correct, Your Honor.

MR. BROWNE: Yes, Your Honor.

THE COURT: All right. Any matters that the parties wish to raise with the court?

MR. DIGGS: No, Your Honor.

MR. BROWNE: No, Your Honor. Thank you.

THE COURT: Has everyone had an opportunity to look at the preliminary jury instructions, which I'm going to read, and do you have any objections or questions?

MS. DALTON: We do not have any.

MR. BROWNE: No, Your Honor.

THE COURT: All right. Please bring the jury in.

THE FOLLOWING PROCEEDINGS WERE HELD
IN THE PRESENCE OF THE JURY:

THE COURT: Ladies and gentlemen, you may be seated.

Let me talk about scheduling for a moment so that you all have it.

As I told you this morning in response to a question that was asked, our court day runs from 9:00 a.m. to 10:30; we then take a 15-minute break; we come back out at 10:45 and go to noon; from noon till 1:30, you're released for lunch. We start again at 1:30 and go till 3:00; break from 3:00 to 3:15; and then we go from 3:15 to 4:30.

I try and keep 4:30 as a hard stop because I appreciate many of you take the bus, or after you've tried driving one day, you'll be taking the bus the next day. That way you can plan that, unless something quite dire happens, that you will be out of here promptly at 4:30.

Other than that, I believe we need to swear the jury in.

THE CLERK: Raise your right hands.

(The jury is sworn.)

THE COURT: Thank you.

What's going to happen this afternoon is as follows: I'm going to read you some preliminary jury instructions. If you want to know what a preliminary jury instruction is, think of it as kind of the operating manual for your new television. It's, you know, how do you turn it on, how do you set the

channel; just very basic information that will be important to you as you serve as jurors in this matter.

At the end of this case, you'll be getting an extended set of instructions from me. I actually read them to you. You have a copy to follow along. They'll go back into the jury room with you. Those are the ones that have the details of the law, and many of the ones I'm going to use today are also restated in those. So these are just, basically, to orient you in terms of where we are and what's going to happen.

The government is then going to give its opening statement. As I told you earlier in the day, the defense has the option of either speaking immediately after the government, or waiting until they're going to put on their case, and they've indicated that they're going to wait.

So after the government finishes its opening statement, then we'll begin with witnesses, and we'll go until three o'clock, and then we'll take our break, and then we'll go till 4:30.

You should know that whatever is in the jury room is yours. No one else looks at it or goes in there, other than the janitor. So that's your space. I'll ask you not to leave stuff out here because the marshals get very excited about things left in the courtroom.

The other thing you should know is that, at some point, when we're using these screens, if your screen is not

functioning, just raise your hand, wave so I can stop, and then we'll get it going.

What happens when something is put up on the visual presenter, I see it, the witness sees it, the lawyers see it, you don't until it is admitted as an exhibit. So get used to seeing just a blank screen, and then when the exhibit is admitted, it will then be published, and that's when you'll get to see it.

Other than that, I don't think we have a high school mock trial team using our courtroom right now, so your chairs are in the upright position. If we have a whole bunch of teenagers in here, they seem to put them in full recline.

With that background, I'll begin with the preliminary instructions.

It is important that you discharge your duties without discrimination, meaning the race, color, religious beliefs, national origin, sexual preference, or gender of the defendant. Any witnesses and the lawyers should play no part in the exercise of your judgment throughout the trial.

Accordingly, this voir dire and jury-selection process, I and the lawyers may ask questions related to the issues of bias and unconscious bias.

Number 1: Jurors, you are now the jury in this case, and I want to take a few minutes to tell you something about your duty as jurors and to give you some preliminary instructions.

At the end of the trial, I will give you more detailed, written instructions that will control your deliberations.

When you deliberate, it will be your duty to weigh and to evaluate the evidence received in the case, and, in that process, to decide the facts. To the facts as you find them, you will apply the law as I give it to you, whether you agree with the law or not.

You must decide the case solely on the evidence and on the law before you, and you must not be influenced by any personal likes or dislikes, opinions, prejudices, sympathy, or biases, including unconscious bias.

Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention. Like conscious bias, unconscious bias, too, can affect how we evaluate information and make decisions.

In addition, please do not take anything I may say or do during the trial as indicating what I think of the evidence or what your verdict should be. That is entirely up to you.

This is a criminal case brought by the United States government. The government charges the defendant with violation of the Arms Export Control Act, Count 1; possession of unregistered firearms, Counts 2 and 3; and possession of a firearm with an obliterated serial number, Count 4.

The charges against the defendant are contained in the

indictment. The indictment simply describes the charges the government brings against the defendant. The indictment is not evidence and does not prove anything.

The defendant has pleaded not guilty to the charges and is presumed innocent unless and until the government proves the defendant guilty beyond a reasonable doubt. In addition, the defendant has the right to remain silent, and never has to prove innocence or to present any evidence.

In order to help you follow the evidence, I will now give you a brief summary of the elements of the crimes, which the government must prove to make its case.

The first count alleges the defendant violated the Arms Export Control Act. As to this count, the government must prove the defendant exported a part of a gun, a Glock lower receiver, to Sweden. The government must prove this receiver was listed on the United States Munitions List at the time it was exported; that the defendant exported this receiver without obtaining a license from the Department of State; and that the defendant was aware that it was unlawful to export that receiver from the United States.

The second count alleges that the defendant possessed an unregistered firearm. As to this charge, the government must prove that on or about July 25, 2017, the defendant possessed a B&T AG Switzerland Tiger silencer; that the defendant was aware the silencer was a device for silencing, muffling, or

diminishing the report of a portable firearm; and that the defendant had not registered that silencer with the National Firearms Registration and Transfer Record.

The third count also alleges that the defendant possessed a second unregistered firearm. As to this charge, the government must prove that on or about August 1, 2017, the defendant possessed a Vortex silencer; that the defendant was aware the silencer was a device for silencing, muffling, or diminishing the report of a portable firearm; and that the defendant had not registered that silencer with the National Firearms Registration and Transfer Record.

Lastly, the fourth count alleges that the defendant possessed a firearm with an obliterated serial number. As to this charge, the government must prove that on or about May 3, 2018, the defendant knew that he possessed a Sturm, Ruger & Company pistol, Model LCP .380 caliber that had been shipped and transported from one state to another. The government must also prove that the serial number on that pistol had been removed, obliterated, or altered, and that the defendant knew the serial number had been removed, obliterated, or altered.

Instruction No. 3: The evidence you are to consider in deciding what the facts are consists of the sworn testimony of any witness and the exhibits which are received into evidence.

The following things are not evidence, and you must not consider them as evidence in deciding the facts of this case: Statements and arguments of the attorneys, questions and objections of the attorneys, the testimony that I instruct you to disregard, and anything that you may see or hear when the court is not in session, even if what you see or hear is done or said by one of the parties or by one of the witnesses.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact such as testimony by a witness about what that person personally saw or heard or did.

Circumstantial evidence is indirect evidence; that is, it is proof of one or more facts from which you can find another fact.

You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction to the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

There are rules of evidence that control what can be received in evidence. When a lawyer asks a question or offers an exhibit into evidence, and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. If I overrule the objection, the question may be answered or the exhibit

received. If I sustain the objection, the question cannot be answered or the exhibit cannot be received. Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer would have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence. That means that when you are deciding the case, you must not consider the evidence that I told you to disregard.

In deciding the facts of this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account the witness's opportunity and ability to see or hear or know the things testified to; the witness's memory; the witness's manner while testifying; the witness's interest in the outcome of the case, if any; the witness's bias or prejudice, if any; whether other evidence contradicted the witness's testimony; the reasonableness of the witness's testimony in light of all of the evidence; and any other factors that bear on believability.

You must avoid bias, conscious or unconscious, based on the witness's race, color, national origin, national religious beliefs, or gender in your determination of credibility.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

Number 8, which the court will be reading to you a couple of times during the course of this trial: I will now say a few words about the conduct of you as jurors.

First, keep an open mind throughout the trial, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide this case based only on the evidence received in the case and on my instructions as to the law that it applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty. Thus, until the end of the case or until I tell you otherwise, do not communicate with anyone in any way, and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone, or electronic means via email, via text messaging, or any Internet chat room, blog, website, or application, including but not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, and any other form of social media. I'm sure there are at least two more forms of social media since that was written,

but you get the gist.

This applies to communicating with your fellow jurors until I give you the case for deliberation, and it applies to communicating with anyone else, including your family members, your employer, the media or press, and the people involved in the trial.

Although you may notify your family and your employer that you have been seated as a juror in the case and how long you expect the trial to last, if you are asked or approached in any way about your jury service or anything to do with the case, you must respond that you have been ordered not to discuss the case, and report it to me.

Because you will receive all of the evidence and legal instruction you properly may consider to return a verdict, do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it. Although I have no information that there will be any news reports about the case, do not do any research such as consulting dictionaries, searching the Internet, or using other reference material, and do not make any investigation or in any way other try to learn about the case on your own. Do not view or visit any place discussed in this case, and do not use Internet programs or other devices to search for or view any place discussed during the trial.

Also, do not do any research about this case, the law, or

the people involved, including the parties, the witnesses, or the lawyers, until you have been excused as jurors.

If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have the case decided only on the evidence that has been presented here in court. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process.

If you do any research or investigation outside the courtroom or gain information through an improper communication, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process.

Each of the parties is entitled to a fair trial by an impartial jury. If you decide the case based on information not presented in court, you will have denied the parties a fair trial.

Remember you have taken an oath to follow these rules, and it is very important that you follow these rules. A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the

court immediately.

At the end of the trial, you will have to make your decisions based on what you recall of the evidence. You will not have a written transcript of the trial. I urge you to pay close attention to the testimony as it is given.

If you wish, you may take notes to help you remember the evidence. If you do take notes, please keep them to yourself, and, two, until you and your fellow jurors go to the jury room to decide the case.

Do not let note taking distract you from being attentive. When you leave the court for recess, your notes should be left in the courtroom. No one will read your notes. That's a different rule at the end of the day. You're free to take them back, and I would urge you to do so. Whether or not you take notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

The next phase of the trial will now begin. The government has indicated it will make an opening statement. An opening statement is not evidence. It is simply an outline to help you understand what the parties expect the evidence will show. A party is not required to make an opening statement.

The government will then present evidence, and counsel for

the defendant may cross-examine. Then if the defendant chooses to offer evidence, counsel for the government may cross-examine.

After the evidence has been presented, I will instruct you on the law that applies to the case, and the attorneys will make closing argument. After that, you'll go to the jury room to deliberate on your verdict.

Lastly, a language other than English may be used for some evidence during this trial. When a witness testifies in another language, the witness will do so through an official court interpreter. When recorded evidence is presented in another language, there will be an official court translation of the recording. The evidence you are to consider on which you must base your decision is only the English-language interpretation provided through the interpreters. Although some of you may know the non-English language used, you must disregard any meaning of the non-English words that differ from the official interpretation.

You must not make any assumptions about a witness or a party based solely on the use of an interpreter to assist that witness or party.

Ladies and gentlemen, those are the preliminary instructions. At this time, I ask you to devote your attention to Ms. Dalton.

GOVERNMENT'S OPENING STATEMENT

MS. DALTON: Can you-all see that on your TVs? Perfect.

May it please the court, defense, members of the jury. This is a case about a man who illegally exported guns to Sweden. In order to avoid detection before shipping those gun parts, the defendant used fake names, fake return addresses, fake Customs declarations. Before shipping the gun parts, he removed their serial numbers. And when he went to the post office, he didn't say he was shipping gun parts; he said he was only shipping used bicycle parts.

But the defendant didn't just illegally ship gun parts to Sweden. He also illegally possessed guns here at home. Here in Washington, the defendant possessed two silencers and a pistol with an obliterated serial number.

In this case, the defendant is charged with committing four crimes. The first count, the defendant is charged with shipping a particular gun part, a Glock lower receiver, to Sweden. The second and third counts, in those ones, the defendant is charged with illegally possessing two silencers. And finally, the fourth count, the defendant is charged with possessing a pistol, knowing that that pistol had an obliterated serial number.

So those are the charges, but let's talk about how this case all began.

This case began with a call from Sweden. In February of

2017, a package was shipped from Washington to Sweden. Swedish customs officials searched that package, and inside they found parts of a gun, parts of a 9mm pistol.

This is the shipping label for that package. The package had been shipped from the North Lakewood Post Office, and had been shipped to Sweden. According to the label, the shipper of the package was reportedly Ben Manacker from Shoreline, Washington. And the contents of this package, they had been falsely described as used bicycle parts.

But this is not all what Swedish law enforcement found. After finding the package and searching it and locating those gun parts, the Swedish law enforcement followed up on leads, and they located a house belonging to a Swedish citizen, Thomas Heydeck. They searched that house, and in the attic of that house, they found this, a Glock lower receiver.

Now, a Glock lower receiver, the lower receiver is the lower portion of the gun, the part that you hold in your hand, the part that contains the trigger. During this trial, you'll also hear us refer to this part as a "frame."

So after locating this gun part, Swedish law enforcement and U.S. law enforcement conducted an investigation. They were looking to see who shipped that package of gun parts to Sweden, who shipped that Glock lower receiver to Thomas Heydeck, and you'll hear that all of the evidence pointed at the defendant.

First, law enforcement found additional shipping labels, labels just like that one on that package of gun parts sent to Sweden. They all contained similar information: Shipment from addresses in Snohomish County, packages mailed to Sweden, contents described as used bicycle parts.

And they noticed that all of these post offices where those shipments had been mailed from, those post offices were all located near the defendant's house.

Additionally, Swedish law enforcement, they found the defendant's telephone number in Robin LavHage's phone. Robin LavHage, well, he was the person in Sweden who the defendant had been selling these gun parts to. Swedish law enforcement, they searched Robin LavHage's phone. They looked in his contacts, and in his contacts they found the defendant's telephone number saved in his contacts as "USA Barrel."

And lastly, that Glock lower receiver, that one that was found in Thomas Heydeck's attic, well, the lower receiver, its serial number had been filed off, obliterated. But this lower receiver, it had another number, what's referred to as a Data Matrix Code. Law enforcement used that number to determine who was the person who last purchased that Glock, and they learned that that person was Mr. Leon Nguyen, one of the defendant's close friends.

But after hearing all of this evidence, you will also hear

a recorded statement of the defendant, and in that recorded statement the defendant says, "Yes, I have been shipping gun parts to Sweden."

You see, the defendant knew that it was only a matter of time before law enforcement would figure out that he was the person that was sending these gun parts to Sweden. Our agents, they were busy going to post offices, they were gathering shipping labels, they were interviewing the defendant's friends. And Swedish law enforcement, they were searching houses, they were conducting arrests, they were seizing cell phones.

So the defendant went to law enforcement, and he told them, "Yes, it was me. I have been sending gun parts to Sweden."

Agents met with law enforcement for the first time on May 31st. They met in Everett, Washington. The agents and the defendant all sat in one of the agent's cars outside a coffee shop, in a parking lot.

And before talking to the defendant, the agents gave the defendant his Miranda rights, and they told the defendant, "You do not have to talk to us." In fact, they told the defendant, "We can't guarantee whether or not you'll ultimately be charged with a crime." But the defendant said no, he wanted to talk.

And so on that day, law enforcement interviewed him, and

with his permission, that interview was recorded. You're going to hear portions of that recorded interview during trial this week.

In that interview, the defendant explained how this all began. He said, "So last year I listed some stuff on eBay, some parts, some gun parts, and I was contacted with -- just some fellow from Europe, from Sweden." The defendant said he knew this person in Sweden by the name of Sven, and this same fellow contacted him, asking if he could supply some more stuff. So the defendant explained, "So I sent the guy a bunch of goodies, a bunch of slides, a bunch of magazines, just stuff that is really hard for them to get over there." Slides and magazines, those are both parts of a gun.

After explaining this, the defendant also told law enforcement about all the ways, all the strategies he used to avoid detection, to avoid getting caught. He explained that before he shipped these gun parts, he filed off their serial numbers, and he said he shipped these gun parts from multiple post offices, including the post offices in Marysville and North Lakewood .

He said when he was shipping these gun parts, he used fake names, fake addresses. And when he shipped these gun parts, he didn't describe the contents of these packages as gun parts. Instead, he said to agents who asked him, "Tell me again. What did you declare on the customs declaration?"

And the defendant said, "I don't know. Logically, I would probably put down 'parts,' maybe 'Air-soft parts,' but it was something other than 'guns,' something other than 'gun parts.'"

The defendant explained that this person in Sweden, Sven, paid him for these gun parts using Bitcoin. Now, Bitcoin is a kind of digital currency -- it's also referred to as a cryptocurrency -- and the defendant talked to Sven using the telephone application called Telegram. Telegram is an application that allows its users to communicate securely through encryption, and after a period of time, the text messages you send through Telegram, they're deleted, and they self-destruct. And this makes sense. They're trying to cover their tracks. They don't send checks or emails or use standard text messages. That would all leave a trail for law enforcement to follow.

The defendant explained that these packages all stopped because Sven told him they all were intercepted and the packages had been seized. Fast-forward a few months. They're frantic, panicking, "Hey, we all got arrested." And then they said, "Hey, sorry, bro. It's all been caught. You know, you know, we can't pay. We didn't get the stuff."

And after this, the defendant explained that for months he waited, waited to see what this might turn into, waited to see if the law enforcement was going to knock on his door.

After that meeting, the defendant continued to provide information to law enforcement. He told them more about Sven, that person who had been purchasing the gun parts in Sweden, and he told them about Thomas Heydeck, that person with the Glock lower receiver in his attic. The defendant talked about packages that he had shipped to Thomas Heydeck.

And in the emails that the defendant sent to the agents, he began to reveal new information. For example, here's one email that the defendant sent to agents. The defendant said, "There has been about 15 to 20 small packages of gun parts in total sent to Sweden."

Now, just a few months earlier, during that first meeting in the car, when the agents asked him how he packages the gun parts that he sent to Sweden, he said, "There's only been eight packages."

So over time, law enforcement begin to learn that the defendant is not telling them everything, or maybe he's just only telling them information that he thinks they already know.

The agents meet with the defendant again at his house in Tulalip, Washington, and during this meeting, the defendant again tells the agents about how he's been shipping gun parts to Sweden. He said, "I've shipped parts of Glocks and ammunition to Sweden."

But in addition to shipping parts of guns to Sweden, the

defendant also says, "I've also shipped gun parts to France." He explained that he shipped Glock magazines and Glock parts to France, and he shipped them to a friend of his who he knew by the name of Bruno, and in exchange, Bruno had sent the defendant two silencers.

Now, the defendant had never mentioned anything about shipments to France or silencers from Bruno. This was the first time he was telling them. But while they were there, sitting around the defendant's dining room table, he said, "I have these two silencers from Bruno." But he assured the agents, "Don't worry. Those two silencers from Bruno, they're destroyed. I don't have them anymore."

During that meeting, the agents asked to search the defendant's gun safe. The defendant has a large gun safe in his bedroom that's locked with a digital lock. The defendant agreed; let the agents into his bedroom, and opened up that safe by putting in the code for that digital lock. And once the safe was open, the agents started removing the guns, about 30 guns, one by one .

And when almost all of those guns had been removed, one of the agents noticed something. On the top of the safe there was a shelf, and on that shelf there was a bag, and inside that bag there was a silencer, a B&T Switzerland Tiger silencer.

Now, the defendant had just finished telling the agents

about, "Those two silencers from Bruno, I don't have them anymore. I destroyed them." But here was one sitting on the shelf in the gun safe.

This is the silencer the defendant is charged with possessing in the Count 2.

During this trial, you'll learn that silencers are considered firearms under the law, and you'll hear how a silencer works. A silencer, essentially, screws on to the end of a gun, and it makes it so when you fire the gun, it's quieter. You'll hear during this trial that we'll refer to these kinds of devices as both "silencers" and "suppressors," "suppressor" because it suppresses the sound of a gunshot.

Now, after this meeting, after that afternoon, the defendant started sending one of the agents in this case -- he sent her a number of text messages. You'll see some of those messages. Here's one of them.

In this text message, the defendant says, "Okay. I'm willing to put all of this behind me and be up front about absolutely everything shady that I've done." And that second suppressor, that suppressor that came from Bruno, the defendant said, "I have cut up that one suppressor from Bruno."

The agents met with the defendant again the very next day, July 26th, 2017. They met with the defendant inside of his home. And you'll hear that that meeting, that interview was

recorded, and you'll hear portions of that recording during trial this week.

During that interview, the defendant told agents, "I have a suppressor, and it's one of the suppressors that came from Bruno."

Now, just the day before, the defendant said he had no suppressors. "Those two suppressors from Bruno, well, those are destroyed. I no longer own them." Then that afternoon, he says, "Okay. I have one suppressor, that suppressor that the agents found in the gun safe, but that second suppressor, that's been cut up."

Now, less than 24 hours later, the defendant says, "I have two suppressors," and a couple of days after that, he turns in this suppressor to law enforcement. This is the silencer that the defendant is charged with possessing in Count 3.

During this trial, you'll hear from experts, a firearms expert, Firearms Enforcement Officer Brian Heishman. He tested those two silencers, and he'll tell you that they work and they meet the legal definition of a silencer under the law.

And you'll also hear that the defendant did not have permission -- he had not registered either of those silencers with the U.S. Government.

So at this point in time, the defendant has admitted to sending gun parts to Sweden. He's been caught with one

silencer. He turned over another. So law enforcement go to arrest him in May of 2018. Now, law enforcement didn't want to arrest him at his home. They knew that he previously had a large number of guns in his house. So instead, one of the agents called up the defendant and said, "Will you meet me at a parking lot in Tulalip just to talk?" The defendant agreed, and he came to that parking lot in Tulalip to talk to the agents, armed with a gun.

The defendant drove up to that parking lot in Tulalip, stepped out of his car, and was immediately arrested. And in the waistband of his pants, agents recovered this Ruger pistol.

Now, this pistol has an obliterated serial number. You see that circled portion in the corner? That's where the serial number used to be.

After the defendant was arrested, he was read his Miranda rights, and, again, the defendant said he wanted to talk to law enforcement. He told law enforcement, "This gun, I purchased it three years ago, and I knew that it had an obliterated serial number."

In fact, the defendant told law enforcement, "This gun, I have been bringing this gun concealed on my person every time I met with the agents."

Based on the summary that I just provided to you of the evidence, we charged the defendant with four crimes. The

first crime, Count 1, that relates to the defendant shipping a particular gun part, that Glock lower receiver, to Thomas Heydeck, the one that was found in the attic.

You'll hear during this trial that it's illegal to ship a firearm like this without first obtaining the permission, getting an export license from the U.S. Government. And you'll hear the defendant's recorded statement where he says, "Yes, I have been shipping guns to Sweden." His admissions were clear. He left no doubt.

In Counts 2 and 3, the defendant is charged with illegally possessing two silencers.

During this trial, you'll learn that it is illegal to possess silencers like these unless you first obtain permission, unless you register them with the U.S. Government. And that makes sense. You'll hear the reason why this is the law. Silencers make it harder to fire a gunshot undetected -- or make it easier -- I'm sorry -- to fire a gunshot undetected. So when you shoot a gun with a silencer, it's hard for the police and others to hear it.

That first silencer, the one on the left, that's the one that was found in the defendant's gun safe, and that silencer on the right, that's the one that the defendant said, in a recorded statement, he owned, and he turned over to law enforcement a few days later.

But those weren't the last weapons that the defendant

possessed illegally. The defendant also possessed this Ruger pistol, knowing that it had an obliterated serial number.

You'll learn that it's illegal to own a weapon like this if you know that its serial number had been obliterated, and you'll hear why.

Law enforcement uses serial numbers to solve crimes, so if a gun is involved in a crime, law enforcement can look at a serial number to see who was the last person to purchase that gun.

In this case, the defendant was arrested with this pistol in his waistband. And shortly after his arrest, the defendant told law enforcement that he knew that the serial number had been obliterated.

During the trial, you're going to see a number of exhibits, you're going to hear from a number of witnesses, and you're going to hear the defendant's statement, his own words in recorded interviews with law enforcement, describing these crimes.

And at the end of this trial, after hearing all of the evidence, we're going to ask that you find the defendant guilty of all four counts.

Thank you.

THE COURT: Thank you, counsel.

Mr. Browne, are you prepared to proceed with the government's case?

MR. BROWNE: Yes, Your Honor. We would be, as indicated, reserving.

THE COURT: Okay. Thank you.

Ladies and gentlemen, at this time, the government will begin presenting its evidence.

The government may call its first witness.

MR. DIGGS: Your Honor, may the interpreter step up?

THE COURT: Yes.

Mr. Diggs, can you provide me with the exhibit numbers?

MR. DIGGS: I believe they're identified in a column on the second page of the summary, but we'll double-check that.

THE COURT: Do I have the summary?

MR. DIGGS: You do. It's Exhibit 48, Your Honor.

THE COURT: Okay.

JOYNI HYTTINEN, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state your name for the record, and spell it for the court reporter.

THE WITNESS: Joyni Hyttinen; J-o-y-n-i; last name, H-y-t-t-i-n-e-n.

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MS. DALTON:

Q Good afternoon.

A Good afternoon.
Q Can you please tell us what your job is?
A For current, I am a police officer, teaching students to be police in the Swedish Police Academy in Stockholm.
Q How long have you been doing that?
A For a year now.
Q And prior to that job, what you were doing?
A I was a police officer.
Q You said you're currently based in Stockholm?
A Yes.
Q Where were you based before Stockholm?
A In Fagersta, Sweden.
Q How long had you been a police officer in Fagersta, Sweden?
A For about eight years.
Q Were you a police officer in Fagersta, Sweden, in February of 2017?
A Yes.
Q On that day, were you asked to search an individual's house?
A Yes.
Q Whose house?
A Mr. Heydeck.
Q What kind of house did Mr. Heydeck live in?
A He lives in an apartment building, two floors.

Q And does he live in both of those floors?
A In the upper, the second floor.
Q What were you looking for in Mr. Heydeck's house?
A For guns.
Q How many officers were there looking to search this house?
A Around four to six officers.
Q And what part of the house did you search?
A I searched the attic.
Q What did you find, if anything, when you searched the attic?
A I found a frame to a handgun, a firearm; some maces, pepper sprays, Tasers, ammunition, and so, yes.
Q You mentioned that you found a frame to a handgun. Where did you find that piece of the gun?
A In a box, in a bigger box, and the frame was in a smaller box in the bigger box.
Q Did you take photographs of that frame?
A Yes, I did.
Q I'm going to show you, on your screen there, what's been marked as Government's Exhibit 1A. Do you recognize that photograph?
A Yes, I do.
Q And do you recognize the second page as well?
A Yes.
Q Did you take these photographs?

A Yes, I did.
Q Do these photographs fairly and accurately show how that frame looked when you located it in Mr. Heydeck's attic?
A Yes.
MS. DALTON: Government offers Exhibit 1A.
MR. BROWNE: Your Honor, I have no objection to 1A. I would like to voir dire if the next photograph is being admitted.
THE COURT: Let's do 1A first. It is admitted.
(Exhibit 1A admitted.)
MS. DALTON: May I publish it, Your Honor?
THE COURT: Yes.
Q (By Ms. Dalton) What is this picture of?
A It's a frame of a Glock.
Q And where were you when you took this photograph?
A In the attic.
Q How would you describe this particular gun piece? What would you call it?
A It's a piece that belongs to a firearm, a Glock, which is made of carbon material. It's light in weight.
Q And there are two photographs here of this particular gun piece. Are these both sides of the same gun?
A Yes.
THE COURT: Mr. Browne, is this the one you want to object to?

MR. BROWNE: Yes, Your Honor. I'm not certain that actually depicts what was actually found.

THE COURT: All right. Ladies and gentlemen, these exhibits are being offered by the government. I've admitted one of them. If the attorney has a question about the admissibility of another exhibit, they're entitled to briefly voir dire, meaning to ask a question. So, Mr. Browne, your question?

VOIR DIRE EXAMINATION

BY MR. BROWNE:

Q Good afternoon, sir.

MR. BROWNE: Is this A2?

MS. DALTON: It is the second page of 1A.

Q (By Mr. Browne) You have in front of you photograph of the bottom half of what appears to be a gun, right?

A Yes.

Q And then there's a clip, correct?

A Yes.

Q Did you find that clip inside the gun?

A Yes.

Q You did? Did you put that in your report?

THE COURT: That's going beyond identification.

MR. BROWNE: All right, Your Honor. Thank you.

THE COURT: I'll admit the second page of Exhibit 1A.

MS. DALTON: Thank you, Your Honor.

(Exhibit 1A-2 admitted.)

Q (By Ms. Dalton) When you took this frame from Mr. Heydeck's attic, what did you do with it?

A I put it in a paper bag, and then we transported it to the police station in Fagersta, and I documented the item in our systems. And then I locked it up in our locker in the station, and then -- yes, that's what I did.

Q And when you documented it in your system, did you create an exhibit number or any other kind of number to mark it in evidence?

A Yes. As soon as we document an item, we get a number.

Q And where has this frame been stored since the time you seized it?

A In Västerås.

Q Where in Västerås was it stored?

A Where evidence -- the evidence department, at the evidence office there.

Q Is it a locked evidence room?

A Yes, it is.

Q When did you last look at this frame?

A The 20th of February this year.

Q So just this past Wednesday?

A Excuse me?

Q Is it just this past Wednesday?

A Yes.

Q And how did you know that the frame that you looked at on Wednesday was the same frame that you found in Thomas Heydeck's attic?
A I looked at it, and I recall that it was the same frame.
Q Did you compare the evidence number that you had created?
A Yes, I did.
Q When you looked at this frame, did you know -- did you see whether or not it was damaged or had any scratches?
A Yes. I noticed a scratch area on the bottom of the frame.
Q Where on the bottom?
A The barrel.
Q The barrel -- can you -- your screen is, actually, interactive, so you can circle it with your finger.
A (Witness complies.)
Q When you saw that scratched area, why did you think it was scratched?
A To remove a number.
Q What kind of number?
A A serial number.
Q I'm going to show you next what's been marked for identification as Government's Exhibit 1B. Do you recognize what's been portrayed in 1B?
A Yes.
Q What is it?
A It's the frame of a Glock.

Q Is it the same frame that was found in Thomas Heydeck's attic?
A Yes, it is.
Q Is this photograph also a true and accurate depiction of the frame that you located in Mr. Heydeck's attic?
A Yes.
MS. DALTON: The government offers Exhibit 1B.
THE COURT: Any objection?
MR. BROWNE: No, Your Honor.
THE COURT: Exhibit 1B is admitted and may be published.
(Exhibit 1B admitted.)
Q (By Ms. Dalton) What part of the frame are we looking at in this photo?
A The top of it.
Q So we're looking down towards the top of the frame?
A Yes.
Q So you previously talked about how the serial number on this gun had been scratched off. Did this frame have a different number on it, another number?
A It has that ten-digit number that you see the depiction of.
Q And where was that ten-digit number located? What part of the frame was it on?
A On the top.

Q When you went and looked at that frame on Wednesday, the one that's in your evidence vault in Västerås, did you see that ten-digit number?
A Yes, I did.
MS. DALTON: I think that's it. Thank you, Your Honor.
THE COURT: Mr. Browne?

CROSS-EXAMINATION

BY MR. BROWNE:
Q Good afternoon.
A Good afternoon.
Q Sir, did you bring this lower receiver with you from Sweden?
A Bring where?
Q The photograph of the lower receiver that you've been testifying about, did you bring that with you?
THE COURT: Mr. Browne, are you talking about the photograph, or the receiver?
MR. BROWNE: The receiver.
A No.
Q (By Mr. Browne) So where is that receiver now?
A It's in Sweden.
Q It's in Sweden, correct?
A Yes.
Q Okay.

Did you have information that the receiver in question, which is on the screen now for everybody -- no? Can we post 1B? Is it on the screen now?

Okay.

Did you receive information during your investigation in this case that Mr. Heydeck, whose apartment you searched, actually this was obtained at the mailbox at a post office? Do you remember that?

A I need to use my translator.

Q Sure.

(Witness converses with translator.)

A I have no information about any -- who has posted or something. It's not -- no, I don't.

Q Do you know a Swedish police officer named Eric Sesone, S-e-s-o-n-e?

A Yes, I do.

Q Is he here today?

A Yes.

Q Okay. Have you spoken to him about where this receiver was obtained?

A He was one of the officers when we did the house search.

Q Did he ever indicate to you that this receiver was actually intercepted at the post office at a local store?

A I don't know.

MR. BROWNE: Thank you, sir.

THE COURT: Redirect, counsel?

MS. DALTON: No. Thank you, Your Honor.

THE COURT: Thank you, sir. Your may step down.

THE WITNESS: Thank you.

MR. DIGGS: The government calls Erik Sesone.

ERIK SESONE, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state your full name, and spell it for the court reporter.

THE WITNESS: Erik Sesone; E-r-i-k, S-e-s-o-n-e.

THE COURT: You may inquire.

MR. DIGGS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. DIGGS:

Q Good afternoon, Officer Sesone.
A Good afternoon.
Q Where do you work?
A I work in a town called Västerås in Sweden.
Q What do you do there?
A I work as a police officer.
Q For which agency?
A The Swedish National Police.
Q And is that the only police force in Sweden?
A Yes, that's correct.
Q What's your specific title there?

A I don't know what it is in English, but "police officer" is fine.
Q I'll refer to you as "officer," then.
A Yes.
Q Where were you working in 2017, Officer?
A I was working at a small town called Fagersta, about 70 kilometers north of Västerås.
Q And just to orient us, how far is Västerås from Stockholm?
A About 100 kilometers.
Q To the north?
A No, to the east of Västerås.
Q What type of cases were you working in 2017 when you were in Fagersta?
A I was mostly working undercover cases. I was doing stakeouts and doing warrants, and it was mostly gun related and narcotics related.
Q Under what circumstances in Sweden may a citizen possess firearms?
A Under no circumstances can you just buy a gun. If you hunt or if you do target practice, you can obtain some rifles, but not automatic rifles, only hunting rifles and some --
MR. BROWNE: Excuse me, Your Honor. I would object to this on relevance grounds.
THE COURT: I believe it's sufficient background, but

keep it short. The objection is overruled.

MR. DIGGS: I'll just follow up briefly.

Q (By Mr. Diggs) With regard to the hunting permit, are there a number of certifications that an individual would have to go through to possess a rifle for hunting?

A Yes.

MR. BROWNE: Objection, Your Honor; leading.

THE COURT: I'll permit it, and then let's move on, Mr. Diggs.

Q (By Mr. Diggs) What about as an officer? Are you allowed to take your firearm home?

A No, I'm not.

Q So when you leave for work that day, what do you do with your firearm?

A I put it in a locked safe.

Q Sir, I'm going to direct your attention to February 22nd of 2017. Were you involved that day with an operation involving an individual named Thomas Heydeck?

A Yes, I was.

Q And where did Mr. Heydeck live?

A In Fagersta in Västmanland.

Q How did you come to be focused on Mr. Heydeck?

A It was given information from our intelligence agency that Heydeck --

MR. BROWNE: Objection, Your Honor. It's hearsay.

THE COURT: Overruled.

THE WITNESS: Can I answer?

THE COURT: Yes.

A That he was trying to buy guns at dark net, so that is why we focused on him and tried to see if he did have any guns.

Q (By Mr. Diggs) What is "dark net"?

A Dark net is a hidden page of the Internet where you can buy illegal stuff.

Q What was your role in the operation involving Mr. Heydeck that day?

A My role was to follow him around and see where he went and if he obtained any packages or where he might leave them, or if he had, like, a hideout or anything like that.

Q Ultimately, did you detain Mr. Heydeck on February 22nd, 2017?

A Yes, I did.

Q Did he have anything on him at the time that you took for evidence?

A Yes, he had a phone.

Q What did you do with that phone upon seizing it?

A I seized it from Mr. Heydeck, and then I put it in a bag, a sealed bag. I typed on the bag, so I put a specific number on that bag so it related to the investigation. And then I sealed it, and then I went to Västerås with it. I locked it up in a cupboard in a safe, and then I put away the key so no

one can get it.
Q Do you recall what the number was you assigned to that evidence?
A Yes, I do.
Q What was it?
A It was 2017-5000-BG-19281-31.
Q And is that the number that's forever assigned to that piece of evidence?
A Yes.
Q You said you locked it in a storage locker?
A Yes.
Q Who else has access to that locker?
A Only the technicians.
Q Did you play any role, sir, in actually searching Mr. Heydeck's phone?
A Only a brief one. Just after -- the day after we had emptied the phone, I was looking at the phone's contents, and I just needed enough to get Mr. Heydeck detained for trafficking guns, and that's what I get. I was looking at shafts and stuff like that that he had sent to other people, and we got enough evidence, so we knew that he was selling guns.
Q You didn't review it in significant detail?
A No, I did not.
MR. DIGGS: If I may have a moment, Your Honor?

No further questions.

THE COURT: Mr. Browne?

CROSS-EXAMINATION

MR. BROWNE:

Q Good afternoon.
A Good afternoon.
Q Officer Sesone, do you recall having a conversation on February 4th, just a couple of weeks ago, with the United States investigators and, actually, the prosecutor, Mr. Diggs? Do you remember having that conversation?
A A telephone conference?
Q Yes.
A Yes.
Q Do you remember that?
A Yes.
Q Do you remember in that conference telling them that this firearm in question was actually recovered at a local store where mail was received?
A No, not this particular --
Q Sorry?
A What particular firearm are you talking about?
Q Do you remember saying that you received intelligence that a package addressed to Heydeck containing firearm parts was intercepted at a local store where mail is received?
A Yes.

Q Do you remember saying that?
A Yes.
Q Okay.
And do you know what type of firearm was recovered at the store?
A No.
Q Were you involved in the search of -- I'm not sure I'm pronouncing it right -- is it *Hey-deck*?
A Yes, Heydeck.
Q Were you involved -- sorry. I interrupted you.
A No problem. Continue.
Q Were you involved in the search of his apartment?
A No.
MR. BROWNE: Okay. Thank you very much.
THE WITNESS: Thank you.
MR. BROWNE: Have a good trip back.
THE WITNESS: Thank you very much.
THE COURT: Redirect?

REDIRECT EXAMINATION

BY MR. DIGGS:
Q Officer, this investigation, did it involve just one firearm seizure, as far as you know, or were there multiple?
A There were multiple firearm seizures.
MR. DIGGS: No further questions.
MR. BROWNE: Nothing further, Your Honor.

THE COURT: You may step down, sir. Thank you.

MS. DALTON: Your Honor, the next witness the government will call is Joakim Henriksen.

JOAKIM HENRIKSEN, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state your name for the record, and spell it for the court reporter.

THE WITNESS: My name is Sven Fredrik Joakim Henriksen.

THE COURT: You may inquire.

DIRECT EXAMINATION

BY MS. DALTON:

Q Good afternoon.

A Good afternoon.

Q What is your job?

A I work as a forensic examiner for the Swedish Police Department.

Q Where is your office located?

A It's located in Västerås in Sweden.

Q How long have you been a forensic examiner for the Swedish National Police?

A I've worked as a forensic examiner since 2008.

Q And what job did you have before you were a forensic examiner?

A I was a computer and server technician at IBM.

Q What are your duties as a forensic examiner?
A I do forensic examination of digital evidence, and most often computers and cell phones.
Q Did you receive any training on how to do forensic examinations of computers and cell phones?
A Yes.
Q What was that training?
A It's basic education, forensic education for 18 weeks at the Swedish Police Academy, and then forensic training on the different software we use.
Q And after that 18-week course, did you also get additional courses, more specific courses?
A Yes. In, like, operating system courses, and, like, regular computer -- like operating systems and how cell phones work and how computers work.
Q As a result of all that training or those two courses, are you familiar with the ways in which cell phones operate?
A Yes.
Q Are you also familiar with the ways cell phones store and retrieve information?
A Yes.
Q And are you trained in how to retrieve information off of cell phones in a forensically sound way?
A Yes.
Q During your career as a forensic examiner, approximately

how many cell phones have you examined?
A Thousands; about 200 a year.
Q Were you asked to examine two cell phones in this case?
A Yes.
Q Whose cell phones were they?
A They belonged to Mr. Heydeck and Mr. LavHage.
Q And what types of cell phones were these?
A Mr. Heydeck's phone was a Samsung, and Mr. LavHage's telephone was an iPhone.
Q Let's talk about Mr. Heydeck's phone first.
When was Mr. Heydeck's phone seized?
A It was seized on February 22nd, 2017.
Q And how did you get that cell phone?
A I got it from a locker where the police officer that seized the phone puts the phone, together with their request for examination, and we collect them from the locker.
Q Is that locker locked?
A Yes.
Q And who has keys to that locker?
A Our forensic department has keys to that locker.
Q How was Mr. Heydeck's phone packaged when you received it?
A It was packed in a plastic bag, a Ziploc bag, and marked with a case number and an evidence number.
Q Do you remember what the case and evidence number were for Mr. Heydeck's phone?

A Yes. 2017-5000-BG-19281-31.
Q Generally speaking, who creates that case and evidence number?
A The computer system. The officer that seized the phone creates a sequential number, and the computer system creates the number before the sequential number.
Q Once you received Mr. Heydeck's phone, did you write that number in your system?
A Yes.
Q Where did you write it?
A We have a computer system for the forensic department where all the evidence is registered.
Q And where would you have saved any extractions or images of that phone?
A All extractions are saved on our server. My forensic department has a lone server where we save all information extracted.
Q And do you have a method that you use to save it, like a folder structure?
A Yeah. We use, like, a top folder with the case number and subfolders with the evidence numbers.
Q What were you asked to do with Mr. Heydeck's phone?
A I was asked to do extractions and pass the information on to the officers that -- to the department when I do the analysis.

Q What kinds of methods did you use to extract data from Mr. Heydeck's phone?
A I used three different methods. One is called logical extraction; one is called physical extraction; and then I also did an ocular exam of the device.
Q Let's start with that first one, the logical extraction. Can you explain what a logical extraction is?
A Simply explained: A logical extraction, the software asks the phone, can you give me your call list, can you give me your SMS messages, and so on, and the telephone gives out whatever it can or whatever it wants to give.
Q What kind of product is generated by that software?
A It generates a file that is connected to that software, which only can be read by that software as well.
Q And how did you know that the extraction in this case was completed successfully?
A The software says, if it retrieved the information it was asked for, it says successfully completed; otherwise, it gives error messages.
Q Did you receive any error message running the software on Thomas Heydeck's phone?
A No.
Q Have you used that software in the past?
A Yes.
Q About how many times?

A Thousands of times.
Q Let's talk about next the ocular examination.
What does that mean?
A It means I have the phone in my hand and going through the application, which the logical exam is not able to retrieve data from.
Q So "ocular" refers to actually just looking at the phone?
A Yeah.
Q How do you save the evidence that you're seeing on the phone when you're doing that ocular examination?
A I would save them by taking photos of the screen.
Q In this case, when you looked at Thomas Heydeck's phone, did you get any additional information from this ocular examination?
A Yes. I believe I photographed a few different applications. I don't remember exactly which applications I photographed, but there was information in several applications, which I passed on to the investigator.
Q And typically when you're doing ocular examination, are there certain types of files or apps or something that you're focused on?
A Yes. Typically it's chat applications that we note.
Q And then, finally, you mentioned that you completed a physical extraction.
A Yes.

Q Can you tell me what a physical extraction is?
A A physical extraction is -- unlike the logical extraction that asks the phone to give you information, the physical extractions takes information from the phone. So it takes all the information from a specific memory area, and then decodes the information.
Q And what product is generated by that physical examination?
A Also a file that can only be read by that software.
Q Based on your training and experience, was the data extracted using these types of examinations from Mr. Heydeck's phone a true and accurate copy of the data that was stored in that phone?
A Yes.
Q What did you do with that data after you completed those three different types of examinations?
A In this case, the analysis was going to be done by another department, so then we create a shared folder between me and the officer that's going to make the analysis. So I created the shared folder with the same folder structure as they were saved.
Q So you created a folder that had the case number and evidence number on it?
A Yes.
Q Let's talk next about Mr. LavHage's phone.

When was that particular phone seized?
A It was seized on February 23rd.
Q How did you get that cell phone?
A It was also in those locked lockers as the other phone.
Q So same as Thomas Heydeck, an officer seized it, put it in a locker, and asked you to create a forensic examination of it?
A Yes.
MR. BROWNE: Counsel, can I point something out to you? I think he said December 23rd. It was actually February 23rd.
MS. DALTON: Oh, okay. Thank you.
Q (By Ms. Dalton) Just to confirm: Mr. LavHage's phone was seized on February 23, 2017?
A Yes.
Q Was that cell phone, Mr. LavHage's phone, also marked with an evidence and a case number?
A Yes, it was.
Q Do you remember that number?
A 2017-5000-19721-2.
Q I think that -- should we try that one again? I think it might be a little off.
So --
A 19791.
Q In advance of you coming to testify today, did you prepare

a report?
A Yes.
Q And in that report, did you talk about these examinations?
A Yes, I did.
Q Would seeing that report help refresh your recollection about the particular seizure number?
A Yes, it would.
Q Okay. I'm going to show you what has been marked as Government's Exhibit 19. Scroll down here.
A Yeah.
Q Does seeing this report help refresh your recollection about what Mr. LavHage's evidence and case number was?
A Yes. It should be BG-19791-2.
Q Can you read me the whole one?
A Yes. 2017-5000-BG-19791-1.
Q Thank you. It's a lot of numbers.
Once you received Mr. LavHage's phone, did you write that particular seizure number in your system?
A Yes. It was registered the same way as Mr. Heydeck's cell phone.
Q And how did you save the extractions from Mr. LavHage's phone?
A In the same way; with the top folder with the case number and evidence number and a subfolder.
Q Were you able to extract --

MR. BROWNE: Excuse me, counsel. I'm sorry.

Your Honor, I'll object to any testimony about Mr. LavHage's cellular phone, since I don't believe that's relevant in this case.

THE COURT: Response, counsel?

MS. DALTON: This particular witness is just talking about how he imaged that phone. The subsequent witness will talk about the context of that, but, in fact, it does have relevance to one point we mentioned in our opening statement.

THE COURT: I'll permit the testimony as to how he downloaded it, but he's not going to testify regarding the content.

MS. DALTON: That's fine.

Q (By Ms. Dalton) So were you able to extract data from Mr. LavHage's phone?

A Yes, I was able to make a logical exam of that phone and also an ocular exam.

Q So let's talk about, first, the logical extraction.

Did you receive any error message when completing that extraction?

A No.

Q Did it extract successfully?

A Yes.

Q In the ocular examination, did you look at Mr. LavHage's phone?

A Yes.
Q And after completing those two examinations, what did you do with the data?
A We created a folder with the officer that was going to do the analysis of the data.
Q Okay.
MS. DALTON: I have no further questions. Thank you.

CROSS-EXAMINATION

BY MR. BROWNE:
Q Good afternoon.
A Good afternoon.
Q When you did do a report -- I think you were just shown the report to refresh your memory, correct?
A Yes, yes.
Q And if you need any other help, it's Exhibit 19, if you need it.
A Okay.
Q Do you ever use Cellebrite?
A Yes.
Q Did you use Cellebrite in this matter?
A For the logical exam for Mr. Heydeck's phone, we used Cellebrite, and for the physical exam of Mr. Heydeck's phone, I used Cellebrite. For the other exams, I used another software called XRY.
Q And perhaps we're not all familiar with what Cellebrite

is. What is Cellebrite?
A It's a software which we use to extract data from telephones, mainly.
Q And you originally had some difficulty with Mr. Heydeck's phone regarding the physical extraction, correct?
A Yes. Physical extraction was not supported for that specific telephone model at the time of the investigation. And then during my investigation, our case was paused because -- because of other cases that were more important, and when we took up the investigation again in 2018, our software had been updated, so we were able to do it also on physical exam.
Q Okay. So there was new technology when you did the second exam?
A Exactly.
Q Okay.
And as far as the phone belonging to Mr. LavHage, you were not doing any physical extractions?
A No. Physical is not supported for that telephone.
Q And when you did the extractions on both of these phones -- let's start with Mr. Heydeck's -- who did you give the information to, what person?
A It was shared with Patric Malmberg.
Q And would that also be true of Mr. LavHage's?
A Yes.

MR. BROWNE: That's all I have. Thank you for coming. Have a good trip back.

THE WITNESS: Thank you.

THE COURT: Any redirect?

MS. DALTON: No, Your Honor. Thank you.

THE COURT: You may step down, sir. Thank you.

Ladies and gentlemen, it's time for your afternoon break. My first comment, which has nothing to do with this case, is that I'm married to a woman who was born in Sweden and moved to the United States at a very early age.

English is mandatory in Sweden from kindergarten through 10th grade. This is what you get, people who have a strong ability to communicate in English.

When I go to Sweden, I can say "please" and "thank you" on a good day. Other than that, I just kind of keep my mouth shut.

The second thing is, you'll remember what I just read you, which is a bunch of rules, one of which is "Why can't we talk about this case among ourselves until we've heard all the evidence?" Well, the answer is that last line. If we let you start talking about the case immediately, you'd say, "Oh, he was a great witness," "Oh, I didn't believe a word he said." We want you to hear all of the evidence, and then speak to each other about the facts. You'll have lots of time to do that.

It's frustrating because sometimes you just heard a really interesting tidbit or you want other people's thoughts about that interesting tidbit. I have to keep instructing you not to do that.

Your cell phones will work back there, but please don't do any research. Don't do any of those things I told you not to do.

You're welcome to check, if you use a social media site, in order to find out if your kids are going to be home at 4:30 or somebody is going to be late. Don't do anything related to this trial or the facts.

A friend of mine in Miami was in trial for ten months, and then found out one of the jurors had a blog. She was not happy to have to start the trial all over again. The juror wasn't happy about what happened to them.

Just now we have these rules. There's a reason for them. We're not hiding anything from you. We just want to make sure you have all the facts you need and that they've had an opportunity to be reviewed by both sides.

Other than that, I'll see you at 3:15.

Please rise for the jury.

(Court in recess 3:00 to 3:19 p.m.)

THE COURT: The government will call its next witness.

MR. DIGGS: Your Honor, the government calls Patric

Malmberg.

PATRIC MALMBERG, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state your name for the record, and spell it for the court reporter.

THE WITNESS: Patric Malmberg; P-a-t-r-i-c, M-a-l-m-b-e-r-g.

THE COURT: You may inquire.

DIRECT EXAMINATION

BY MR. DIGGS:

Q Good afternoon, Detective Malmberg. Could you tell the jury how you're employed?

A I'm employed in the Swedish Police. I'm the chief of the group working with the Transnational Serious Organized Crime, and that's what I do right now in the Swedish Police.

Q I called you a detective. Are you out every day working the streets, or are you doing something different?

A No. I'm an investigator.

Q What type of cases do you typically investigate?

A It's human trafficking, and sometimes, like this one, we get something from other nations.

Q Which city or town in Sweden do you work in?

A Västerås.

Q Sir, I want to direct your attention to an investigation in Sweden of individuals names Thomas Heydeck and Robin

LavHage. Were you involved in that investigation?
A Yes.
Q What was your role?
A I was interviewing Heydeck, and I was the one analyzing the telephones that were seized.
Q When you say "analyzing the telephones," does something happen before you look at the telephone?
A Yeah. The telephone was seized by other police officers, and they bring them back, and we have Joakim Henriksen that makes an image of the telephone, and then it comes to my computer, I pick it up, and I look at it.
Q So you come in after Mr. Henriksen has made an image?
A Yes, I do.
Q How do you assure yourself that the data you're reviewing on a computer, I presume, came from a specific phone?
A The phone that is seized gets a special sieze number, and when I look at the file in my computer, I see a seize number in that specific file.
Q Like on the folder in the computer?
A Yeah, on the folder in the computer and when I'm looking at the image as well.
Q And did you review seized information both for a phone from Mr. Heydeck and from Mr. LavHage?
A Yes, I did.
Q For the phone from Mr. Heydeck, did you confirm the folder

number matched the seizure for the phone?
A Yes, I did.
Q Was there also evidence within the image itself that told you who the phone belonged to?
MR. BROWNE: Your Honor, that's a leading question.
THE COURT: Sustained.
Q (By Mr. Diggs) Did you ultimately review the data recovered from Mr. Heydeck's phone?
A Yes, I did.
Q In looking at that evidence, what type of items did you see?
A I saw a few images from -- I don't know what you say -- but package numbers, I saw contacts in the contact book, I saw some emails.
Q And did the content of those emails give you any evidence as to who had owned the phone?
A Yes.
Q And who was that?
A Thomas Heydeck.
Q Okay.
If you would, sir, look at -- in front of you, you've got two binders there. One of them says "government's exhibits," and one of them says "defendant's exhibits." If you'd look at the government exhibits binder and turn to Exhibits 10A through 10E, and look at those, please.

A Yes.
Q Okay. Have you previously seen those exhibits?
A Yes, I have.
Q What are they?
A These are -- they're images from -- I guess it's Heydeck's phone. It can also be in the LavHage phone, but --

MR. BROWNE: Your Honor, I object. We need to have a bit of foundation as to whose phone it is.

THE COURT: I'll sustain the objection.

Q (By Mr. Diggs) Looking at those images --
A Yes.
Q -- which phones did you observe those images on?
A I found those in both phones.

MR. DIGGS: The government offers Exhibits 10A through 10E.

THE COURT: Mr. Browne, any objection?

MR. BROWNE: Your Honor, I think we need to go through them item by item, so I would object at this point.

THE COURT: Okay. Let's go through them item by item, starting with 10A. Is there any objection to 10A?

MR. BROWNE: There is an objection, unless we can figure out whose phone it came from.

THE COURT: He said it came from both of them.

MR. BROWNE: Okay.

THE COURT: You may proceed. It is admitted and may

be published.

(Exhibit 10A admitted.)

MR. DIGGS: Is that 10A, or 10A through E?

THE COURT: 10A.

Q (By Mr. Diggs) Detective Malmberg, would you look at 10B?

A Yes.

Q Where was that photograph found?

A In Heydeck's phone.

Q Was it also found in LavHage's?

A Yes.

MR. DIGGS: Government offers 10B.

THE COURT: Any objection?

MR. BROWNE: No.

THE COURT: 10B is admitted.

(Exhibit 10B admitted.)

Q (By Mr. Diggs) And 10C, where was that image found?

A In Heydeck's phone and in LavHage's phone.

MR. DIGGS: The government offers 10C.

MR. BROWNE: No objection, Your Honor.

THE COURT: 10C is admitted.

(Exhibit 10C admitted.)

Q (By Mr. Diggs) And 10D, where was that image found?

A In Heydeck's phone and in LavHage's phone.

MR. DIGGS: Government offers 10D.

MR. BROWNE: E?

MR. DIGGS: D.
MR. BROWNE: No objection.
THE COURT: 10D, as in "dog," is admitted.
(Exhibit 10D admitted.)
Q (By Mr. Diggs) Turning to Exhibit 10E, do you recognize that screenshot?
A Yes.
Q Where was that one found?
A In Heydeck and LavHage's phone.
MR. DIGGS: Government offers Exhibit 10E.
MR. BROWNE: No objection, Your Honor.
THE COURT: 10E is admitted.
(Exhibit 10E admitted.)
Q (By Mr. Diggs) Would you also turn to Exhibit 11, sir?
A Yes.
Q Do you recognize that photograph?
A Yes, I do.
Q How do you recognize it?
A I've seen it in Heydeck's phone and in LavHage's phone.
MR. DIGGS: Government offers Exhibit 11.
MR. BROWNE: Your Honor, may I voir dire briefly on that?
THE COURT: Yes.
VOIR DIRE EXAMINATION
BY MR. BROWNE:

Q Good afternoon, sir.
A Good afternoon.
Q For instance, on all these exhibits, but let's talk about 11, there is a large number beginning with "E" as in "Edward" and "H" as in "Harry." What is that number?
THE COURT: That's not voir dire, counsel. That's inquiring for discovery purposes.
MR. BROWNE: No, Your Honor. It's in aid of my objection as to whether this is even relevant. I don't --
THE COURT: These are -- the phones that they're coming from, I think, have been established as relevant. I mean, do you know what this is, sir? Are we just fishing?
MR. BROWNE: No.
THE COURT: All right. I'll permit the question, but we need a basis for your voir dire.
Q (By Mr. Browne) Do you have any idea what that number is and whether that relates to Mr. Heydeck's or the other gentleman's phone?
A Do you mean the whole number with the letters as well?
Q It begins "8H."
A No idea.
Q No idea.
MR. BROWNE: Your Honor, I would object unless there's some foundation laid as to which actual phone it came from and what the relevance is.

THE COURT: Well, I'm going to overrule the objection. The testimony three times is that they each had this image in the phone. So the exhibit is admitted.

(Exhibit 11 admitted.)

MR. DIGGS: Your Honor, permission to publish 10B.

THE COURT: 10A is admitted and may be published.

MR. DIGGS: That was "B" as in "boy."

THE COURT: Then 10B is admitted and may be published.

(Exhibit 10B admitted again.)

Q (By Mr. Diggs) Detective Malmberg, I'm showing on the screen --
A Yeah, I see it.
Q -- a screenshot, which is marked as Government's Exhibit 10B.

Are all of 10A through 10E similar screenshots to this one?
A Yes.
Q With a bar code, a number below it?
A Yes.
Q And at the bottom, the name "Dingo D"?
A Yes.
Q Were you able to determine how Mr. Heydeck received these screenshots?
A Yes. He was -- he had them --

MR. BROWNE: Objection, Your Honor. This calls for hearsay.

MR. DIGGS: I don't think it does, Your Honor.

THE COURT: Overruled. We don't know how he got it. How can it be hearsay?

MR. BROWNE: Your Honor, respectfully, it sounds like it calls for hearsay; it's not personal knowledge.

THE COURT: The objection is overruled.

Q (By Mr. Diggs) You may answer.

A What I'm looking at in Heydeck's phone, I see that he has been getting these images of LavHage by message, SMS, MMS.

Q Who was he receiving them from?

A From LavHage.

Q And is that information you were able to determine from Mr. Heydeck's phone?

A Yes.

Q Did you say "SMS"?

A Yeah. I don't know if it's in -- in the bottom, when I'm looking at it, it says "Messenger" messages, and it can be text messages, which is SMS, and it can be a picture of it, and then it's an MMS, so it's both.

Q And just so we're clear, the direction of the message was from LavHage to Heydeck?

A Yes, it was.

Q Were you able to determine when these images were received

by Mr. Heydeck?
A Yes, I was.
Q Do you remember the approximate timeframe?
A I believe it was between the 13th and 17th of February 2017, something like that.
Q Is that the case for all of the images shown in 10A through 10E?
A Yes.
Q Is it also the case for the image shown in 11?
A Yes.
Q Did you search the contacts of Mr. Heydeck's phone?
A Yes, I did.
Q And did you find a contact for LavHage?
A Yes, I did.
Q What was it listed as?
A "LavHage."
Q Was there a phone number associated with that contact?
A Yes, there was.
Q How did that phone number compare to the phone that you searched associated with Mr. LavHage?
A It was the same.
Q And in searching Mr. LavHage's phone, did you find, as well, Exhibits 10A through 10E?
A Yes, I did.
Q Did you find additional screenshots of customs forms in

Mr. LavHage's phone that were not in Mr. Heydeck's phone?
A Yes, I did.
Q Would you turn, sir, to what's been marked as Government's 12A through 12C in the binder in front of you?
Do you recognize those screenshots, sir?
A Yes, I do.
Q How do you recognize them?
A I saw them in LavHage's phone.
MR. DIGGS: Government offers Exhibits 12A, 12B, and 12C.
MR. BROWNE: I apologize. I did not hear the witness's response.
THE COURT: The response was, "I saw them in LavHage's phone."
MR. BROWNE: Thank you, Your Honor. No objection.
THE COURT: They're admitted and may be be published.
(Exhibits 12A, 12B, and 12C admitted.)
Q (By Mr. Diggs) Showing you Exhibit 12A, these exhibits also had the "Dingo D" on them?
A Yeah, they did.
Q Were you able to determine, in searching LavHage's phone, the source of the Dingo D, where it came from?
A Yeah. I looked at his phone physically, and I saw in the application that he had in the phone that was Telegram, and when I opened Telegram, he had a contact called "Dingo D."

Q Are you familiar with the application Telegram?
A Yeah, I am.
Q What is it?
A It's an encrypted application, so you can -- you can set it for how long messages is going to be in the phone. So you can set it for an hour, a day, a week, if you want to.
Q Would you turn, sir, to what's been marked as Government's Exhibit 29 in the binder?
Do you recognize that photograph?
A Yeah, I do.
Q What is it?
A It's from LavHage's telephone, and it's the application, Telegram.
MR. DIGGS: Government offers Exhibit 29.
MR. BROWNE: No objection, Your Honor.
THE COURT: Exhibit 29 is admitted and may be published.
(Exhibit 29 admitted.)
Q (By Mr. Diggs) Sir, is this the reference to Dingo D in the Telegram application you were referring to?
A Yes, it is.
Q Did you search the contacts of Mr. LavHage's phone as well?
A Yes, I did.
Q Did you observe any telephone numbers recognizable to you

as a United States phone number?
A Yes, I did. He had two contacts with the same number.
Q And what were the same contact names for that number?
A "US Barrel" and "USA."
Q Do you recall the telephone number?
A Yes, I do; (425) 531-8540.
MR. BROWNE: Did you say "40"?
THE WITNESS: 4-0.
MR. BROWNE: Thank you.
Q (By Mr. Diggs) Upon observing this number, did you provide it to United States law enforcement?
A Yes, I did.
MR. DIGGS: If I may have a moment, Your Honor?
That's all for this witness.
THE COURT: Mr. Browne?
MR. BROWNE: Thank you, Your Honor.
Your Honor, I have no questions.
THE COURT: Thank you, sir. You may step down.
MR. DIGGS: The interpreter may step down. Thank you, ma'am.

MATTHEW CHEN, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state your full name, and spell your last name for the record.
THE WITNESS: Matthew Chen; M-a-t-t-h-e-w; last name,

C-h-e-n.

THE COURT: You may inquire.

DIRECT EXAMINATION

BY MR. DIGGS:

Q Good afternoon, Mr. Chen.

A Good afternoon.

Q You can go ahead and close those binders in front of you to make some more room.

Sir, how are you employed?

A I work for Glock, Incorporated.

Q What do you do for Glock?

A I'm the Western United States regional manager.

Q What does that mean to be the Western United States regional manager?

A I oversee the law enforcement and commercial activity for a majority of the West Coast.

Q And so on a day-to-day basis, what types of things are you doing?

A On a day-to-day basis, I'm managing our field factory representatives and assisting them in their daily duties with law enforcement, as well as the commercial market. I also serve as their point of contact when they need assistance directly from the factory as well.

Q Do you have regular communication with the Glock factory as that intermediary?

A Yes, I do.
Q What type of firearms does Glock make?
A We make handguns.
Q And where are these firearms made?
A The firearms are made in Austria, as well as the United States, in our factory in Atlanta, Georgia.
Q Does your role as the West Coast regional manager cover the distribution and servicing of both the Austrian-made and United States-made Glock handguns?
A Yes.
Q And is your company, Glock, Inc., the sole importer of Glock handguns into the United States?
A Yes.
Q Do you distribute any firearms other than Glock?
A No.
Q In your role, are you familiar with the manufacturing process for Glock firearms?
A Yes.
Q Have you observed that manufacturing process both in Austria and in the United States?
A Yes.
Q Are the specifications for making those firearms the same in Austria and in the United States?
A Yes, they are.
Q In your role, are you familiar with the records maintained

related to the manufacture of Glock firearms?
A Yes.
Q Are those recordkeeping systems the same for Glock firearms made in the United States and for Austria?
A Yes, they are.
Q So in your role, are you familiar with various components of a Glock pistol?
A Yes.
Q Have you previously reviewed the animation that's marked as Government's Exhibit 47?
A Yes.
Q And would that animation assist you in describing a couple of the major components of a Glock firearm?
A Yes.
MR. DIGGS: Your Honor, the government offers this exhibit as a demonstrative to assist the witness's testimony, and so it's a video, so you're not going to find anything too helpful in your binder.
THE COURT: Mr. Browne, have you seen this?
MR. BROWNE: Yes.
Did you say for demonstrative purposes?
MR. DIGGS: Yes.
MR. BROWNE: No objection.
THE COURT: You've previously seen it?
MR. BROWNE: Yes. Well, my staff has.

THE COURT: All right. Exhibit 47 is admitted for demonstrative purposes.

(Demonstrative Exhibit 47 admitted.)

THE COURT: Ladies and gentlemen, a subtle difference there. I've admitted some exhibits. Those are exhibits in the case. They will go back to the jury room with you.

A demonstrative exhibit is something that is exactly that. It's to help explain something that's going to be the witness's testimony. Demonstrative exhibits don't back into the jury room.

Many times they're they most interesting part of the trial, and I get notes from the jury saying, "Where the heck is this?" The answer is, it's out here, and you don't get it. So this is something that if you're really interested in it, you might want to take notes because you will not have it available to you in the jury room.

Thank you, counsel.

Q (By Mr. Diggs) Mr. Chen, before we show this short animation, do you recall, from seeing it, which type of Glock is shown in the animation?

A Yes. I believe -- it's a rather generic image, but I believe it's a compact model 19 or possibly 23.

(Video is played.)

Q (By Mr. Diggs) Okay. I'm going to stop it there for a moment.

What's this item that has the yellow dot on it?
A That is a magazine.
Q How about this item?
A That is the slide with barrel and recall spring assembly.
Q And the item circled below?
A That is a complete frame.
Q And is a frame also referred to as a receiver?
A It can be, yes.
Q Are these just components of the barrel that are being disassembled?
A That is the firing pin mechanism and firing pin channel liner.
MR. DIGGS: Your Honor, I'd like to show it one time through without stopping it. It's very short.
THE COURT: I'll permit it.
(Video is played.)
MR. BROWNE: Your Honor, may I have just a moment to talk to the agent about something?
(Brief pause in proceedings.)
MR. BROWNE: Thank you, Your Honor.
Q (By Mr. Diggs) Mr. Chen, Exhibit 1A has been admitted. I'm going to show it to you on the screen. Do you recognize that?
A Yes.
Q What is it?

A That is a frame of a Glock pistol.
Q Are you able to say what make or model it is?
A Yeah. Based on the image, it would appear to be a Model 34, due to the configuration of some of the components.
Q Showing you what's been admitted as Government's Exhibit 1B, do you recognize this?
A Yes, I do.
Q What is this?
A That is the view of the frame from the top, down, and the numbers you're seeing is what we call the DMC, or Data Matrix Code, and that is a clear text version of that DMC.
Q Where on the frame is that DMC imprinted?
A It's on the left-hand side of -- for the clear text.
Q You called it a DMC? What does that stand for?
A It's a Data Matrix Code.
Q What's the purpose of a Data Matrix Code?
A The Data Matrix Code is a very valuable piece of the production tracking. It tells us just about everything we need to know about that specific part that's being manufactured.
We can track the country of origin. We can track the raw materials that were used. We can track the machines that were used. We can track the production sequence, as well as even down to the operator who was working that machine, down to the minute and second.

Q Is it a unique code, meaning is it only applied to one item?
A Yes. Our ERP system only allows for one DMC to exist at a time. It's not possible to enter in the same number more than once.
Q You said "ERP system." What does that stand for?
A "Enterprise Resource Planning System."
Q When does the DMC code get imprinted on a frame like that?
A The DMC code is imprinted on that frame during the final molding process of the frame. It's a totally enclosed, encapsulated process, where the frame comes out of the mold and robotically is placed in a laser jig, if you will. And there are cameras that will check and double-check for redundancy, the number being engraved on that frame. Also the DOT matrix code, which is a machine-readable version of the clear text code as well, but can be used by both camera and scanner.
Q Sir, what is a serial number as it relates to Glock firearms?
A So the serial number is the unique number to that for the manufacture that we place on the frame. And once the serial number is on the frame, the frame becomes the firearm at that time. The serial number also can be referenced by looking up the DMC codes.
Q If you look at what's been admitted as Government's

Exhibit 1A, can you mark on your screen where the serial number would apply on this firearm?
A Yeah. Can I mark --
Q It should be interactive.
A So on this location underneath the dust cover of the frame -- you'd have to turn the frame upside down to see it -- but there is an imprinted metal tab with the serial number that is imprinted per ATF regulation on that frame.
Q And could you mark, if you can, where the DMC code would be on the frame, the readable one?
A The clear text, yeah.
Q So is it correct that every Glock firearm will have both a Data Matrix Code and a serial number on it?
A Yes. So the serial number is unique to the frame, but if you look at a Glock pistol, you'll also notice that serial number, which we also refer to as the "weapon ID," is also on the barrel and the slide assembly.
Because the serial number is unique to the frame and the firearm, we only call it the serial number when it is on the frame, but it is also located on the slide and barrel as well.
The slide and the barrel also have their unique DMC or production tracking number as well. That gives us all the production information.
Q Is the pairing unique in that only one DMC can be paired

with a single serial number?
A Yes. The system only allows for one pairing at a time. The operation numerator is part of the system that will assign the serial number to the specific product DMC.
It's very important for us because we use it for maintaining our -- it's a very, very regulated production process, as well as our quality assurance and accountability. So we can backtrack if there is any issue with the production. We can backtrack and look very far back into the earliest phases of the components' history and determine what type -- what went wrong where, as well as maintain compliance with the ATF.
Q What is the name of the records system where the DMC and the serial number are retained?
A It's all in a module of the ERP system, our Enterprise Resource Planning system. The ERP system consists of several modules, and it works -- from sales to customer service, planning production. It incorporates all of that. It's what keeps us moving on a day-to-day basis.
Q What's the purpose for which you use the ERP system?
A From my standpoint, there are two times I've really utilized something like this. One is in the warranty part, which is pretty rare. But if there was -- if we were seeing an issue with a certain series of pistols, we could look back using that DMC number or the serial number, and look back to

almost the birth of the pistol, look back to where something might have gotten mixed up; if a tool was in the incorrect position, if the operator was not utilizing their -- there are a number of different things that can go into the frame-building process, and that allows us to backtrack all of that very, very accurately.

The second time is in assisting law enforcement. If a frame or a pistol is recovered, or even -- oftentimes there -- I think during the California wildfires is a good example, when we had large amounts of handguns with agencies and civilians alike that were destroyed in the fire. The intense heat damaged a lot of the frames and, in many case, the slides as well beyond recognition. And using -- if we're able to recover a DOT matrix code or a data matrix code in clear text, that would allow us to give those records to law enforcement, if they so needed it.

Q Is this ERP record the primary record that allows Glock to track the production history of its firearms?

A Yes.

Q Is it the primary record that Glock uses to comply with ATF regulations that it track the production history of its firearms?

A Yes.

Q Would you turn, sir, in the binder in front of you, to Government's Exhibit 13? Are you there?

A Yes.
Q Do you recognize that record?
A Yes, I do.
Q And what is it?
A This is a result of a query based on a Data Matrix Code that was input. This is in the Austrian system, so it's in German, but because the U.S. utilizes the same system, the numbers are recognizable. So I can look at a number here and understand what it related to in the English translation.
Q Are these ERP records regularly made in the normal course of Glock's business?
A Yes.
Q Are these records made at or near the time of the event being shown by the record?
A Yes. When the process is complete, the transaction time is noted. And in this search query, it has -- you can see the transaction times where the certain part was -- the serial number was applied to that part.
Q Are these records regularly kept in the course of Glock's business?
A Yes. In accordance with ATF, we maintain these -- Glock will maintain these for the life of the company, and if the company goes away, they'll be submitted to ATF for their records.
MR. DIGGS: Government offers Exhibit 13, Your Honor.

THE COURT: Any objection?

MR. BROWNE: May I inquire?

THE COURT: Yes.

VOIR DIRE EXAMINATION

BY MR. BROWNE:

Q Good afternoon, sir.

A Hi. Afternoon.

Q So the purpose of this exhibit is to relate the DMC code to the serial number? Is that what that exhibit does?

A Yes. You can see the DMC, and when that's entered, you can see the weapon ID it relates to, which, in the case of the frame, that would be the serial number.

MR. BROWNE: Okay. Thanks. That's all I wanted. I have no objection, Your Honor.

THE COURT: Exhibit 13 is admitted and may be published.

(Exhibit 13 admitted.)

Q (By Mr. Diggs) Sir, what does the column "Data Matrix Code" refer to?

A Data Matrix Code will refer to the DMC that is laser engraved into the frame in this case, or imprinted on the barrel or slide.

Q So if we were to take the first one, what does that correspond to?

A The first one is going to refer to the barrel, I believe,

on this one.
Q Okay. And the second?
A Would be the slide.
Q And the third that's circled in red?
A That is a frame.
Q All right.
And do you know what the status "GUT" refers to?
A Yes. That's a production status. So if the part meets spec when produced, in English it would say "good." If there was an issue with the production, it would say "scrapped" or "destroyed" as well. So that just gives you the component status when it's manufactured.
Q Were there any issues with this DMC code?
A No. These were all good.
Q Directing your attention to the column "Waffen ID," what does that refer to?
A The Waffen ID, that is the weapon ID. In the case of the barrel -- I'm sorry -- the frame, that is the serial number for this pistol.
Q Based on this record and your familiarity with Glock's recordkeeping system, what is the serial number for the frame that bears Data Matrix Code 1534020919?
A That is BATR295.
MR. DIGGS: Just a moment, Your Honor.
That's all I have.

THE COURT: Mr. Browne?

MR. BROWNE: Could we see 1A? Is that on your screen?

THE COURT: You have to push the button.

CROSS-EXAMINATION

BY MR. BROWNE:

Q This is a lower receiver?

A It can be.

Q And what is the other term you used?

A We use "frame."

Q Frame. Okay.

And this is not a slide?

A This is not a slide.

Q Okay.

And I think you just answered this question, but I just want to make it clear. The DMC code is unique; true or false?

A True, it is unique.

Q Okay. And by using the DMC code, you can determine the serial number?

A The serial number and the weapon ID.

Q Okay.

MR. BROWNE: That's all I have, Your Honor.

THE COURT: All right. Any redirect?

MR. DIGGS: No, Your Honor. Thank you.

THE COURT: You may step down, sir. Thank you very much.

THE WITNESS: Thank you.

MR. BROWNE: Your Honor, with the court's indulgence, I would like to call Mr. Malmberg back because I forgot to ask him some questions. He's still here.

THE COURT: Mr. Diggs, do you object?

MR. DIGGS: No, Your Honor, but I want to make clear once these witnesses are released today, they are going back to Sweden. I'm not sure which way that cuts, other than once they're gone, they're gone.

MR. BROWNE: Got it. That's why I asked.

THE COURT: Unless he subpoenas him.

Mr. Browne, you may recall him.

Please come down, Mr. Malmberg. You're still under oath, sir.

THE WITNESS: Yeah, okay, good.

PATRIC MALMBERG, HAVING BEEN PREVIOUSLY SWORN, TESTIFIED AS FOLLOWS:

CROSS-EXAMINATION continued

BY MR. BROWNE:

Q Welcome back.

A Thank you.

Q Mr. Malmberg, is there a book in front of you that says "Defense Exhibits" rather than "Government Exhibits"?

A Yes.
Q Could you go to Tab A-20?
THE COURT: Mr. Browne, before tomorrow, can I get one that has tabs in it?
MR. BROWNE: We delivered those this morning. And I apologize, but they were delivered this morning. But, yes, the answer to your question is yes.
THE COURT: Approximately where is A-20?
MR. BROWNE: It is Page No. 1309. It's halfway through. It's a Department of Homeland Security detailed investigation report.
THE COURT: Okay. Please continue, and please get it tabbed. Your may continue, sir.
MR. BROWNE: Thank you, Your Honor.
Q (By Mr. Browne) Sir, did you have a chance to look at that? Just read it over to yourself.
MR. DIGGS: Mr. Browne, is that A-20?
MR. BROWNE: It's A-20.
THE COURT: Please continue.
Q (By Mr. Browne) Did you get a chance to read it?
A Yes.
Q Do you remember having a conversation on the phone, I believe, with agents from the United States concerning this matter, on January 27th, 2019?
A Yeah. We talked about several other shipments, yes.

Q Okay. The question was, do you remember what's chronicled in this exhibit, which was a conversation on January 27th, 2019?
A I don't remember exactly what we were talking about on the 27th of January.
Q Do you remember having a conversation, and on the phone was Mr. Diggs and Ms. Dalton? Do you remember that?
A Yeah. I've been talking to them, yeah.
Q Okay.
Do you remember, in that conversation of January 27th, 2019, that a firearm slide was retrieved from Mr. Heydeck; isn't that what it says?
A I don't know if it --
MR. DIGGS: Objection as to the form of the question, Your Honor. He's asking what it says.
THE COURT: Why don't you ask him if it refreshes his recollection; otherwise, it's hearsay.
MR. BROWNE: Sure. Let me do a better foundation, Your Honor.
Q (By Mr. Browne) Did you inform the United States attorneys and the agents that the item in question was a firearm slide?
A Yeah. We talked about the slides that we seized from a postal office.
Q That was my next question.

You did talk about a slide, right?
A Yeah, we did.
Q Okay. And received from a postal office, correct?
A Yes.
Q Okay.
A And the postal office is the same as a food --
Q Right. It's a store?
A Yes.
THE COURT: Don't step on his answer. You may finish your answer.
A From a food store. They have a postal office in there.
Q (By Mr. Browne) Thank you.
And in that conversation, you said the source of the slide was Mr. LavHage. I can't pronounce that name.
A LavHage.
Q Yes. You said that was the source of it, correct?
A What do you mean, "the source"? That he was the one getting it, or...?
Q Did you tell the agents and the U.S. attorneys in that conversation that Heydeck stated that LavHage was the source of the firearm?
MR. DIGGS: Objection; calls for hearsay as to what Mr. Heydeck told him.
THE COURT: Mr. Browne, your question was, "Did you tell the agents and the U.S. attorneys in that conversation

that Heydeck stated that LavHage was the source of the firearm?"

Is that the question you wanted to ask?

MR. BROWNE: Yes, Your Honor.

THE COURT: Why is that not hearsay?

MR. BROWNE: It is.

THE COURT: Then the objection is sustained.

MR. BROWNE: Thank you. Sorry to have to call you back.

THE COURT: You may step down, sir. Thank you.

Ladies and gentlemen, while the government sorts out what it does next, you've heard the phrase "hearsay" used, and you'll hear it a lot in this trial. You've all graduated from your first semester of law school at this point, and you're now in your second. You're taking evidence.

The hearsay rule says that someone can't say "so-and-so told me something." Your witness is then vouching that this is what a third person said. They also, then, in Chapter 11 of the evidence rules, have 127 exceptions to the hearsay rule.

So you can't really tell sometimes until you hear the answer if it's hearsay or not because it may fit into one of those exceptions.

But on the final exam, there will be a hearsay question, I can assure you, and you'll ace it with that amount of

knowledge.

The government's next witness, please, for ten minutes or so.

MR. DIGGS: The government calls Mr. Nguyen.

THE CLERK: Please come forward.

NHOH NGUYEN, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state your full name for the record, and spell your last name for the court reporter.

THE WITNESS: Nhoh Nguyen; N-h-o-n, N-g-u-y-e-n.

THE COURT: You may inquire.

DIRECT EXAMINATION

BY MR. DIGGS:

Q Where do you live?

A In Seattle.

Q What do you do for work?

A I'm a behavioral health case manager.

Q Who is your employer?

A The Crisis Solution Center, under the umbrella of Downtown Emergency Service Center.

Q And who do you provide services to?

A To the Seattle homeless that's brought in by the police department or the ER.

Q Sir, do you go by a nickname?

A I go by "Leon" since college.

Q And is this a common nickname? Most people call you Leon?
A I don't know if it's common, but they call me Leon.
Q Sir, what are your hobbies?
A Before used to be volleyball, swimming, but shooting guns is also one of my hobbies.
Q When did that become one of your hobbies?
A Back in 2015.
Q Mr. Nguyen, do you know the defendant, Hany Veletanlic?
A Yes, I do.
Q And could you identify him by something he's wearing?
A I think a green sweater.

MR. DIGGS: The record should reflect --

MR. BROWNE: We have no objection to the ID, Your Honor.

THE COURT: All right. The consent is noted. Please continue.

Q (By Mr. Diggs) How long have you known Mr. Veletanlic?
A Since about 2015.
Q And in what context did you know him?
A We traded guns, and we hang out to shoot guns and things like that.
Q Where did you shoot guns?
A Usually at my -- at my gun range, Wade's Eastside Gun, or sometimes outside in the pits out nowhere.
Q I'm sorry. I didn't hear the end of that.

A Sometimes out in, you know, pits that people go out to shoot.
Q Outdoor areas?
A Yes.
Q Did Mr. Veletanlic appear knowledgeable about firearms to you?
A Yes, very much.
Q Knowledgeable about different brands of firearms?
A Yes.
Q Different types?
A Yes.
Q Can you give an example of his knowledge?
A He seemed to know everything about guns, and at that time I'm like a newbie. He knows. He knows his guns.
Q Sir, do you own a number of guns?
A I do.
Q Did Mr. Veletanlic ever assist you in servicing or polishing any of your guns?
A Yes. They, basically, call it a 25-cent trigger job, where you're just basically polishing the metal parts of the gun that glide, you know, together, and it doesn't cost anything. That's why they call it 25-cent trigger job.
Q And Mr. Veletanlic did that for some of your guns?
A Yes, yes.
Q Have you ever been to his house?

A Yes.
Q Have you seen his firearm collection?
A Yes.
Q And did you ever see a silencer at his house?
A Yes.
Q Did Mr. Veletanlic tell you to where he got that silencer?
A No.
Q What was the caliber of the silencer, if you recall?
A I believe it was a .22 LR, .22 long rifle.
Q What, if anything, did you and the defendant do with the silencer?
A We took it out back and shoot it into the ground.
Q Sir, I want to direct your attention to February of 2017. Did you purchase a Glock Model 34 in that time frame?
A Yes.
Q In front of you, Mr. Nguyen, is a binder marked "Government's Exhibits" on the cover. Do you see that?
A Yeah.
Q Would you turn to the tab marked Exhibit 15?
A Okay. I'm here.
Q Do you recognize that?
A Yes. It's me.
Q What is it?
A It's a FFL transfer form.
Q And are you the transferee or the buyer on that form?

A I am the buyer.

MR. DIGGS: Government offers Exhibit 15.

MR. BROWNE: No objection.

THE COURT: Exhibit 15 is admitted and may be published.

(Exhibit 15 admitted.)

Q (By Mr. Diggs) Sir, what is a firearms transaction record like this?

A What is this?

Q Yeah. What is the form used for?

A This is used to transfer ownership from one person to another person, and it's done at an FFL dealer.

Q And an FFL dealer, what is that?

A It's a place where they, Your Honor, have a license to buy, sell, and do transfer of guns.

Q And this was for a firearm that you purchased?

A Yes, at Precise Shooter.

Q Is this your signature?

A Yes, it is.

Q And is February 8th, 2017, the date that you purchased these firearms?

A Yes. That is my handwriting.

Q How many firearms did you purchase associated with this form?

A On the third page it says two.

Q Are these the two firearms that you purchased on February 8th, 2017?
A Yes.
Q Is the highlighted firearm the Glock 34?
A Yes.
Q What was the serial number of that firearm that you purchased?
A It's BATR295.
Q What did you do with that Glock 34 after you purchased it?
A I shoot it, which normally what I would do, I would go shoot it.
Q Could you pull the microphone a little closer to yourself?
A I would probably go shoot it. I'm pretty sure we go shoot it.
Q Would you shoot the firearm the same day after you bought it -- excuse me -- the same day that you bought it?
A Normally the same or the next day.
Q After shooting the Glock 34, what did you do with it?
A I sold it to Hany.
Q Is that Mr. Veletanlic?
A Yes.
Q Where did you sell it to him?
A I think probably at Wade's Eastside Gun, maybe after we meet together and shoot.
Q How much did you sell it for?

A Usually at cost plus the $25 transfer fee.
Q How did he pay you for it? What form of payment?
A It would be cash.
Q When you sold it to Mr. Veletanlic, was it intact?
A Yes.
Q You didn't take it apart and sell one part to him?
A No.
Q Had you taken off the serial number of that firearm before you sold it?
A No.
Q Showing what's been admitted as Government's Exhibit 1A, is this consistent with the frame of the firearm you sold Mr. Veletanlic?
A It is consistent.
Q Sir, you were interviewed by law enforcement agents in this case on May 30th, 2017; do you recall that?
A Yes.
Q Were you asked about this same firearm?
A Yes.
Q What did you tell the law enforcement agents that you'd done with this firearm after you purchased it?
A Basically, I lie.
Q What did you say?
A I said it was lost.
Q Why didn't you tell the truth initially?

A I was afraid. I was scared for myself and for Hany.
Q After the agents left your house on May 30th, 2017, what did you do next?
A Well, I called Hany and said that the agent came by, visit, and I think he should give them a call. I give him the agent's contact information.
Q Okay.
MR. DIGGS: If I may have a moment, Your Honor?
No further questions.
THE COURT: Mr. Browne, how long will you be with this witness?
MR. BROWNE: Nothing.
THE COURT: All right. That's even better.
You may step down, sir. Thank you very much.
THE WITNESS: Thank you.
THE COURT: Mr. Browne, I interpreted that as you have no questions.
MR. BROWNE: "No time," I guess, would be the appropriate answer.
THE COURT: All right.
Ladies and gentlemen, I'm going to get you out of here ten minutes early. The lawyers have asked to take up a matter, which we have to take up outside the presence of the jury. We try very hard never to do that while you're here, so we use your time wisely. But I figure if you have ten minutes

extra to make your bus or whatever, you won't be too upset about that.

Let's review the rules. When you go home tonight and they ask if you were picked for the jury, you can say yes. "What's the case about?"

"None of your business."

"When can you tell me?"

"After we finish our deliberations."

You're free to talk to your employer and say, "I've been selected for a jury," and give them an estimate out of how long you're going to be gone.

I'll ask you not to talk about the case among yourselves. Wait until you hear all the testimony. We got in a lot of testimony today. Don't do any research. Don't go online typing in some juicy name or whatever. You'd be amazed what comes up. And lastly and most importantly, please keep an open mind. The government is putting on its case right now. Mr. Browne is cross-examining the witnesses. The defense doesn't get to put on its case until the government rests. Remember the defendant is innocent until proven guilty. I'll ask you to keep an open mind.

Please come in maybe ten minutes before 9:00 tomorrow. The lobby shouldn't be as congested tomorrow, but there may be a snowstorm or a semi will jackknife on I-5 and you won't be able to get here. We can't start until you're all here.

With that, please have a wonderful evening.

Please rise for the jury.

THE FOLLOWING PROCEEDINGS WERE HELD
OUTSIDE THE PRESENCE OF THE JURY:

THE COURT: Mr. Browne?

MR. BROWNE: Thank you, Your Honor.

This will be brief because the people that are left in my office are researching it now.

I'm going to move, at some point, to dismiss Count 1. I assumed all along that the government would have the actual receiver in evidence. I don't believe a photograph would do.

So I'm just bringing the court's attention to that. We were going to research it. I'm actually very surprised they don't have it. And then if I'm right that they need to have it, then we'll bring that to the court's attention, and then we'll move to withdraw Exhibit A. But I don't know what the law is right now. Somebody is working on it.

THE COURT: All right. And I don't know what all the testimony is going to be.

MR. BROWNE: That's right.

THE COURT: All right. Counsel, I'll see you all -- we rarely ever get started on time on day two because it's going to snow tonight or something terrible is going to happen. And all those people that ride the bus mistakenly think when it says it's going to be Downtown at 7:30, it's

going to be here at 7:30 as opposed to ten minutes to 9:00. But we can do what we can, which is to be here on time, and if there are matters to take up and the jury isn't here yet, that is a good time to do it, when the jury is not here.

MR. BROWNE: Your Honor, can I leave my items in the bookcase?

THE COURT: Yes. The courtroom will be locked, so you don't need to worry about that.

We'll be in recess. Thank you, counsel.

(Court adjourned at 4:24 p.m.)

C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 9th day of May 2019.

/S/ Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter