UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO. CR18-162JLR |
| Plaintiff, | ) | |
| | ) | SEATTLE, WASHINGTON |
| v. | ) | February 26, 2019 |
| | ) | |
| HANY VELETANLIC, | ) | 9:00 a.m. |
| | ) | |
| Defendant. | ) | JURY TRIAL |
| | ) | Vol. 2 of 3 |

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES L. ROBART
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: MATTHEW DIGGS
MARIE DALTON
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101

For the Defendant: JOHN HENRY BROWNE
Law Offices of John Henry Browne
801 Second Avenue, Suite 800
Seattle WA 98104

Reported by: NANCY L. BAUER, CCR, RPR
Federal Court Reporter
700 Stewart Street, Suite 17205
Seattle, WA 98101
(206) 370-8506
nancy_bauer@wawd.uscourts.gov

EXAMINATION INDEX


| EXAMINATION OF | | PAGE |
|---|---|---|
| GLENN KARABEIKA | DIRECT EXAMINATION BY MS. DALTON | 8 |
| | CROSS-EXAMINATION BY MR. BROWNE | 56 |
| | REDIRECT EXAMINATION BY MS. DALTON | 86 |
| | RECROSS-EXAMINATION BY MR. BROWNE | 94 |
| WILBERT WALKER | DIRECT EXAMINATION BY MS. DALTON | 100 |
| CLAUDIA GRIGORE | DIRECT EXAMINATION BY MR. DIGGS | 107 |
| | CROSS-EXAMINATION BY MR. BROWNE | 139 |
| | REDIRECT EXAMINATION BY MR. DIGGS | 151 |
| TANIA PLEASANTS | DIRECT EXAMINATION BY MS. DALTON | 154 |
| | CROSS-EXAMINATION BY MR. BROWNE | 162 |
| BRIAN HEISHMAN | DIRECT EXAMINATION BY MS. DALTON | 164 |

## EXHIBIT INDEX


| EXHIBITS ADMITTED | PAGE |
|---|---|
| 2 | 118 |
| 3 | 130 |
| 4 | 133 |
| 5 | 117 |
| 6 | 119 |
| 7 | 130 |
| 8 | 134 |
| 9A THROUGH 9G | 10 |
| 16 | 161 |
| 17 | 159 |
| 18 | 160 |
| 20 | 27 |
| 22 | 122 |
| 23 | 122 |
| 25 | 129 |
| 26 | 129 |
| 30 | 37 |
| 32 | 39 |
| 33 | 43 |
| 34 | 45 |
| 36 | 50 |
| 38 | 120 |
| 39A THROUGH D | 31 |
| 41A | 125 |
| 41B | 126 |
| 48 | 18 |
| 49 | 14 |

THE FOLLOWING PROCEEDINGS WERE HELD
OUTSIDE THE PRESENCE OF THE JURY:

THE COURT: We currently have a couple of jurors who left Everett at 7:00 a.m. and have not yet arrived. One is now here. It pretty much happens every time we start one of these trials.

I'd like to use a few moments here, and if we get all our jurors here, I'll just stay out on the bench; otherwise, I'll continue to give you a break.

From the government, where are we in terms of your case?

MR. DIGGS: Your Honor, we made good progress yesterday.

THE COURT: That's what prompted my question.

MR. DIGGS: We put on six witnesses yesterday. We've got five lined up today. I think they'll be more lengthy than the witnesses yesterday. I think we'll take most of the day today, but, perhaps, not all of it.

THE COURT: What's the order for your witnesses?

MR. DIGGS: It will be Special Agent Karabeika; Mr. Walker will be the second witness; third will be Special Agent Grigore; fourth will be Tania Pleasants; fifth will be Brian Heishman; and we won't be calling the German translator.

THE COURT: All right. Fairly good chance you're not going to finish today because you have cross-examination,

but, obviously, I don't know that.

Mr. Browne, you're on notice that you may start putting on witnesses pretty soon.

MR. BROWNE: Today?

THE COURT: If I were to guess, it wouldn't be today, but I just want you to know what's coming.

MR. BROWNE: We're all set, and my only witness is in the room.

THE COURT: Okay.

Counsel, any other matters that we should take up at this time?

MR. DIGGS: None from the government, Your Honor.

MR. BROWNE: No, Your Honor.

As I indicated yesterday, Emma Scanlan is researching right now on the best evidence rule regarding the fact that we don't have the actual evidence item in evidence and whether a photograph that doesn't even show an obliterated serial number could be the basis of a charge. So we're working on that. We'll have a short brief on it.

THE COURT: All right.

When we get jury trial filings, what I try and do is make sure the other side has an opportunity to respond to them, other than standing up in court and saying, "We're going to work on it," so I have a fuller record. So you shouldn't expect to get an immediate ruling from the court when you

file it.

If Agent Karabeika is the first witness today, has everybody looked at the limiting instructions we proposed?

MR. BROWNE: I believe I have, but --

THE COURT: In the course-of-trial instructions, I think it's No. 6.

MR. BROWNE: Sixteen?

THE COURT: Six.

MR. BROWNE: Got it.

MS. DALTON: We have looked at it, Your Honor, and we have no objection to it.

MR. BROWNE: Neither do we, Your Honor.

THE COURT: All right. Know that it would be my plan, then, after the government announces its intentions to call Agent Karabeika, he's taken the stand and been sworn in, at that point I'll read it.

MR. BROWNE: Sounds good.

THE COURT: And we have a jury. Please bring them in.

THE FOLLOWING PROCEEDINGS WERE HELD
IN THE PRESENCE OF THE JURY:

THE COURT: Good morning, ladies and gentlemen. You did good. We got started at ten minutes after 9:00. I understand some of you had difficulty getting here. It's much appreciated that you make the effort; secondly, not only

by me, but by the other jurors who can't start without you. But you had a nice opportunity to drink coffee and enjoy the fabulous view from the jury room. It's apparently designed that way so you'll have nothing else to do but concentrate on being jurors.

At this time, we're still in the government's case, and I call on the government to call its next witness.

MS. DALTON: Thank you, Your Honor. The government calls HSI Special Agent Glenn Karabeika.

GLENN KARABEIKA, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state your full name for the record, and spell it for court reporter.

THE WITNESS: Glenn Karabeika, K-a-r-a-b-e-i-k-a.

THE COURT: Ladies and gentlemen of the jury, you are about to hear evidence that concerns information Special Agent Karabeika received from Swedish law enforcement officers. I'm now going to ask you to do some mental gymnastics.

I instruct you that this evidence is admitted only for the limited purpose of explaining the effect the information would have on the officers hearing the information, and to provide context for the officer's response, and, therefore, you must consider it only for that limited purpose and not for other purposes.

You may inquire, counsel.

MS. DALTON: Thank you.

DIRECT EXAMINATION

BY MS. DALTON:

Q Good morning.

A Good morning.

Q Where are you employed?

A I'm employed by Homeland Security Investigations here in Seattle, Washington.

Q How long have you been with Homeland Security Investigations?

A I've been with HSI and its predecessor agency, U.S. Customs Service, for over 30 years.

Q What type of cases do you investigate with HSI?

A The majority of the cases I investigate are export-related cases, violations of the export laws.

Q And are you one of the two case agents working on this case?

A Yes, I am.

Q In February of 2017, did Swedish law enforcement reach out to HSI for assistance in a criminal investigation that they were conducting?

A Yes, they did.

Q And what did you learn?

A I learned that a package had been intercepted in Sweden

that was mailed from the United States, from North Lakewood, Washington, and in the package there was a slide, a spring, and a barrel for a weapon.
Q Did you learn anything about where that package was shipped from?
A Yes. It was shipped from an address in Shoreline, Washington, purportedly. The return address was from Shoreline, Washington, from a Ben Manacker.
Q Did you hear any other information about tracking numbers or post offices?
A Yes. There was a tracking number, and like I said, it was sent from North Lakewood, Washington, post office, which is not where Shoreline is located.
Q What did you do after learning that information from Swedish officials?
A So I went by the address in Shoreline, Washington. I researched the address that was on the package, and I noticed that there was not that particular address on that block on 179th in Shoreline, Washington. I also started looking in different databases to determine if a Ben Manacker, in fact, existed in that area, and he did not.
Q Did you go and attempt to find this postal label?
A Yes, I did. So I went up to the North Lakewood Post Office, which is north of Everett, Washington, probably a good 30 miles north of Shoreline, Washington, and I went to

the post office, which was a small, one-room post office with one employee. It had, like, a little back room also. I went to retrieve the customs export declaration by the number and the name, which was kept on file there at the post office.

Q In the course of your investigation, did you gather a number of postal labels from post offices in Snohomish County?

A Yes, I did.

Q I'd like you to look in your binder at what's been marked for identification as Government's Exhibit 9A through 9G.

A Yes, I've looked through them.

Q What are these documents?

A These are copies of U.S. Customs export declarations and tracking numbers from the U.S. Post Office.

Q Did you gather these shipping forms?

A Yes, I did. I gathered them from a number of post offices in Snohomish County.

MS. DALTON: The government offers Exhibits 9A through 9G.

MR. BROWNE: No objection.

THE COURT: Exhibits 9A through 9G are admitted and may be published.

(Exhibit 9A through 9G admitted.)

Q (By Ms. Dalton) I'm going to show you what's been marked as Exhibit 9E.

THE COURT: Ladies and gentlemen, is it up on your screen?

JUROR: Yes. Thank you.

Q (By Ms. Dalton) What package was associated with this shipping label?

A This is the original information that we received from Swedish law enforcement, and it has the tracking number and the sender's information of Ben Manacker, 2135 North 179th Street in Shoreline, Washington, and it was addressed to a Daniel Esteban Casanueva in Vedum, Sweden. And it had -- the listed contents was Schwinn bicycle front shaft used part for $20, and sent from the North Lakewood, Washington, post office on February 14th, 2017.

Q Now, you mentioned that the contents were described as used bicycle parts. Did the Swedish law enforcement actually find used bicycle parts in this particular package?

A They did not.

Q What did they find?

A Gun parts.

Q After finding this shipping label, what did you do next?

A I looked for additional shipping labels that were similar in the timeframe sent to Sweden, and so in the same post office in North Lakewood, we recovered several -- or two more, one or two more.

Q And were you able, in that post office, to identify any

other shipments from Ben Manacker?
A Yes, there was one more from Ben Manacker.
MR. BROWNE: Excuse me, counsel.
Your Honor, I do believe the instruction that you read to the jury just a moment ago covers the hearsay; for instance, "This is what the Swedish people told me." Does that instruction cover that, do you believe?
THE COURT: Yes.
MR. BROWNE: Because it would be hearsay otherwise.
THE COURT: Yes.
MR. BROWNE: Thank you.
Q (By Ms. Dalton) I'm going to show you what has been marked -- what has been admitted as Government's Exhibit 9A.
Where did you locate this postal declaration?
A Also at the North Lakewood Post Office.
Q And why did you pick out this label?
A I had the same person that was allegedly sent from, a Ben Manacker, and it was going to Sweden, although a different address in Sweden, to a Joakim Wesstrom, W-e-s-s-t-r-o-m, in Krylbo, Sweden; however, the Ben Manacker apparently lived at a different address in Lynnwood, Washington.
And the items were described as mountain bike chain gears, used part, and it was shipped on February 17th of 2017.
Q You mentioned a minute ago that the Ben Manacker address was different. I'm going to put those two custom

declarations up side by side.

What was different about those Ben Manacker addresses?

A The one on the left is in Shoreline, Washington, and the one on the right is in Lynnwood, Washington. So they're approximately five, six, seven miles apart.

Q After locating these shipping labels at the North Lakewood Post Office, did you visit any other post office branches?

A Yes, I did.

Q Which branches did you visit?

A The Marysville and Arlington.

Q I'm going to show you what's been marked for identification as Government's Exhibit 49. Do you recognize this document?

A Yes, I do.

Q What is it?

A It is a map of the post offices that I visited, which are marked in red, and the green house right here is where Mr. Veletanlic lives.

Q Is this map a reasonably accurate representation of the locations of the North Lakewood, Arlington, and Marysville post offices and the defendant's home?

A Yes.

MS. DALTON: We offer Exhibit 49.

MR. BROWNE: No objection, Your Honor.

THE COURT: Exhibit 49 is admitted and may be

published.

(Exhibit 49 admitted.)

Q (By Ms. Dalton) So you said that after leaving the North Lakewood Post Office, you first went to the Marysville Post Office; is that right?

A Yes.

Q Did you find any other shipments mailed to Sweden from that post office?

A Yes, I did.

Q I'm going to show you what's been admitted as 9F.

Who is the sender of this package?

A This particular package was purportedly sent by Edward Valentine from the address of 9020 9th Place Southeast in Lake Stevens, Washington, and it was sent to Daniel Casanueva Esteban in Vedum, Sweden. And this particular package was described or manifested contents as Trek bicycle used parts, value of $19.95, and it was mailed on January 5th of 2017.

Q So this one wasn't sent by Ben Manacker. What made you pull out this particular shipping label?

A The fact that it was during the same time frame as the other ones; that it was being sent to Sweden; that the described contents was used bicycle parts; and the handwriting appeared similar.

MR. BROWNE: Your Honor, may I inquire? I think the witness said that was January 5th. I'm not sure if it is

January 5th. It's really hard to read. Did the witness say it was January 5th?

THE COURT: January 5th, 2012.

MR. BROWNE: Okay. Thank you.

Q (By Ms. Dalton) Was it 2012 or 2017, Agent Karabeika?

A My apologies. It was 2017.

Q I'm going to show you 9C.

Who was the sender of this package?

A It was purportedly sent by Edward Tucker, 9016 9th Place SE, Lake Stevens, Washington, and it was sent to Thomas Heydeck in Fagersta, Sweden. And this particular item was described as used bicycle parts with a value of $20, and it was sent on February 6th, 2017.

Q Now, you mentioned the recipient is Thomas Heydeck. Is that name familiar to you?

A Yes.

Q How it is familiar?

A It was one of the names provided to us by Swedish law enforcement.

Q What made you pull out this particular shipping label?

A Well, similar to the last one that I mentioned, it was sent in the same time frame, early 2017. It was sent from a post office that was nearby the other post office, North Lakewood. It was sent to Sweden, and also described as bicycle parts.

Q Okay. I'm next going to show you what's been admitted as Exhibit 9B.
Who was the sender of this package?
A It was purportedly sent by a David Becker at 5215 Seahurst Avenue, Everett, Washington, and sent to Robert Bildas, Bildas, in Fagersta, Sweden, and this one was described as used Suzuki front shaft, a value of $20, and it was sent on February 17th, 2017.
Q I'm going to show you what's been admitted as Exhibit 9D.
Who is the sender of this package?
A This was purportedly sent by an Edward Becker at 9018 9th Place Southeast, Lake Stevens, Washington, and it was sent to a Mikael Ohman in Stockholm, Sweden. And this particular item or package was described as used bike part, plastic grip, value of $18.99, and it was shipped February 21st, 2017.
Q I'm going to zoom in on one particular portion of this shipping label.
How much did this package cost to ship?
A It cost $63.90.
Q And let's zoom in on another portion.
How much were those bike parts purportedly worth?
A $18.99.
Q How were those bike parts categorized on this form?
A As a gift.

Q And then lastly, what's the insured value on this package?
A $200.
Q After you visited the Marysville Post Office, did you go to any other post offices?
A Yes.
Q Where did you go?
A Arlington Post Office.
Q About how far away is the Arlington Post Office from the Marysville Post Office?
A About five to seven miles.
Q And did you locate any other shipping labels at the Arlington Post Office?
A Yes.
Q Let me show you what's been admitted as 9G. I'm going to zoom in on one portion.
MR. BROWNE: Did you say "9G," counsel?
MS. DALTON: Yes.
MR. BROWNE: As in "dog"?
MS. DALTON: "G" as in "green."
MR. BROWNE: Okay. Thank you.
Q (By Ms. Dalton) What was described as the contents of this package?
A Used bike part.
Q And in advance of you testifying here today, did you prepare a chart to assist in your testimony?

A Yes, I did.
Q I'm going to show you what is marked as Exhibit 48. I'll zoom in here and make it a little bigger for you.
A Thank you.
Q What is this?
A This is a chart depicting the Customs export declaration forms that I located at the three different post offices in Snohomish County.
Q Is this an accurate depiction of those shipping labels that you gathered from the North Lakewood, Arlington, and Marysville post offices?
A Yes.
MS. DALTON: We offer Exhibit 48.
MR. BROWNE: Sorry, counsel. I'm having a hard time hearing your letters. A?
MS. DALTON: There's no "A." It's just 48.
MR. BROWNE: Forty-eight. One second, Your Honor. No objection, Your Honor.
THE COURT: Exhibit 48 is admitted and may be published.
(Exhibit 48 admitted.)
Q (By Ms. Dalton) Once you had all of these shipping labels together, did you notice any similarities between them?
A Yes, I did.
Q What were they?

A Well, there's several similarities. The post offices, they are all within a close proximity. The posted date all around the same time, in early 2017. On the senders, there was three surnames of Becker, a David and an Edward, and then two Manackers. Oddly enough, all six out of seven ended in "e-r," "k-e-r."

The sender address, there was three that were from the same block of 9th Place SE in Lake Stevens, Washington. There was also -- a couple of the recipients were the same, Mr. Bildas. They were all sent to Sweden, of course. And on the description, they were all manifested or described as used parts for two-wheeled modes of transportation.

Q Now, during the course of this trial, did you hear Swedish law enforcement, Patric Malmberg, testify about some customs forms that they had seized from Thomas and Robin LavHage's phones?

A Yes.

Q Did you receive copies of those customs forms from Swedish law enforcement?

A Yes.

Q I'm going to show you what has been admitted as 10A.

For example, is 10A one of those custom forms you received from Swedish law enforcement?

A Yes.

Q Let's go back to that summary chart.

Now, once you got those custom forms from those two telephones, did you compare them to the shipping labels that you had gathered from the post offices?
A Yes.
Q Did any of those tracking numbers on the customs forms match the tracking numbers that were on these shipping labels?
A Yes, three did.
Q I'm going to show you the second page of this exhibit.
Can you tell me the significance of the highlighting?
A Yes.
The ones that are highlighted were located by the Swedish law enforcement, as well as me finding the original ones at the post offices in Snohomish County.
Q How were you able to figure out that the ones that were in the phones were also the ones you had collected from the Snohomish County post offices?
A By the unique tracking number, which is in the second column.
Q Now, during the course of this investigation, did you also obtain screenshots from Heydeck and LavHage's phones that weren't contained on this chart?
A Yes.
Q I'm going to show you what has been admitted as 10C.
For example, did you receive this picture from Swedish

law enforcement?
A Yes.
Q Before receiving this picture, had you already identified this shipping label?
A Yes.
This -- this particular shipping label?
Q Yes.
A No. I'm sorry. This is not the shipping label.
Q So let's talk about all of the packages.
A Okay.
Q How many shipping labels did you find at those post offices?
A A total of seven.
Q And how many tracking numbers were located inside of LavHage's and Heydeck's phones?
A Seven.
Q And how many of those that were in the phones were duplicates of ones that you already got from the post offices?
A Three.
Q So doing the math, how many total shipments had you identified between the post offices and the text messages?
A A total of 11.
Q In addition to those text messages, did you obtain any other information from Swedish law enforcement regarding

either -- Robin LavHage's phone, for instance?
A Yes, I did.
Q What did you get?
A That there was a phone number associated with the messages, and the phone number was a U.S. phone number. It was area code (425) 531-8540.
Q Are you familiar with that area code 425?
A Yes, I am. That's the greater Seattle area.
Q Fast-forward in time. Did you later receive a telephone call from that telephone number?
A Yes, I did.
Q And whose telephone number was it?
A That was from the defendant, Mr. Veletanlic.
Q I'm going to show you one more shipping label. This is what's been admitted as 9D. We talked about this one earlier, but I want to ask you about that return address.
Is there anything significant to you about that return address?
A Yes. This particular address, 9018 9th Place SE in Lake Stevens, Washington, is an address that, during our investigation, we determined that Mr. Veletanlic had lived at at one point in time.
Q While you were conducting this investigation, locating those shipping labels, did you receive any information from Swedish law enforcement about a gun part that they had

recovered?
A Yes.
Q What kind of gun part was it?
A It was the lower part of a Glock pistol.
Q And where did they recover that gun part?
A At Mr. Heydeck's residence.
Q Did you receive a photograph --
MR. BROWNE: Your Honor, excuse me. I'll try to do this without sending the jury out.
I'm not certain that the instruction that you read covers this, since we actually don't have the alleged item in evidence. And so if this is being stated for the truth of the matter, it would not be proper.
THE COURT: For reasons that I'll further explain when we take our break, I'm going to overrule the objection.
You may answer the question, sir.
Q (By Ms. Dalton) The question was: Did you receive a photograph of that gun part from Sweden?
A Yes, I did.
Q I'm going to show you what's been admitted as Government's Exhibit 1B.
Is this one of those photographs?
A Yes, it is.
Q What did you do after obtaining that photograph?
A I contacted Special Agent Claudia Grigore of the Alcohol,

Tobacco, Firearms and Explosives to assist in tracing the last-known purchaser of that firearm.

Q Why not just use the serial number for that gun?

A Because the serial number was obliterated.

MR. BROWNE: Your Honor, that would be a further objection on that matter.

May I voir dire briefly?

THE COURT: Yes.

VOIR DIRE EXAMINATION

BY MR. BROWNE:

Q Good morning, sir.

A Good morning, Mr. Browne.

Q You never saw this part of the gun, physically, did you?

A I did not.

Q As far as you know, whatever this is is still in Sweden?

A Correct.

MR. BROWNE: Then I would object or, at least, have the instruction read again about this not being substantive evidence.

THE COURT: I'm not going to read the instruction again. I think we've done it twice now, and you've objected twice so it's been further emphasized.

MR. BROWNE: Okay.

THE COURT: You may proceed.

Q (By Ms. Dalton) After obtaining this photograph and

giving it to Special Agent Grigore, at some point did you go meet with Mr. Nguyen to talk to him about this gun?
A Yes.
Q Did you show Mr. Nguyen a picture of the defendant?
A I did.
Q Did he recognize that photograph?
A Yes. He immediately recognized the photograph as his buddy, Hany Veletanlic. He said "Hany."
Q Now, at this point in time, let's talk about all of the ways that you've linked the defendant to those shipments to Sweden and that lower receiver found in Thomas Heydeck's attic. Can you tell me those ways?
A Yes.
So there was the phone number. The firearm was traced to Mr. Nguyen, and Mr. Nguyen was a friend of -- or is a friend of Mr. Veletanlic. The area that the post offices that were used to send the items were in close proximity to Mr. Veletanlic's residence.
Q Anything about the addresses on those forms?
A Oh, yes. And one address was an address that was used -- or Mr. Veletanlic lived at at one time.
Q At a point in this investigation, did you end up meeting the defendant?
A Yes, I did.
Q How did that meeting come about?

A He called me the very next day after we met Mr. Nguyen, which would have been May 31st, 2017.
Q And what did he say when he called you?
A He wanted to talk about the gun parts, because we had talked to his friend the day before, and he wanted to meet. Originally he suggested meeting at his residence, and I suggested a more public place, and he said he was going to be in downtown Everett, Washington, so I randomly picked a coffee shop off the Internet -- I wasn't too familiar with downtown Everett -- and he agreed, and I texted him the address.
Q Did you meet with the defendant inside that coffee shop?
A Yeah. Myself and Special Agent Grigore were in the coffee shop about 2:30 in the afternoon, and Mr. Veletanlic came into the coffee shop, and we greeted him and showed him our respective credentials, and we were dressed in plainclothes.
Q And where did you go after you met him in that coffee shop?
A Because the coffee shop had patrons going around, I suggested and asked Mr. Veletanlic if it would be okay if we sat in my government vehicle, which was parked outside, which is an unmarked white Ford pickup truck. Well, at the time. I don't have it anymore.
Q At the beginning of that interview on May 31st, did you provide the defendant with his Miranda rights?

A Yes, I did.
Q I'm going to show you what has been marked for identification as Exhibit 20. What is this document?
A This is a form of the -- the Miranda rights, or statement of rights, and it was read and understood by Mr. Veletanlic and signed by Mr. Veletanlic on May 31st, 2017, at about 2:35 p.m., and signed by myself and Special Agent Grigore.
MS. DALTON: We offer Exhibit 20.
MR. BROWNE: No objection, Your Honor.
THE COURT: Exhibit 20 is admitted and may be published.
(Exhibit 20 admitted.)
Q (By Ms. Dalton) Can you tell me there which one is your signature?
A Yes. It's the one that's second from the bottom.
Q And which one is the defendant's signature?
A The one above mine, to the right.
Q Did he sign this document in your presence?
A Yes, in my presence and in the presence of Special Agent Grigore.
Q While you were talking to the defendant, did you make him or tell him any promises about whether or not he'd be arrested?
A I did not.
Q What did you tell him?

A I told him that any cooperation, anything he said would be brought to the attention of the United States government prosecuting office, and they make the ultimate decision as to prosecution or not.

Q When you met with the defendant on May 31st, was that interview recorded?

A Yes, it was.

Q How was it recorded?

A With a digital tape recorder.

Q How long was that interview?

A It was under an hour.

Q For this trial, we've created excerpts of that recorded statement. They're marked as Exhibits 39A through D. Have you had an opportunity to review those excerpts?

A I have.

Q And were those excerpts an accurate recording of the statements made on May 31st?

A Yes.

MS. DALTON: We offer Exhibits 39A through D.

MR. BROWNE: May I inquire?

THE COURT: Yes.

VOIR DIRE EXAMINATION

BY MR. BROWNE:

Q Hello again.

A Hello.

Q These are not the entire transcript of your meeting with Mr. Veletanlic, correct?
A The one from May 31st?
Q Yes.
A They are excerpts. No, it's not the entire.
Q It is not the entire interview, correct?
A Correct.
MR. BROWNE: Your Honor, I'd ask, if this be admitted, that the entire interview be admitted.
THE COURT: Counsel, I believe excerpts are commonly used. Do you have the entire interview?
MR. BROWNE: I do.
THE COURT: All right. Then you can use it for cross-examination.
MR. BROWNE: Okay. Thank you. It's in the exhibit book, too, which I think you have tabs now.
Q (By Ms. Dalton) In advance of testifying here today, did you also review transcripts of those recordings?
A I did.
Q Are those transcripts identified as Exhibits 40A through D?
A Yes.
Q And when you reviewed them, did you conclude that those are accurate transcriptions of the statements made on May 31st?

A Yes.
Q Let's start with Exhibit 39A. Is this the first portion of that recorded interview?
It won't be in your book. It's an audio recording.
A Oh, it's just the recording?
Yes.
Q At the beginning of this interview, did the defendant start off by telling you that he'd been shipping gun parts to Sweden?
A Yes.
MS. DALTON: We ask permission to play 39A to the jury.
MR. BROWNE: Your Honor, has it been admitted?
THE COURT: No, it hasn't.
MR. BROWNE: I didn't think so.
MS. DALTON: Oh, I apologize.
We offer 39A through D into evidence.
MR. BROWNE: Once again, my objection would stand as to being just partial parts of the transcript.
THE COURT: "Excerpts" is the word that you're looking for.
Counsel, I'm going to overrule the objection with the understanding that you may use any other part of the recording in your examination of the agent.
MR. BROWNE: Thank you.

(Exhibits 39A through D admitted.)

MS. DALTON: Now may I have permission to play?

THE COURT: Yes.

MS. DALTON: Thank you, Your Honor.

Q (By Ms. Dalton) The first portion of this recording is about ten minutes in length.

(Exhibit 39A audio is played.)

Q (By Ms. Dalton) Let's pause it there.

At this point in time, before we listen to the next portion of this clip, did the defendant say what carrier he liked to use to mail these shipments to Sweden?

A The U.S. Postal Service.

Q And did he explain what address he was shipping these things to in Sweden?

A Addresses that were sent to him or communicated to him by his contact, Sven, over in Sweden.

Q I'm going to push "play," and we can listen to the last portion of this recording. This is the longest one that we have for you, so it's an additional ten minutes.

THE COURT: Before you do that, the court's earlier ruling, you have the right to use the rest of this when you do your examination.

MR. BROWNE: Thank you.

(Exhibit 39A audio is played.)

Q (By Ms. Dalton) In the last portion of that recording,

the defendant said he communicated with Sven using Telegram. Are you familiar with that app?

A I am.

Q What is it?

A It is an app on smart phones which is used to communicate between different people, and it's one that can be set to have the messages disappear after a set amount of time that you determine beforehand.

Q In the next portion of this interview, do you start talking to the defendant about Mr. Leon Nguyen?

A Yes.

MS. DALTON: Permission to play 39B.

THE COURT: Any objection, Mr. Browne?

MR. BROWNE: Yes, Your Honor. Thank you. Which would be the 40B transcript, correct?

MS. DALTON: That's correct.

MR. BROWNE: Thank you.

THE COURT: Do you have any objection?

MR. BROWNE: All set.

THE COURT: All right.

(Exhibit 39B audio is played.)

Q (By Ms. Dalton) So at the end of that recording, how many total guns did the defendant say he owned?

A He said he had five: One at his house and four at the pawnshop, for a total of five.

Q In the next part of this conversation, did you then start asking the defendant about what types of guns he sent to Sweden?
A Yes.
MS. DALTON: Permission to play Exhibit 39C.
MR. BROWNE: Which would be the transcript at 40C?
MS. DALTON: Yes.
MR. BROWNE: Thank you.
THE COURT: You may play it.
(Exhibit 39C audio is played.)
Q (By Ms. Dalton) And in this final clip, did you start talking to the defendant about silencers or suppressors?
A Yes.
MS. DALTON: Permission to play 39D.
THE COURT: Mr. Browne?
MR. BROWNE: Yeah, and that would be 40D?
MS. DALTON: That's right.
MR. BROWNE: Thank you.
THE COURT: You may play it.
(Exhibit 39D audio is played.)
Q (By Ms. Dalton) After this first meeting, did the defendant continue to provide you with information?
A Yes, he did.
Q Did you exchange a number of emails with the defendant?
A Yes, I did.

Q I'd like you to look in your binder at Exhibit 30, 32 -- I'll let you look at them one by one instead of having to remember. So 30 is the first one, and then 32.

MR. BROWNE: Counsel, are you going to do these one at a time?

MS. DALTON: I'm going to bulk offer them, and then we'll go through them one at a time.

Q (By Ms. Dalton) Exhibit 33, 34, and 36.

MR. BROWNE: Did you say 35, or 36?

MS. DALTON: Not 35; 36.

MR. BROWNE: What about 35?

MS. DALTON: No.

MR. BROWNE: You're not doing 35?

MS. DALTON: I'm not doing 35.

MR. BROWNE: Thank you.

Q (By Ms. Dalton) What are these documents?

A These documents are copies of emails sent by Mr. Veletanlic to myself and Agent Grigore subsequent to our meeting on May 31st of 2017.

Q Do you recognize the defendant's email address?

A I do.

Q What is it?

A It's dingod1990@gmail.com.

Q Have some of those emails been redacted; that is, has information been removed from them?

A Yes.
Q Other than that, are they true and accurate copies of emails and the attachments that the defendant sent to you?
A Yes.
MS. DALTON: We offer Exhibits 30, 32, 33, 34, and 36.
MR. BROWNE: Your Honor, I would prefer to do it item by item.
THE COURT: All right. Start with 32.
MR. BROWNE: I think 30 was the first one, correct?
MS. DALTON: Yes, that's right.
Q (By Ms. Dalton) Okay. Let's start with Exhibit 30.
THE COURT: You need to move its admission if you're going to start questioning him about it.
MS. DALTON: Do you want me to identify it and lay a foundation for each of them separately?
THE COURT: That was the request.
MS. DALTON: Okay. That's fine.
Q (By Ms. Dalton) Exhibit 30, what is this particular document?
A Yes, ma'am. This is a copy of the email from Mr. Veletanlic, dingod1990@gmail.com, to myself, dated Friday, June 2nd, 2017, at 4:11 p.m.
MS. DALTON: We offer Exhibit 30.
MR. BROWNE: Counsel, I believe there's other pages

in this. Did you want to lay a foundation for them?
Q (By Ms. Dalton) Are there any documents attached to particular email?
A Yes, there are. There are copies of screenshots from conversations between Sven and Mr. Veletanlic.
Q And who attached those text messages?
A Mr. Veletanlic.
MS. DALTON: We offer Exhibit 30.
MR. BROWNE: May I inquire, Your Honor?
THE COURT: Yes.

VOIR DIRE EXAMINATION

BY MR. BROWNE:
Q Hello, again.
The screenshots, they don't have any dates on them, do they?
A No.
Q Do you have any way of determining when those communications occurred?
A I don't know exactly when they occurred. Sometime before they were sent to me.
Q Okay.
MR. BROWNE: That's fine, Your Honor. I have no objection.
THE COURT: Thirty is admitted. It's admitted and may be published.

(Exhibit 30 admitted.)
Q (By Ms. Dalton) What date was this email sent?
A Friday, June 2nd, 2017.
Q Let's talk about those text messages that are attached to this email.
A Okay.
Q Who is the sender and recipient of these text messages?
A On the left is Sven, a person in Sweden, highlighted in blue, and on the right is Mr. Veletanlic, highlighted in black.
Q Were you familiar with the name "Sven"?
A Yes. That is the name that Mr. Veletanlic had attached to his contact in Sweden.
Q So he said that "My contact in Sweden, his name is Sven"?
A Essentially. He made up the name Sven because it's kind of a Swedish name.
Q That telephone at the top, whose telephone number is that?
A That is Sven's.
Q I'm going to zoom in on a portion of this text message here.
What is captured in this exchange?
A It is from Sven, "Don't forget to send your BTC," which stands for Bitcoin, "address to my email." "So CSN," I think it means "so I can," "give you the rest of the cash."
Q You may have said this. What is BTC?

A Bitcoin, a digital form of currency.
Q And why was Sven asking for the defendant's Bitcoin address?
A So Sven can send Mr. Veletanlic money for some of the guns that were shipped over -- gun parts that were shipped over.
Q Is this consistent with what the defendant had told you about how Sven typically paid him?
A Yes, it is.
Q I'm going to next show you what has been marked for identification as Exhibit 32.
MR. BROWNE: Counsel, you are not going to go over the second page of 30?
MS. DALTON: No.
Q (By Ms. Dalton) What is this document?
A This is a copy of an email sent from Mr. Veletanlic, at the dingod1990@gmail.com, to myself, at the government email address, Friday, June 9th, 2017, 9:39 p.m., and it's an email with a number of text messages attached.
Q Is this document and its attachments a true and accurate copy of the email and the attachment the defendant sent to you?
A Yes.
MS. DALTON: We offer Exhibit 32.
MR. BROWNE: Just one second, Your Honor.
Is counsel not going to be doing 31?

MS. DALTON: Not right now.

MR. BROWNE: We're on 32, then. Okay. No objection, Your Honor.

THE COURT: Exhibit 32 is admitted and may be published.

(Exhibit 32 admitted.)

Q (By Ms. Dalton) Let's zoom in on the first portion of this email.

Can you tell me when this email was sent?

A Yes. Friday, June 9th, 2017, 9:39 p.m.

Q And then let's look at the text messages attached to that email.

Again, who is sending and receiving these text messages?

A Sven is in the blue, the contact in Sweden, and on the right is Mr. Veletanlic in the black.

Q Let me zoom in on a portion of this text message.

What is Sven saying here?

A He says, "Got arrested since some packages were stuck in customs, and then search warrant and," misspelled, "the whole package. So they found a couple of things."

Q Is this statement consistent with the information that you'd obtained from Swedish law enforcement regarding those packages?

A Yes, it is.

Q How is it?
A That some of the suspects in Sweden were -- a search warrant was performed at their residence, and --
MR. BROWNE: Your Honor, this is hearsay, and unless there is a foundation as to when, what time or date this was sent, I don't see how there's a foundation. It could have been some other event.
I don't want to make a speaking objection, and I won't say anything more.
THE COURT: Counsel, these are emails the defendant sent to the agent; is that correct?
MS. DALTON: That's correct.
THE COURT: Ladies and gentlemen, I'm going to allow the exhibit but ask you to recognize that, just what we talked about earlier, the agent can testify as to his understanding. He can't tell you what Sven was thinking.
So with that understanding, I'll overrule the objection.
MR. BROWNE: Thank you, Your Honor.
THE COURT: You may wish to rephrase your question, counsel.
Q (By Ms. Dalton) I'm just going to back out of this so you can see it again.
This conversation, the two parties, is this between Sven and the defendant?
A Yes.

Q I'm going to skip forward, below, and zoom in on this portion.
What's captured in this exchange?
A It's from Sven: "Then I was set in prison for three weeks or so, meanwhile they had searched my phone and had a lot of interrogations," which is misspelled.
Q Had you heard, at this point, from the defendant that Sven had been arrested?
A Yes, yes.
Q And before this, were you aware that Swedish police had searched LavHage's phone?
A Yes.
Q Going to the next portion, how did the defendant respond to just that past text message?
A On the top, in the black, "I'm okay. Everything is fine here. Is this the stuff we sent while back?"
Sven responds, "Yes. This is quite long ago. I think it was some Glocks and some," misspelled, "other girl gun."
Q I'm going to show you next what's been marked as Exhibit 33.
What is this document?
A This is an email sent from Mr. Veletanlic, dingod1990@gmail.com, sent to me at my government email address on Wednesday, June 14th, 2017, and with that there is a number of attachments, screenshots of messaging between

Mr. Veletanlic and Sven.

Q Is this copy of this email and attachments a true and correct copy of the document the defendant sent to you on June 14th, 2017?

A Yes.

MS. DALTON: We offer Exhibit 33.

MR. BROWNE: Your Honor, I do not have an objection. I'm assuming when counsel moves for the admission of these exhibits, which have a number of screenshots attached to them, even if she doesn't go into some of the screenshots, they will still be admitted; is that correct?

THE COURT: My general rule is that if it's not used during the trial, I don't send the additional pages. If counsel want to stipulate to a different arrangement, that's fine with me. But my concern is the jury is then given stuff that they know nothing about, and I don't want them to speculate.

MR. BROWNE: The reason I'm asking, Your Honor, is because there are a number of screenshots in the last two exhibits that were not referenced, and I think they need to be in evidence if it's all part of that exhibit.

THE COURT: Is the government prepared to admit the entire exhibit?

MS. DALTON: Yes, we're happy to admit them in their entirety.

THE COURT: All right. Then they're in.

MR. BROWNE: Thank you, Your Honor. Then I have no objection to 33.

THE COURT: Thirty-three is admitted and may be published.

(Exhibit 33 admitted.)

Q (By Ms. Dalton) Is this a continuation of your prior conversation with the defendant?
A Yes.
Q And when was this particular email, the last one, sent?
A June 14th, 2017, at 12:13 p.m.
Q Let's look at the text messages that are attached to this email.
Who is sending and receiving these text messages?
A The person -- or the stuff captured in blue is from Sven, and on the right or in the black is from Mr. Veletanlic.
Q I'm going to zoom in on one portion of this text message.
What's captured here?
A From Sven: "Ready to place me order. I think we use my address. It should not be a problem."
Q Did Sven tell the defendant where to ship that particular order?
A Yes, to Thomas Heydeck, Almvagen 25G, 73745, Fagersta, Sweden. "Try to find me a Glock 17 if it's possible."

MR. BROWNE: Your Honor, may I ask for clarification

about something?

THE COURT: Yes.

MR. BROWNE: Sir, at some point, Mr. Veletanlic was assisting the government, correct?

THE COURT: That's not a clarification, counsel.

MR. BROWNE: All right. Well, I'm just trying to pinpoint whether these exhibits were while Mr. Veletanlic was doing what the government asked him to do, or whether these were --

THE COURT: Counsel, stop. The date of the exhibits is covered by -- or that point is covered by the email that was sent from your client to the government. Look at the introduction to these things. Other than that, you're invading areas that I've ruled on prior to this trial, and I'm not going to allow questions in those areas.

MR. BROWNE: Thank you, Your Honor. I think I can clarify on cross.

Q (By Ms. Dalton) At the bottom of this chat exchange, does Sven tell the defendant what to do before he ships weapons to him?

A Yes. He says, "Ship it like before, with regular postal services. Don't forget to take away all serial numbers and so on."

Q Is this consistent with what the defendant had previously told you about how had he shipped those items to Sweden?

A Yes.
Q I'm going to show you what's been marked for identification as Government's Exhibit 34.
What is this document?
A This is a copy of an email sent from Mr. Veletanlic, dingod1990, to myself and Special Agent Claudia Grigore from ATF, and it was sent Tuesday, July 4th, 2017, at 10:03 p.m., and the subject was "Info on Sven, AKA Robin LavHage."
Q Has this email been redacted?
A Yes, it has.
Q So it has portions of the information grayed out?
A Correct.
Q Other than those redacts, is this a true and accurate copy of the email the defendant sent to you?
A Yes.
MS. DALTON: We move to admit Exhibit 34.
MR. BROWNE: I have no objection, Your Honor.
THE COURT: Thirty-four is admitted and may be published.
(Exhibit 34 admitted.)
Q (By Ms. Dalton) Let's zoom in on a portion of this email here.
What is the subject of that email?
A "Info on Sven, AKA Robin LavHage."
Q Is that consistent with your understanding that Sven was,

in fact, Robin LavHage?
A Yes.
Q I'm going to show you another zoomed-in portion.
What's captured in this portion of the email?
A It says, "There has been about 15-20 small packages of parts in total. They also requested as many Glock 17 barrels as possible. I've sent them about five to six of them. There's also been another G17 frame and slide," G17 referring to Glock Model 17.
Q When you first met with the defendant on May 31st, did you ask him how many packages of gun parts he'd sent to Sweden?
A Yes, I did, and he said eight.
Q And now how many packages is he saying?
A More than double. He says 15 to 20.
Q I'm going to show you one more portion of this email.
What's captured here?
A It says, "I would like to start from the very beginning without leaving out any details. I was hesitant to talk to you two openly because I wasn't and still am not sure what your plan is with me."
Q Showing you what's been marked as Exhibit 36.
THE COURT: Counsel, stop at this point. I want to take up a matter outside the presence of the jury.
Ladies and gentlemen, it's 10:30. You get your 15 minutes. I'll try to keep it to 15 minutes, but I have to

talk to the lawyers, and I want to give them a break, so it may be a bit later. Other than that, please rise for the jury.

THE FOLLOWING PROCEEDINGS WERE HELD
OUTSIDE THE PRESENCE OF THE JURY:

THE COURT: Mr. Browne, do you wish to be heard?

MR. BROWNE: I can't remember, but I will.

THE COURT: It's never stopped you in the past, sir.

MR. BROWNE: I'm learning, Your Honor.

I think the record is complete about what my position is, and I was just trying to put in context when these texts were --

THE COURT: No. You wanted to take up a matter concerning, I assume, your best evidence argument, and I cut you off because I didn't want the jury to hear that dispute.

MR. BROWNE: We're not ready on that yet. My staff is still researching it.

THE COURT: No, but you were objecting to material that was being used as exhibits, on the basis of something, and I'm assuming it's your best-evidence argument, and I want to make sure you have an opportunity to make your record as to, yes, wait for the ruling on that, or if it's a different argument.

MR. BROWNE: I think the only best evidence -- that's hard to say -- the best-evidence issue I have is regarding

this supposed item that's still in Sweden. I don't think I have another best-evidence issue.

THE COURT: All right. Let me, hopefully, give you a clue as to the court's concern here.

I think it is Evidence Rule 1001, which would be the basis for your objection; is that correct?

MR. BROWNE: Yes.

THE COURT: 1001, by its terms, applies to writings, recordings, and photographs.

Since your argument is, if it's under the best-evidence rule, a gun would not be covered by 1001. So when you submit something to the court, you're going to need to address that distinction.

MR. BROWNE: Yes, Your Honor. One of my associates sent me a text this morning that references another rule that talks about our having access to physical evidence to examine it, which, obviously, we haven't. So I will provide that rule to the court also.

THE COURT: All right. That's what I wanted to make sure, that you understood where I'm coming from. I want to see your briefing, and I want to see the government's response, but you keep using the phrase "best evidence," which, we're both so old that that's what we were taught. But that specifically is not the rule that seemed to cover this situation.

MR. BROWNE: Thank you.

THE COURT: All right. We'll be in recess.

(Court in recess 10:33 to 10:50 a.m.)

THE FOLLOWING PROCEEDINGS WERE HELD
OUTSIDE THE PRESENCE OF THE JURY:

THE COURT: We have a status report from the ever helpful CJA coordinator, Ms. Harmon. She is working on locating a lawyer who can talk to RK. She'll let us know as soon as she finds someone, so we'll know who it is, and we have told her that it is likely that he would testify tomorrow. So that's the status of that matter.

MR. BROWNE: Thank you.

THE COURT: Are we ready to bring the jury back in?

MR. BROWNE: Yes, Your Honor.

MR. DIGGS: Yes, Your Honor.

THE COURT: All right.

THE FOLLOWING PROCEEDINGS WERE HELD
IN THE PRESENCE OF THE JURY:

THE COURT: Please be seated, ladies and gentlemen. We're still on the government's questioning.

You may begin.

MS. DALTON: Thank you.

Q (By Ms. Dalton) I believe we left off at Exhibit 36. Do you see that there in front of you?

A I do.

Q Is this a continuation of your prior emails with the defendant, the last one we marked as Exhibit 33?
A Yes, it is.
Q Let's skip ahead on this email.
I'm sorry.
Is this a true and accurate copy of the email that the defendant sent to you on July 20th and the emails that precede it?
A Yes.
MS. DALTON: We offer Exhibit 36.
MR. BROWNE: Your Honor, I just don't think counsel indicated that part of this exhibit was redacted. Is that true, counsel?
MS. DALTON: It is true, yes.
MR. BROWNE: Okay. I have no objection.
THE COURT: Exhibit 36, as presented in court, is admitted and may be published.
(Exhibit 36 admitted.)
Q (By Ms. Dalton) I'm going to zoom into a section of this particular email.
What is the date on that email?
A Tuesday, July 11th, 2017, 9:49 p.m., from Mr. Veletanlic, dingod1990@gmail.com.
Q And this is an email to you?
A Correct.

MR. BROWNE: Which page is that, counsel?

MS. DALTON: I think that -- the one I'm pulling up is the third page. That was the second page. You'll see July 11th.

MR. BROWNE: So it is 36.4?

MS. DALTON: I think it's two. So that one is two. Yeah, you're right.

MR. BROWNE: Thank you.

Q (By Ms. Dalton) What's captured in this part of the exchange?

A So this is an email sent by Mr. Veletanlic to myself, and it says, "Several months ago, after all of those packages were picked up by Swedish Customs, Sven asked me to see if it would be possible to hide guns inside of auto parts. I sent him several photos of test-fitting, and since I have taken those photos with a phone I gave you to scan, I assume that this is the reason why you asked me if I have ever sent guns inside of something else. The answer is no," capitalized, "because I have not sent him anything after the whole shit show from earlier this year because I had never gotten paid and wasn't gonna risk losing even more gear in transit."

Q Had you previously asked the defendant about whether or not he had shipped gun parts inside of auto parts?

A Yes, I did. On the recorded interview that you heard earlier, on May 31st of 2017, so just several weeks before, I

asked him specifically if he had sent any of the weapons, weapon parts inside the auto parts, which is part of his -- his business, how he makes money.

Q After looking back at all of those emails that we just reviewed, how did what the defendant tell you in those emails compare to what the defendant told you on May 31st?

A Well, there was several differences. He did not bring up the fact that he had, at least, tested the putting guns in the auto parts; that the -- the number of packages that he originally had told us was eight, and then the email stated it was about 15 to 20 different packages.

Q Did you meet with the defendant on July 25th, 2017?

A Yes.

Q Where did you meet?

A At his residence in Tulalip, Washington.

Q Who was there?

A It was myself and Special Agent Claudia Grigore from ATF.

Q And where were you-all talking?

A Inside Mr. Veletanlic's. He lived in a very neat and clean double-wide mobile-type home, and we met in the living room area, which was sparsely furnished. It was a table and desk of some sort and three chairs, and we sat down in the living room area.

Q What did Mr. Veletanlic tell you during that meeting?

A He told us about shipping some other gun parts to another

crew of sorts in Sweden, other than Sven, and also that he had sent some Glock parts and magazines to an individual in France named Bruno.

Q What else did the defendant tell you about Bruno?

A So -- and he received, in exchange for these Glock parts, two silencers from Bruno that he had not mentioned before in our other conversations, either in the recorded interview from May 31st, 2017, or in subsequent emails between that interview and this particular meeting.

Q Those shipments to France, had the defendant previously told you about those shipments?

A He had not.

Q And what did the defendant tell you about those two silencers from Bruno?

A That he had destroyed these silencers after we had met.

Q At some point in this interview, did you go and see the defendant's gun safe?

A Yes, I did. His gun safe was in the bedroom of the house, and it was a very large gun safe, and -- about five-foot tall, three foot by three foot, and Mr. Veletanlic opened it up with a digital combination, which he was shielding from our view, and, you know, I gave him privacy and didn't see what his combination was.

Q After the gun safe was opened, what did you locate inside of it?

A Yes.

So as previously mentioned and during our interview with Mr. Veletanlic, he stated that he had five guns total: One Glock at the house, and then four at a pawnshop. And myself and my coinvestigator, Special Agent Grigore, expected one Glock, and we were concerned for our safety and just wanted to know how many guns.

So upon opening the safe, there was close to 30 guns, mostly long arms, and it was just chock-full of guns.

Q Other than guns, did you find anything else in that safe?

A Yes, a silencer located, which was located in a soft-sided case on one of the shelves.

Q What did you take with you from that day? Did you take that silencer?

A Yes, we took that silencer.

Q Why did you take that silencer?

A Because silencers are contraband unless they are registered with the ATF.

Q Let's fast-forward in time.

At some point during this investigation, did you arrest the defendant?

A Yes, we did, on May 3rd, 2018.

Q Where did you arrest him?

A In a gas station parking lot up in Tulalip, Washington, a couple of miles from his house.

Q At the time of his arrest, was the defendant armed?
A Yes, he was armed.
So myself and Agent Grigore, set to meet Mr. Veletanlic, we were standing outside of our vehicle, and Mr. Veletanlic approached us and then was arrested by our colleagues. And then upon searching Mr. Veletanlic for weapons or contraband or what have you, a small pistol was located, tucked in his waistband. And when the agents, our colleagues, were making sure the weapon was safe and so forth, it was noticed that there was no serial number on this gun, and it was, in fact, loaded.
Q What, if anything, was noticed about that serial number?
A That it was obliterated, not there.
Q When you arrested the defendant, did you provide him with Miranda warnings?
A Yes, I did.
Q Did the defendant, after that, talk to you?
A Yes, he did.
Q What did he say about that gun?
A He stated that he had received it three years before and that the gun had -- he knew it had an obliterated serial number.
And also, when we arrested him, we were a little surprised that he had had a gun on him because we had specifically told him not to come with a gun. Even though he was not

prohibited from owning guns, when we met him, we said, "Don't come with a gun."

Q I want to circle back to just one more thing that you said earlier.

You mentioned the acronym "ITAR," or I suppose it was, actually, mentioned in that recording. What is ITAR?

A ITAR stands for International Trafficking Arms Regulations. So it is State Department regulations, which regulate the exportation of firearms and other munitions list items, which are made by the State Department, from going overseas. So it ranges from anything from guns to a battleship and anywhere in between, and there are different categories.

MS. DALTON: Thank you. Nothing further.

THE COURT: Mr. Browne?

MR. BROWNE: Thank you. Let me just write a note down here.

CROSS-EXAMINATION

BY MR. BROWNE:

Q Good morning, again.

A Good morning, sir.

Q Special Agent, it's obvious from your testimony that there was a cooperation agreement between the United States government --

MS. DALTON: Objection, Your Honor.

THE COURT: I'll see counsel at sidebar.

Ladies and gentlemen, your hearing hasn't gone bad. Your hearing aids are still working. That's white noise, and it's designed from you potentially overhearing what we're going to talk about over there. The court reporter has an earphone, so she gets to hear what we're talking about over there.

I know it's irritating, but that's what they've given us to work with.

(The following was held at sidebar:)

MS. DALTON: I think this line of questioning violates the court's prior order; that we specifically talk only about what we'd learned about the Swedish investigation and not about the defendant's cooperation.

MR. BROWNE: I don't believe that is the court's ruling. I think, just so everybody knows, I'm not, at this point, going to argue, but the fact that he is cooperating and there is a cooperation agreement is relevant, clearly.

THE COURT: Response?

MS. DALTON: I think 403 is more relevant at this stage in the game, and none of the crimes that were committed have anything to do with his cooperation.

His cooperation occurred after the first crime was already committed. And the second agreement, there's nothing that he didn't say, under color of right, by us or any other aspect of his cooperation related to the crimes that he's been

charged with.

THE COURT: My ruling is going to be as follows: I'm going to permit acknowledgment that he has a cooperation agreement; otherwise, what happens in the next 30 days doesn't make any sense. However, I have limited pointing to anything other than the specific transactions that are in controversy in this case. We're not going to get into Russia or Brazil or any of the rest of that.

Any questions, counsel?

MR. BROWNE: No. Thank you, Your Honor.

(End of sidebar.)

MR. BROWNE: May I proceed, Your Honor?

THE COURT: Yes.

Q (By Mr. Browne) So there was a cooperation agreement with Mr. Veletanlic, was there not?
A Yes.
Q Okay. And you have in front of you Defense Exhibit book, which is now tabbed before everybody, A-2. Do you see that?
A Yes, I do.
Q I don't intend to admit it.
Would you peruse it to yourself?
A Yes, sir.
Q Thank you, sir.
Basically, that's the cooperation agreement, correct?
A Correct.

Q Okay. And so it should be obvious to all of us now that my client was actually cooperating with the government, correct?
A Correct.
Q Okay. And were all of the -- I don't know the answer to this. Were all of your communications with my client tape-recorded?
A No.
Q No?
A No.
Q Okay.
Were they more in a social manner rather than anything that has to do with the case?
A I wouldn't categorize it as social. It was exchange -- I'd say exchange. Mr. Veletanlic gave us information.
Q Sorry. I didn't hear that.
A Mr. Veletanlic gave us information. Certainly there was small talk in there.
Q I can point them out to you, and I probably will. There were emails you sent to him saying, "Good work," "thanks for the work," things like that, correct?
A Yes.
Q And I'll get to this later on in my questioning, but some of the screenshots that have been admitted today -- I will get to them specifically -- were done after Mr. Veletanlic

began cooperating with the government, correct?
A Correct.
Q Okay. And they were to whoever Sven is, right?
A Sven, yes.
Q Did you notice that on some of those -- I'll get to them specifically -- that the telephone number listed for this supposed Sven was different on some of those screenshots?
A There was a different phone number.
Q There were, correct?
A Correct.
Q Of all the shipping receipts that have been admitted into evidence, you're aware of the fact that my client is charged with just one count of supposedly shipping -- and I'm not sure whether it's a slide or a receiver at this point -- but the charge says a receiver to Sweden, correct?
A I'm sorry. Can you repeat the question, please?
Q Count 1 is sending a receiver to Sweden?
A Yes.
Q Okay.
Which one of the mailing receipts relates to that receiver, or do you know?
A I'm not a hundred percent sure which one it was.
Q That's what I thought.
And he also explained to you in your communication with him that he had a business sending parts, sometimes 50

packages a day, correct?
A Auto parts, yes.
Q Okay.
You don't know, from your own personal knowledge, whether any of those receipts were for actual bike parts, do you? To your own personal knowledge.
A So are you asking me if I saw, at some point, the bicycle parts or a lack of bicycle parts? I'm not sure if I'm following your exact questioning, sir.
Q Let me make it more clear, perhaps.
You don't, from your own personal knowledge, know whether any of these receipts that are in evidence were for actual bike parts, do you?
A Correct.
Q If you could go to Government's Exhibit No. 48, and I'll ask counsel to put that up on the screen.
A Forty-eight?
Q Yes. Sorry. I mumbled.
A Deep in the lineup here.
Q It may take you a while.
A I don't want to rip them.
Okay. I'm at Exhibit 48 in the book, and it's on the screen.
Q Well, you were here when Mr. Nguyen testified, right?
A Correct, yes.

Q And you know he purchased a Glock in February of 2017?
A Correct.
Q So the first entry here of 1/5/17 would, obviously, not have been a Glock associated with Mr. Nguyen, correct?
A Not the particular Glock in question.
Q Well, there's only one at issue in this case, correct, Count 1?
A Okay. Correct.
Q And then the next entry is February 6th, correct?
A Correct.
Q And it's to this Thomas Heydeck fellow, if that's his real name, which it probably isn't, right?
THE COURT: Counsel, let's not have you testify. Just ask questions.
Q (By Mr. Browne) Thomas Heydeck.
A That second one.
Q And it says bicycle parts, right?
A "Used bicycle part."
Q Now, there's been testimony so far in this trial, I believe, from Swedish authorities, that some kind of contraband was found in Mr. Heydeck's attic, I believe?
A Correct.
Q There's also been testimony that that same part was found at a post office, correct?
MS. DALTON: Objection; mischaracterizing the

evidence.

THE COURT: I believe that's correct, counsel. The objection is sustained.

Q (By Mr. Browne) Do you recall testimony from the Swedish agent about obtaining an item from a post office?

A One of the Swedish officers did mention getting something from the post office, but also they testified about finding a Glock lower receiver in Mr. Heydeck's attic.

Q Okay. I think you added to what I was asking you, but there was also some -- your reports themselves indicate that this "some contraband" item was found by Swedish customs, correct?

A Yes, that's what it said in the report, customs, law enforcement of Sweden.

Q You have 1A on your screen now?

A Correct, yes.

Q You've never seen that in person, have you?

A No.

Q You've never examined the bottom part of it?

A No.

Q Do you know where that is now?

A Yes. It's in Swedish law enforcement custody.

Q Okay. Do you know if they destroyed it or not?

A I don't think they destroyed it.

Q That's a good answer. Okay.

And the first contact you had with my client was when he called you on May 31st, correct?
A Correct.
Q And he indicated he wanted to meet?
A Yes.
Q And you met with him?
A Correct.
Q And if you could look at Government's Exhibit 20, and we'll put it on the screen. It's been admitted.
That is what we, in our business, probably call the Miranda form?
A Correct.
Q And it's one of the first things you did when you met with my client was to read him his rights?
A Yes.
Q And it speaks for itself. We've all seen it. We've seen it a lot. People see it on television. "You don't have to talk to me," basically, correct?
A Correct.
Q "If you do talk to me, it's voluntary," correct?
A Correct.
Q And he either read that or had it read to him or both?
A Both, essentially, yeah.
Q And I think you stated in your testimony he understood it, but, of course, that would be your impression that he

understood it, correct?
A I asked him, "Do you understand it?"
Q Okay. Good.
And he said "yes"?
THE COURT: Counsel, stop commenting on his answers. Ask questions.
Q (By Mr. Browne) And he said yes?
A Yes.
Q Okay.
And he waived -- the second part of that is "waiver." He waived his right?
A Correct.
Q When we listened to the interview, the parts that were played, it's apparent to you that my client speaks rather quickly?
A Yes.
Q Okay.
Did he indicate to you that he was trying his best to communicate with you?
A Well, I'm not sure I exactly follow your questioning, sir.
Q Were you aware that he may have some nervous temperament?
A He spoke quickly.
Q Okay.
Now, in part of that interview he talked to you about his slide for a Smith & Wesson, correct?

A Correct.
Q That is not an issue in this case, is it?
A It is not an issue in the charges.
Q And he indicated he never sent whole guns?
A He indicated, as played by the recording, that he did not ship whole guns, but he said "if you put them together," indicating that he sent a part here, he sent a part there, you put them all together. That's my impression of what he said.
Q That was my next question.
So he did say he never sent whole guns, but perhaps parts could be put together?
A Correct.
Q And he indicated to you the reason he put low values on this was because he was instructed to, so whoever receives these in Sweden wouldn't have to pay high duty; that was part of the conversation?
A That was part of the conversation.
Q If you need to look at the transcript of the interview, I have it. Okay?
A Okay.
Q Neither you or Agent Grigore ever asked him if he knew it was illegal to send parts. You never asked him that question, did you?
A I would have to look at the transcript to make an accurate

answer on that one.
Q Well, it's kind of long. Perhaps over the noon hour, you can look at that and see. It's in my exhibit book.
A If you can point me to a section, I can quickly read it.
Q Sure.
If you will refer to Government's Exhibit 40A, which I think has not been admitted, but it is a transcript of some of the audio that we heard. Are you there?
A Yes, I'm at 40A.
Q So let's just go through that now, if we might.
This is the transcript of the interview on May 31st, correct?
A Correct, yeah.
Q And it starts at page 2 here, but page 2, line 21, my client indicated that last year he listed some stuff on eBay, parts. Do you see that?
A Yes, I see that.
Q And you said, "What kind of parts?" Correct?
A Yes.
Q And he said, "Gun parts."
A He said, "Some gun parts."
Q Sorry?
A He said, "Some gun parts."
Q Thank you.
And that's when he told you it was a slide for an old

Smith & Wesson?
A Correct.
Q And Mr. Veletanlic, my client, told you that this was just a, quote/unquote, normal transaction. Line 23.
A On page?
Q Three.
A On page 3, line...?
Q Twenty-three.
A "Just a normal transaction, you know, on eBay." That's what he said.
Q And he told you in this interview that he never sent whole guns?
A Correct.
Q Correct, you remember that, right?
A Yes.
Q I can point you to the transcript, but you remember that.
During your interview, my client told you that this was a new thing for him?
A Yes, he mentioned that in the interview.
Q When asked in this interview, by yourself -- you're on page 10 of 63. If you want to go there, Agent.
A Yes, I'm there.
Q You asked him, "Did you realize you were breaking the law?" And what was his answer?
A He answered, "Well, now I do."

Q "Now I do," correct?
A And I asked, "What -- at the time?" And he said -- I said, "Do you realize that at the time" --
Q Let me ask the questions, and I'll get the entire context out.
He said, "Now I do," right?
And then you said, "Did you realize that at the time, that you put something other than what it really was," and Mr. Veletanlic interrupted you, correct?
A Yes.
Q And he said, "No, I didn't realize it was that big of a deal," correct?
A Correct.
Q And if he thought it was a big deal, he wouldn't have done it?
A Well, I don't know what he was thinking.
Q Well, what does he say?
A He said, "If I thought it was that big of a deal, I would never engage in something where I would have to talk to two federal agents after this. So I thought it was just one of those things. Hey, declare less value so I don't have to pay tax over there. You know, the import duties."
Q Thank you.
And on page 12, you were -- Ms. Grigore was with you at the time?

A Correct.
Q And Ms. Grigore is an ATF agent?
A Correct.
Q And do you remember her asking, "How many guns total did you send?" Do you remember that question? It's on page 12.
A I see Agent Grigore said, "Okay, how many lowers?" Is that the part you're referring to, sir?
Q No. Page 12, line 2.
A Line 2, SA Grigore: "Okay. How many guns, total, did you send?"
Q She used the word "guns," right?
A She used the word "guns," yes.
Q She did, right?
And my client said, "I didn't send any guns."
A "I sent parts. I've sent eight packages."
Q Thank you.
I think the last question counsel for the government asked you was a question about ITAR. Do you remember that?
A Yes.
Q Do you think the general population knows much about ITAR?
MS. DALTON: Objection; calls for speculation.
THE COURT: I'll sustain that objection.
Q (By Mr. Browne) Did Mr. Veletanlic tell you in this interview that he didn't know anything about ITAR?
I'm on page 21, line 8.

A I'm at that spot. He said, "I didn't, no. I didn't know what that unit was. Now I know about the ITAR thing."
Q Okay. I think you need to read more to make it make sense. Do you need to read more?
A No.
Q Okay.
A Unless you want me to.
Q What's that?
A Unless you want me to read more.
Q No, it's not necessary.
Now, at some point during Mr. Veletanlic's cooperation and Mr. Veletanlic's cooperation with you, he turned two guns over to you that turned out to be stolen, correct?
A He turned them over to Special Agent Grigore from ATF.
Q Okay. And that's not the subject of this matter, is it?
A It is not.
Q And that was when he was cooperating with you, correct?
A When you say "you," you mean the government in general?
Q Yes.
A Yes.
Q Okay. Government's Exhibit 40E, can you grab that?
A Okay. Yes.
Q Got it?
A Yes.
Q On page 31?

A Thirty-one, you said?
Q Yes, sir.
A Okay. I'm there.
Q Agent -- is it *Gri-gor-ee* or *Gri-gor*?
A *Gri-gor-ee.*
Q -- Grigore, she asked --
MS. DALTON: Objection, Your Honor. This is hearsay.
MR. BROWNE: Sorry?
MS. DALTON: Calls for hearsay.
THE COURT: Counsel, stop. You're in 40E?
MR. BROWNE: That's correct, Your Honor.
THE COURT: Let me get there.
MR. BROWNE: Certainly, Your Honor. Page 31.
THE COURT: Counsel, the 40E in my volume has pages 1 through 63, and you're on page...?
MR. BROWNE: Thirty-one, the first line, Your Honor.
THE COURT: All right. And your question, counsel?
Q (By Mr. Browne) At some point during this interview, did the agents ask my client whether he could buy more guns for them?
THE COURT: All right. That question, I'll permit.
A Line 1, SA Grigore: "Can you -- can you work for us and buy more guns for them?"
Q (By Mr. Browne) Thank you.
Agent, I'm going to go to 40B now, as in "boy."

A 4-0-boy?
Q Yeah.
A Okay. I'm there.
Q It was in that interview that you asked him, my client, how many guns he had at the time, and he said five, correct?
A Correct; four at the pawnshop, one at the house, a Glock.
Q And then he said, on line 18, "But I've had a lot more than that," correct?
A Line 18 says, "That's not his real name." You're on page 28?
Q No, I'm on page 30. Did I say 28?
A That's okay.
Q Sorry.
A No worries.
Can you repeat?
Q Line 14 says he's got five guns, right?
A Line 14 he says, "Um, I have a Glock at home."
Q Okay. 16: "Five guns total"?
A Mr. Veletanlic: "Yeah, five guns total at the moment."
Q And what does he say on line 18?
A "But I've had a lot more than that in" -- he doesn't finish the sentence -- then it says, "Okay. Over the years."
Q Now, you were at my client's house physically on two different occasions, or more than that?
A It was at least two.

Q Okay.
The first time he was cooperating and surrendered -- or gave you guns he thought might have been stolen, right?
A That may have been the second time.
Q Okay. Let's go to that time.
At that time you saw there was a fairly large gun safe, did you not?
A At some point I saw there was a fairy large gun safe.
Q Forty D as in "dog."
A Okay. I'm at 40D.
Q Hang on a second.
THE COURT: Counsel, I believe 40D only has one page.
MR. BROWNE: Correct.
Q (By Mr. Browne) Can you read that to yourself for a minute?
A Yes.
Q Let me know when you're done.
A I'm done.
Q Okay.
This exhibit, 40D, you were there for this interview, correct?
A Yes.
Q You can't nod because --
A Sorry. Yes, I was.
Q Okay. And Agent Grigore asked if Hany had sent any

silencers, correct? First line, right after the redaction.
A Yes.
Q So she said that. "Did you ever send any silencers?" Right?
A She used the past term, "sent any silencer pieces."
Q Right. And he answered that down at line 20, "No"?
A He answered, on line 5, "no" to that question.
Q More than once he said no, right?
A Well, for context, let's see. He did not send them -- no, overseas -- he interrupted the question, and answered "no."
Q Okay. Nowhere on that page in that exhibit does it indicate you or Agent Grigore ever asked him if he had silencers or suppressors, did you?
A That was not asked.
I'm sorry. Can you repeat that question? You said send, did he send any?
Q The last question I asked you, sir, was, did you or the other agent ever ask him whether he possessed any?
A No, we did not ask that question.
Q Thank you for clearing that up.
A You're welcome.
MR. BROWNE: Your Honor, has Government's 35 been admitted? I don't know.
THE COURT: No.
Q (By Mr. Browne) Could you take a look at Government's

Exhibit 35 for me? And just read it to yourself. Don't read it out loud.

MS. DALTON: Counsel, so you know, 35 is an unredacted version of 34.

MR. BROWNE: Okay. I'm not going to move to admit it, though, but thank you. Thank you very much, counsel.

Let's go to 34, which is the same but redacted. Okay?

A Okay. I'm there.

Q (By Mr. Browne) And this is an email from my client to yourself and Ms. Grigore, on July 4th, 2017, correct?

A Correct.

Q And, I'm sorry, but I believe 34 was admitted?

So this is him trying to say --

THE COURT: Counsel, don't testify. Ask questions.

Q (By Mr. Browne) My client indicated he was willing to meet with you and discuss any details, correct, among other things?

A Are you talking -- referring to this particular email, or in general, counsel?

Q I'm referring to the first email in the exhibit after the redaction.

A In that particular paragraph, he doesn't mention anything about meeting in person, unless I'm missing something.

Q Did he indicate to you that, from the very beginning -- he'd like to start from the very beginning without leaving

any details out, correct?
A Correct.
Q And then did he indicate to you he was hesitant to talk to you because he didn't know what was going to happen to him?
A Correct. That would be the second line.
Q Thank you.
So my client's cooperation with you began on the first meeting, May 31st, I believe?
A Correct.
Q If you look at Exhibit No. 30, is that an email from my client to yourself?
A Yes, it is.
Q And that's dated June 2nd?
A Correct, 2017.
Q So a few days after the first meeting?
A Correct.
Q And he was sending you -- so we know this exhibit has a couple of screenshots, correct?
A Correct.
Q And the screenshots are not dated, are they?
A They are not.
Q But he sent you those, correct?
A Correct.
Q Is it your understanding that these screenshots were communications from this Sven person to my client?

A Back and forth, a conversation.
Q Before he was cooperating with you?
A It was before he sent them to us -- to me.
Q Was it your understanding that he was sending you what he had from Sven, from previous communications with Sven?
A Correct.
Q Thank you.
Thirty-two --
A Okay. I'm there.
Q Can you just look over 32 for me, sir, and there are a number of screenshots also. If you'd just take a look at the email and then the screenshots, just briefly.
Okay?
A Yes.
Q The email, it's been admitted as an exhibit, and perhaps counsel could bring up 32, the email. Thank you, counsel.
This is an exhibit where you responded to my client by saying, "Good work," right?
A Yes, on June 8th, "Hany, good work."
Q And the attachments up on the top, right underneath "subject," are one, two, three, four, five, six screenshots?
A Twelve, actually. There are two columns.
Q And are those all included in this exhibit, Exhibit 32?
A I'd have to count them up. I can, if you'd like.
Q Please. I think there are 12.

A Twelve, yep.
Q In 32, which is on the screen now, my client is basically asking you for help as to whether he should continue to communicate with Sven, or whoever he is, right?
A That's a general characterization of what he wrote.
Q Huh?
A I said that was a general characterization of what he wrote on the first line, yes.
Q Thank you.
Do you know whether these screenshots that are included in Exhibit 32, for instance --
MR. BROWNE: Counsel, can you go to the first screenshot for me -- thank you -- just as an example?
Okay. I believe that's --
MR. DIGGS: This one, counsel?
MR. BROWNE: 32.004?
MR. DIGGS: Yes.
MR. BROWNE: Okay.
Q (By Mr. Browne) Do you know whether this communication between Sven and my client occurred before he was cooperating with you or after he was cooperating with you?
A I'm not entirely sure.
Q Sorry?
A I'm not entirely sure when they were, but I believe they were, since he was cooperating with us.

Q Because there's no dates on these, are there?
A Correct, there's no dates on them.
Q Okay. Thank you.
Can you refer to Government's Exhibit 33, please?
A Okay. I'm at 33.
Q Thank you, sir. Just take a look at it yourself.
A I've looked over the email and the attachments.
Q Thank you.
Agent, in the first page of 33, just for your reference, I'll ask you a question.
My client asked you whether you wanted him to send Glock parts to Sweden. It's the second paragraph. Correct?
A Your question is -- I can read it, if you'd like.
Q Sure.
A So the second paragraph that says, on June 12th, it was from me to Mr. Veletanlic. "Hany, you're not annoying at all. You're thinking of some plausible ideas. However, do not start buying any Glocks or altering them in any way."
Q I'm referring to the bottom of that exhibit. You just read a response to what he sent you?
A Yes.
Q Okay. So he sent you -- which is also on Exhibit 33. He's asking you whether you want him to send Sven any packages and that you can use a Glock and completely disarm it by cutting down the striker and destroying the barrel

chamber, correct?
A That's what he wrote.
Q Okay. So he was asking you whether you wanted him to do that, right?
A Correct.
Q Then once again, Exhibit 33 has a number of screenshots, correct?
A That was 33.
Q Yeah.
A Okay. Yes.
Q It's screenshots --
A Yes, it has seven.
Q And as far as you know, those were sent after my client was cooperating with you?
A I believe that's when they're sent.
Q And while we're --
A Let me explain, please.
That's when they were sent to me.
Q Got it.
A Yeah. Okay.
Q Just as an example, in 33, the screenshots have "Sven" with a telephone number of 46 -- I guess that would be country code, correct? -- 76-920-7933, right?
A Yes. That's on the screenshot, the number under "Sven" has a contact.

Q That was the top one?
A Yes.
Q Now go to 31, please.
A Exhibit 31?
Q Yes.
A Okay.
Q And just as an example, 31.09, or any of them, has Sven with a different telephone number than 33, correct?
A Yes, two different numbers.
Q Did you ever track any of those numbers to determine who they actually belong to?
A No.
Q Go to Exhibit 36, please, sir. 3-6, that is, sir.
A Okay.
Q Government's Exhibit 36, I believe it's been admitted, and it's redacted to a certain extent, correct?
A Correct.
Q Go to the second page, and would you read that first paragraph to yourself?
MR. BROWNE: Well, actually, we can put it up on the screen, since it's been admitted, if you don't mind. Thank you, counsel.
Q (By Mr. Browne) Referring to the first paragraph, Agent.
A Yes.
Q My client was asking you whether he should, as requested

by Sven, hide parts inside auto parts, correct?
A Yes.
Q So that's where that came from. He's asking you whether he should hide gun parts in auto parts. He's asking you that, right?
A Correct.
Q And then farther down, the third-to-the-last paragraph, I've touched the screen and there's a little dot there. Sorry, the one before that.
He's asking you to tell him whatever was recovered in Sweden, and then he could tell you whether he had anything to do with it, correct?
A Yes, that's what it says.
Q Jumping ahead. When you were at my client's house --
MR. BROWNE: I only have about four more questions. Do you want me to wait?
THE COURT: No.
Q (By Mr. Browne) When you were at my client's house on July 25th, I believe --
A Yes.
Q Was that the day the suppressor or silencer was recovered?
A Correct.
Q He actually handed that to Agent Grigore, didn't he?
A I don't remember the specifics of how it came from the safe, but it came from the safe.

Q Well, he voluntarily opened the safe, right?
A Correct.
Q And you don't recall whether he actually handed that to her or you?
A It wasn't me. I didn't handle any of the firearms coming out of the safe.
Q Agent Grigore, on that day, also took some rifles that she thought might be illegal that turned out to be not illegal?
A Correct.
Q So she's an ATF agent. She's supposed to be an expert. She took these rifles thinking they were --
MR. DIGGS: Objection as to the characterization.
THE COURT: Sustained as to relevance. It's also subject to a motion in limine, counsel.
Q (By Mr. Browne) In your reports, anywhere, or your memory -- let me start over again.
You wrote reports in this case, correct?
A I wrote reports on this case, correct.
Q Are they call ROI?
A ROI, reports of investigation.
Q Got it.
In any of those reports of investigation, did you ever put in those written reports that you told my client not to be armed in any meetings he had with you?
A That is not in any of the reports.

MR. BROWNE: I'm done. Thank you, sir.

THE WITNESS: You're welcome.

THE COURT: How long for rebuttal?

MS. DALTON: Ten minutes, Your Honor.

THE COURT: Ladies and gentlemen, I haven't entertained you with our usual discussion of the rules, but now you're going to go out into the world, and it probably makes sense for me to do so again. You will become tired of me reading it to you.

We're about to take a break. Remember, until the trial is over, do not discuss the case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else, and do not allow others to discuss the case with you. This includes discussing the case in person, in writing, by telephone or electronic means, via email, via text messaging, or any Internet chat rooms, blogs, websites, or applications.

If anyone tries to communicate with you about the case, please let me know about it immediately. Believe it or not, that's happened twice. Once it was a fellow in the elevator who was trying to hit on a juror, who was an attractive young lady, and he said, "Oh, what's the case about?" and tried to chat her up, and he ended up getting to spend part of his afternoon in jail.

So if anyone tries to communicate with you about the case,

please let me know about it immediately. Do not read, watch, or listen to any news reports. I don't believe there are any. Don't do any research. And, finally, most importantly, keep an open mind until you've heard all the evidence and then heard the arguments of counsel, my instructions of the law, and the views of your fellow jurors.

Enjoy your lunch. I'll ask you to be back here at 1:20, 1:25, and we'll begin again. Thank you for your attention this morning. You've been very attentive in this case. I don't have anything else to do, so I sit and watch you, and I know you're paying attention and getting the elements of this case.

Please rise for the jury.

(Court in recess 12:01 to 1:31 p.m.)

THE FOLLOWING PROCEEDINGS WERE HELD
IN THE PRESENCE OF THE JURY:

THE COURT: You may inquire.

MS. DALTON: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. DALTON:

Q We talked a little bit about the cooperation agreement in the last portion of your testimony.

Is there any part of that agreement that says that the defendant will not be charged with a crime?

MR. BROWNE: Your Honor, this is going to open the

door to the whole agreement.

THE COURT: You opened the door to it, sir.

MR. BROWNE: Admitted.

THE COURT: And you brought it up and asked him questions about it.

MR. BROWNE: No question, that's true.

THE COURT: Well, I'm sorry. What are you saying now, then? I've already ruled on the scope of what is permissible under it. Are you taking a position different than that?

MR. BROWNE: I think if counsel asked questions about it, then the entire document would be admissible. I just asked if there was one.

THE COURT: Did you not show it to the witness?

MR. BROWNE: He looked at the -- yes.

THE COURT: All right. I'm going to overrule the objection, then, and allow that question.

The point is well taken, however, counsel.

MS. DALTON: Thank you, Your Honor.

THE COURT: The court has made rulings in this area, and we're going to stick with them.

THE WITNESS: Can you repeat the question, please?

MS. DALTON: Of course.

Q (By Ms. Dalton) Is there any portion of the agreement that says whether or not the defendant will be charged with a

crime?
A There is not.
Q What did you tell the defendant before you spoke to him on May 31st, 2017?
A That any cooperation will be told to the United States Attorney's Office, and they are the ultimate decision-makers as to whether charges will be filed or not.
Q After the defendant began cooperating, did you learn that he had not provided you with truthful information?
THE COURT: Counsel, you're leading the witness.
MS. DALTON: I apologize, Your Honor.
THE COURT: Ladies and gentlemen, there's a distinction here. If the government calls a witness, unless they're declared adverse, they are not permitted to lead the witness. A question like, "After the defendant began cooperating, did you learn," that's a leading question.
When you're defending against that particular witness, you are permitted to ask leading questions. So the roles in this are a little bit different depending on who is doing the questioning. I've just reminded the government that this is their witness, and they're not permitted to lead.
We're going to have a non-leading question now.
MS. DALTON: Thank you, Your Honor.
Q (By Ms. Dalton) After the defendant began cooperating, how would you characterize the information that he provided?

A It was initially not entirely true.
Q Can you give me an example?
A Yes. For instance, initially, Mr. Veletanlic said there was eight packages that were sent, and then later on in the email that he sent to me, he said it was 15 to 20. And then also during the initial interview, he never mentioned France or mentioned the fact that he had received silencers from an individual in France.
Q After learning that information, did you have any opinion on whether or not the defendant -- the information he was giving you was reliable?
A At that point, questioning -- definitely questioning if it was reliable or not. The story changed.
Q I want to ask you a few questions about the charges in this case, just to clarify.
What is the defendant charged with shipping to Sweden?
A A Glock pistol frame, or lower receiver, as it's sometimes called.
Q Where was that found?
A In Sweden.
Q In any particular home?
A In Mr. Heydeck's home, in the attic.
Q Were there any other packages that were also found linked to Sweden?
A Yes.

Q Can you tell me whether those packages are relevant to your investigation?

MR. BROWNE: Your Honor, this calls for hearsay. That's beyond what you permitted in your order.

THE COURT: The question pertains to Sweden. Are you interpreting it as broader than that, counsel?

MR. BROWNE: Yes, Your Honor.

THE COURT: Then let's clarify the question.

Q (By Ms. Dalton) During the course of your investigation, did you identify other shipping labels and packages sent from Washington to Sweden?

A Yes.

Q Were those relevant to your investigation?

A Yes, they were.

Q Why?

A Well, they were shipped from the area of Mr. Veletanlic's home. They had the destination of Sweden. One had the name of the recipient of one of the individuals that was under investigation in Sweden. They were all listed or manifested as bicycle or motorcycle parts.

Q You mentioned one of the individuals under investigation. Who was that individual?

A Thomas Heydeck.

Q Did the defendant say who he was shipping gun parts to in Sweden when he spoke to you on May 31st?

A Specifically by name?
Q Or just in general.
A In general, he said he was sending it to Sven or people associated with Sven, and Mr. Veletanlic would get the address from Sven and ship the packages from there using names and addresses provided to Mr. Veletanlic by Sven.
Q All of those shipments -- all those shipping labels that you had located, did all those shipments occur before he began cooperating?
A Yes, significantly before.
Q During that conversation that you had with the defendant on May 31st, did you ask the defendant any questions that were relevant to you in determining whether or not the defendant knew that shipping firearms was unlawful?
A I asked him about the ITAR, which regulates shipping of firearm parts out of the country.
Q Did you ask him about how he sent those shipments?
A The method by which he shipped it? Yes, via the U.S. Postal Service.
Q Did you ask him anything about, like, for instance, the labels that would influence or inform your belief as to whether or not he thought that these were illegal shipments?
MR. BROWNE: Objection; leading question.
MS. DALTON: I can rephrase it, counsel.
THE COURT: Let me read it first.

Why don't you rephrase it, counsel?
Q (By Ms. Dalton) When the defendant was talking to you on May 31st, did he tell you anything that he led you to believe that he knew that these shipments were illegal?
A Well, yes, by the fact that he was concealing the nature of what was on the -- the items declared on the customs declarations, and by making up fake names of the sender, which was him, and also the fake return address, which was also written by Mr. Veletanlic.
Q After the defendant began providing you information after he began cooperating, did he send you -- he sent you emails?
A Yes.
Q And in these emails, did he describe solely prospective things, or did he also describe historical things, things that had already happened?
A Well, he mentioned, yes, one of the -- one that comes to mind was, he said during an email conversation that there was 15 to 20 packages, where previously, in our conversations on May 31st, he said that there was eight packages.
Q I just want to show you one of those emails, 36.002.
This portion at the top there, that first paragraph, is the defendant describing something that had already happened in the past, or something that you were going to direct him to do in the future?
A I was presuming it was something that happened in the

past.
Q I just have two more questions.
During the course of this investigation, did you learn about a phone -- Mr. LavHage's phone?
A Yes.
Q What did you learn about what Swedish law enforcement had done with that phone?
A They did a forensic examination of the phone.
Q And they seized it?
A They seized it, and then did a forensic examination of the phone.
Q The two telephone numbers that Sven has, do you have any understanding about why there were two different telephone numbers?
MR. BROWNE: I object. This calls for hearsay.
THE COURT: Is this his understanding, counsel?
MS. DALTON: Yes.
THE COURT: Then I'm going to permit the question.
THE WITNESS: I'm sorry. Can you repeat the question?
THE COURT: Why don't you rephrase it, counsel. Why don't you establish a foundation for it; better able to address Mr. Browne's objection.
MR. BROWNE: Thank you.
Q (By Ms. Dalton) Were you aware, during the course of this

investigation, these text messages that were sent to you, that Sven had two different telephone numbers?
A Yes.
Q And did you form an opinion as to why Sven had two different telephone numbers? Did you learn why?
A Because he switched telephones, and sometimes people have two telephones.
Q Did it have anything to do with the Swedish law enforcement action?
A Did I have anything to do with it?
Q No, the switching of the telephone numbers.
A The Swedish law enforcement --
MR. BROWNE: Objection.
THE COURT: Sustained.
Q (By Ms. Dalton) Did the defendant ever suggest that he was communicating with another person other than Sven?
A He did not.
MS. DALTON: Thank you. Nothing further.
THE COURT: Mr. Browne?
MR. BROWNE: Thank you.

RECROSS-EXAMINATION

BY MR. BROWNE:
Q Good morning, Special Agent.
A Good morning, Mr. Browne.
Q If you could refer to Government's Exhibit 40A.

A 4-0-A as in "Adam," sir?
Q Yes.
A Okay. I got it.
Q 40A-009, the first page, I think, correct?
A The first page is page 2 of 63.
Q Actually, it's 10 of 63.
A You want 10 of 63?
Q You might be looking at the unredacted version. It doesn't matter. Just 10 of 63.
A It starts with myself at the top, "Okay"?
Q Yes, sir.
A Okay.
Q So you specifically asked my client, "Did you realize you were breaking some sort of law?" And his response was, "Well, now I do," correct?
A That is the verbiage that is on the transcript.
Q Okay.
And then going to the same exhibit, Bates stamp -- well, at the top, 21 out of 63. Okay?
A Yep. I'm on that page, sir.
Q Okay. And you asked my client, "During any of these shipments, did you obtain a license from the State Department or Commerce Department to ship any of these parts?" That was your question, correct?
A Yes.

Q And his response was, "I didn't know. I didn't know what that even was. Now I know about ITAR," correct?
A That is correct.
Q So he says at the end of that, "Now I know," correct?
A "So now I know" is the last sentence in that part.
Q Okay.
You have no idea what was sent in the other packages, do you?
A The original package that we got the information contained a slide, a barrel, and a spring for another -- for a firearm.
Q Are you sure about that? Isn't it just a receiver?
A The initial information we received from Swedish law enforcement was a slide, barrel, and a spring, as best as I can recall.
Q And my client's charged with supposedly sending a receiver, right?
A That's correct.
Q The initial report, ROI, that you wrote in this case indicates that this investigation was began because of an item found by Swedish authorities in customs, correct?
A That's what the report says, and that's the information I received from my counterpart, who received it from Swedish law enforcement.
Q Okay. So let's go to the original question I started with this afternoon.

You have no personal information as to what was in other packages that there are package receipts for. You don't have any idea, do you?
A The original package, like I mentioned, had a spring -- a slide and a barrel and a spring for an item that was not a Glock.
Q Okay. We, actually --
THE COURT: You're stepping on his answer, counsel.
MR. BROWNE: Sorry. I don't like to do that.
THE COURT: Let him finish.
MR. BROWNE: Did you finish?
A No, actually, I didn't.
Q (By Mr. Browne) Go ahead.
A There was also ammunition --
THE COURT: Counsel, don't comment on his testimony, don't give testimony. Ask questions. We don't really care if, oh, I don't like that. You're not on trial. So let's stay with asking questions.
MR. BROWNE: Could we read back the last question?
THE COURT: The question was, "Go ahead." Ask a fresh question, counsel.
MR. BROWNE: Thank you. May I ask counsel something?
THE COURT: Yes.
MR. BROWNE: Thank you.
Q (By Mr. Browne) Okay. In front of everyone now should be

Exhibit 48, which has been admitted, I believe.

MR. BROWNE: Is it on your screen, Your Honor?

THE COURT: Yes.

Q (By Mr. Browne) Special Agent, you're looking at Exhibit No. 48 now, right?

A Yes, I am.

Q You have no idea which one of these shipments contained the alleged -- now you say slide, spring, whatever. You have no idea which one of those packages was intercepted by Swedish authorities, do you?

A But -- that's incorrect.

Q So if you --

A If I may take a closer look at this.

The third one down from Ben Manacker, Shoreline, Washington, to Daniel Esteban Casanueva in Vedum, Sweden, that was the one that had the slide, the barrel, and the spring.

Q The slide, the barrel, and the spring?

A Yes.

Q Okay.

And you're saying that because it has Ben Manacker's name on it, and that was what the Swedish authorities gave you a receipt for?

A That is the information which the Swedish law enforcement relayed to me; that the item in that package was like I

mentioned, and it was sent from a Ben Manacker in Shoreline, Washington. That was the return address in the United States.

Q Okay. So that leaves six packages that you don't know what's in them.

A One of the packages, I'm not sure exactly which one it is, but it had ammunition in it that was seized by the --

Q How do you know that?

A Because they told me.

Q Okay. How do you know that?

THE COURT: How does he know what they told him?

MR. BROWNE: No, no, what was in that package.

A They advised me.

Q (By Mr. Browne) Do you know which one of the packages?

A If we can pull up the next one that has the highlighting, that would help my recollection. Thank you.

Actually, you know what? It's a bunch of numbers. I don't remember exactly which one had ammunition in it, but I was advised that one had ammunition.

Q Okay.

Do you know -- did the Swedish authorities tell you when they searched Heydeck's apartment, if that's his name, whether he was an avid bicyclist or a motorcycle rider? Do you know that?

A They did not advise me of that.

MR. BROWNE: Okay. That's all I have, Your Honor. Thank you.

THE COURT: Redirect?

MS. DALTON: No. Thank you, Your Honor.

THE COURT: All right. You may step down.

The government will call its next witness.

MS. DALTON: The government will next call Wilbert Walker.

WILBERT LEE WALKER, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state your name for the record, and spell it for the court reporter.

THE WITNESS: Wilbert Lee Walker; W-i-l-b-e-r-t; L-e-e; W-a-l-k-e-r.

THE COURT: You may inquire.

DIRECT EXAMINATION

BY MS. DALTON:

Q Good afternoon.

A Good afternoon.

Q What is your current job?

A I'm a senior analyst.

Q And who do you work for?

A I work for the Director of Defense Trade Control, Licensing Division, U.S. Department of State, Washington, D.C.

Q How long have you been a senior analyst at the Director of Defense Trade Control?
A Eight years.
Q And how were you employed before working for the State Department as a senior analyst?
A My prior service, I was in the U.S. Army for 20 years, and after that I was employed at the Department of State.
Q What are your duties as a senior analyst?
A My job as a senior analyst is to conduct a second-level review, basically, a second look at all licenses and applications before they're released.
Q What kind of licenses are we talking about here?
A We're talking about export licenses, temporary export licenses and temporary import licenses.
Q And what kinds of things are being imported or exported?
A Defense articles.
MR. BROWNE: Sorry, Your Honor. I didn't hear that response.
THE COURT: "Defense articles."
MR. BROWNE: Thank you.
Q (By Ms. Dalton) You mentioned that you're employed by the Director of Defense Trade Control. What does that organization do?
A The Director of Defense Trade Control is responsible for the control of the export of defense articles, the temporary

export of defense articles, and the temporary import of defense articles.

Q Is there a certain act that you operate under?

A Yes. We operate under the Arms Export Control Act and the International Traffic and Arms Regulation.

Q Is there an acronym that you use for the International Traffic and Arms Regulation?

A Yes. It's called the ITAR.

Q What's the relationship between the Arms Export Control Act and the ITAR?

A They both are responsible to describe the defense articles that are listed on the United States Munitions List, for plans and policies, and to establish civil and criminal fines and penalties.

Q So what is the United States Munitions List?

A The United States Munitions List is a list of specific items that are adopted for, designed, and modified for military configuration.

Q So what's the significance of a defense article being on the munitions list?

A In order to export that article, you must have a license application -- an approved license application.

Q Are firearms one of the defense articles that are listed on that munitions list?

A Yes, it is.

Q What about parts of firearms?
A Yes.
Q Would that include frames or receivers?
A Yes, it would.
Q If a firearm or firearm part, like a receiver, is listed on the munitions list, is it legal to export it from the United States to another country?
A Yes, as long as you have a license, and it depends on the country that it's being exported to.
Q What would one need to do to obtain an export license?
A First they must be registered with DDTC, and once they're registered, they would need to apply for a license application.
Q And "DDTC," that's just the acronym for the Director of Defense Trade Control?
A Yes, it is.
Q In this case, were you asked to conduct a search of DDTC's records related to this investigation?
A Yes, I was.
Q How are those records kept?
A Those records are kept -- we have, basically, a database, which is where all registrations are kept and all license applications that are issued are also kept.
Q What's the name of that database?
A It's called DITRA [phonetic].

Q Okay.
Do you routinely search that database as part of your job?
A Yes, we do.
Q Were you asked to conduct a search of that database in this case?
A Yes, I was.
Q What did you search for?
A We searched for any license applications that were issued to the defendant.
Q So how did you conduct that search?
A Well, first we did a search through our registration database to confirm whether or not the defendant was registered with DDTC. After that, we did a search of all license applications that were issued and approved, based on the defendant's name.
Q So in this case, his name was Hany Veletanlic. You ran that through your system?
A Yes, we did.
Q What were the results of that search?
A We were not able to find any application or registration. We weren't able to find anything to show that he was registered or had any approved license applications.
Q So you didn't located any export licenses? You didn't locate any license for --

A No, we did not.

MS. DALTON: Thank you. No further questions.

MR. BROWNE: Good afternoon, sir.

THE WITNESS: Good afternoon.

MR. BROWNE: I have no questions, Your Honor.

THE COURT: Thank you. You may step down, sir.

The government will call its next witness.

MR. DIGGS: Your Honor, the government calls Special Agent Grigore, and if I might flag for the court two issues. One, the dual-role testimony. Additionally, she'll be coming to the witness stand with some physical evidence in a box so I don't have to go back and forth.

THE COURT: All right. Mr. Browne, you're aware of this?

MR. BROWNE: I am now, and I understand.

CLAUDIA LIGIANA GRIGORE, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state your full name for the record, and spell your name for the court reporter.

THE WITNESS: Claudia Ligiana Grigore; C-l-a-u-d-i-a; L-i-g-i-a-n-a; G-r-i-g-o-r-e.

THE COURT: Ladies and gentlemen of the jury, I'm going to read you another one of those advance notices.

You are about to hear the testimony of Special Agent Grigore, who will testify to both facts and opinions and the

reasons for her opinions.

Fact testimony is based on what the witness saw or heard or did. Opinion testimony is based on the education or experience of the witness.

As to testimony about facts, it is your job to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it or none of it.

As to the testimony about the witness's opinions, this opinion testimony is allowed because of the education or experience of this witness. Opinion testimony should be judged just like any other testimony. You may accept all of it or part of it or none of it. You should give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

What we're trying to highlight for you is, you've seen a number of witnesses who have testified to facts. Sometimes people qualify as experts, and they get to give opinions as opposed to just what they factually know, and there are somewhat different rules in regards to that, so we're trying to highlight the fact that this particular witness is going to be in two roles, and we've tried to separate them out so you'll now which standard to apply to each.

Thank you, Mr. Diggs.

MR. DIGGS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. DIGGS:

Q Special Agent Grigore, good afternoon.
A Good afternoon.
Q What do you do for work?
A I'm a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.
Q How long have you been a special agent with ATF?
A Since March 2014.
Q Which office do you work out of?
A I work out of Seattle, Washington.
Q What type of cases do you typically investigate?
A I investigate criminal cases in regards to criminal possession of firearms, explosives, and arson investigations.
Q Are you one of the case agents involved in the case against Mr. Veletanlic?
A Yes, sir.
Q Can you remember back to approximately when you first received information related to this case?
A Yes, sir.
Back in March of 2017.
Q What information did you receive?
A I received information from my partner, Special Agent Karabeika, that a firearm was recovered in Europe, and he

requested me to run a serial number for him.
Q Which country in Europe?
A Sweden.
Q And at the time you received that information, did you have a serial number or a different number for that firearm?
A No, sir. Special Agent Karabeika provided me with a ten-digit number.
Q What did you do with that ten-digit number?
A I contacted the customer service representative at Glock and requested them to help me recover the serial number.
Q After contacting Glock, did you, in fact, receive a serial number in return from Glock?
A Yes, sir.
Q What did you then use that serial number to do?
A I inserted the serial number into our ATF tracing system, and with that information, I -- I recovered the last purchaser -- the last transaction that was recorded through an FFL.
Q For that particular firearm?
A For that particular firearm, yes.
Q I'm going to show you what's been admitted as Government's Exhibit 15. And, Special Agent, you've got a binder in front of you that says "Government's Exhibits," as well as a screen.
A Yes, sir.

Q When you put that serial number into your system, is this the firearms transactions record that you obtained?
A So when I put that serial number into the system, I -- I received information where that transaction occurred. It was Precise Shooter. So I went to that specific FFL and recovered this form from them.
Q How did you know which form to request from Precise Shooter?
A Well, as the form says, it's a firearms transaction record, so it is the form that is provided and records transactions with regards to specific firearms.
Q Did you ask for the form for a specific serial number?
A Yes.
Q If we look at the third page of this form, did you ask for the form corresponding to Serial No. BATR295?
A Yes.
Q On this form, who is responsible for recording this serial number?
A The FFL -- the FFL representative.
Q And in this case, that's a representative of Precise Shooter?
A That's correct, an employee of Precise Shooter.
Q What was the date of that last recorded sale of that firearm?
A February 8th, 2017.

Q Who was the purchaser?
A Mr. Nguyen.
Q Did you eventually talk to Mr. Nguyen?
A Yes.
Q What occurred after your interview with Mr. Nguyen that was of relevance to this investigation?
A I met Mr. Veletanlic.
Q And had he contacted your partner, Agent Karabeika?
A Yes, sir.
Q We're going to move forward in the investigation to July of 2017.
Did you go to the defendant's house on July 25th, 2017?
A Yes, sir.
Q What was your purpose of going to the house that day?
A Well, both Agent Karabeika and I wanted to have a better environment to sit down with him and talk to Mr. Veletanlic and make sure we were on the same page with numerous information that we received in the meantime, from May 31st until that day, from Mr. Veletanlic.
Q Okay.
You had been receiving some information from him?
A Yes.
Q And you wanted to ask him further questions about it?
A Yes, sir.
Q Were you invited into his house that day?

A Yes.
Q Did he offer you a seat when you arrived?
A Yes.
Q Who was present?
A Mr. Veletanlic and Agent Karabeika.
Q Where in the house did you start your conversation with him?
A In Mr. Veletanlic's living room, right as you enter his residence.
Q What did you begin to talk to him about?
A We talked about him sending packages to France -- to Sweden, multiple groups in Sweden, as well as sending packages to France.
Q Prior to sitting down, did he tell you he was sending multiple packages to Sweden?
A No.
Q Had he told you he was sending packages to France?
A No.
Q Did he provide you information about the individuals in Sweden, any specifics about the individuals he was sending packages to?
A Yes. He -- he was able to identify -- well, he -- Mr. Veletanlic told us that he sent packages to two different groups in Sweden. He called it the "Sven group" and "Dan" or "Doc group," and then he identified the Sven group -- he

identified Sven as Robin LavHage, and then he also told us that Thomas Heydeck was another individual involved with Sven's group. And then he -- he talked about another group or another individual that he sent packages to Sweden, called Dan or Doc.

Q Did he provide you any specifics about the individual in France to whom he sent packages?

A Yes. He identified him as "Bruno." He didn't know his last name.

Q Had he received anything in return for those packages to Bruno?

A Yes. Mr. Veletanlic told us that he had received two suppressors from Bruno, but since he had contact with us, he had destroyed those silencers or suppressors.

Q Since he had contact with you when?

A On May 31st, 2017.

Q So that day in his house, what did he tell you? After he told you about Bruno, what did he tell you about those two silencers?

A That they were destroyed.

Q Did you have a reaction to learning that he had, in fact, previously received these silencers from an individual, Bruno?

A Yes.

Q Was your reaction?

A I was surprised and intrigued, because prior to that meeting on May 31st, Mr. Veletanlic did say that he didn't have any silencers or did not send any silencers, and that silencer discussion was for another time.

Q Did you, at that point, after learning that he had received these silencers, threaten to arrest him?

A No, I did not.

Q What happened next after the discussion about these destroyed silencers?

A The discussion went in the direction that Mr. Veletanlic felt like he needed to prove to us that he had nothing to hide, so we followed Mr. Veletanlic into his bedroom, where he opened his safe, and he allowed us to look at his firearms.

Q Was that safe locked?

A Yes.

Q Who entered the combination?

A Mr. Veletanlic.

Q Who actually, initially, pulled the firearms out of the safe?

A Mr. Veletanlic reached in to pull a firearm out of the safe, at which point I told him not to because I was concerned about my safety and his safety.

Q So what did you do next?

A I told Mr. Veletanlic to step aside, and I -- I took the

firearms out of the safe, secured them, and then recorded the serial numbers.
Q Approximately how many firearms were in that safe?
A Thirty.
Q And you said you recorded the serial numbers of those firearms.
A The ones that had serial numbers, yes.
Q Why was that something that you wanted to do?
A Well, we wanted to make sure that Mr. Veletanlic didn't possess any contraband, meaning any stolen firearms.
Q Okay. And why does a serial number help you do that?
A The serial numbers are important because they are unique numbers to a specific firearm, like a social security number to a person, and that serial number helps law enforcement trace a specific firearm to a specific time: the manufacturing, to a sale.
Q And you mentioned -- so some of the firearms in that safe did not have serial numbers; is that accurate?
A That's correct.
Q Was this of concern to you with regard to those firearms in the safe?
A No.
Q And why not?
A Because individuals have the right of manufacturing their own firearms, and at that point Mr. Veletanlic was -- is able

to manufacture, if he wanted, a firearm.
Q So why is a firearm that is being manufactured that doesn't have a serial number not a concern?
A It's allowed, by law, for an individual to make their own firearms as long as they're not sold in the commerce and transferred to another person.
Q So firearms that did not have serial number, those were referred to as self-made?
A Yes, self-made. They are referred to as "ghost guns," actually.
Q What does that mean?
A That means they're made from different parts, and they are sometimes made by -- by an individual by drilling into an 80-percent receiver or frame.
Q What is an 80-percent receiver?
A It's an unfinished firearm. It's a block of metal until it's drilled to have the specific cavities for a firearm.
Q Did Mr. Veletanlic's safe contain any of those 80-percent frames?
A Two of them, yes.
Q And without a serial number, is it illegal to transfer those firearms?
A That's correct.
MR. BROWNE: It's a leading question, Your Honor.
THE COURT: Sustained.

Q (By Mr. Diggs) Are there restrictions on what you can do with a firearm that doesn't have a serial number?
A Yes, sir.
Q What are those?
A Those firearms are only required to be possessed by the person that made them, and they cannot be transferred to any other individual.
Q Other than the rifles and the handguns in the safe, was anything else of evidentiary value found?
A Yes, sir. There was a suppressor.
Q Where did you find the suppressor?
A It was in a Ziploc bag inside a soft bag on top of the shelf in the safe.
Q And were you the person who found that soft bag in the safe?
A Yes, sir.
Q I'm going to show you what's been marked for identification as Government's Exhibit 5. It will be on your screen. Do you recognize this, Special Agent Grigore?
A Yes, sir.
Q And what is it?
A That's the suppressor that I found in the safe.
MR. DIGGS: Government offers Exhibit 5.
MR. BROWNE: No objection, Your Honor.
THE COURT: Five is admitted and may be published.

(Exhibit 5 admitted.)
Q (By Mr. Diggs) Special Agent Grigore, what are we looking at here?
A We are looking at the floor of Mr. Veletanlic's bedroom, and in that Ziploc is the suppressor that I found.
Q And is it your testimony that this Ziploc was inside another bag inside the safe?
A That's correct, sir.
Q When you pulled it out, was it immediately evident to you what it was?
A Yes, sir.
Q What did you say to the defendant when you recovered it?
A Well, I was surprised to find it there, obviously, because Mr. Veletanlic told me that he didn't have any suppressors and that he destroyed them.
Q Did you seize the suppressor that day? Did you take it with you?
A I did, sir.
Q You've got a couple of items at your feet. Would you look down and review the one that's marked Government's Exhibit 2?
A Yes, sir.
Q Do you recognize that item?
A Yes.
Q And what is it?
A It is the suppressor that I took from Mr. Veletanlic's

safe.

MR. DIGGS: Government offers Exhibit 2, Your Honor.

MR. BROWNE: No objection.

THE COURT: Exhibit 2 is admitted. It may be published.

(Exhibit 2 admitted.)

Q (By Mr. Diggs) Would you hold Exhibit 2 up and show it to the jury?

A (Witness complies.)

Q Can everybody see that?

Have you also -- would you also look at Government's Exhibit 6, Special Agent Grigore?

A Yes, sir.

Q Do you recognize that?

A Yes.

Q What's that?

A That's the same suppressor that is here.

Q A photograph of it?

A Yes, sir.

MR. DIGGS: Government offers Exhibit 6.

THE WITNESS: It's not on the screen.

MR. DIGGS: It's not supposed to be on the screen.

MR. BROWNE: No objection.

THE COURT: Exhibit 6 is admitted and may be published.

(Exhibit 6 admitted.)

Q (By Mr. Diggs) So this is the suppressor that you seized on July 25th?
A Yes, sir.
Q Where it's written ".22 LR," what does that refer to?
A That refers to the caliber. It's a .22 long rifle.
Q Does this suppressor have a serial number?
A It does, sir.
Q Where is that? If you could mark it with your finger.
A It is right here. 16-38766.
Q That day, before you left the defendant's house with the suppressor, did he provide you any information in person about any other suppressors that he had?
A After I departed from his house, Mr. Veletanlic sent me numerous texts.
Q Okay. Anything else at the house, while you were at the house?
A While at the house? No.
Q And if we -- you mentioned some text messages. Were those the night of July 25th?
A That's correct, sir, yes.
Q I'm going to show you what's been marked for identification as Government's Exhibit 38.
Do you recognize Exhibit 38?
A Yes, sir.

Q And is this a redacted version of a text message you received from the defendant that night?
A Yes, sir.
MR. DIGGS: Government offers Exhibit 38.
MR. BROWNE: No objection.
THE COURT: Thirty-eight is admitted.
(Exhibit 38 admitted.)
Q (By Mr. Diggs) This gray writing in this text message, is that a message from him to you or from you to him?
A This is a message from Mr. Veletanlic to me.
Q Where he says that he's "going to be up front about everything shady I've done," what did you take that to be referring to?
A Him telling me more about what he's done.
Q With regard to?
A With regards to any activities that he has not come forward yet.
Q Below, where he says, "I have cut up one suppressor from" -- possibly "from Bruno," when you were at the house earlier that day, had he told you that he had a cut-up suppressor in his possession?
A Not at the house, no.
So at the house, he told me that he received two suppressors from Bruno that he destroyed. After I went into his safe, I discovered one of the suppressors from Bruno.

And then in this text, he tells me that he cut up the second suppressor from Bruno.

Q When you received this text, did you assume that this was referring to the second suppressor?

A That's correct, yes.

Q Let's go to the next day.

Did you return to the defendant's house on July 26th, 2017?

A Yes, sir.

Q What was the purpose of going there that day?

A It was -- I had returned three suspected short-barrel rifles that, after consulting with our ATF firearms specialist, we deemed to be just air pistols, which is legally -- can be legally possessed by someone.

Q When did you take those rifles?

A The same day when I took the suppressors, on the 25th of July 2017.

Q Did you return them to the defendant the next day?

A Yes, I did.

Q Would you turn in the book to Exhibits 22 and 23? Do you see those, Special Agent Grigore?

A Yes, sir.

Q Do you recognize those documents?

A Yes, sir.

Q What's Exhibit 22?

A Exhibit 22 is the receipt for the four items I took on the 25th of July 2017.
Q Is it signed by the defendant?
A It is.
Q What's Exhibit 23?
A Exhibit 23 is the consent for forfeiture for the silencer that I took from Mr. Veletanlic on the 25th.
Q Is it signed by the defendant?
A Yes, sir.
MR. DIGGS: Government offers Exhibit 22 and 23.
MR. BROWNE: No objection, Your Honor.
THE COURT: Exhibits 22 and 23 are admitted and may be published.
(Exhibit 22 and 23 admitted.)
Q (By Mr. Diggs) Showing Exhibit 23, the silencer that you'd taken the day before, correct?
A That's correct, sir.
Q When you went back on the 26th, did you have any further discussion with the defendant about this specific silencer?
A Not about this specific silencer -- oh, well, I -- confirmed with him whether -- whether he registered this silencer, and he said he did not.
Q Did you ask him whether he had imported it through legal means?
A I did -- well, I did not because he already told me he

received it from Bruno by mail, so I knew that he did not import it legally. And also I knew by looking at the silencer --

MR. BROWNE: Your Honor, this not responsive anymore.

THE WITNESS: Excuse me? Oh.

THE COURT: Why don't you re-ask the question, counsel?

Ladies and gentlemen, disregard the prior answer.

Q (By Mr. Diggs) Okay. So you had learned that he had imported it from Bruno, correct?

A That he received it from Bruno, yes.

Q Received it from Bruno?

A Yes.

Q Okay. Do you know, based on your training and experience, whether that was a receipt by legal means?

A I do, and I know that this was not received by legal means.

Q How do you know?

A Because the marking on the silencer is missing the important information that is required by law.

Q On the 26th, so the day after you took that silencer, did he provide you any other physical evidence that day?

A Yes, sir.

Q What did he provide you?

A He provided me with a Ziploc full of metal scrap that

looked circular, and he told me that that contained two destroyed silencers.
Q So he told you that that contained two destroyed silencers?
A That's correct.
Q Okay.
A And I believe he was referring to the ones that he texted me about.
Q Okay.
And did you do anything to have those metal pieces tested?
A No.
Q Did you conduct an interview of the defendant that day, July 26th, about some of the new information he'd provided?
A Yes, sir.
Q And was that interview recorded?
A Yes, sir.
Q Have you reviewed, in preparation for your testimony today, Government's Exhibit 41A?
A Yes, sir.
Q Is that a fair and accurate recording of a portion of the recording between you and the defendant that day?
A Yes, sir.
MR. DIGGS: Government offers Exhibit 41A.
THE COURT: Any objection?

MR. BROWNE: No objection, Your Honor.

THE COURT: The exhibit is admitted and may be published.

(Exhibit 41A admitted.)

Q (By Mr. Diggs) I'm going to play a portion of this interview. It's quite short, and then I'll stop it and ask you a question in a moment.

(Exhibit 41A audio is played.)

Q (By Mr. Diggs) Okay. Who was Dan that he's referring to?

A The second group of individuals that he sent parts and firearms to in Sweden.

Q And who is Sven?

A Robin LavHage.

(Exhibit 41A audio is played.)

Q (By Mr. Diggs) Did this interview continue on beyond the time that we stopped it in this excerpt?

A Yes, sir.

Q And have you listened to what's been marked as Government's Exhibit 41B?

A Yes.

Q Does that excerpt fairly and accurately reflect a portion of the interview?

A Yes, sir.

MR. DIGGS: Government offers Exhibit 41B.

MR. BROWNE: No objection, Your Honor.

THE COURT: It is admitted and may be published.

(Exhibit 41B admitted.)

Q (By Mr. Diggs) Before we play this portion of the interview, Agent Grigore, can you set the stage for the jury and let them know what portion of the interview this section comes from?

A This section of the interview is towards the end of my interview, actually. When I interview a person, I finish my interview by asking them whether they -- if I have missed anything, if they want to tell me anything else.

Q And is that what precedes this section of the interview?

A That's correct.

MR. BROWNE: Counsel, is this page 17 of 20?

MS. DALTON: Yes.

MR. BROWNE: Thank you.

(Exhibit 41B audio is played.)

Q (By Mr. Diggs) In that section of the interview, the defendant refers to a production suppressor; is that correct?

A That's correct.

Q What is that?

A It is a suppressor that is made by a licensed manufacturer rather than made homemade, the suppressor.

Q And at the end, he refers to the caliber of the suppressor?

A That's correct.

Q What was the caliber of this one?
A It's .556.
Q How does that relate to a .22 LR?
A It's quite similar. .556 is the metric measurement, and .22 LR is the inches, the U.S. measurement. .556 is equivalent to a .223 caliber, which is millionths of -- it is --
Q A hair thicker than --
MR. BROWNE: Your Honor, counsel is interrupting.
A Yes.
THE COURT: Thank you, Mr. Browne.
Let her finish her answer.
A So it is quite similar to .22 LR with 223. The difference, it's very small.
Q (By Mr. Diggs) What was your reaction to the defendant telling you, on July 26th, that he, in fact, had a second intact suppressor?
A Well, I was quite surprised, and quite upset, too, because he just texted me the night before saying he destroyed that silencer, and now he's telling me he has it intact, buried somewhere.
Q So from the beginning of the day on July 25th until the end of the day on July 26th, can you walk us through what you learned about the defendant's suppressor possession?
A Well, within the 24 hours, I learned that he actually had

two suppressors; that he received them from France; that he destroyed them; and then that he actually did not destroy them but had one because I found one in his safe.

Later that night, he told me that he -- the second silencer that he received from France, he actually destroyed it, and then he also made his own suppressor, but he destroyed those, too.

And then I arrived at his house on the 26th. He handed me a bag that I assumed to be the homemade suppressor that he cut, and then the second France suppressor, and then throughout that meeting, I discovered that actually was not true because he had another suppressor buried somewhere else, the second suppressor from France.

Q Approximately a week later, did you meet the defendant near his home?

A Yes, sir.

Q To receive that -- what was the purpose of that meeting?

A For him to hand me the second suppressor he had received from Bruno.

Q If we could turn, Agent Grigore, in the book to Exhibit 25 and 26. Do you recognize these?

A Yes, sir.

Q What is Exhibit 25?

A It is a receipt for that suppressor that he handed to me on the 1st of August 2017.

Q Is it signed by the defendant?
A Yes, sir.
Q What is Exhibit 26?
A It is the consent to forfeit that same suppressor to me.
Q Is it also signed by the defendant?
A Yes, sir.
MR. DIGGS: Government offers Exhibit 25 and 26, Your Honor.
MR. BROWNE: No objection to 25, Your Honor. I don't seem to have 26 in my book. Counsel, can you just make an offer for what it is? My book goes from 25 to 28.
Thank you.
I have no objection to 26.
THE COURT: Exhibit 25 and 26 are admitted and may be published.
(Exhibit 25 and 26 admitted.)
Q (By Mr. Diggs) Showing you Exhibit 26, you called this the consent; is that correct?
A That's correct, sir.
Q And you've identified the second suppressor as what?
A A Vortex RDS Industry suppressor. It did not have a serial number on it.
Q At your feet, do you have an item with a tag, Government's Exhibit 3, Agent Grigore?
A Yes, sir.

Q Do you recognize that item?
A Yes, sir.
Q What is it?
A It is the same Vortex RDS Industry suppressor.
MR. DIGGS: The government offers Exhibit 3, Your Honor.
MR. BROWNE: No objection.
THE COURT: Exhibit 3 is admitted and may be published.
(Exhibit 3 admitted.)
Q (By Mr. Diggs) Agent, would you hold that up and show it to the jury, please?
A (Witness complies.)
Q Showing you Exhibit 7, do you recognize that?
A Yes.
Q What is it?
A It's the same suppressor I have here.
Q A photograph of it?
A Yes, sir.
MR. DIGGS: Government offers Exhibit 7.
MR. BROWNE: No objection.
THE COURT: Exhibit 7 is admitted and may be published to the jury.
(Exhibit 7 admitted.)
Q (By Mr. Diggs) You reference that this suppressor lacked

a serial number; is that accurate?
A That's correct, sir.
Q Was this a concern to you?
A Yes, sir.
Q Why?
A Well, it indicated that -- it did not have the proper markings for a U.S.-allowed product, firearm.
Q I want to go forward now to May of 2018.
Did the investigation -- did you obtain an arrest warrant for Mr. Veletanlic in May of 2018?
A My co-case agent obtained one, yes.
Q And where was the arrest to be executed?
A In the parking lot of a Chevron in Tulalip, Washington.
Q Did you communicate with the defendant prior to his arrest?
A Yes, sir.
Q Did you tell him he was going to be arrested in advance?
A No, sir.
Q What did you tell him?
A I asked him to meet me at that location at a set time.
Q Did you observe him arrive at the parking lot in Tulalip, Washington?
A Yes, sir.
Q Did you observe him get arrested?
A Yes, sir.

Q Can you explain how that happened?
A As he exited his vehicle and walked towards my vehicle, they stopped him and arrested him.
Q And you were watching this?
A I was just a few feet away, so, yes, I was watching.
Q Was he patted down at the time he was arrested?
A Yes.
Q Was anything recovered?
A Yes. On Mr. Veletanlic, there was a Ruger pistol inside his pants, an abdominal carry.
Q Excuse me. I didn't catch the end of that.
A An abdominal carry.
Q Was it visible?
A It was concealed.
Q And did you observe it being taken from him?
A Yes, sir.
Q Did you take the pistol into your control?
A Yes, sir, later in the day.
Q How did you mark that pistol for identification?
A I entered it into ATF property, and I tagged it as property.
Q When the pistol was taken from the defendant, was it loaded?
A It was loaded with six rounds of ammunition.
Q If you'd look at your feet for what's marked as

Government's Exhibit 4, please.
A Yes, sir.
Q Do you see that?
A Yes.
Q Do you recognize it?
A Yes, sir.
Q What is it?
A It is the same pistol that Mr. Veletanlic was carrying that day.

MR. DIGGS: The government offers Exhibit 4, Your Honor.

MR. BROWNE: May I inquire?

Counsel, my Exhibit 4 just says "bulk." Are you talking about the actual weapon?

MR. DIGGS: It's the one at her feet.

MR. BROWNE: Okay. And that's 4?

MR. DIGGS: Yes.

MR. BROWNE: No objection, Your Honor.

THE COURT: Exhibit 4 is admitted and may be published.

(Exhibit 4 admitted.)

Q (By Mr. Diggs) Would you hold Exhibit 4 up and show the jury?
A This firearm is cleared, so pardon me if it scares you.
Q You can put that on the desk in front of you. I'm not

sure you can. Actually, don't do anything you shouldn't do.

Did you have a chance to review what's been marked as Government's Exhibit 8, Agent Grigore?

A Yes, sir.

Q And what is Exhibit 8, two pages?

A Photographs of the same firearm here in front of me.

Q The one that was seized?

A Yes, sir.

MR. DIGGS: Government offers Exhibit 8, two pages.

MR. BROWNE: No objection, Your Honor.

THE COURT: Exhibit 8 is admitted and may be published.

(Exhibit 8 admitted.)

Q (By Mr. Diggs) The item that I circled, what's that?

A That's a magazine that contains rounds of ammunition.

Q Was it the magazine from this firearm?

A Yes, sir.

Q And the red circle in the upper right-hand corner, what's that?

A That's the place where the serial number would be on that firearm.

Q When did you learn that this firearm had an obliterated serial number?

A The date of the arrest.

Q And that was before or after you transferred the defendant

for purposes of the arrest?
A It was before, right after he was arrested.
Q So while you were still in the parking lot?
A That's correct, so, yes.
Q Was the defendant read his Miranda rights while he was with you and Agent Karabeika in the car?
A Yes, sir.
Q Did he agree to waive those rights and to talk with you?
A Yes, sir.
Q What did the defendant tell you about the pistol that had been seized from him that day?
A He told us that he has carried this pistol every time he has met with us. He also told us that he had purchased this pistol approximately three years prior and that the serial number was removed because it was a stolen firearm.
Q Had he previously told you that he was carrying a concealed pistol when he met with you?
A No, he never did.
Q Had you done any -- taken any investigative steps with regard to whether or not the defendant could carry a concealed pistol?
A I did. It's my habit of checking whether a person has a CPL issued to them prior to me meeting them, just as a safety to me and the person that meets with me.
Q Did you say "CPL"?

A "CPL." Sorry. It's a concealed carry permit, pistol permit -- license. Sorry. "CPL" stands for "concealed pistol license."

Q Did the defendant have a concealed pistol license?

A No, he did not.

Q Is that something you knew before your first interaction with the defendant?

A Yes. And also --

MR. BROWNE: Objection, Your Honor. There's no question pending.

THE COURT: There's no question pending.

Q (By Mr. Diggs) Did you or another agent typically pat the defendant down when you met with him?

A No, we didn't pat him down.

Q Did the fact that you knew that he didn't have a CPL affect your investigative steps with regard to the defendant?

A No.

Q When you examined his safe on July 25th, was that firearm, this one, was that in the safe?

A No.

Q What did you do with Exhibit 4 after you took it into evidence? That's the Ruger.

A Yes. We took it to our lab, and we fired it. We fired two rounds out of it. I witnessed one of my co-workers doing that. And then later on, this month, actually, I fired it

again.
Q And did it successfully fire a round?
A Yes.
Q Is this something that you typically do with the firearms that you seize?
A Yes.
Q Okay. I'm going to now switch areas and ask you about other investigative steps you took with regard to this firearm.
Can you talk a little bit about your background and training as it relates to determining the place of manufacture of a firearm?
A So back in April of 2018, I was certified as a firearms interstate nexus expert for ATF and for my group. During that training, I received -- I received -- during that week, I received training regarding how to identify and research firearms and to determine whether those firearms have been affected in interstate commerce.
Q Why is that something that's relevant to your investigation?
A Because I investigate federal crimes, and one of the requirements for federal crimes is to be -- to occur within two states -- two states or territories of the United States.
Q So this training, was it specific to your role as an interstate commerce expert?

A That's correct.
Q In that role, how many firearms, approximately, have you examined to determine the place of manufacture?
A Thirty-eight.
Q And have you, in this case, conducted research to determine where Exhibit 4 was manufactured?
A Yes.
Q Was there a clue to the place of manufacture located on the firearm itself?
A Yes.
Q What was it?
A The firearm showed the city and the state where it was manufactured.
Q And I should have asked you before, but what was the make and model of this particular firearm?
A It is a Ruger LCP pistol, a .380 auto caliber.
Q Did you conduct research into firearms, manuals or resources, to determine, by an additional way, the location of this firearm's manufacturer?
A Yes, sir. As an interstate nexus expert, I was provided the library of books, so I looked into the blue book of guns to research a specific firearm.
Additionally, as an interstate nexus expert, I have access to a database maintained by other interstate nexus experts within ATF, and that literature led me to my conclusion that

this specific firearm was produced in Prescott, Arizona, outside of the state of Washington.

Q So taking the fact that it was seized in Washington, what's your opinion as to whether this firearm has traveled in interstate commerce?

A My opinion is this firearm traveled in interstate nexus.

Q From one state to another?

A From Arizona to Washington.

MR. DIGGS: If I may have one moment?

No further questions.

THE COURT: Mr. Browne, you have seven or eight minutes before we'll take our break.

MR. BROWNE: Okay.

CROSS-EXAMINATION

BY MR. BROWNE:

Q Good afternoon.

A Good afternoon.

Q You referenced that a firearm was allegedly seized or found in Sweden, correct? You used the term "firearm"?

A Yes, sir.

Q Was it an entire firearm, that you know of?

A I know that there was the frame of a firearm, but by definition, that is a firearm.

Q Okay. So in your opinion, a part of a firearm is a firearm?

MR. DIGGS: Objection. This is not her opinion testimony.

THE COURT: I'm going to sustain that objection. You might clarify, when she says "definition," where that comes from.

MR. BROWNE: Sure.

Q (By Mr. Browne) Is a part of a firearm considered a firearm under the law?

A No.

Q The first contact you had with my client was a meeting that he originated?

A Yes.

Q Okay. And you never asked him, ever, if he had any silencers until you were at his house on July 25th, correct?

A I asked him if he has -- if he has sent silencers.

Q Sorry. I couldn't understand your response.

A I asked him if he sent silencers. So in order to send a silencer, that means he had them.

Q Okay. So you recall asking him whether he had sent silencers?

A That's correct.

Q Thank you.

The weapons that he surrendered to you and he felt were stolen, they, indeed, were stolen, were they not?

A Can you tell me more details about those weapons?

Q Well, on one occasion -- I can get you the date -- he came in, or you had some contact with him, and he provided two firearms that came from the initials RK --

MR. DIGGS: Objection, Your Honor; beyond the scope.

THE COURT: I'm going to sustain that. He provided two guns, counsel.

MR. BROWNE: That's fine.

Q (By Mr. Browne) He provided two guns to you, indicating he thought they were stolen, correct?

A Correct.

Q And you ran those, and they were stolen, correct?

A Yes.

Q But he gave those to you, correct?

A Correct.

Q And speaking of stolen firearms, when you searched his -- when you looked into his safe on the 25th, you took the serial numbers of all the guns that were there, right?

A Yes.

Q And none of those were stolen, were they?

A I checked, and none of them were stolen, yes.

Q And you are qualified as an expert in firearms?

A No.

Q Okay.

When you were in his house on the 25th of July, that was the day you obtained the first suppressor, correct?

A Yes.
Q And you also took -- I can find the exhibit, if you want. You took two or three other weapons that you thought might be illegal, right?
A Correct.
Q Do you know if it was two, or three? I can't remember.
A Three.
Q Three?
A Yes.
Q And it turns out they were legal, correct?
A Correct.
Q Just to clarify, if a person is a hobbyist or a manufacturer of homemade firearms, there is no legal requirement that they have a serial number, correct?
A Can you clarify that question?
Q I'm not sure, but I'll try.
A Well, are you talking about ghost guns?
Q I have never heard that term before, but, sure. What do you call that? A ghost gun?
A Yes.
So are you asking me -- what are you asking me?
Q Is there any legal requirement that a ghost gun have a registration number -- serial number?
A Not when a person manufactures -- makes that firearm for his own personal use. That firearm becomes illegal when that

person transfers the specific firearm that he made, the ghost gun, to another individual.
Q Okay. So what you're saying is I could possess a ghost gun --
A That's correct, if you made it.
Q If I made it --
A Yes.
Q -- and it did not have a serial number on it, that's not illegal, right?
A That's not illegal if you made that serial number -- that firearm for yourself and not to sell.
Q Right.
A Yeah.
Q So if I sold it or gave it to somebody else, it could be illegal?
A It is illegal.
Q It is illegal?
A Yes.
Q Okay.
MR. BROWNE: Your Honor, I need to organize a couple of exhibits. It might be more efficient if we took our break now, but it's up to you.
THE COURT: You have about 20 seconds left, but that's all right.
Ladies and gentlemen, we'll take our break. You already

heard me twice today about what not to do back there. We'll see you in 15 minutes.

Please rise for the jury.

(Court in recess 3:00 to 3:21 p.m.)

THE COURT: Mr. Browne, you may resume.

MR. BROWNE: Thank you, Your Honor.

Q (By Mr. Browne) Good afternoon, ma'am, again.

Do you have the government's exhibit book in front of you?

A Yes, sir.

Q Can you look at 42B, as in "boy"?

A Yes, sir.

Q Are you there?

A Yes, sir.

Q Okay.

This is a recorded interview that you had with Mr. Veletanlic, and it was the day he gave you the bag of parts. Remember?

A Yes, sir.

Q And you see, on line 15, he says, "I've given you that bag," and you said, "Yes," right?

A What page, sir?

Q There's only one page to this exhibit.

THE COURT: That's not true, sir.

MR. BROWNE: It's 42B.

THE WITNESS: Yes, sir.

MR. BROWNE: It says, on the top, "17."

THE COURT: There's "17, and then there's "18," and a little bit of "19."

MR. BROWNE: Thank you. I got it mixed up for a moment.

Q (By Mr. Browne) Do you see page 17?
A I see page 17, sir.
Q Okay. And he says he gave you a bag, correct?
A What line is that, sir?
Q Fourteen.
A Line 14 says, "So now what?"

THE COURT: I think you want 16, Mr. Browne.

MR. BROWNE: I not only need hearing aids, I need glasses.

Q (By Mr. Browne) Sixteen.
A Yes, sir.
Q Thank you.
And he says he gave you a bag of parts, right?
A No. He says, "I've given you" --
Q What does he --
A -- "that bag of."
Q And then you say, "Yes."
A Yes.
Q And then he says?

A "Suppressor parts."
Q And then he says, "You probably would like want to ask me if I have anything else suppressor related."
A Yes, sir.
Q He said that?
A Yes.
Q And you said, "Do you?"
A Yes.
Q And he said, "Yes," correct?
A Correct.
Q If he hadn't have said that, you wouldn't have known about it, correct?
A Correct.
Q And then he said, "I have a suppressor," correct?
A Line 25, yes.
Q Now, in your testimony, you said you were surprised, if not alarmed, when he told you this. But if you'll go to the next page, which is page 18 -- and we heard it, we heard your words -- and he's telling you, on line 16, it's a production suppressor, correct?
A Correct.
Q And then you say -- and we heard your voice -- "All right. Go ahead and dig it out and call me when you're ready to give it to me," right?
A Yes.

Q Okay.
You have another notebook up there that is defense exhibits?
A Yes, sir.
Q Would you go to A-10?
A Yes, sir.
Q And A-10 is a report of investigation for July 26th, correct?
A That's correct.
Q Okay.
And the day before was the day you found the suppressor, correct?
A Correct, one suppressor.
Q Sorry?
A One suppressor, yes.
Q Okay. So let me change my focus here.
Look at A-9, please.
A A-9?
Q Yes, ma'am.
A Yes, sir.
Q You got it?
A Yes.
Q The third page.
A Yes, sir.
Q Paragraph 7.

A Yes.
Q My client told you there was a suppressor in his safe, correct?
A The one that I -- I got in the safe, yes. He told me that that was from Bruno.
Q Okay. You said earlier you found the suppressor. He actually told you the suppressor was in the safe, right? That's what you wrote?
A That's what -- when I asked him where that suppressor was, he told me it was from Bruno, yes.
Q So the entire paragraph you wrote about that is, "When Special Agent Grigore and Special Agent Karabeika were inventorying the safe, Veletanlic stated that one of the silencers he received from Bruno was in the safe," correct?
MR. DIGGS: Objection. That's not the entire paragraph.
MR. BROWNE: I'm not done.
MR. DIGGS: Oh, I'm sorry.
THE COURT: Mr. Browne, if you're going to cross-examine on the exhibit, it needs to get admitted into evidence.
MR. BROWNE: Oh, it hasn't been?
THE COURT: Not A-9. At least I don't believe so. Everyone is nodding --
MR. BROWNE: May I refresh her memory with it?

THE COURT: Yes.
MR. BROWNE: Okay.
THE COURT: You need to show it to her.
MR. BROWNE: She has a copy.
THE COURT: All right.
Q (By Mr. Browne) So paragraph 7 of A-9 says that my client told you --
MR. DIGGS: Objection, Your Honor; reading the exhibit into evidence rather than refreshing her recollection with it.
Q (By Mr. Browne) By reading paragraph 7, do you recall that my client told you the suppressor was in the safe?
A No. When I re- -- when I discovered the suppressor in the safe, he told me that that suppressor was from Bruno. That's what I meant by writing that paragraph.
Q Well, actually, you said he told you there was a suppressor in the safe, correct?
A He told me that the suppressor that was in the safe was from Bruno, although he previously stated that he had destroyed it. That's what that paragraph says.
Q I didn't ask you that.
A Okay.
Q You wrote a report --
A I did.
Q -- saying he told you the suppressor was in the safe.

MR. DIGGS: Objection, Your Honor.

THE COURT: One more try, counsel, and then let's move on.

MR. BROWNE: I think I beat that horse enough.

THE COURT: Ladies and gentlemen, when we were talking about demonstratives the other day, this is an example of something that will not be back in the jury room with you. So those of you who are keeping notes, I want you to be mindful of that because it's something you may want to write down.

Q (By Mr. Browne) When my client was arrested, he was not told he was going to be arrested. You told him to meet you some place, right?

A I did not inform him that the meeting about -- was for him to be arrested, no.

Q Okay. So you asked him to meet you some place?

A Yes.

Q You'd done that before?

A Yes.

Q And when he was arrested on that day, he was cooperative?

A Yes.

Q He actually waived his rights and spoke to you some more.

A That was his rights to waive, yes.

Q And he specifically told you -- if you need to look at it, and we're talking about A-11 in the defense notebook. Are

you there?
A I'm there.
Q Okay. Look at the page numbers at the bottom, page 4 out of 4. Do you see that?
A Yes, sir.
Q You do?
A Yes, sir.
Q When he was talking about the gun he was armed with when he was arrested, he told you the gun was not for Glenn, it was for him.
A That's what he said, yes.
Q Implying he was going to kill himself?
A He didn't say that specifically, but he said it was for himself and not my partner.
Q And he gave you consent to search his vehicle?
A Yes.
MR. BROWNE: That's all I have, Your Honor. Thank you.

REDIRECT EXAMINATION

BY MR. DIGGS:
Q Agent Grigore, you were asked a question by defense counsel about whether parts -- firearm parts constituted a firearm under the law. Do you remember that?
A That's right, sir.
Q Is a lower receiver for a firearm a firearm under the law?

A Yes, sir.
Q And what part of the firearm is required to have a serial number on it?
A The lower receiver, or the frame.
Q And those are --
A Interchangeable terms.
Q You were also asked about a couple of firearms that were provided to you as potentially stolen by the defendant. Do you remember that?
A That's correct.
Q In advance, had the defendant provided you the serial numbers for those firearms?
A Yes, sir.
Q Finally, why didn't you inform the defendant in -- I'll withdraw that question.
With regard to the arrest of the defendant, why didn't you conduct it at his house?
A Because of officer safety. I was aware that Mr. Veletanlic had --
MR. BROWNE: This is outside the scope.
A -- at least 29 firearms.
THE COURT: Sorry, Mr. Browne. I didn't hear you.
MR. BROWNE: It's outside the scope.
THE COURT: I'll permit the question. I believe it was partially covered in your examination.

MR. DIGGS: You may answer.
THE WITNESS: Could you repeat the question, please?
Q (By Mr. Diggs) Why didn't you arrest him at his house?
A For officer safety and Mr. Veletanlic's safety. We had previous knowledge of him having --
MR. BROWNE: Objection.
A -- twenty-nine firearms.
THE COURT: That question has been answered.
Q (By Mr. Diggs) Why didn't you inform him in advance that he was going to be arrested?
A Because of the same reason: For officer safety and his safety.
MR. DIGGS: No further questions.
THE COURT: Recross?
MR. BROWNE: Nothing further, Your Honor. Thank you. Thank you.
THE COURT: All right. You may step down.
Ladies and gentlemen of the jury, I forget to tell you that when they bring guns out, they disable them before they bring them out. But since the gun was laid in a manner that it would only shoot me, that didn't seem to be a problem.
My favorite part about drug cases is that we also don't let the drugs go back into the jury room. We put them on the counter in front of the first row and ask you to just inspect them. That's not at all involved in this case, but it's

always interesting to see 12 people who have not previously seen kilos of cocaine or pounds of heroin look at this. It's part of the entertainment we provide you in the judicial process.

MS. DALTON: The government next calls Tania Pleasants.

TANIA PLEASANTS, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state your name for the record, and spell it for the court reporter.

THE WITNESS: Tania Pleasants; T-a-n-i-a; Pleasants, P-l-e-a-s-a-n-t-s.

THE COURT: You may inquire.

DIRECT EXAMINATION

BY MS. DALTON:

Q Good afternoon. What is your current job?

A I am an industry operations investigator assigned to ATF's National Firearms Act Division.

Q And where are you based?

A I'm based in Seattle; however, the division that I'm assigned to is actually located in Martinsburg, West Virginia.

Q How long have you been an industry operations investigator with the ATF?

A Approximately four years.

Q How were you employed prior to working as an industry operations investigator?

A I've been with ATF for about ten years, four of those of which were as an industry operations investigator; before that, an analyst; and then prior to that, I spent five years with the Coast Guard Investigative Service as an analyst.

Q What are your duties as an ATF industry operations investigator?

A Industry operations investigators conduct investigations and inspections that are focused on the firearms and explosives industries. We have specialized training in identifying firearms and recognizing evidence of firearms trafficking.

Q And you mentioned that you were employed by the ATF's National Firearms Act Division. What is the National Firearms Act?

A The National Firearms Act of 1934, which most people just call the NFA, is a law that, in part, requires the federal registration of certain types of firearms. It also stipulates that those firearms be engraved with certain information, including manufacturer and importer names, as well as a serial number.

Q Can you explain what makes a weapon a firearm under the Act?

A I can, yeah.

A firearm is any weapon designed to expel -- designed to expel or can be configured to expel a projectile by means of an explosive.
Q What about silencers? Are they considered firearms?
A Yes, they are.
Q And are those required to be registered, silencers?
A Yes, they are.
Q What does the ATF NFA Division do?
A The NFA Division is in charge of handling all applications to possess, make, import, export, and transfer NFA firearms.
Q And what tool does the NFA Division use to carry out its function?
A The NFA uses an Oracle database called the National Firearms Registration and Transfer Record.
Q What kind of information is contained in the registration and transfer record?
A The transfer record contains firearms descriptions, registered owner information, as well as a specific firearms transfer history, who it has passed through.
Q And how many records are contained in that registration and transfer record?
A There are almost 6 million individual records.
Q Have you received training on the use of the registration and transfer record?
A Yes. I received extensive one-the-job training in the

structure and use of the records.

Q And how many times, approximately, have you retrieved information from that record?

A I use the record virtually every day and retrieve -- I've probably retrieved thousands of records from it just in the time I've been there.

Q How is information retrieved from the registration and transfer record?

A Information is retrieved through a search that we can -- we use a search tool, where we fill in what we're looking for. Depending on what criteria is provided, I can search using a person's name, date of birth, I can search by a social security number, an address, firearms information, including make, model, and serial number.

Q And is the registration and transfer record accurate?

A The record is accurate; however, we do receive, daily, notifications from registered firearms owners that have made changes to firearms, and they want their information updated.

So there's always -- there's always something in need of updating in the database, and that's one of the things that I do on a regular basis is make updates.

Q How do you ensure that the results of your searches are correct?

A To ensure a search is not only correct but comprehensive, I search using different criteria and techniques. I not only

search by the actual name that I'm provided, but I also will search using wildcards, which I will use partial spelling of somebody's name, and then use a wildcard, which can compensate for a spelling error or an alias. I can also use that with -- when I search by serial number. To compensate for serial number variations, I can put in wildcards. So that brings back a comprehensive retrieval of information in which I can filter through to make sure I'm covering all my bases.

Q In this case, were you asked to search the registration and transfer record related to this investigation?

A I was.

Q And what you were you asked to search for?

A Two silencers, as well as the name "Hany Veletanlic."

Q I'm going to show you what's been marked for identification as Exhibit 17.

During the course of this investigation, were you asked to determine if a B&T Switzerland Tiger silencer was registered in the registration and transfer record?

A Yes, I was.

Q How did you search the registration and transfer record for that device?

A Do you have the next sheet?

Q I do.

A Yes. This is actually the search certificate I prepared.

I searched for this silencer by the serial number provided. I can read it, if you need me to. But that is the serial number I searched for.

Q And you recognize Exhibit 17 as that search certification?

A It is.

MS. DALTON: We offer 17.

MR. BROWNE: No objection.

THE COURT: Exhibit 17 is admitted. It may be published.

(Exhibit 17 admitted.)

Q (By Ms. Dalton) What is the silencer that's listed on this certification?

A This is the B&T HP22.

Q What were the result of this search?

A The searching was negative. The silencer is not registered in the National Registration and Transfer Record.

Q I'm going to show you what's been marked for identification as Government's Exhibit 18.

Did you also conduct a search of the registration and transfer record for an RDS Industry Vortex silencer?

A I did.

This one is a little more unique. It was not engraved with the serial number, which means it cannot be registered in our registry.

However, I did query, for all silencers under the

manufacturer name, "RDS Industry," and I located no silencers registered under that name. I also queried under the model name "Vortex," which is the engraved model, and I found 100 silencers with the model listed as "Vortex." All of these silencers had serial numbers, and none of them were registered to Mr. Veletanlic.

Q After completing this search, did you create a search certification?

A I did.

Q Do you recognize Exhibit 18?

A Yes.

Q What is it?

A This is my search certificate reflecting that the RDS Industry silencer is not registered in the National Firearms Registration and Transfer Record.

MS. DALTON: We offer 18.

MR. BROWNE: No objection.

THE COURT: Exhibit 18 is admitted and may be published.

(Exhibit 18 admitted.)

Q (By Ms. Dalton) During the course of this investigation, were you also asked to determine whether or not the defendant had registered any firearms or destructive devices in the registration and transfer record?

A I was.

Q How did you conduct that search?
A For a search for a person, no firearms data is used, and I search on the first and last name together, and then I search for the first name only and the last name only. I also use my wildcard to fill in. I use partial data and use the wildcards to ensure that I'm getting a comprehensive look, to make sure if there is any spelling variations, I'm capturing those, as well as we have a sound test tool that I use to see if there's something in there that sounds like "Hany Veletanlic," and it will return any results.
Q Did you create a search certification after completing that search?
A I did.
Q And is Exhibit 16 that search certification?
A Yes, it is.
MS. DALTON: We offer Exhibit 16.
MR. BROWNE: No objection, Your Honor.
THE COURT: Exhibit 16 is admitted and may be published.
(Exhibit 16 admitted.)
Q (By Ms. Dalton) What is the name listed on this certification?
A Hany Veletanlic.
Q And what were the results of this search?
A The search was negative. Mr. Veletanlic had no firearms

or silencers registered in the National Firearms Registration and Transfer Record.

MS. DALTON: Thank you. I have no further questions.

THE COURT: Mr. Browne?

MR. BROWNE: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BROWNE:

Q Hi.

A Hi.

Q So just a couple of questions.

A Sure.

Q The exhibits that have been admitted -- we'll start with 16 -- was dated February 7, 2019.

A Okay. I don't have it up on my screen anymore.

Q It's in the book in front of you, but perhaps counsel can put it up on the screen.

See that date at the bottom?

A Oh, the date on the bottom is February 7th, 2019.

Q Okay. That's when you did that work?

A Yes.

Q Okay. Then let's look at 17. It's dated January 30th, 2019, correct?

A Yes, correct.

Q Eighteen, January 30th, 2019?

A Correct.

Q So as far as you know, it wasn't determined until very recently whether these silencers were registered or not, correct, as far as you know?
A I conducted my search and prepared my search certificates probably within -- this is a guesstimate on my part -- within two weeks of myself being requested to do so.
Q That's fair. Thank you.
A Sure.
MR. BROWNE: That's all I have, Your Honor.
THE COURT: Redirect, counsel?
MS. DALTON: No. Thank you, Your Honor.
THE COURT: All right. You may step down.
THE WITNESS: Thank you.
THE COURT: The government will call its next witness, please.
MS. DALTON: We call Firearms Enforcement Officer Brian Heishman.
BRIAN HEISHMAN, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state your name for the record, and spell your last name for the court reporter.
THE WITNESS: My name is Brian Allen Heishman; B-r-i-a-n; H-e-i-s-h-m-a-n.
THE COURT: You may inquire.

DIRECT EXAMINATION

BY MS. DALTON:

Q What is your current job?

A My current job is I'm an ordnance equipment specialist for the department of ATF, which is in armor.

Q How long have you been doing that job?

A Since October of 2017.

Q And what was your prior job?

A Prior to that, I was a firearms enforcement officer for ATF.

Q Where are you based?

A Based out of Martinsburg, West Virginia.

Q And before being a firearms enforcement officer with ATF, how were you employed?

A Prior to that, I spent six years with the Department of Homeland Security Immigration and Custom enforcement as an armor for that agency.

Q You say the word "armor." Can you explain what is that in just plain language?

A An armor is simply a person who fixes and repairs firearms, duty-issued firearms, mostly, for an agency.

Q And before you worked with Homeland Security, what did you do?

A I spent two years back with ATF as a supervisor in the Federal Firearms Licensing Center.

Q And prior to that?
A And prior to that, I spent 20 years in the United States Marine Corps as an armor for the Marine Corps as well.
Q What are you duties as an ATF firearms enforcement officer?
A Our duties -- the duties as a firearms enforcement officer are to identify and apply the laws of the Gun Control Act and the National Firearms Act as they apply to any evidence or items we receive in the office.
THE COURT: Sir, I'm going to ask a favor of you. You need to slow down a little bit.
THE WITNESS: Okay. Sorry, sir.
THE COURT: We have a really great court reporter, but...
Q (By Ms. Dalton) Did you receive any firearms-related training while working at ATF?
A Yes. We've attended numerous armors classes for -- factory-authorized armors classes, and we've also received training from different folks for acoustic amplifiers and measuring devices for measuring the sound of silencers.
Q Have you ever been a firearms instructor in a firearms training course?
A I have. I did that when I was in the Marine Corps, and I was also a field maintenance armor instructor for the Department of Homeland Security.

Q Have you ever toured any firearms factories?
A Yes. Part of the training as a firearms enforcement officer was we toured numerous firearms factories to see how they are made and the manufacturing process.
Q And have you toured any ammunition factories?
A The same applies there. Yes, we've toured numerous firearms and ammunition manufacturing facilities.
Q In your career, how many -- just a ballpark here -- firearms have you examined?
A When I was a firearms enforcement officer, I had approximately 50 cases and examined over a hundred items of evidence during that time frame.
Q Let's focus on silencers for a moment.
What is the definition of a silencer?
A According to the Gun Control Act, and the NFA refers back to the definition in the Gun Control Act, it is a device for silencing, muffling, or diminishing the report of a reportable firearm.
Q And where does that definition come from?
A Under the GCA, it comes under Title 18 of the U.S. Code and under the NFA, it comes under Title 26.
Q Are there other terms that are frequently used to describe silencers?
A Yes. Silencers are commonly referred to as suppressors, cans, and mufflers.

Q Can a silencer be legally owned?
A Depending on the laws of the state; federally, yes, silencers can be legally owned as long as the person applies for the process, goes through the background check, and submits a fee of $200.
Q Did you examine silencers in the course of your duties as a firearms officer when you were a firearms enforcement officer?
A Yes, ma'am.
Q Approximately how many silencers have you examined?
A It was between 25 and 30.
Q Have you ever examined a suspected silencer and concluded that it didn't meet the criteria of a silencer?
A Yes.
Q What are the design characteristics of a typical silencer?
A Your typical silencer usually consists of an outer tube. The internal system has what -- either baffles or wipes in it that disperses the gas inside the tube so it's self-contained so that it reduces the amount of noise that actually escapes.
Q You mentioned the term "baffle." What is a baffle?
A A baffle is a portion inside of the tube that, depending on the design, is angled in a certain manner so that as the gas escapes from the muzzle of the barrel, it diverts the gas inside the tube to allow it not to have, basically, a straight shot. It's almost like a speed bump for the gases

escaping.

Q Does a silencer typically make a firearm when it's shooting completely silent?

A No, they're usually not completely silent.

Q What do they do?

A They usually reduce the noise down to a noticeably less level, but you will still get a slight amount of gas escaping and a slight amount of noise escaping.

Q In front of you there, I believe you have Exhibit 2, which is already in evidence.

A Yes, ma'am.

Q Do you recognize that device?

A Yes, ma'am.

Q I'm also going to pull up on the screen, just for your reference, what's already been admitted as Exhibit 6.

Is this a photograph of that same device?

A Yes, ma'am.

Q Did you examine Exhibit 2, the one you have in your hands?

A Yes, ma'am.

Q For what purpose?

A It was submitted as part of a criminal report for the duties as a firearms enforcement officer.

Q And broadly speaking, how did you conduct your examination?

A When we receive these, we use an internal scope and look

on the inside of them to see if there is the construction components that match a silencer. And then after that, we use an acoustic test microphone that measures the amount of decibel reduction. We will fire five shots, unsuppressed, to get a baseline, and then we'll screw the suppressor or the silencer onto the firearm and get the difference between the two.
Q Let's talk about the external characteristics, what this silencer looks like on the outside.
What company manufactures this silencer?
A B&T of Switzerland.
Q Does this silencer have a serial number?
A It does, and the serial number is 16-38766.
Q What does that indicate to you, that it has a serial number?
A It's just -- a serial number is part of the manufacturing process to allow them to keep and maintain trackability of their product as it goes through the process.
Q And the marking there that says "FR2016," what does that mean?
A FR2016 would be the model number of the weapon that was -- I'm assuming it was -- or, I'm sorry. It's, like, a lot number, where it has the year of manufacture on it.
Q So it was manufactured in 2016?
A Yes.

Q Does that device appear to have any means of attaching to a firearm?
A Yes. One end has, internally, a threaded portion so that it can screw onto the barrel and muzzle the firearm.
Q And does -- on the other side is the threaded portion. Does the other side have an area where a bullet could escape out of?
A Yes.
Q What is the opening measurement, just approximately, of that side where the bullet would come out?
A It would be approximately a quarter of an inch.
Q Is that large enough to allow a projectile, like a bullet, to exit safely?
A Yes.
Q Did you disassemble Exhibit 2 during your examination, or did you look at it with just a probe, I think you mentioned?
A We used a borescope to look on the inside of it and observe it.
Q Can you just tell me what a borescope is?
A It is a lighted optical device that you look through one end, and it has a magnifying lens so that it -- it lights the inside of the object. In this particular case, it's very dark on the inside. So you look through, and you can actually take pictures of the device from the inside without having to tear it apart.

Q Was there anything on the inside of that device?
A Yes. The device had multiple baffles and expansion chambers.
Q We talked about baffles, but what are expansion chambers?
A When the gas hits the baffle and diverts, it has to have a place to go, so the expansion chamber is to allow the gas to disperse internally inside the silencer.
Q After looking at the inside of the silencer, did you reach any conclusions about the purpose of those components?
A That the device had the design characteristics and features of a silencer.
Q In addition to your examination, did you perform any testing of Exhibit 2?
A Yes. We took the device and did the previously mentioned test where we fired five shots unsuppressed. Then we attached a silencer to it and fired four more shots to get a measurement in decibel reduction.
Q So let's talk about the first one.
So you attached that B&T silencer to a firearm?
A Yes.
Q And then you fired the first five shots. How did you measure the sound?
A The first five shots are actually fired without the silencer attached, to get the baseline. And then to get the measurement, we hooked up an acoustics microphone that is

extremely sensitive. It is calibrated prior to each test, and it's calibrated by the factory annually.

To get the measurement, you stand approximately three feet to the right-hand side of it, then you fire, and it absorbs and measures the amount of decibels that the firearm gives off.

Q So between the time when you had the firearm without the silencer on it and the time when you had the firearm with the silencer on it, what was the reduction in the decibel level?

A I would have to look at my original report to get the exact number.

Q I'm going to show you what has been marked for identification as 44. It's also in the binder in front of you. I know it's multiple pages. It might be easier to look at the binder with the seal.

A I believe that's the front page of -- it might be on the next page over.

Q Uh-huh.

A Yes, at the bottom of the page.

Without the silencer, it recorded 153.89 decibels, and with the silencer attached, it recorded 127.84. I believe the next page has the synopsis of the math, which would be a 26.06 decibel reduction.

Q So a 26 decibel reduction, is that a meaningful reduction in the power of that sound?

A Yes. The normal average of the silencers we test hover around 18 to 19 decibels, so this would be an above-average designed silencer.
Q When you conducted these tests with the silencer and without the silencer, did you wear hearing protection?
A Yes.
Q With this hearing protection, could you hear whether or not there was a reduction in the sound?
A Yes.
Q What did you hear?
A There was a noticeable reduction in the noise level firing with the silencer.
Q On the basis of your training, experience, and knowledge, do you have an opinion on whether Exhibit 2, that B&T silencer, is a device for reducing the report of a reportable firearm?
A I do. It is, by definition, a silencer.
MR. BROWNE: Did you want to admit those exhibits? I don't have any problem with it.
MS. DALTON: Oh, no. I'm fine. I used it as a refresher.
Q (By Ms. Dalton) Before you you'll see Exhibit 3. It's previously been admitted.
A Yes, ma'am.
Q I'm going to pull up Exhibit 7 here, which is also in

evidence.

What is that Exhibit 3 that you're holding in your hand?

A This would be a Vortex silencer, or suppressor, from France.

Q And is the picture that's Exhibit 7 on your screen, is that a photograph of that particular silencer?

A Yes.

Q Did you take this picture?

A Yes.

Q You mentioned you examined that particular exhibit?

A Yes.

Q For what purpose?

A For the purpose of determining if it was a firearm silencer as defined.

Q And broadly speaking, how did you conduct that examination?

A The examination was conducted in the exact same manner that the previous silencer had been, using the lighted optical probe and the acoustic measuring devices.

Q So let's talk about the external characteristics, the outside of that silencer.

What company manufactures that silencer?

A The company would be RDS Industries of France.

Q And it says "Vortex" on it. What is that?

A Vortex would be a company name or a brand name.
Q Does that exhibit that you're holding in your hand, that Vortex silencer, does it have a serial number?
A It does not.
Q Is one required?
A By U.S. law, yes, one is required.
Q Is it missing any other markings on it?
A To be brought into the country, it would have to have the importer's identification marks on it as well; the name of the importer and the state and the city in which the importer is located.
Q Now, I see on the outside of that suppressor it says "France." What does that mean?
A France could be the country of manufacture.
Q And does that silencer have the ability to attach to a firearm?
A Yes.
Q How does it do that?
A It has an internal threaded mechanism on one end that would allow it to be threaded onto the end of a muzzle.
Q Does it have an exit opening on the other side?
A Yes, ma'am.
Q And is that opening large enough to allow a projectile, like a bullet, to exit safely?
A Yes, ma'am.

Q You mentioned you looked at this one through a lighted optical probe?
A Yes.
Q And what did you see?
A It had the same design characteristics of baffles and expansion chambers internally.
Q Did you reach any conclusions about the purpose of those components?
A The design characteristics of the device -- or the design characteristics -- the synopsis was the silencer had the same design characteristics of a silencer.
Q In addition to your examination with the lighted optical probe, did you perform any testing of that Vortex silencer?
A Yes. We did the acoustic testing as well with the Vortex silencer.
Q Can you just describe that test?
A The test was conducted in the same manner, using the same amplifier, the same microphone. Five shots were shot with no silencer attached, and then five shots were shot with the silencer attached to it.
Q Can you describe the results of that particular test?
A The results had a noticeable reduction. I would have to look at the report again to get the exact number.
Q Let me just show that to you once more.
Does that help refresh your recollection as to the

results?
A Yes, ma'am.
With no silencer attached, it gave off 154.06 decibels, and with the silencer attached, it gave off 132.12 decibels.
Q What is the difference between those two decibel levels?
A The reduction is being recorded as a 21.94 decibel reduction.
Q Is that a meaningful reduction in the power of the sound?
A Yes.
Q And even though you were wearing hearing protection, could you hear, with your own ears, a noticeable reduction in the sound?
A Yes.
Q On the basis of your training, experience, and knowledge, do you have an opinion on whether or not that Vortex silencer is a device for reducing the report of a reportable firearm?
A Yes, it is.
MS. DALTON: No further questions.
MR. BROWNE: I have no questions. Thank you.
THE COURT: You may step down. Thank you.
Does the government wish to call additional witnesses?
MR. DIGGS: We do not, Your Honor. Subject to checking our exhibits with the clerk in terms of admitted exhibits, the government rests.

THE COURT: All right. Ladies and gentlemen, you get to go home 20 minutes early today. I know that will break your heart. You should take this time to study for the quiz tomorrow, where we're going to ask you what he just said.

I'm going to ask you to come in at 9:15 tomorrow for the reason that I'm going to meet with the lawyers at nine o'clock.

This afternoon I'm tossing you out of here, in part, because there are some legal things that happen after one side rests, and you don't get to hear those; I do.

Tomorrow, when you come in, we'll be having the defense present its case, and I need to talk to Mr. Browne about the order of that and whatever.

I have learned never to predict anything in trials, but there is some chance that you will finish hearing evidence tomorrow, and if that's the case, then what's left is for me to read you the really meaningful instructions of the law that will govern you, then have closing arguments. It's my rule that when we have closing arguments, you hear them back to back. We're not going to have one side go, and then you go home and have all evening to think about it, and then the other side goes. So the timing on the last day is, many times, unknown until we get there.

At the conclusion of those closing arguments, the two most important people in the courtroom are going to be chosen, and

they get to go home, and the rest will retire to the jury room. The two that get to go home still don't talk about the case. And if anything happens to any of you, then they come back and take your place. So that's our game plan. Thank you for your attention today.

Ladies and gentlemen, please rise for the jury.

THE FOLLOWING PROCEEDINGS WERE HELD
OUTSIDE THE PRESENCE OF THE JURY:

THE COURT: Mr. Browne, does the defense wish to make motions at this time?

MR. BROWNE: Yes.

We would move to dismiss Count 1.

I actually wanted to bring it to the court's attention, and maybe this is something we can defer until tomorrow for your ruling.

Federal Rule 16(1)(E), about the government providing documents and objects on request. "The government must permit the defendant to inspect," da-da, da-da, da-da, "tangible objects," da-da, da-da, da-da, "if within the government's possession, custody, or control."

And then Subsection 1, "anything material to the defense;" Subsection 2 is "government intends to use;" Subsection 3, "items that were obtained or belong to the defendant."

I also believe, while I don't have the citation, people in my office are working on that right now, but the local rule

requires pretty much the same. And, frankly, we are surprised that the government didn't produce whatever this object is that was found in Sweden, and I don't think there's a basis to go forward on that count.

THE COURT: All right. I'm going to take it under reservation at this time. I'm going to give you a chance to file your written brief, if that's what your plan is, or was that your written brief?

MR. BROWNE: It will be pretty much like that.

THE COURT: Yeah.

MR. BROWNE: But, yeah, I certainly know that you will read the rule, and there are some citations under the rule. I pretty much think that's what everybody would need.

And I'm just not familiar with the specific subsection of the local rule about that. I do know that Mr. Veletanlic had a previous attorney, whom I respect, and I assume that he, at the time of arraignment, asked for discovery pursuant to the local rule.

THE COURT: That would be referenced in the local docket.

MR. BROWNE: That's good.

THE COURT: All right. I'll also give the government time to respond, so you may well see this case continue a bit before a ruling comes down on that.

MR. BROWNE: Thank you, Your Honor.

Would you like a little bit of a heads-up on what we're up to tomorrow?

THE COURT: That's the next question. In fact, let me give you an update.

MR. BROWNE: Sure.

THE COURT: The CJA coordinator has found, I believe, Shawn Gillespie, who is going to advise Mr. Kunkel, and we have said that we thought it was likely he would be testifying early tomorrow. So that would -- hopefully he'll get to talk to him between now and then.

Just to cover the contingency, I'd like Mr. Walsh to testify first. That will give us additional time. Is that possible?

MR. BROWNE: Certainly.

THE COURT: Okay. And then we'll see where we are with Mr. Kunkel after that.

MR. BROWNE: Perhaps just a little background. You probably figured it out already.

It is our belief that the .380 pistol in question that has what is claimed to be an obliterated serial number was provided to my client by Mr. Kunkel, and also that weapon was determined to be stolen. So it may be that Mr. Kunkel will not be testifying, if he has an attorney, at least.

THE COURT: Yeah. I understand what Mr. Walsh's testimony is going to be. I have your letter. I am

concerned that Mr. Kunkel be fully advised before he comes up here and potentially admits to a crime. This is not a great place to do that, particularly in front of the U.S. attorney. So we'll find out tomorrow the stories on that.

Counsel, the other thing that I need to figure out is objections to jury instructions. I am tempted to ask you to come in at 8:30 or 8:45, if everyone's had a chance to look at them and you don't think you're going to have much by way of exceptions.

Let me start with the government. Ms. Dalton?

MS. DALTON: I think the jury instructions, as drafted, were fine. I think there was one typo that I noticed, and I'll bring it in tomorrow.

In addition to this, I think that the basis of the defendant's expert tomorrow is going to potentially raise a deliberate ignorance or willful blindness argument, and I think we should be entitled to that instruction. We can file that proposed instruction tonight.

MR. BROWNE: I've never seen one of those, so I'll look forward to it.

THE COURT: All right. Why don't you file it.

I don't want the jury to sit around. We only have one copy machine, and it is a hand-crank. Don't assume we can suddenly produce a great number of instructions.

Consequently, there is going to be some delay in all of

this, and that's why I would like to get instruction exceptions taken early on.

MR. BROWNE: I took a brief look at the instructions, and I don't think I'm going to have any problem with them, but I'm taking them home tonight.

THE COURT: All right. How about if I see you at 8:45 tomorrow?

MR. BROWNE: That's fine. I actually -- what time do you open the doors?

THE CLERK: As early as 8:00.

MR. BROWNE: So if I come in at 8:00, can I do that at 8:00?

THE CLERK: Yes.

MR. BROWNE: I'll be here at 8:00.

THE COURT: We'll plan on seeing you at 8:45.

The last question, and this is not designed as a trap. How long does the government anticipate for its closing?

MR. DIGGS: Less than 30 minutes, Your Honor. That would be the initial closing, the rebuttal; maybe 35 total.

MR. BROWNE: Five minutes for rebuttal?

THE COURT: Mr. Browne?

MR. BROWNE: I'm kind of known for having short closings, but short to me usually means, at the most, 45 minutes.

THE COURT: All right. Counsel, likely what will

happen is, I will send the jury out for an early lunch, have them come back, maybe even have read the instructions to them at that point, and then have you do your closings, because it sounds like we can fit both of them in in the afternoon.

MR. BROWNE: Easily.

THE COURT: They will not get a free lunch tomorrow. They'll have to come back on Thursday to do that. That's tentatively where the court thinks we're going.

MR. BROWNE: The bottom line is, we're ahead.

THE COURT: We're way ahead.

I'll see you tomorrow at 8:45.

MR. DIGGS: Your Honor, just one thing on the scheduling. I think we still have the defense opening. Is that still going to happen?

MR. BROWNE: Oh, no.

MR. DIGGS: It's been reserved.

MR. BROWNE: Well, I'm going to reserve-reserve. I don't think it would be any point at this point to do my opening and then do my closing.

MR. DIGGS: Fair enough.

MR. BROWNE: Because we still haven't decided whether Mr. Veletanlic will take the stand, although I will certainly advise you I think we will.

THE COURT: That's fine. It's entirely up to you. I'll see you all at 8:45. Jury instructions and the verdict

form, remember we have two things to do.

We'll be in recess. Thank you.

(Court adjourned at 4:20 p.m.)

C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 9th day of May 2019.

/S/ Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter