UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>HANY VELETANLIC,<br>Defendant. | CASE NO. CR18-162JLR<br>SEATTLE, WASHINGTON<br>February 27, 2019<br>8:45 a.m.<br>JURY TRIAL<br>Vol. 3 of 3 |

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES L. ROBART
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: MATTHEW DIGGS
MARIE DALTON
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101

For the Defendant: JOHN HENRY BROWNE
Law Offices of John Henry Browne
801 Second Avenue, Suite 800
Seattle WA 98104

Reported by: NANCY L. BAUER, CCR, RPR
Federal Court Reporter
700 Stewart Street, Suite 17205
Seattle, WA 98101
(206) 370-8506
nancy_bauer@wawd.uscourts.gov

EXAMINATION INDEX


| EXAMINATION OF | | PAGE |
|---|---|---|
| GREG WALSH | DIRECT EXAMINATION BY MR. BROWNE | 19 |
| | CROSS-EXAMINATION BY MS. DALTON | 36 |
| | REDIRECT EXAMINATION BY MR. BROWNE | 39 |
| BRIAN HEISHMAN | REBUTTAL DIRECT EXAMINATION BY MS. DALTON | 42 |
| | REBUTTAL CROSS-EXAMINATION BY MR. BROWNE | 46 |

| | |
|---|---|
| JURY INSTRUCTIONS | 50 |
| GOVERNMENT'S CLOSING ARGUMENT | 69 |
| DEFENDANT'S CLOSING ARGUMENT | 84 |
| GOVERNMENT REBUTTAL ARGUMENT | 100 |


EXHIBIT INDEX


| EXHIBITS ADMITTED | PAGE |
|---|---|
| 48 | 16 |
| 70 | 28 |

THE FOLLOWING PROCEEDINGS WERE HELD
OUTSIDE THE PRESENCE OF THE JURY:

THE COURT: Please be seated. Thank you for coming early, and thank you to the staff for coming in early.

The list of things that I think we hope to accomplish today are exceptions to the jury instructions and verdict form, which is why I asked you to come in early.

If any of you wish to do so, you are free to examine the numbers that are in the jury box, as I once had an appeal based on the fact that I had stacked the deck.

MR. BROWNE: I don't even understand that.

THE COURT: Well, since it has 1 through 14, the assumption was I didn't like No. 7, or something.

So you're welcome to do that.

MR. BROWNE: You mean we get to choose someone we don't like?

THE COURT: No, but I guess I don't either, so...

For the record, I'm going to ask Mr. Browne about waiving his opening statement. The defense is going to call witnesses. I understand that witness Kunkel is around somewhere.

MR. BROWNE: Right there.

THE COURT: All right.

I would certainly permit counsel to talk to his lawyer, but on the specific subject of what questions you're going to

ask so that he makes an informed decision.

Then I'll ask Mr. Veletanlic, or you can tell me if he's going to testify or not before we close the evidence.

Then if all goes well, I'll read jury instructions, we'll have closings, we'll select the alternates, and then we're done for the day.

Mr. Browne, since you've taken to the podium, I assume you have something you want to raise.

MR. BROWNE: Yes, Your Honor, just to help streamline, and then also maybe throw a little fly in the ointment here.

I spoke with Mr. Kunkel and his attorney, and just as an offer of proof, Mr. Kunkel does not remember whether he provided this .380 to my client. He said they traded guns back and forth all the time.

So I don't think it's terribly relevant. I'm also concerned, and I told his attorney, that there's evidence that this particular .380 was stolen, but, of course, if Mr. Kunkel says, "I don't know whether I gave that to him or not," it's not really very helpful to me, so I'm releasing Mr. Kunkel from his subpoena.

THE COURT: All right.

MR. BROWNE: I do have a couple other matters, Your Honor.

THE COURT: All right. Go to them.

MR. BROWNE: Did you want to inquire?

THE COURT: No. If you're releasing him, I don't think the government is asking him to stay.

MR. DIGGS: No, Your Honor.

THE COURT: Thank you, counsel. I appreciate you stepping in on such short notice.

MR. BROWNE: An issue that arose yesterday, which I think is rather serious, is the testimony from, I believe the witness's name is Ms. Pleasant -- am I correct on that?

MS. DALTON: Pleasant, yes.

MR. BROWNE: Yeah -- who did the search on the database to determine whether the silencers were registered. She didn't do that until two or three weeks ago.

I'm very curious how the government could have gotten an indictment when that is the issue. In other words, you're allowed to have a silencer if it's registered. And I'm concerned that there was misrepresentation to the grand jury. I don't know that there was probable cause. I'm referring to grand jury -- it's, by the way, Your Honor, A-17 in our book, and on page 13, there's discussions about the silencer with the U.S. attorney and Ms. Grigore, and she's talking about the first silencer, the second silencer. And then there's a question on page 14, beginning on page 13, by the U.S. attorney: "Just so we're clear, the two silencers, the one on July 25th and the one on August 1st, those are the two

that are mentioned in Counts 2 and 3 of the indictment?" And Ms. Grigore said, "Yes, that's correct."

There is no -- as far as I can tell in the grand jury transcript, there's no information about whether the silencers were registered or not. So I am going to be moving to dismiss Count 2 and Count 3 because I don't believe there was probable cause for the indictment, and it may require a hearing.

I just want to put that on the record. I'm just trying to make a record here. I'm, actually, quite concerned about this.

You recall yesterday we established that the testing -- or the analysis she did was within the last three weeks, basically. So until then, the government didn't know that they weren't registered. And there's no evidence, nor did my client ever tell them, that they weren't registered.

So I'm quite concerned about that and would make a motion to dismiss Counts 2 and 3, and I'd ask for a hearing on that matter.

To streamline matters this morning, Your Honor, after talking with my client and doing a lot of work last night and figuring out what's been proven and not proven, I've advised my client that I don't think he should testify -- of course, that's one of those decisions that's totally up to the client -- and he agrees with me on that. You may want to

inquire on that, which you probably do.

I have been reviewing and going through the jury instructions. I don't see any problem, actually.

So I'm very concerned about this issue on the registration of the silencer.

THE COURT: I will consider the motion in regards to the silencers to have been made. I would like you to submit a pleading on it so that I understand the dimension of it and the things that you think support it, and feel free to make reference to the record that's been created here in court.

I would like the government to have the opportunity to respond to it. So it's not going to interfere with what we do today. But if it turns out that you're correct, then I'll strike the verdict, if there is one, and if it's in your favor, we don't need to strike it.

MR. BROWNE: Thank you, Your Honor.

As an aside, by the way, Your Honor, you may recall the last time we were in trial together, it was the Fryberg case, I think, and at one point you suggested -- this is just funny, kind of -- that maybe I should get my hearing tested, and the next day I went and had my hearing tested, and it was 100 percent in one ear and 80 percent in the other ear. So I think it's pretty good.

You do have a soft voice, and I don't mean to criticize you in any way, Your Honor. So thank you for having me get

my hearing tested, but that was the result on that.

So, Your Honor, I'll go any way you want to go at this point.

THE COURT: Let's take the exceptions to the jury instructions and the verdict form.

MR. BROWNE: Okay.

THE COURT: By the way, counsel, there's been a gentleman who's been sitting over in front of the screen. He was wearing a delightful Hawaiian shirt yesterday, and the court security officers inquired of me, do I know who that is, because they're always nervous when there's --

MR. BROWNE: It's the husband of one of the jurors.

MR. DIGGS: Husband of a juror.

THE COURT: That's fine.

MR. BROWNE: I only know that because I saw them walk out to lunch together.

THE COURT: Then how do you know it's her husband?

MR. BROWNE: Exactly right.

MR. DIGGS: I asked him. It's her husband.

THE COURT: We're very sensitive to that, after Judge Lasnik's experience with the Hells Angels, where they planted someone right there, who ultimately turned out to have a camera and was taking photos of the jurors. So the CSOs have an increased scrutiny of anyone who is there for a long period of time.

I'll ask the government to take the podium and tell me, of the instructions that are proposed, you have an additional one that you want to propose. You might want to highlight that; also the verdict form; and then tell me if there are any of your instructions that I didn't give that you think I should have.

MS. DALTON: Thank you, Your Honor.

We have one edit to the existing instructions, which is Jury Instruction No. 25.

THE COURT: All right. I'm there.

MS. DALTON: The pistol that's described in the second paragraph, there's one typo. In the description of the pistol, it's "Sturn," S-t-u-r-n, instead of "Sturm."

THE COURT: All right.

MS. DALTON: And then, secondly, we have no other edits to these jury instructions or, alternatively, to the verdict form.

We do request that the court give the deliberate ignorance instruction in this case. We're heard substantial testimony that the defendant is very knowledgeable about firearms; in fact, builds his own firearms, and has obliterated serial numbers in the past.

It is expected that the defense expert this morning is going to testify that someone who looked at that particular firearm that's in question in this case might have been

confused and thought that the stippling on the side of the firearm was simply the removal of the safety and not the serial number itself.

We think, given the defendant's knowledge of firearms, that this raises a sufficient issue that we should be entitled to a deliberate ignorance instruction, which we have proposed. Of course, that instruction also contains the same typo. It should be "Sturm" instead of "Sturn." My apologies.

THE COURT: All right.

Is there a reason, in your proposed instructions, you eliminated the last three or four words of the last paragraph?

MS. DALTON: The last three or four words?

MR. BROWNE: Your Honor, is this Ninth Circuit Model Jury Instruction 5.7 we're referring to?

THE COURT: It's not 5.7. I think it's 5.8.

MR. BROWNE: Because it didn't come through on my phone this morning or last night when counsel sent it to me. So is this the one that begins with, "You may find"?

MS. DALTON: Yes.

THE COURT: And it's not properly cited by the government. I think it's the 5.8.

MS. DALTON: I have the model here. I have it at 5.7, but if the court has a different version, I'm happy to

use that. The 5.7, this is the identical model that I had from the Ninth Circuit, but I can look again and see --

THE COURT: Why don't you pull up 5.8 on your computer so we can see.

MS. DALTON: Okay.

THE COURT: The case law is relatively strong that you get this instruction. So I'll hear from Mr. Browne.

MR. BROWNE: Your Honor, could you say that again? Did you say the case law is strongly in favor of it?

THE COURT: Yes.

MR. BROWNE: It sounds like a comment on the evidence to me. I would object to giving it. As I said yesterday, I've never seen one before, and it's unusual, to say the least, and as a presumption, you know, basically, I think it's a presumption, which, of course, we can't have in a criminal case. I'm quite concerned about it.

THE COURT: Well, it's an elements instruction. They have to prove beyond a reasonable doubt that he possessed the firearm; that it had been shipped and transported from one state to another; that the serial number had been removed, obliterated, or altered; and that the defendant knew that.

It seems to me those are all things that you would like, so I'm a bit surprised that you're going to object to it.

MR. BROWNE: I want to make sure we're talking about the same one, Your Honor. Is this the one that begins with,

"You may find the defendant acted"?

THE COURT: It's 26.

MR. BROWNE: It's not numbered on mine.

THE COURT: Oh. It's 26, and it says, "You may find the defendant acted knowingly if you find, beyond a reasonable doubt, that the defendant, one, was aware of a high probability that the serial number on the Sturm, Ruger & Company pistol model," whatever, "had been removed, obliterated, or altered, and deliberately avoided learning the truth. You may not find such knowledge, however, if you find that the defendant actually believed that the serial number had not been removed, obliterated, or altered, or if you find the defendant was simply negligent."

I believe the government stopped at that point and left off "careless or foolish."

MR. BROWNE: Mine reads differently. It says, "pistol had not been removed, obliterated, or altered, or if you find the defendant was simply careless." So maybe you're reading --

THE COURT: I'm reading the entire instruction as it's set out in the Ninth Circuit.

MR. BROWNE: Okay.

THE COURT: If I'm going to give it, I'm going to give the entire instruction. I'm not going to let the government edit it.

MR. BROWNE: Yes, now that you've read that and explained that to me and added those words, Your Honor, I don't have any objection.

THE COURT: All right.

I'm told by the people who get paid to keep me out of trouble, the government cited to the 2010 version, I checked it with the current version approved March 2018. So that's where we're running into that discrepancy.

MS. DALTON: Thank you, Your Honor.

THE COURT: Mr. Browne, I'm going to record you as accepting Instruction No. 26, the one that begins, "You may find."

MR. BROWNE: Yes, Your Honor.

THE COURT: Do you have any other exceptions to the instructions or the verdict form?

MR. BROWNE: Let me grab my packet.

The short answer is no, but I just want to go through and look at my highlights I made at twelve o'clock last night.

Jury Instruction No. 1 is fine; No. 2 is fine; No. 3 is now necessary; alternate No. 3 is not necessary.

THE COURT: Well, No. 3 I think you want. "The defendant in a criminal case" --

MR. BROWNE: Yes.

THE COURT: Yes.

MR. BROWNE: I'm sorry, Your Honor. I interrupted,

and I hate to do that.

THE COURT: And the one that we're going to strike is the alternative version, which is to be given if the defendant testifies. That's the one we're going to eliminate.

MR. BROWNE: So 4 is fine; 5 is fine; 6 is fine; 7 is fine; 8 is fine; 9 is definitely necessary and fine; 10 is fine; 11 is fine; 12 is fine; 13 is fine; 14, fine; 15, fine; 16 -- although it was interesting yesterday when Ms. Grigore was testifying, and I asked her, "Well, you're an expert," and she goes, "No." I must admit I was a little stunned by that response.

THE COURT: I think she wanted to qualify she was not an expert in everything. She was an expert in whatever it is, interstate transportation.

MR. BROWNE: All right.

So 16 is appropriate; 17 is appropriate; 18 is appropriate. I'm not sure there's been any charts that have been admitted.

THE COURT: There was packing slips.

MR. BROWNE: Right. I thought that was just a demonstrative.

THE COURT: No.

MR. BROWNE: I'd like to have that submitted.

THE COURT: The clerk can check on that.

MR. BROWNE: No. 19 is fine; 20 is fine, appropriate; 21 is appropriate, as is 22. The definition of "knowingly" in 23 is right out of the model instructions, so it's fine; No. 24 is fine. I'm not sure it's necessary, but it's fine; 25 is correct; 26 is the general instruction, that's fine; 27 is appropriate; 28 is appropriate; 29 is, obviously, appropriate; 30 is appropriate; 31 is appropriate; 32 is appropriate, which always reminds me, when I see 32, Judge Coughenour once told me, in one of the many trials in front of him, he's never had an intelligent question from a jury, which, you know how he is, which I thought was pretty funny, and it's kind of been my experience, too.

And then I do -- we're talking about -- No. 26 is the new proposed one, correct?

THE COURT: Yes.

MR. BROWNE: That's fine also.

Did you consider or do you think we need a repeat of the instruction that you admitted some evidence not as substantive evidence but, basically, as state of mind. You read it to them twice, I believe, and normally, I think, there's one like that that goes to them now, too, but I'm not sure.

THE COURT: Does the government take a position on that?

MS. DALTON: I think the record has been sufficient

on that particular instruction, but if the court feels it's necessary.

THE COURT: Mr. Browne, you have a copy of it. It's one of the in-course-of-trial instructions, feel free to make mention of it in your closing --

MR. BROWNE: All right.

THE COURT: -- just to remind them.

MR. BROWNE: I do.

THE COURT: If we had a better copy machine.

MR. BROWNE: Mine is a hand-crank, but it's not much better.

THE COURT: And the verdict form?

MR. BROWNE: Fine.

THE COURT: All right.

For your information, Exhibit 48 is the summary chart that has the coloring on it, and that's been admitted.

(Exhibit 48 admitted.)

MR. BROWNE: That's fine.

THE COURT: All right. Any other matters to take up before we bring the jury in at 9:15?

MS. DALTON: I think we forgot to tell you yesterday, Your Honor, that we will be having a very short rebuttal expert at the conclusion of the defense's case.

THE COURT: Yes, you forgot to tell me that, so let me add that.

Mr. Veletanlic, this is the one time I get to address you directly.

Are you aware, sir, that you have a right to testify as a witness in this matter, and am I correct that you have chosen not to exercise that right?

THE DEFENDANT: Yes.

THE COURT: All right. That was a compound question. There are two parts to it.

Thank you.

MR. BROWNE: Your Honor, may I have ten minutes to talk to Mr. Walsh, who I noticed just arrived, and I would like to pare down his testimony a bit, and I need to talk to him about that.

THE COURT: You have until about 9:15, or a little bit past it, and that's assuming they're all here on time, so you should be fine.

MR. BROWNE: Are they all here now?

THE COURT: We're not sure. We're out here, and they're in there. We'll go find out.

MR. BROWNE: Thank you.

MR. DIGGS: Your Honor, do we have on the record that the defense has waived its opening?

MR. BROWNE: No -- well, I think we did yesterday, but I do waive my opening.

MR. DIGGS: Thank you.

THE COURT: All right. Counsel, we'll be in recess. I hope everyone has a lifetime supply of cough drops to get us through the jury instructions.

We'll be in recess.

(Court in recess 9:10 to 9:25 a.m.)

THE FOLLOWING PROCEEDINGS WERE HELD
IN THE PRESENCE OF THE JURY:

MR. DIGGS: Your Honor, Mr. Browne has asked that Exhibit 4 be placed on the witness stand, so since it has to stay with the special agent, may she stay in the courtroom during this testimony?

THE COURT: Yes.

MR. BROWNE: I have no objection to that, Your Honor.

THE COURT: Ladies and gentlemen, I'll remind you that Exhibit 4 is a firearm, and again note that before they come in here, we actually remove the firing pin and stick a marker in there, so it's been rendered inoperable.

Mr. Browne, your first witness?

MR. BROWNE: Yes, Your Honor. Just for the record, I'm going to waive my opening statement because right now --

THE COURT: Because you're going to do your closing.

MR. BROWNE: Right. Because my closing is going to happen soon.

We'd call Greg Walsh, Your Honor.

THE COURT: Please come forward, Mr. Walsh.

I haven't seen you for a bit, sir. Welcome.

GREG WALSH, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state your full name for the record, and spell it for the court reporter.

THE WITNESS: My name is Greg Walsh; G-r-e-g; W-a-l-s-h.

THE COURT: You may inquire.

DIRECT EXAMINATION

BY MR. BROWNE:

Q Good morning, Mr. Walsh.
A Good morning.
Q Mr. Walsh, how are you employed?
A I'm a private investigator. The company I work for is Pacific Confidential, PLLC.
Q How long have you been in the business of a private investigator?
A Since 2007.
Q Can you tell us a little bit about your background before that?
A All of my adult life in public safety: In EMS, fire rescue, technical rescue, air medical rescue, criminal investigation, law enforcement, and forensic medical investigation.
Q Okay. You're about to be told by the judge to talk a

little slower. Okay?

A Yes, sir.

Q What is your expertise in firearms?

A I am a licensed private investigator in the state of Washington, endorsed by the Washington Department of Licensing as an armed private investigator, and by the Washington Criminal Justice Training Commission as a certified trainer for armed, private investigators, security officers, and bail enforcement agents.

I'm also an NRA-certified firearms instructor, in-home firearms safety, basic pistol, personal protection inside the home, personal protection outside the home, and defensive pistol.

I am also an NRA-certified firing range safety officer qualified to implement and act and enforce firing range safety procedures and to ensure safe operation in handling, including in the event of malfunction, of every type of firearm that can be introduced into a firing range.

I've also been qualified and testified and been a consulting expert on a number of cases relating to firearms, non-firearms weapons, and use-of-force issues.

THE COURT: Mr. Walsh, you used some initials in there. We probably all know what they mean, but some of the jury may not. You said "NRA." What's that?

THE WITNESS: I'm sorry. "National Rifle

Association."

THE COURT: Thank you.

Q (By Mr. Browne) Have you testified previously as an expert?

A Yes.

Q For the government as well as defense?

A Yes.

Q Okay.

You had some affiliation with law enforcement when you lived in Jefferson County, correct?

A Yes, and also with two departments in New Mexico.

Q Okay.

In front of you is Exhibit No. 4, which is a .380 Ruger. Do you see that?

A I assume that's what that it is in front of me. I'd have to look at it.

Q It's been disarmed. It's safe.

A Okay.

Q It's been cleared. Is that the right word?

A Yes.

Q Would you take a look at that?

A Including handling it?

Q Yes.

And so everyone knows, there's no ammunition in it, either.

Have you seen that before?
A I believe I've seen this exact firearm before.
Q Okay.
And did you make an effort to see that when it was in the custody of the evidence technicians in this case?
A I asked for and was granted the opportunity to inspect this firearm, and it was made available to me by Special Agent Grigore at the Alcohol, Tobacco, and Firearms office in Seattle.
Q Okay.
Briefly, if you could -- if counsel could assist me again, I'd appreciate it. Exhibit 8?
It will come on your screen. It's been admitted. Is it on your screen, Mr. Walsh?
A It is.
THE COURT: More importantly, is everyone's screen up, ladies and gentlemen?
Great. Thank you.
Q (By Mr. Browne) Would you just -- and I think the screen is interactive. See how I just made a mark on it?
A Yes.
Q I don't know how to get rid of the mark, but can you --
THE COURT: Push "clear."
MR. BROWNE: It's fine.
Q (By Mr. Browne) Would you describe the parts of the gun

that are visible in Exhibit No. 8? You can make an arrow or anything you want.
A Well, the first thing I would indicate is the slide, the slide assembly and part of the barrel is visible.
The next thing I'll indicate is the frame, and a distinction should be made between the frame and receiver on this particular model. Because there is an internal component that attaches to this plastic frame -- I'm going to make a little circle to indicate what I'm referring to -- that is removable and is the serialized part of this gun.
I'm also indicating now the magazine, and there is a round and, apparently, other rounds in the magazine. There's also an aftermarket-built clip affixed to this gun.
Q What is that?
A It's an aftermarket clip. I believe it's sold by a company called Techna Clip for use in lieu of a holster.
Q Okay. I'm going to draw on that.
Is that what you're talking about, right there?
THE COURT: Mr. Browne, I'm going to ask, would you and the government stipulate to which gun this is?
MR. BROWNE: We did.
THE COURT: The jury has heard a number of testimony about multiple guns. Where did this one come from?
MR. BROWNE: Would you like to say it?
MR. DIGGS: Sure.

THE COURT: Well, just --

MR. DIGGS: This one was taken from Mr. Veletanlic on May 3rd, 2018.

THE COURT: Please repeat that, sir.

MR. DIGGS: So this was the firearm that was seized from Mr. Veletanlic's front on May 3rd, 2018.

THE COURT: All right.

MR. BROWNE: I was going to add something to that, but I forgot.

Oh, this is the gun that is the subject of Count 4?

THE COURT: That's correct.

Q (By Mr. Browne) Where I drew that little line, that's the clip you're talking about?

A I'm going to point to the magazine, which some people refer to as a "clip."

Q No, I'm sorry.

The clip that goes into your jeans or something?

A Correct, that would be accurately referred to as a "clip."

Q Okay.

MR. BROWNE: Counsel, can we go to the other side of this?

This is also Exhibit 4?

MS. DALTON: Exhibit 8.

MR. DIGGS: Exhibit 8, it is a photograph of 4.

MR. BROWNE: Yeah. But there's two photographs, and

they're both of Exhibit 8?
MR. DIGGS: Right.
Q (By Mr. Browne) Just so the record is clear, this is another photograph from Exhibit No. 8, which has been admitted.
Is this the other side of the weapon in question?
A Apparently so.
Q Okay.
Can you describe again -- and you can -- the screen is interactive, if you want, if it helps -- describe -- well, we know what the clip is that has bullets in it, so let's not worry about that. Okay?
A To clarify, we've referred to two things now with the word "clip."
Q I know. There's another word for it. It's called a "magazine"?
A Magazine.
Q So this right here is the magazine, right?
A Yes, sir.
Q Okay.
So using the interactive process on your screen, can you describe what the -- what's depicted on this gun?
A Yes. I'm going to indicate, coming in from the left, the magazine; a visible round on top of the magazine; witness holes in the magazine, which presumably indicate additional

rounds in the magazine; a slide assembly. In this view, you can't quite see whether there is a barrel in place, but if the angle was slightly more vertical, you would probably see it there; this whole assembly. I recall the frame because there are, actually, two components to the receiver of this gun, one of which cannot be seen here.

Q What do the letters mean, "LCP"?

A Those are Ruger's proprietary name for this particular weapon, and it stands for "light-carry pistol."

Q Okay.

And you see -- I'm going to circle it. What is that?

A What do I know it to be now?

Q Yes.

THE COURT: Counsel, you need to rephrase your question. He doesn't get to ask questions.

MR. BROWNE: That's true.

Q (By Mr. Browne) When you looked -- how long ago was it that you looked at this evidence item?

A I think it was about three months ago.

Q Okay.

When you looked at it, could you determine whether what I just circled or not was a serial number?

A No.

Q Okay.

Would that be a normal place to find a serial number on

any other firearm that you know of?
A No.
Q On other firearms that are similar to the .380, are there indentations that like that are for other purposes?
A Yes.
Q And what would that be?
A There are a number of guns marketed under various manufacturer names, some of which bought each other approximately two decades ago, that had a fore and aft slide safety residing in the recess on the receiver in this position, which would normally correspond to the thumb of a right-handed shooter. Those guns have been discontinued and that safety design has been changed, and I believe some of them have been subject to recall.
Do you want a list of the manufacturers?
Q No.
So what would you normally think would be in that spot that I put the circle on?
A My first guess, not being intimately familiar with this weapon, would have been that there had been a slide safety there, possibly de-contented from some specification when it was sold.
Q Okay. Let's go to --
MR. BROWNE: Do you have Exhibit 70 on the computer?
MS. DALTON: Yes.

Q (By Mr. Browne) May we go to Exhibit 70 now, Mr. Walsh?
A Is that something I change on the screen?
Q It will be on your screen, and it's also in the book, Government's Exhibit No. 70.

THE COURT: Counsel, the exhibit has not been admitted.

MR. BROWNE: Oh, okay. It's not being shown to the jury at this point, correct?

THE COURT: Correct. Do you want to move the admission of it so it can be displayed?

Q (By Mr. Browne) Have you seen this photograph before?

THE COURT: Counsel, you can't ask questions about it until it's admitted.

MR. BROWNE: Well, I'll move to admit it, then. I was trying to lay a foundation.

MS. DALTON: We have no objection.

THE COURT: Exhibit 70 is admitted.

(Exhibit 70 admitted.)

MR. BROWNE: Thank you.

And the jury can see it now?

THE COURT: Yes.

Q (By Mr. Browne) Okay. What is Exhibit 70?
A I've not seen or handled this item, so I'm not positive, but it appears to be a new or nearly new frame from the Ruger LCP .380.

Q Okay.
And the oblong circle, can you draw a circle around that?
A (Witness complies.)
Q And just because there's been some testimony in this case about frames, there's been testimony about slides, there's been testimony about springs, there's been testimony about barrels. Okay?
A Yes, sir.
Q What is this?
A Most knowledgeable people would refer to this as the "frame" for this pistol.
Q Okay.
Now if we could go to the next photograph in Exhibit 70, is that the same weapon, as far as you know, on the other side?
A I believe that is correct.
Q Okay.
Is the receiver depicted either in this photograph or in the last photograph?
A Due to the peculiarities of modern gun construction, integrating plastics, this could have been referred to as the receiver, but to be most accurate, I would call this the frame part of the receiver.
Q Okay. Let's go to the next part, please.

Now, can you identify this?
A I don't know what Ruger calls this. I would call this the fire control group of the receiver assembly for that Ruger LCP .380 pistol.
Q Okay. So this could be commonly referred to as a "receiver"?
A I would say someone very knowledgeable about this particular gun and careful with their terminology would call this one of two assemblies of a completed receiver for this particular gun.
Q Okay. And is that number the serial number?
A That is my understanding.
Q And how does this part fit into this part?
A It's actually designed to be removed, and there is a disassembly pin that goes in this hole. Some guns that have a metal -- or a plastic frame like this and a metal fire control group comprising the two components of a completed receiver do not have components designed to be separated.
In this particular gun, the two components are designed to be separated, although many users would not disassemble it to that point.
Q Okay. I think we've not shown you another photograph.
Does this photograph show -- we're still dealing with Exhibit 70 -- two components put together?
A This shows the relationship between the two, but the metal

component is not fully in position. It's been raised to show how it relates to the plastic frame component. You can tell because the whole thing is too high and the trigger is too high.

Q Mr. Walsh, this serial number here, would it be visible underneath -- if we could go to this one. Thank you -- would it be visible through this hole?

A When the gun was fully assembled, yes.

Q Okay.

If there was --

THE COURT: Counsel, careful with your leading.

MR. BROWNE: Yes.

THE COURT: He's your witness.

MR. BROWNE: I know. Thank you.

Q (By Mr. Browne) If there was a substance of some sort placed in this oval, would that allow the serial number to be seen if the whole thing was assembled?

A It would depend on whether the substance was opaque or transparent or translucent. It would interfere, to some extent, with the visibility of the serial number.

Q Okay.

If you pulled that out from the weapon, would you expect to see this serial number there?

A If I was familiar with this particular gun enough to readily recognize that the oval gap in the frame was for the

purpose of viewing the serial number on what I'm going to call the fire control group.

Q Okay. Would this serial number be underneath the oval?

A It would be -- if the gun was fully assembled, that serial number would be beneath and surrounded by the oval gap and the frame.

Q Now, if you'll look at the actual .380 there, the one you looked at before.

When you first examined that gun, did you believe that there was obliteration of a serial number?

A I had been informed of that before I ever saw that particular gun, so I had advanced knowledge of that issue when I went to look at this gun.

Q Okay.

Well, did you expect to find a serial number in that position?

A I knew when I inspected this gun that that was a normal place where the serial number would be, because I was investigating that issue when I inspected this gun.

Q Okay.

Did you take the gun apart to determine whether the serial number was still underneath?

A I did not touch the gun at all.

Q What was your impression when you first saw the oval and any substance in the oval?

A In person, or in photographs or photocopies of photographs before I saw the gun?

Q I'm not sure I understand.

THE COURT: He's asking you a question, so why don't you rephrase your question.

Q (By Mr. Browne) What was your impression when you first saw the oval on the firearm?

A That it appeared that metal had been corroded inside that oval.

Q Okay. Is that common with firearms?

A It can be, depending on the quality of the metal, maintenance, how it's carried, whether it's holstered, exposed to skin and oils, things like that.

Q Do you know whether the serial number -- if the gun was removed, as you've described, in different pieces, do you know whether that serial number would still exist if parts were removed?

A I don't know. On this exact gun, I don't know.

Q Okay.

Changing subjects a bit.

There's been testimony in this trial about slides. What is a slide?

A A slide is the reciprocating component of a semiautomatic pistol that moves fore and aft as the gun operates, and it comprises the barrel, the firing pin, it may or may not

include a hammer, depending on the design of the particular gun, and then the larger slide, which functions as the breech and breech face.

Q Have you seen a photograph of this before?

A I've seen this or a very similar photograph before.

Q Okay. What part of a weapon is that?

A That appears to be a factory, unmodified Glock receiver with a magazine inserted, and I can't tell which of two possible frame sizes this is without a size reference or a comparison.

Q Can you tell from this 1A photograph whether any serial number has been removed or anything?

MS. DALTON: Objection, Your Honor. We request a sidebar.

THE COURT: Counsel --

MR. BROWNE: I'll withdraw that question.

THE COURT: All right.

MR. BROWNE: Could I see 1B?

Q (By Mr. Browne) Have you seen this photograph before?

A I believe so.

Q Okay.

Can you describe what's depicted in this photograph?

MR. BROWNE: And for the record, Your Honor, it's 1B.

MS. DALTON: I have the same objection, Your Honor.

THE COURT: Counsel, I'll see you at sidebar, and I

would ask once again, for the jury's sake, would you establish which gun this is a photograph of? They've heard about a whole bunch of them. So we'll discuss that and see if you can come up with a stipulation.

MR. BROWNE: Would you like me to do that now, Your Honor?

THE COURT: No. We'll talk at sidebar.

(The following was held at sidebar:)

THE COURT: Am I correct, counsel, that 1A and 1B is the guns from Sweden?

MR. BROWNE: Yes, part.

THE COURT: Whatever it is.

Let me see the letter.

I don't remember him being qualified or disclosed to be discussing the gun from Sweden in your letter. Your letter was the Count 4 obfuscation of the serial number.

MR. BROWNE: Well, I think he's been qualified as an expert in firearms. And I'll back off from that, if you want.

THE COURT: You have to. You're in federal court, and they have those disclosure rules, and he was not disclosed on that subject.

(End of sidebar.)

THE COURT: Ladies and gentlemen, you'll disregard the last question that was asked as being withdrawn.

MR. BROWNE: Would you still like me to explain what this is?

THE COURT: Yes.

MR. BROWNE: Okay.

This is the item that was supposedly seized in Sweden.

Thank you, Mr. Walsh. That's all the questions I have.

THE COURT: Cross-examination by the government?

MS. DALTON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. DALTON:

Q Good morning.

A Good morning.

Q You are a certified law enforcement armorer; is that correct?

A Yes.

Q And you did your certification with the American Gunsmith Institute?

A Yes.

Q That course is on DVDs; is that correct?

A Yes, and there is a testing component.

Q So it's all done via watching a video?

A There's a testing component as well.

Q You were hired by the defense to testify in this case?

A Absolutely.

Q And they're paying you for that testimony?

A I presume so. I'm paid for my time. I wouldn't carve out my testimony as being particularly unique in that part.
Q But they're paying for your time here today in court?
A Yes.
Q What is your hourly rate?
A For this case, $75 an hour.
Q In advance of testifying here today, you examined that Ruger pistol. I'm going to show you Exhibit 8. Did you examine this Ruger pistol in advance of your testimony here today?
A Yes, I did.
Q And do you agree that the serial number on that pistol, that would have been located here?
A Yes.
Q And you agree that that serial number has been obliterated?
A I could not determine that in my inspection and still don't know whether that's true.
Q I think you said in your testimony today that you think it may have been corroded?
A That's what I -- that was the impression I had after inspecting this gun in person.
Q But the remainder of this gun is in good, working order?
A I've never handled this gun except here today and have not operated any of the mechanisms or attempted to inspect it by

handling it or disassembling it.
Q So the only portion on the exterior on this gun that looks stippled like that happens to be where the serial number is located?
A Yes.
Q Before testifying here today, did you research Ruger LCP pistols like this one?
A Yes.
Q And isn't it true that Ruger LCP .380 pistols have never had a slide safety?
A I believe that's true. I don't know that to be true, but I think you're right.
Q Before testifying today, you mentioned that you're not intimately familiar with this gun.
A I have handled them in the past. I contemplated buying one, it was one of several models under consideration when selecting a sidearm for my wife, and for a variety of unrelated reasons, we didn't select this one.
Q But you've never owned this gun?
A That is correct.
Q And you mentioned you never touched this actual gun?
A That's correct.
Q Do you have guns that you've owned for three years or more?
A Yes.

Q And are you intimately familiar with those guns?
A Most of them.
Q Was one of the reasons that you went to view this gun at that evidence viewing with Special Agent Grigore, was the purpose of your visit to determine if this gun had a serial number on it?
A It was to understand what I was seeing, because what I'd previously seen were photocopies of photographs, and I couldn't understand what was obscuring the view in that gap in the receiver.
Q But you never found on this gun any portion where you could see a serial number?
A I did not touch the gun. I don't think I moved it at all. I merely inspected the gap in the receiver and took -- looked at it under a magnifier and took photographs.
Q While you were looking at this gun, you never saw a serial number on this weapon?
A That's correct.

MS. DALTON: Thank you. No further questions.

THE COURT: Redirect, Mr. Browne?

REDIRECT EXAMINATION

BY MR. BROWNE:
Q Mr. Walsh, this portion of this weapon can be removed?
A Yes.
Q And when that's removed, this portion also comes out?

A I don't believe that's correct. It could be. But what I would expect is that the part you indicated could be removed for routine, normal maintenance by removal of the pin I'm indicating here.

I think to view -- to move the assembly that includes the serial number, I believe several steps are required in addition to that, including removal of this pin that I'm indicating now, forward of the trigger.

MR. BROWNE: Can we see 70, counsel?

Q (By Mr. Browne) This clearly has a serial number on it, correct?

A It appears to, yes.

Q Huh?

A Yes, sir.

Q So this somehow can be removed from the weapon, correct?

A Yes. And I believe the hole, which I'm indicating, forward of the trigger that corresponds to the pin, visible in the previous photograph, the pin has to be removed in order for this assembly to be lifted out of the frame.

Q Okay.

So if this was lifted out of the frame, would this number still appear?

A Would the serial number still appear if this component was lifted from the frame?

Q Yes.

A Yes.

MR. BROWNE: That's all I have, Your Honor. Thank you.

THE COURT: Any recross?

MS. DALTON: No, Your Honor.

THE COURT: You may step down.

Mr. Browne, do you have any further witnesses you wish to call?

MR. BROWNE: No, Your Honor. The defense rests.

THE COURT: All right.

Does the government wish to have a rebuttal case?

MS. DALTON: We wish to call just one rebuttal witness, Firearms Enforcement Officer Brian Heishman.

THE COURT: All right.

Ladies and gentlemen, the defendant has exercised his privilege of not testifying. You will remember that I have previously instructed you that a defendant in a criminal case has a constitutional right not to testify. In arriving at your verdict, the law prohibits you from considering, in any manner, that the defendant did not testify.

MR. BROWNE: Your Honor, may Mr. Walsh remain in the courtroom?

THE COURT: Absolutely.

Sir, you've already been sworn. You'll still under oath.

BRIAN HEISHMAN, HAVING BEEN PREVIOUSLY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state your name for the record, and spell it for the court reporter.

THE WITNESS: Brian Heishman; B-r-i-a-n; H-e-i-s-h-m-a-n.

THE COURT: You may inquire.

REBUTTAL DIRECT EXAMINATION

BY MS. DALTON:

Q Good morning.

A Good morning.

Q You've already told us a bit about your training and experience. Can we just focus in on what your experience is related to pistols and firearms themselves?

A As far as firearms go, I've been involved in the firearms industry and the military for over 30 years. I'm currently a custodian for a records collection that contains over 15,000 firearms.

Q Have you ever served as an armor?

A Yes.

Q And are you trained -- were you trained to be an armor?

A Yes.

Q Can you describe some of that training for me?

A I've been to various military and law enforcement classes, authorized by the factory, for numerous trainings. I

probably have well over 500 hours of classroom time, learning different firearms and to be certified as an armor.

Q Was this training done via video, or was it in person?

A The classes I attended were all factory-authorized, in-person classes.

Q Are you familiar with the Ruger LCP .380 pistol?

A Yes, ma'am.

Q How are you familiar with it?

A I'm familiar with it. I've worked on it pertaining to my normal duties, and I'm also an owner of one.

Q So you've used a Ruger pistol in your everyday life?

A Yes, ma'am.

Q Did you examine the Ruger LCP .380 pistol that's at issue in this case in Count 4?

A Yes.

Q I believe that is in front of you as Exhibit 4; is that correct?

A Yes.

Q And just to clarify, again, this is the pistol that was removed from the defendant when he was arrested.

Did you have time to examine that particular Ruger closely?

A Yes.

Q Did you have enough time to look at it to form conclusions in this case?

A Yes.
Q I'm going to show you what has been admitted as Government's Exhibit 70.
Did you take these photographs?
A Yes.
Q What is this?
A That is what's called the grip frame on a Ruger pistol. That is the factory nomenclature for it.
Q Okay. Grip frame.
Okay. Let me show you the next page.
What's that?
A That is the opposite side of the same picture.
Q And the following page, what is that?
A That is the metal insert that goes on the inside of the grip frame. That is what has been classified as the actual frame or receiver of the firearm by ATF.
Q And then, finally, I'm going to show them together.
Do you see this hole here?
A Yes.
Q What is the purpose of that hole?
A The purpose of that hole is a viewing window so that when the firearm is completely assembled, you can see the serial number.
Q And where is the serial number located here?
A It is right in the middle of the firearm. It's the digits

that start with the "3."
Q So this there?
A Yes.
Q So if I understand you, that hole is designed so that when this frame is slid in, you can see the serial number; is that correct?
A Yes.
Q Is this common on polymer pistols?
A Since 2007, when SIG started importing -- or started bringing into the country their P250 pistol, that is a manufacturing technique that is more modern, and several other manufacturers use it nowadays.
Q Can you tell me what other manufacturers use that particular design with the hole so you can view the serial number?
A Taurus Firearms has one that has the serial number close to the same location, and then several other manufacturers, H&K, Smith & Wesson, Walther, have the serial number in the same location they kept on the right side out of the frame.
Q Is this Ruger pistol manufactured with a safety?
A The Ruger LCP has never been manufactured with a manual safety.
Q When you examined this device, did you form an opinion on whether or not you believe that its serial number had been obliterated?

A Yes.
Q What was that opinion?
A The serial number window in the receiver had been filled in with a hard material, very similar to an epoxy, that covers the serial number so it's not visible.
Q And just to be clear, can you circle on that screen where that obliterated serial number was?
A (Witness complies.)
MS. DALTON: Thank you. No further questions.
MR. BROWNE: Your Honor, may I get something from Mr. Walsh?
THE COURT: Yes.

REBUTTAL CROSS-EXAMINATION

BY MR. BROWNE:
Q Hello, again.
A Hi, sir.
MR. BROWNE: Can I see 70-4?
Q (By Mr. Browne) Sir, I'm a little confused, genuinely, so let me ask you a question.
This right here --
A Yes, sir.
Q -- does it go down into the gun?
A Yes, sir.
Q Sorry?
A Yes.

Q Okay.

And when this goes down into the gun, this number would be here?

A Yes.

Q Did you ever disassemble this Exhibit 4, the .380?

A Exhibit 4? I have not disassembled Exhibit 4.

Q Okay.

So you don't know whether, if you took this out of the weapon, the number would still be there?

A I do not.

MR. BROWNE: That's all I have. Thank you.

THE COURT: Redirect?

MS. DALTON: No. Thank you, Your Honor.

THE COURT: All right. You may step down, sir.

Does the government wish to call any other rebuttal witnesses?

MS. DALTON: No, Your Honor. The government rests.

THE COURT: All right. Mr. Browne, any re-rebuttal?

MR. BROWNE: No, Your Honor. Thank you.

THE COURT: Ladies and gentlemen, the next thing that's going to happen is, I'm going to read you the jury instructions. There are, I think, around 30 of them, and it will probably take me about 45 minutes. For that reason, I'm going to release you to the jury room, since you're going to have to come back out here and listen to me for a long time,

and then we'll go through and take our morning break.

After I read all those jury instructions, probably sometime after 11:00, I'm going to release you to lunch, but I'm only going to release you for an hour. When you come back, you'll hear the government's closing argument, you'll hear the defendant's closing argument, and then the government gets a rebuttal.

Let me draw a distinction for you.

You heard opening statements. That's a statement. They told you what it was you were going to hear as evidence in the case.

In closing argument, the difference between statement and argument, counsel are going to be able to talk to you about what they think your decision should be. So this is the part you see on the television where folks get up and wave their arms around and make impassioned pleas. That doesn't happen as much here because this is reality, that's television. But this is the opportunity for them to attempt to persuade you as to what your decision should be.

At the conclusion of all of that, the clerk will draw two numbers. Those will be the alternates. The other 12 will retire to the jury room for your deliberations. And in the course of reading you the instructions, there are some things in there about you can't deliberate unless everybody is there at the same time.

So, ladies and gentlemen, please rise for the jury. Know this is your morning break but a little early.

(Court in recess 10:12 to 10:31 a.m.)

THE COURT: Ladies and gentlemen, we're now to the most fascinating part of the trial, my reading you the jury instructions. You're going to get your own copy of the jury instructions, and I'm going to read them to you.

You're probably thinking, "Well, why is he wasting our time doing both of those?" We blame it all on the sociologists, because they've determined that your recall and comprehension is better if you have your own written version in front of you while I read them out loud. And, apparently, it makes a fairly big difference. So that's what I'm told to do, and that's how I do it.

When I have to go on a cross-country plane flight, I go in and I buy the cheapest detective story that I can, and I almost always turn to the last page to find out who did it, and then I start to read it. Don't do that. The reason is, I need you to page along with me, or else we defeat the whole purpose of this.

The second thing that you've got is a verdict form, and that's been prepared by the court and it's been discussed with counsel, and it will be the verdict form in this matter.

When you go back into the jury room, you will get one that says "original" on it, but the rest are for you to keep track

of what you decide as you go along.

So that's where we are. I have my cough drops and my water at the ready, so we'll get started.

When we finish doing this, we're going to keep you out here. We'll draw out the numbers of the two alternates, and then I'll release everyone. You'll still be bound by all those instructions about don't talk about the case and whatever.

Your deliberations, when you start on them, are covered here in the instructions, everybody has to be there. Sometimes people like to come at 7:30 in the morning because the coffee is so good, and they want to start talking about, "Well, wasn't that interesting," and "I thought." That would deprive your other jurors of your views, so we ask you to not begin your deliberations until everyone is back.

When you come back after lunch, I'm going to set a time. I'm not going to bring you back out here because you'll have everything that you need, and the in-court deputy will check and make sure that you're all here. If the lawyers want to hang around, she'll come out and tell them, "Yes, everyone came back, and they've begun deliberations."

JURY INSTRUCTIONS

THE COURT: So page 1: Members of the jury, now that you have heard all the evidence, it is my duty to instruct you on the law that applies to this case. A copy of these

instructions will be available in the jury room for you to consult, and you'll each have a copy.

It is your duty to weigh and to evaluate all the evidence received in the case, and in that process to decide the facts. It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not.

You must decide the case solely on the evidence and the law, not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you. You should also not be influenced by any person's race, color, religion, national ancestry, or gender, sexual orientation, profession, occupation, celebrity, economic circumstances, or position in life or in the community. You will recall that you took an oath promising to do so at the beginning of the case.

You must follow all these instructions and not single out some and ignore others. They are all equally important. Please do not read into the instructions, or into anything I may have said or done, any suggestion as to what your verdict should be or verdict you should return. That is a matter entirely up to you.

The indictment is not evidence. The defendant has pleaded not guilty to the charges. The defendant is presumed to be innocent unless and until the government proves the defendant

guilty beyond a reasonable doubt. In addition, the defendant does not have to testify or present any evidence. The defendant does not have to prove innocence. The government has the burden of proving every element of the charges beyond a reasonable doubt.

The first line in No. 2 says the indictment is not evidence. In some courts, they send the indictment back with you. I don't. So if you're in the jury room and you're wondering where the indictment is, it's because you don't have it.

No. 3: A defendant in a criminal case has a constitutional right not to testify. In arriving at your verdict, the law prohibits you from considering, in any manner, that the defendant did not testify.

No. 4: Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty. It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense, and it is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence or from lack of evidence.

If, after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the

defendant not guilty. On the other hand, if, after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

No. 5: The evidence you are to consider in deciding what the facts are consist of the sworn testimony of any witness and the exhibits received in evidence.

In reaching your verdict, you may consider only the testimony and exhibits received in evidence. The following things are not evidence, and you may not consider them in deciding what the facts are:

Questions, statements, objections, and arguments by the lawyers are not evidence. The lawyers are not witnesses. Although you must consider a lawyer's questions to understand the answers of a witness, the lawyers' questions are not evidence. Similarly, what the lawyers have said to you in their opening statements, will say to you in their closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

Any testimony that I have excluded, stricken, or instructed you to disregard is not evidence. In addition, some evidence was received only for a limited purpose. When I have instructed you to consider certain evidence in a

limited way, you must do so.

Finally, anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.

Circumstantial evidence is indirect evidence; that is, proof of one or more facts from which you can find another fact.

You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any of the evidence.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to see or hear or know the things testified to; the witness's memory; the witness's manner while testifying; the witness's interest in the outcome of the case, if any; the witness's bias or prejudice, if any; whether other evidence

contradicted the witness's testimony; the reasonableness of the witness's testimony in light of all of the evidence; and any other factors that bear on believability.

You must avoid bias, conscious or unconscious, based on the witness's race, color, religious beliefs, national origin, sexual orientation, gender identity, or gender in your determinations of credibility.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You should consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think that the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true, and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

You are here only to determine whether the defendant is guilty or not guilty of the charges in the indictment. The defendant is not on trial for any conduct or offense not charged in the indictment.

A separate crime is charged against the defendant in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count.

You have heard testimony of a witness who testified in the Swedish language. Witnesses who do not speak English or who are more proficient in another language testified through an official interpreter. Although some of you may know the Swedish language, it is important that all jurors consider the same evidence; therefore, you must accept the interpreter's translations of the witness's testimony. You must disregard any different meaning. You must not make any assumptions about a witness or a party based solely on the fact that an interpreter was used.

The indictment charges that the offenses alleged in Counts 2 and 3 were committed on or about a certain date. Although it is necessary for the government to prove beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged in Counts 2 and 3 of the indictment, it is not necessary for the government to prove that the offense was committed precisely on the date charged.

You have heard testimony that the defendant made a statement. It is for you to decide whether the defendant made the statement, and, if so, how much weight to give to it. In making those decisions, you should consider all of the evidence about the statement, including the circumstances under which the defendant may have made it.

You have heard testimony from Firearms Enforcement Officer Brian Heishman, who testified to opinions and the reasons for his opinion. This opinion testimony is allowed because of the education and experience of this witness. Such opinion testimony should be judged like any other testimony. You may accept or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

You have heard testimony from Greg Walsh, who testified to opinions and the reasons for his opinions. This opinion testimony is allowed because of the education or experience of this witness. Such opinion testimony should be judged like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

You have heard testimony from Special Agent Claudia

Grigore, who testified to both facts and opinions and the reason for her opinions. Fact testimony is based on what that witness saw, heard, or did. Opinion testimony is based on the education or experience of the witness.

As to the testimony about facts, it is your job to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

As to the testimony about the witness's opinions, this opinion testimony is allowed because of the education and experience of the witness. Opinion testimony should be judged like any other testimony. You may accept all of it, or part of it, or none of it. You should give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

During the trial, certain charts and summaries were shown to you to help explain the evidence in the case. These charts and summaries were not admitted into evidence and won't go into the jury room with you. They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries, and determine the facts from the underlying evidence.

Number 18: Certain charts and summaries have been

admitted into evidence. Charts and summaries are only as good as the underlying supporting material. You should, therefore, give them only as much weight as you think the underlying material deserves.

Number 19: The defendant is charged in Count 1 of the indictment with violating the Arms Export Control Act. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, on a date uncertain but earlier than February 8th, 2017, the defendant exported an article; second, the article was listed in the United States Munitions List at the time of export; third, the defendant did so without obtaining a license from the Department of State; and fourth, the defendant acted willingly; that is, he was aware that it was unlawful to export the article from the United States.

Although the government must prove that the defendant knew it was unlawful to export the articles from the United States, the government need not prove that the defendant was aware of any specific licensing requirement.

Firearm receivers, parens, frames, unquote, are the types of, quote, defense articles, unquote, listed in the United States Munitions List.

Number 21: The defendant is charged in Count 2 of the indictment with possession of an unregistered firearm, in

violation of Section 5861(d) of Title 26 of the United States Code. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, that on or about July 25, 2017, the defendant knowingly possessed a silencer; and, second, the defendant was aware that the silencer was a device for silencing, muffling, or diminishing the report of a reportable firearm; and third, the defendant had not registered the silencer with the National Firearms Registration and Transfer Record. The government need not prove that the defendant knew that possessing the firearm was illegal.

Number 22: The defendant is charged in Count 3 of the indictment with possession of an unregistered firearm, in violation of Section 5861(d) of Title 26 of the United States Code. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, that on or about August 1, 2017, the defendant knowingly possessed a silencer; second, the defendant was aware that the silencer was a device for silencing, muffling, or diminishing the report of a reportable firearm; and third, the defendant had not registered the silencer with the National Firearms Register and Transfer Record. The government need not prove that the defendant knew that

possessing the firearm was illegal.

Number 23: An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. The government is not required to prove that the defendant knew that his acts or omissions were unlawful. You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

A person has possession of something if the person knows of its presence and has physical control of it, or knows of its presence and has the power and intention to control it. More than one person can be in possession of something if each knows of its presence and has the power and intention to control it.

The defendant is charged in Count 4 of the indictment with possessing a firearm which has the serial number removed, obliterated, or altered, in violation of Section 922(k) of Title 18 of the United States Code. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

First, that on or about May 3rd, 2018, the defendant knew that he possessed a Sturm, Ruger and Company pistol, Model LCP .380 caliber, that had been shipped and transported from one state to another; second, the serial number of that

Sturm, Ruger and Company pistol had been removed, obliterated, or altered; and third, the defendant knew that the serial number had been removed, obliterated, or altered.

You may find the defendant acted knowingly if you find beyond a reasonable doubt that the defendant was aware of a high probability that the serial number on the Sturm, Ruger and Company pistol, Model LCP .380 caliber, had been removed, obliterated, or altered, and deliberately avoided learning the truth.

You may not find such knowledge, however, if you find that the defendant actually believed that the serial number on the Sturm, Ruger and Company pistol had not been removed, obliterated, or altered, or if you find that the defendant was simply negligent, careless, or foolish.

Number 27: When you begin your deliberations, elect one member as your jury foreperson, who will preside over your deliberations and speak for you here in court. You will then discuss the case with your fellow jurors to reach agreement, if you can do so. Your verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion

persuades you that you should do so, but do not come to a decision simply because other jurors think it is right. It is important that you attempt to reach a unanimous verdict, but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially. Do not allow personal likes or dislikes, sympathy, prejudice, fear, or public opinion to influence you. You should not be influenced by any person's race, color, religion, national ancestry, or gender, sexual orientation, profession, occupation, celebrity, economic circumstances, or position in life or in the community.

It is your duty as jurors to consult with one another and deliberate with one another with a view towards reaching an agreement, if you can do so. During your deliberations, you should not hesitate to re-examine your own views and change your opinion if you become persuaded that it is wrong.

Because you must base your verdict solely upon the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or the issues it involves. Except for discussing the case with your fellow jurors during your deliberations, do not communicate with anyone in any way and

do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via email, text messaging, or any Internet chat rooms, blogs, websites, or other features.

This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything to do with the case, you must respond that you have been ordered not to discuss the matter, and report the contact to the court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it. Do not do any research such as consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these instructions to ensure the parties have a fair trial, based on the same evidence that each party has an opportunity to address. The juror who violates these restrictions jeopardizes the fairness of the proceeding, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the court immediately.

Some of you have taken notes during trial. Whether or not

you took notes, you should rely on your own memory of what was said. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

The punishment provided by law for this crime is for the court to decide. You may not consider punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt.

I want to remind you about your duties as jurors. When you deliberate, it will be your duty to weigh and to evaluate all of the evidence received in the case, and in that process to decide the facts.

The facts as you decide them -- to the facts as you find them, you will apply the law as I give it to you, whether you agree with the law or not. You must decide the case solely on the evidence and on the law before you, and you must not be influenced by any personal likes or dislikes, opinions, prejudices, sympathy, biases, including unconscious bias.

Unconscious bias are stereotypes, attitudes, or preferences that people may consciously reject, but may be expressed without conscious awareness, control, or intention. Like conscious bias, unconscious bias, too, can affect how we evaluate information and make decisions.

Number 32: A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your

foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the clerk you are ready to return to the courtroom.

Lastly, if it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk, signed by any one or more of you. No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing or here in open court.

If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question.

Remember, you are not to tell anyone, including me, how the jury stands, numerically or otherwise, on any question submitted to you, including the question of guilt of the defendant, until you have reached a unanimous verdict or have been discharged.

Ladies and gentlemen, those are the instructions of law from the court. At this time, I would ask you to give your attention to the government, who will present its closing argument, followed by the defense, and then by the government rebuttal.

Counsel?

MR. BROWNE: Your Honor.

MR. DIGGS: Your Honor, may we approach briefly? It's a scheduling matter.

(The following was held at sidebar:)

MR. DIGGS: Your Honor, about the schedule this morning.

THE COURT: I'm taking you at your word that you're going to take a half hour.

MR. DIGGS: Okay.

THE COURT: He's going to take no more than an hour.

MR. BROWNE: I'm not ready now, because you said that we --

THE COURT: That's fine, counsel. That's fine. We'll send them out to lunch, then.

MR. BROWNE: Is that okay?

(End of sidebar.)

THE COURT: Ladies and gentlemen, the lawyers did something dangerous. They relied on my word.

When I talked to you this morning, I said that we would send you to lunch, and when you come back, you'll hear closings.

We did such an expedient job -- which I thank the lawyers -- that I was hopeful we could do closings, but since they're relying on my word, I'm going to release you to lunch at this time, and I'll ask you to come back at noon. At that point, we'll begin with closing arguments.

Ladies and gentlemen, please rise for the jury.

(Court in recess 11:02 to 12:05 p.m.)

THE FOLLOWING PROCEEDINGS WERE HELD
OUTSIDE THE PRESENCE OF THE JURY:

THE COURT: Please be seated, counsel.

We have been approached by Juror 14, who told us in voir dire that she had a daughter who either is pregnant or has recently given birth -- pregnant.

She has now received a phone call over the break saying the daughter is sick. We explained to her the consequences; that we'll take it up, talk to the attorneys. "If you stay and you're a jury member, and you have to leave, the jury has to start over again, and if you stay, then there's no problem, so help us with how serious this is," and she has now asked to be excused.

So does the government take a position on this?

MR. BROWNE: I guess that would be one of the alternates.

THE COURT: We'd be down to one alternate.

MR. DIGGS: No objection with that, Your Honor.

MR. BROWNE: No.

THE COURT: All right. Then we'll excuse 14, and bring the rest out.

Thank you, counsel.

It's also my plan to put the exhibits on the bar. As the

jury files out, they can view them.

(Clerk exits the courtroom to retrieve the jury.)

THE COURT: Counsel, over the lunch hour, Juror 14 talked to her family. The medical emergency has quieted down, and she now expresses an interest in staying.

Does anyone wish to comment on that before I say that's fine?

MR. BROWNE: That's fine with me.

MR. DIGGS: That's fine with us, Your Honor.

THE COURT: All right. Let's try again. Bring the jury in.

THE FOLLOWING PROCEEDINGS WERE HELD
IN THE PRESENCE OF THE JURY:

THE COURT: You may be seated.

Mr. Diggs, the government will go first.

Closing argument, ladies and gentlemen.

GOVERNMENT'S CLOSING ARGUMENT

MR. DIGGS: Thank you, Your Honor. May it please the court, counsel, ladies and gentlemen of the jury.

Much of the evidence you've heard over the last two days has been straightforward. Much of is not in dispute and is not contested, it's not controversial.

The evidence related to Counts 2 and 3 in this case, the possession of the two silencers, is downright simple, as is the evidence of Count 4, the possession of a firearm with the

obliterated serial number. I'm going to talk about those counts first, and then I'll return and talk about the export count, and I submit to you, ladies and gentlemen, that when you return to that jury room to deliberate, you can take your verdict form and check guilty on Counts 2, 3, and 4 right away. The proof is simple.

Count 2 is for the defendant's possession of this silencer. Count 3 is for the defendant's possession of this silencer.

Of course, the elements for those counts are the same: that the defendant knowingly possessed a silencer; that he was aware that it was a device for silencing, muffling, or diminishing the report of a reportable firearm; and that the defendant had not registered that silencer in the National Firearms Registration and Transfer Record.

Ladies and gentlemen, the evidence of these elements is crystal clear. The defendant possessed these silencers, he provided them -- both of them to law enforcement; one was found in his safe; the other provided after he initially said he didn't have it, but provided to law enforcement.

Second, the defendant was aware of what these items were used for. He calls them silencers, suppressors. He tells the agents what caliber firearm they fit. And remember, he shot one of the silencers with the witness, Mr. Leon Nguyen. There's no question that the defendant knew that these were

silencers.

And, finally, there's no question that the defendant had not registered either of those items. First, he told Special Agent Grigore that on July 26th. He didn't have a license for the silencers. And you also heard the testimony of Tania Pleasants, who testified yesterday, that after a search, neither the silencers nor the defendant's name appeared anywhere in the historical record of having any license for these items.

Let's talk about Count 4. The proof here is, again, simple. Possession of a firearm with an obliterated serial number.

On May 3rd, when he was arrested, the defendant possessed this Ruger pistol, concealed in the front of his pants. There is no question, ladies and gentlemen, that this firearm had an obliterated serial number. You heard testimony this morning from the defense's own expert that he showed up in the evidence room with a magnifying class and couldn't see the serial number. The serial number is obliterated or altered.

Here are the elements that the government has proved beyond a reasonable doubt with regard to Count 4: That on May 3rd, the defendant possessed this pistol, which had been shipped in interstate commerce, or from one state to another. You heard the testimony of Special Agent Grigore that this

pistol was manufactured in Arizona. Of course, it was recovered in Washington. Second, the serial number of the pistol had been removed, obliterated, or altered. There's the pistol, ladies and gentlemen, and there's the serial number removed, obliterated, or altered.

And third, the defendant knew that that serial number had been removed, obliterated, or altered.

So let's talk about this third element.

You've heard, throughout the course of this trial, that the defendant is a gun enthusiast. He makes his own firearms, he has many firearms. He provided serial numbers to law enforcement. The defendant is the person who would know that this serial number was removed or altered on a pistol that he carried every time he met with those agents. That's what he told the agents.

But you don't need just circumstantial evidence. You don't need to just assume in this case what the defendant knew, because he told the agents at the time he was arrested exactly what he knew. You heard testimony from both of the case agents in this case on this direct point.

Question to Special Agent Karabeika: "What did he say about that gun?"

ANSWER: "He said that he had received it three years ago, and he knew it had an obliterated serial number."

Identical question, almost, to Special Agent Grigore.

"What did the defendant tell you about the gun that had been seized from him that day?"

"He told us that he carried this pistol every time he met with us. He told us that he had purchased this pistol approximately three years prior, and that the serial number was removed because it was a stolen firearm."

Ladies and gentlemen, you don't need a defense expert to come in and tell you how this firearm is made or where the serial number is. You can look at it with your own eyes, you've seen it with your own eyes, and, most important, you have the defendant's own words, the testimony from two agents as to what the defendant said about just what he knew about that firearm's serial number.

So I submit to you, ladies and gentlemen, that the proof on Count 4 is overwhelming, and that upon returning to that jury room, you should check guilty right away on Counts 2, 3, and 4.

That leaves Count 1. The evidence you've heard about Count 1, the export case, is slightly more complex but no less overwhelming.

The defendant sent guns to Sweden. He admitted this to agents the first time they met him, on May 31st, 2017. He was clear and he was specific and he left no doubt he obliterated the serial numbers on the firearms that he sent, he used false mailing addresses, fake names, and he labeled

the gun parts not as gun parts but as bike parts.

We'll return to talk about the defendant's admissions in a moment, but first I want to talk about where this case started, the proof that led us to the defendant's admissions.

This proof started 4,644 miles away from this courthouse in Fagersta, Sweden, where Swedish Officer Joyni Hyttinen recovered this firearm frame. He told you this is the one he recovered from the attic of Thomas Heydeck's residence. He was clear. He'd even gone this week to check that frame and confirm that it had that code -- that Data Matrix Code printed on the frame.

Now, the frame had the serial number obliterated, just like the defendant said that he did, and that provided an initial obstacle in law enforcement's ability to trace where this gun came from. But it wasn't an insurmountable one. We presented evidence that clearly shows where this gun came from and where it went. Let's follow the evidence.

That Data Matrix Code, Matt Chen, the Glock witness, testified matches up on a one-to-one relationship with the serial number. You'll have the Glock record in evidence. There are no duplicates. This is the way Glock keeps track of its frames for ATF, the way it keeps track of its receivers. So that DMC is a definitive match to the serial number.

Armed with that serial number, law enforcement was able to

determine the last recorded sale of that firearm. Again, the Form 4473, the federal firearms license, the sale form is a form required to be kept, on which the seller, or the business through which the sale is conducted, is required to record the accurate serial number. And you'll see in Exhibit 15 that that last sale was to Leon Nguyen on February 8th, 2017, at Precise Shooter. It all matches up.

And Leon Nguyen, what did he tell you he did with that gun? Well, he sold it to the defendant, Mr. Veletanlic, one day after buying it, after he shot it. He was clear.

And the defendant was as well. He, in his own recorded statement, admits that he buys and trades guns with Leon. Listen to what he says.

(Audio is played.)

MR. DIGGS: The firearm that Leon bought on February 8, 2017, is recovered from Thomas Heydeck's attic on February 22nd, 2017. And, ladies and gentlemen, there can be no reasonable conclusion here, other than that the defendant was the one that sent it there.

Now, the defense in this case has tried to infuse confusion about the number of shipments and was it a slide and was it a magazine. There's no confusion here, ladies and gentlemen. This is the direct tracing of a firearm frame with a specific number seized in Sweden, through the Glock record, to the last sale to Mr. Nguyen, who sold it to the

defendant. With these uncontroverted facts, you can wrack your brain back in the jury room, and there is simply no other conceivable way that this firearm could have ended up in Sweden, other than the defendant sending it there.

But there's even more corroborating evidence that definitively proves that the defendant sent this Glock firearm frame to Sweden, and that evidence comes in the form of Mr. Heydeck and Mr. LavHage's cell phones, which were seized in Sweden, and you heard the testimony about what was on those phones.

One of the things that was those phones was screenshots of U.S. Customs forms, screenshots that, when compared to the forms that Special Agent Karabeika pulled from Snohomish County post offices, some of them had the exact same matching customs number. From post offices within the vicinity of the defendant's house, to post offices of which he admitted he sent packages of firearm parts to Sweden. Wrack your brains, ladies and gentlemen. There is no other conceivable way that that firearm frame got to Sweden, other than the defendant sending it there. Simply a zero percent chance.

Throw in the customs form that had the defendant's old address on it, additional evidence linking this defendant to this group of firearm recipients in Sweden and this frame.

As if there is a need for more evidence linking this defendant, there is some, and that's the defendant's name and

his nickname he uses when dealing with this group in Sweden, Dingo D. That's the name on those customs forms you'll see in the jury room seized from Mr. LavHage's and Mr. Heydeck's cell phones, the screenshot with the name "Dingo D" at the bottom.

Detective Malmberg, the Swedish detective, testified that when he got LavHage's phone, there was the Telegram application on it, and who was Mr. LavHage chatting with on Telegram? Dingo D. After the defendant makes his admissions in July when he's emailing the agents, the email he's using, "Dingo D." This all lines up and points to the defendant as the only conceivable person who sent this firearm to Sweden.

Finally, Mr. LavHage's phone had the defendant's phone number in it, the same phone number the defendant used when contacted the agents on May 30th, right before his interview on May 31st, the same phone number.

Now, the dots here are all connected before the defendant ever reaches out and talks to the agents. The agents had connected them through tracing the gun, through those codes, and to the serial number, through the customs forms, and through the phone information. All of this evidence pointed at the defendant.

The defendant calls up Special Agent Karabeika and says he wants to talk. So they have an interview at which the defendant gives recorded admissions as to sending firearms to

Sweden. And his admissions are specific. He talks about sending goodies to Sweden. Let's hear what he says.

(Audio Exhibit 39A is played.)

MR. DIGGS: "If you wanted to, you could combine stuff."

The defendant is someone who could combine stuff because he, ladies and gentlemen, was a firearms enthusiast. He has many of them. And one thing he knew about firearms is that if you were going to trace a firearm, you needed to have the serial number. So what steps did he take in those shipments to Sweden? Well, listen. He told you.

(Audio Exhibit 39A is played.)

MR. DIGGS: But in case he could still be -- have the guns traced back to him, he took additional steps. He used fake names, he used fake addresses. Listen to what he told the agents.

(Audio Exhibit 39A is played.)

MR. DIGGS: And, of course, he mislabeled what he was sending, calling these "bike parts," not gun parts. He explained the whole thing in crystal-clear detail, hitting every element of Count 1. Here are the elements which you'll consider, and the government has proved each of these beyond a reasonable doubt:

That the defendant exported an article. Right? That's the Glock lower receiver.

That the article of the Glock lower receiver was listed on the United States Munitions List. You'll have a jury instruction in the jury room instructing you that a lower receiver is listed on the munitions list.

Third, the defendant did so without obtaining a license from the Department of State. The defendant himself admits he doesn't have a license, admitted he didn't have a license. And you also heard the testimony of Pete Walker that, after a search, no license was found.

And, finally, four, that the defendant acted willfully; that is, he was aware that it was unlawful to export the article from the United States, that he knew it was illegal.

So let's talk about the evidence that shows that the defendant in this case acted willfully, that he knew it was unlawful, because that evidence, ladies and gentlemen, is overwhelming.

He used fake names when he sent these packages. He didn't use his own name. He didn't use "Hany Veletanlic." He used fake addresses, including a house he used to live at and others on that block; some houses that didn't even exist. He removed the serial numbers from the firearms. You don't do this if you think you're following the law.

His communication started out on eBay, and then he moved to private email, and then to Telegram, this encrypted chat application.

How he gets paid for these, moving from PayPal to the cryptocurrency BitCoin.

And finally, falsely labeled the packages as bike parts to avoid detection.

Ladies and gentlemen, what you see here is lies, deception, covering up in every aspect of this transaction.

The initial communication about the gun from eBay to Telegram.

The actual gun itself, obliterating the serial number.

The sending of the gun, fake names, fake addresses.

The payment for the item, PayPal to BitCoin.

There was not a single aspect of these transactions that was aboveboard.

The defendant, a gun enthusiast, there is no plausible way that he could have thought that taking firearms, removing the serial numbers, breaking them down, putting them in packages, falsely labeling them, and sending them to people in Sweden who he never met could possibly be legal. Simply no way.

Ladies and gentlemen, there's nothing in those jury instructions that the court read to you and that you'll have that tells you you need to check your commonsense at that door when you go back there. You know from your everyday lives that people don't lie without reason. People don't falsify information about who they are, where they live, where they're sending things without a reason. People don't

cover up the truth without reason. The reason the defendant did this is because he knew it was unlawful. He doesn't need to know ITAR or what ITAR means. He needs to know it's unlawful, and he clearly did.

Ladies and gentlemen of the jury, the government has proved the charged exportation in this case beyond any reasonable doubt, based on a host -- a host of evidence.

Now, when I sit down, Mr. Browne will stand up, and he'll tell you that after the government -- or excuse me -- after the defendant was caught sending these packages to Sweden, he tried to provide information. He sent over some chat messages, and he tried to be helpful after he was caught; that he turned things over.

Now, when the defendant admitted to sending this stuff overseas, he made a decision. His best hope was to do it, in his words, to spill the beans and try to provide information. This was his reality based on his choices, based on decisions he had made.

But when he provided information to the government, rather than be truthful, he minimized. He continued to hide and he continued to obfuscate. He did that all the way until he was arrested almost a year later.

In that initial conversation, he was asked, "How many guns do you have?"

"I've got one at home."

Seven weeks later, when the agent looked in his gun safe, he's got about 30.

Now, take the silencers, what he says about the suppressors. "These are very hard to get in the United States," he says, "but the law might be changing on that." "They're very hard to get. I used to mess around with them, but the law might be changing."

And this is what he said in his initial interview about the suppressors.

(Audio Exhibit 39D is played.)

MR. DIGGS: "Drama for another day." That day would come, and it would be July 25th, 2017, when the agents arrived at Mr. Veletanlic's house.

That was the day he told them, "Yeah, I've also sent some things to France," and in return I got a couple of silencers, but don't worry. I destroyed those. Since I had my first contact with you, I destroyed the silencers."

Lo and behold, the agents looked in the gun safe, and way in the back, in a padded bag, they find Exhibit 2. "Uh-oh." So Exhibit 2 has been found, one of the suppressors.

The defendant doesn't come clean. He doubles down and says, "Well, I destroyed the other one. The other one is destroyed." And you'll have that text message with you, Exhibit 38, in the jury room. "I destroyed the other one."

And the next day, when the agent is back to conduct

another recorded interview to get the truth, "Oh, lo and behold, I actually have another silencer I didn't turn over." This is the defendant's MO, evolving a story to fit the defendant's needs, to fit what he thinks law enforcement already knows.

Now, ladies and gentlemen, there is no jury instruction in this case about providing information to law enforcement, because it's not a defense in this case.

The defendant provided information to law enforcement after he had exported that firearm to Sweden. And after the defendant began to provide information, that's when he possessed those silencers illegally. And after the defendant began to provide information, that's when he possessed the firearm with the obliterated serial number that he never told the agents about, that he concealed in his pants, even though he didn't have a concealed pistol license; after he was providing information, the firearm that he told the agents, "Hey, I carried this to all of our meetings, even though I told you I didn't."

Ladies and gentlemen, there's overwhelming evidence in this case that connects the defendant to the Glock lower receiver seized in the attic of Thomas Heydeck's house. All of that evidence came together and pointed at the defendant on May 31st, 2017, when he admitted, made admissions, when he told the agents what he'd done. And you've heard his

recorded words.

But that day he admitted to some things, and he hid other things, and he kept hiding them right up till the day he was arrested, May 3rd, 2018, when he shows up for a meeting with the agents with a concealed and loaded .380 caliber pistol.

Ladies and gentlemen, based on all of the evidence you've heard and the testimony, we ask that you return verdicts of guilty on all four counts.

Thank you.

THE COURT: Mr. Browne?

MR. BROWNE: Thank you, Your Honor.

DEFENDANT'S CLOSING ARGUMENT

MR. BROWNE: I'm tall enough. I can look over this. I like podiums, but this one does not move, so I'd like to get your attention, and, hopefully, you can all see me and listen to me.

In closing arguments, we're allowed to argue now. I will explain to you my process, because it may seem a little disjointed.

I took notes when Mr. Diggs was giving his closing, and I have my prepared notes, so I'm going to go through some of the things that Mr. Diggs said in his closing that I would like to take issue with, and then I will go to the more organized presentation, and also talk to you about some of the jury instructions.

So let's focus first on some of the things that were said by Mr. Diggs just now.

First of all, I want to say that you guys -- you people have had the opportunity to have a good experience, I think. In my experience, rarely is -- everybody is quite good at what they do, including the government, hopefully myself, certainly the judge, and this case actually moved fairly quickly compared to what we told you to begin with, so I think you can go away with an experience that the system is well staffed with us, and, believe me, all cases don't go like that.

So Mr. Diggs says many of the things we don't contest, which is, well, we do. We contest to the extent that when he says that, it's ignoring the government's responsibility to prove everything beyond a reasonable doubt, and to apply the presumption of innocence. So when he says it's not contested, that's not accurate.

The law -- as a matter of fact, if you had to vote right now, you'd have to vote not guilty, because the presumption of innocence is a cloak that all of us wear. We all wear that. And that cloak protects us from the substantial power of the government. And until that cloak is removed by the evidence beyond a reasonable doubt, then, as the judge has informed you -- he actually used the word "duty" seven times in the jury instructions. And very few times, as citizens,

do we have an opportunity to serve the government and the people and the Constitution. One of those is when we serve in the armed services, and you, clearly, have duties.

Another one, I think, is when you vote, and I hope more of us do than have in the past.

Another duty is sitting as a juror. And the jury instruction used the word -- you can find them yourselves -- "you have a duty." "If the government has not proven its case beyond a reasonable doubt, you have a duty to return a verdict of not guilty."

The jury instructions do not say that when you go back to the jury room, you try to figure out the case for the government, because you see the inequities just from a standpoint of power. I'm not sure if anybody's been in the crosshairs of the government, but I'm very honored and very proud to be a defense lawyer. I like standing between the individual -- the individual and the government.

As a matter of fact, our system wouldn't work -- and I know sometimes we, as defense lawyers, get a bad rap, but the reality is, our system won't work unless we do our job and we do it well and we're nonjudgmental and we're honest and we're questioning authority. That's our job. That's your job when you go back to the jury room, questioning authority.

A couple more points from Mr. Diggs' remarks. It's interesting that -- and it may be an issue, legally, later

on, but the government never even made an effort to determine whether the suppressors or silencers involved in Count 2 or Count 3 were registered until three weeks ago, and yet without that evidence, the power of government charges this person, but they didn't make that effort until two or three weeks ago.

Now, let me -- I'm going -- changing subjects here a little bit.

I really want to stress that if anything that I say to you does not conform with your memory, follow your memory. The judge has stressed it. I will stress it. I haven't heard counsel, but I know they believe in this concept, and that is what we say is not evidence. You will find, when you go back into the jury room, the collective memories of the 12 of you will be phenomenal. So I apologize if I say something that's not borne out by your memory. If I do, follow your memory.

For instance, I do not recall the evidence in this case indicating that Mr. Veletanlic told the agents that he knew the silencers were not registered. Mr. Diggs said that. He could be right. That's not my memory. I would implore you to look at your notes and use your collective memory.

I do not recall Mr. Walsh saying -- now, I could have just not heard it, but I do not recall Mr. Walsh saying that he had to look at the .380 with a magnifying glass.

What's very interesting about that -- you now know -- is

if that .380 was disassembled, that's where the serial number would appear. Now, it would also appear through the oval, if it hadn't been corroded or something, but I hope it's clear to you now, based on my questioning of the government's expert, as well as Mr. Walsh, that the serial number on that Ruger -- did I say "Glock"? If I did, I'm sorry -- on that Ruger is underneath, and if you slide it apart, it's there.

Another thing is, how did the government, the agents, determine that this .380 was stolen if it couldn't read the serial number? Now, I'm sure Mr. Diggs -- I'm sorry -- co-counsel will do just that, that that's because my client told them, and that's not my memory of the testimony.

I'm still going with my notes I took when Mr. Diggs was giving his presentation.

There's been a lot of talk in this case, some of it by myself in questioning, that the serial number on whatever this is that was recovered in Sweden -- because we really don't know, but, anyway -- that the serial number was obliterated. That doesn't matter.

Whether there's a serial number on whatever the item is is not an issue. The issue on Count 1 is, was a part of a gun knowingly sent to another country, and that part of a gun was on this long, long, long, long list. I think Agent Karabeika said something that was quite funny, really, and I don't think he meant it to be funny, but it was funny. This list,

for instance, in sending ammunition, I think said "or battleships." So between ammunition and battleships, there's a lot of other things.

So the actual -- whether there is an obliterated serial number on the -- whatever was recovered in Sweden is really not an issue, frankly.

I am still talking about Mr. Diggs' remarks.

I'm not certain whether Leon said he sold it or traded to my client the day after he bought it. There's no question that at some point he did. He wasn't honest, Leon Nguyen. He was not honest with the agents when he first talked to them. I guess it's okay because, apparently, the government called him as a witness. And he said, "Hany is a friend of mine and we target shoot, and we do all that sort of stuff," but he was dishonest when he first talked to the agents, just like my client was.

Mr. Diggs said that my client hid obscure things. Well, I asked Agent Grigore, "Would you have even known about the suppressors if Mr. Veletanlic hadn't told you?" She said no.

So what we have here, really, is the theme my grandfather used to say -- actually, it was my grandmother: "No good deed goes unpunished."

So you sign a cooperation agreement with the government to work with them, and we know that, and you cooperate. Certainly, maybe there are times when you're not cooperating

totally honestly, but you're cooperating. You're turning over -- Mr. Diggs didn't mention the two guns that Mr. Veletanlic turned over to the agents and said, "These are stolen, I think." That wouldn't have happened unless he did it.

I'm repeating myself now.

But the suppressors wouldn't have even been known about by the agents, unless he said that, and Agent Grigore admitted that. Now, what I assume counsel will say is, "Well, she's looking through this safe, and she would have found it." And when you go to assessing the credibility of the witnesses, think about that.

Agent Grigore told you that she found it. Then I confronted her with her own report, where she said Mr. Veletanlic indicated there was a suppressor in the safe. Once again, he was trying to cooperate with the government; not that the agent found it, like she said.

It is true that Mr. Veletanlic originally said to the agents early on, when he was fully cooperating and a cooperating witness with a contract, that he had, at that time, eight or so guns. That was in May. The fact that he had more in July is a fact. He had more in July. That doesn't mean he had more on the 8th.

What's really interesting about that, when the agents looked through the safe with his permission, still

cooperating, no good deed goes unpunished, "Look in my safe," see if there is anything stolen or anything in there. He voluntarily opens the safe. And on one occasion, when Agent Grigore was taking the weapons out of the safe, she asked for his assistance because she didn't know, even though she is an expert, how to clear -- by the way, that's a term of art in the gun world, "clearing the gun" means making it safe. She asked him to do that, and he did that. But he voluntarily said, "Sure, look in my safe." And Agent Grigore, the expert, took the suppressor, which he told her about, and three other weapons, which she thought were not legal, and it turns out, she finds out the next day, they are legal. So, once again, no good deed goes unpunished.

And there was some testimony by Agent Grigore that she was very upset and concerned about -- learning about the second suppressor. You heard that. I'm not sure whether you're allowed to hear the audio or not. The court will let us know. But you remember the audio of that exchange and Mr. Veletanlic saying to her, "Would you like me to destroy it? Would you like me to bring it up?" She said, "Oh, just dig it up." He said it had been buried. And she said, very calmly, "Just dig it up and bring it to me," which is exactly what he did.

And I could be wrong again, but Mr. Diggs said something about there being evidence that the agents knew my client did

not have a concealed weapons permit. I don't remember any testimony about that. I could be wrong. Check your notes. Check your memory. I just think that's just one of the those things where I don't remember it that way, and perhaps I'm wrong.

All right. Now we'll go to my prepared remarks, and it won't take that long.

For those of you who haven't been on a jury before, for those of you who are really interested in the rights of individuals versus the power of government, it seems unfair, almost, that the government gets the last word. When I'm done, one of these talented lawyers will get up here and rebut what I've said, and you would think a citizen who is in the crosshairs of the government would be able to have the last word. The reason we don't, and I think the judge explained that to you in his opening instructions, is because the people who founded our country -- the brilliant people who founded our country -- I'm not sure where they are these days -- knew that the government's burden of proof was so heavy: Beyond a reasonable doubt, a doubt that would cause you to hesitate in the most serious matters of your life.

You have to have an abiding belief in the truth of the charges. "Abiding" means "permanent." Three weeks from now, you can't go, "I really do have a reasonable doubt about count so-and-so."

It's serious. The reason I don't get another chance -- and it's not my practice, by the way, and I'm sure it won't happen with these talented attorneys -- but it's not my practice to interrupt during the argument. They may say -- I may not be able to anticipate everything they will say, so I'll have to rely on you, if there's something that's said, if it does not comport with your memory, you need to fall on your memory. It's not my practice to jump up and say, "That's not the evidence."

But I'm talking about this because it seems unfair that the person in the crosshairs doesn't get the last word. But it's not unfair if you give meaning to the Constitution and if you give meaning to the very -- there's no heavier burden in the law than proof beyond a reasonable doubt.

I'm reluctant -- I say this because I don't want you to take it the wrong way. But when you go back and deliberate, and I don't mean to be patronizing on this, and if it sounds that way, I apologize. There's really no guessing allowed.

There are substantial problems with Count 1 in this case. Even counsel knows that. Are we talking about a slide? Are we talking about a receiver? One of the Swedish agents said it was a spring and a tube.

Are we talking about an item that was seized by Swedish customs, which is what Agent Karabeika testified to? Was it an item found at this funny post office that's in a grocery

store in Sweden? We still have those. There's one on Bainbridge Island. Is it found there, whatever it was? Was it found in Mr. Heydeck's attic? And what was it? It's described in all these different ways: slide, tube, spring, frame, and bottom part. That's important. You can't just gloss over it.

Whatever was recovered in Sweden -- can you put 3 on the screen?

MS. DALTON: We no longer have that.

MR. BROWNE: The receiver, I think it's finally been identified, was supposedly obtained in Sweden, and we're probably surprised we don't have that.

Because there's this confusion -- did they seize it, where did they seize it, and what was it? -- you can't guess. You can't fill in the blanks for the government.

I would like to talk briefly -- how much time have I used, Your Honor?

THE COURT: About 25 minutes.

MR. BROWNE: Thank you, sir.

Let me talk briefly about the jury instructions. You don't need to look at them. You'll have a copy.

Instruction No. 1 is interesting, it's one of those jury instructions that talks about your duties, and it uses the word "duty," and that you've taken an oath to apply the Constitution and these principles we're talking about.

Basically, you've taken an oath to work hard.

And the sole issue before you is whether the government has proven all these things beyond a reasonable doubt, the highest standard in the law.

Jury Instruction No. 2 is the one about the defendant is presumed innocent unless or until the government proves the defendant guilty beyond a reasonable doubt, and it goes on, in the last sentence, to say, again, the defendant does not have to prove innocence. The government has the burden of proving every element of the charge beyond a reasonable doubt. That's why they get the last say, because their job is, theoretically and constitutionally, very difficult.

I never know whether I should mention this instruction because I don't know how you take it, but it's clear. I mean, people -- people are dying today for our Constitution, right? And fighting for it.

But Jury Instruction No. 3 is very simple. It says any person who is sitting in that chair, in the crosshairs of the government, has no requirement to testify. And I know sometimes that may bother people, but the law is you can't take it into consideration for one reason or another. It's just not -- not a factor.

No. 4 goes on and talks about further definition of reasonable doubt and uses the word "firmly convinced." You know, it's the kind of effort -- we talked about this in voir

dire a bit. Some of you were on juries before. Some of the people I asked questions of. Does it take an effort for you to apply the presumption of innocence and proof beyond a reasonable doubt? And I think the consensus of all the jurors was, yes, it takes an effort. It's the kind of effort, the kind of quality of thought, in my opinion, that you would put into are you going to get married? Are you going to get a divorce? Are you going to adopt a child? Are you going to have serious surgery? That's the kind of quality of thought that has to go into this process.

Four says "firmly convinced," and this instruction also uses the word "duty" twice.

Six, I already covered, and that is anything contradicted by your memory, follow your memory.

Interestingly enough, one of the jury instructions also says -- and this is very important -- and that is a reasonable doubt can be based on the evidence or the lack of evidence.

The jury instructions talk about you're the sole judges of the credibility of the witnesses, and I will ask you, respectfully, to consider the demeanor of the witnesses who testified for the government and whether they were forthcoming or whether they had an agenda. I leave that to you.

Nine is my client isn't on trial for any conduct or

offense not listed in the indictment, and the judge read you this two or three times in the trial.

And I hope you took notes. There was some evidence admitted for a limited purpose.

Basically, the state of mind, why agent so-and-so went to so-and-so, not to prove the truth of the matter, and those are really critical distinctions, and the judge read you that instruction, I think, two or three times.

And then there was testimony, and the meaning of that instruction is, you can't take what was said as the truth of the matter, and I think he even spoke to you directly about that. It's only for state of mind why I went from here to there. What did the postal agent tell me, not for the truth of the matter, it's for where I went.

Jury Instruction No. 26 has to deal with the .380 Ruger. The last part of that is, if you find the defendant was simply negligent, careless, or foolish. Without knowing whether there was a serial number or not a serial number, then you can't use that as a basis to convict.

Interestingly enough, I don't believe you're going to have the gun, but nobody's taken the gun apart to see if the numbers underneath that hole -- you saw in the dummy photographs where the number is on the inside of that mechanism, and the hole would allow you, normally, to look at that number, but that doesn't mean the number is still not on

there.

And the jury instruction, this is the one -- I went to college with a famous Jerry Spence, from Wyoming, and he calls this instruction the stick-to-your-guns instruction; that is, deliberate, listen to everybody else, give everybody else a chance to talk, listen with an open mind, but do not surrender your beliefs simply to agree with others or simply to return a verdict.

Let's talk about confusion a little more. There is really nothing but confusion in this case as to whether whatever was seized in Sweden, what it was. We saw a picture, but you have to consider that picture in light of the reports, which said, one, it was seized by customs, and it was a slide; two, it was recovered in the mail, and it was a slide; three, it was recovered at Mr. Heydeck's residence in the attic, and it was, apparently, a receiver. I don't know how you can explain that confusion. Perhaps counsel can. They probably will try, but we just rely on the reports and what was written.

I'm done, pretty much.

None of us would do this job if we didn't believe in the sacredness of the Constitution, and I don't think anybody can understand what it's like to be in the crosshairs of the government and how helpless you feel, and how you have one person, an able-bodied investigator, to counter-, flying in

four people from Sweden with government money, people from West Virginia. Individuals don't have unlimited resources, individuals don't have unlimited power, but what we do have is the most brilliant and sacred document ever, and that's the Constitution of the United States.

And I am waving the flag, there's no question about it, because I believe in it fully. But you have to give it meaning. You have to, by the judge's instruction, have a duty to determine whether the cloak of innocence has been removed by proof beyond a reasonable doubt, and you can't do the government's job for them.

You have all been -- the think the judge has commented -- amazingly involved in this. You're all taking notes, you're all listening. I want to thank you. We all want to thank you. This is not an easy job. You've taken a lot of time out of your life; not as much as some cases; you know, a lot. You have personal things going on and other things on your mind, but right now you need to do your duty, and I just want to thank you from the bottom of my heart for the effort you've put into this so far. I appreciate it. Good luck. Thank you.

Thank you, Your Honor.

THE COURT: Thank you.

Government's rebuttal, please.

GOVERNMENT REBUTTAL ARGUMENT

MS. DALTON: May it please the court, counsel, members of the jury.

You just heard counsel describe his client as a cooperator. But the defendant's claims that he cooperated are just hollow attempts to try to deflect blame in this case. Let's be perfectly clear. You don't get off scot-free just because you provide some information to law enforcement. That's not how this works.

You were just read a long series of jury instructions, and there's nothing in those instructions that says it's a defense, in any crime, to be a cooperator, and it's especially not here.

The defendant claims that he cooperated, but what he really did was lied, misled, and minimized.

Agents caught him in so many lies, it's hard to keep track. Of course, you remember first he had no suppressors, then he had one, then he had two. First he said that he shipped eight packages to Sweden, then it was 10 to 20. And he said that he wasn't armed when he went to meet with those agents, only to later tell them that every time they met, he had that Glock concealed in his waistband.

The defendant says no good deed goes unpunished. But did you hear any good deeds there? This is not cooperation. This isn't coming clean. He said it himself. The defendant

waited for months to see what this might turn into; waited to see if law enforcement was going to come knock on his door. He knew that his buyers in Sweden had been arrested. Packages had been seized. He knew what he was doing was criminal. He didn't go to law enforcement then. He waited until agents went, interviewed his friend, and Leon Nguyen called him hysterical, afraid. Only then did the defendant finally call law enforcement. He didn't do it because he was trying to come clean. He did it because he knew he had no other choice. This wasn't going away.

And even once he was caught, the defendant didn't change his ways. He didn't resolve to never commit crimes again. Even after he started cooperating, he illegally possessed two silencers, and he had a pistol with an obliterated serial number. This wasn't a wake-up call. This was another opportunity for the defendant to lie, deceive, and try to deceive the agents for his own benefit.

The defendant's tactic in this case is to try to induce confusion, to cause you-all to doubt your memories, to question the testimony, the things that you clearly heard. First, he wants to make you think that there's some misunderstanding, some doubt about what was found in Sweden, what gun the defendant is charged with possessing in Count 1. Don't let them distract you. The evidence was clear. You heard it yourself.

The weapon that the defendant is charged with exporting in Count 1, that is the Glock lower receiver. You've seen pictures of it. We brought in four agents from Sweden to tell you about it. You've heard a number of things about that Glock lower receiver found in Thomas Heydeck's attic.

You also heard that, in addition to that Glock lower receiver, there were other packages, packages that the defendant mailed in this case. Those packages, well, the first package was in February of 2017. That contained a slide, parts of a 9mm weapon. There were other packages, others described to you, but what the defendant has been charged with is only the Glock lower receiver that is found in Thomas Heydeck's attic. There is no confusion.

You've heard that receiver was found in Thomas Heydeck's attic. The person who purchased that receiver was Leon Nguyen. Leon Nguyen told you that he sold that gun to the defendant, and the defendant admitted, in recorded statements, that he was shipping gun parts to Sweden. None of these facts have been disputed.

The defendant sent that lower receiver to Sweden. There is no other conceivable scenario as to how it got there. How else would this Glock last owned by Leon Nguyen end up in an attic in Sweden? The only connection between Leon Nguyen and Thomas Heydeck is the defendant. There's no other explanation.

The defense also wants to introduce confusion about whether or not these silencers were registered. But you heard the testimony. The evidence was clear. Remember, Tania Pleasants told you that she conducted a search of the National Firearms Transfer Record, and in that record it stated the defendant never registered a firearm, including silencers. He had no firearms registered to him, not then, not now, not ever.

And that makes sense. You heard from Special Agent Grigore that that silencer, it didn't have the external markings that would have shown that it had been imported legally into the United States. She could look at it, with her own eyes, the outside of that silencer and immediately conclude this device had not been legally imported into the United States.

And you heard Tania Pleasants and Firearms Enforcement Officer Heishman, they told you that that Vortex silencer had no serial number. They told you that you cannot possess a silencer like that legally in the United States without a serial number. And Tania Pleasants told you that she could tell just by looking at that silencer that it wasn't registered, because if it was registered, it would have had a serial number, and it didn't.

Now the defense is trying to introduce a new theory of confusion, that somehow, if we just took this Glock -- this

Ruger .380 pistol, the one that the defendant had in his waistband the day of his arrest, if we just took it apart, maybe we could then see the serial number. But you're going to see that gun with your own eyes. You heard there's a hole on the grip, the frame of that gun that enables you to see the serial number, and you heard that the serial number was obscured. You're going to see it yourself.

Read the instruction. All that is necessary is that the serial number has been altered, obliterated, or removed. That stippling on the outside of the serial number, that is clearly an alteration.

Now, we have provided you with evidence in this case, and you've heard from a number of witnesses, and through the course of these past few days, we've proven beyond any doubt that the defendant is guilty of the four counts charged in the indictment.

In his recorded statement alone, the defendant admits to exporting guns to Sweden. He was caught with one silencer in his gun safe. He admitted to possessing the second silencer, only then to turn it over to agents a few days later. And after he was arrested, the defendant admitted that he knew that that Ruger pistol, he knew that it had an obliterated serial number. The defendant's admissions were clear. They left no doubt.

We ask that you return the verdict, the only verdict that

is supported by the evidence in this case, a verdict of guilty on all four counts.

Thank you.

THE COURT: Thank you, counsel.

Ladies and gentlemen, at this time, the case belongs to you.

I'm going to ask the government to put the three exhibits up on the railing in front of the bar, and I'll ask you to go out through your doors that way, and you can pass by it. Take your time. You're not allowed to pick it up and see what it's like to point it or whatever. This is just your opportunity to review it.

The other exhibits that were admitted during the trial will be back in the jury room with you. You'll have your set of the instructions. You will have copy of the verdict form. One verdict form has "original" stamped on it, and that's the one that you complete and return.

How long you take to deliberate is up to you. I will tell you at 4:30, probably about 4:25, 4:20, I will call you out and read that fabulous instruction about don't talk to anyone except your fellow jurors, and then I'll send you home for the evening.

Tomorrow, if you're back, it will be at nine o'clock. You'll come in and begin deliberating as soon as everyone is here.

So with those items, the government will please put the exhibits up there, and the juror at the end of the row, you get to go out first.

Ladies and gentlemen, please rise for the jury.

Ladies and gentlemen, they just pointed out to me that we haven't done the alternates. Madam Clerk, please pull the alternates.

THE CLERK: Juror No. 6 and Juror No. 12.

THE COURT: You don't get any choice. Please continue.

THE FOLLOWING PROCEEDINGS WERE HELD
OUTSIDE THE PRESENCE OF THE JURY:

THE COURT: I don't think taking Nyquil and trying to do a trial at the same time is really optimal.

It's my policy that if we get any question, you're alerted to it. We'll try to read you the question over the phone. If it's simple, "Can we have more pencils," something like that, we'll deal with it over the telephone and everyone is on the line. If it's more complex, I'll ask you to come in to talk about it. We use the form that asks -- they write the question down, and we write down the response so there is a record of it, and it goes into the docket.

I would ask you to please leave your cellular telephones on at all times, until at least 4:30. Because we have this experience at least once a month, you've been out of the

office and your voice mails are full, and if we call and can't get you, there's no way to leave a message, and then you get a really cranky judge. And I'd ask you to not be more than ten minutes away from the courthouse; otherwise, it takes us a half hour to respond to questions.

As I've indicated to the jury, they'll come out about 4:20, probably. I'll read them the instruction that says don't do anything and they can talk to each other when they reconvene tomorrow. They'll come back at 9:00, go directly to the jury room. They'll be advised that they can't begin deliberations until everyone is here.

If you want to come at 4:30, that's fine. You don't need to be here. It's not mandatory attendance.

I would ask you not to sit out in the lobby, because the jurors stroll through there, and it bugs them if you're there.

Any questions from the government?

MR. DIGGS: No, Your Honor. Thank you.

THE COURT: Mr. Browne, any questions?

MR. BROWNE: Your Honor, as I understand, and I think I remember from our previous trials, we don't have to be here at 4:30, unless you ask us to?

THE COURT: That's correct.

MR. BROWNE: Fine. I understand all that.

THE COURT: All right. Then we'll be in recess, and

when we have questions, I'll be in contact with you.

Thank you.

MR. BROWNE: Thank you, Your Honor.

(Court in recess 1:28 to 3:25 p.m.)

THE COURT: Counsel, were we able to give you the questions?

THE CLERK: I just provided them.

THE COURT: Everybody study for a moment, and then we'll take this up.

Counsel, has everyone had an opportunity to look at the questions?

MR. BROWNE: Yes, Your Honor.

MR. DIGGS: Yes, Your Honor.

THE COURT: The one that begins, "Count 4," came first, at 3:45.

MR. BROWNE: Which is funny because it's 3:25.

THE COURT: Yes. It's supposed to say "2:45." It came out as incomplete sentence, and we had to send it back in to finish writing it, and I have no idea who the foreperson is, or if that even is the foreperson.

Mr. Browne, it looks a lot like your signature.

MR. BROWNE: No. Actually, you can read my signature. I'm one of the only people I know.

THE COURT: The second one starts, "Count 4." Is there any reason that came out shortly thereafter? I have

some ideas about how to do this, but I'm sure you have ideas, also. So we can either do both at the same time, or we can take one in front of the other.

Mr. Diggs, why don't we take a stab at doing them both? What's the government's suggestion as to a proper answer?

MR. DIGGS: Your Honor, I think just to point them back to the jury instructions and the evidence in the case. I'm sure Your Honor has a tried-and-true response in that vein. I don't think there's anything more specific than that to address either of these, but I'd certainly like to hear what the court's thoughts are.

THE COURT: Well, I'll tell you that, before we got hauled out to do that supervised release violation, I'd gotten as far as determining the phrase "relative term" is not a term of grammar. It seems to be a creation on the part of the jury. So that answered part of my question.

Mr. Browne, your ideas?

MR. BROWNE: May I sit, Your Honor? Want me to stand up?

THE COURT: Oh, sit.

MR. BROWNE: Remember when I told you what Judge Coughenour told me about he's never had an intelligent question from the jury? And that's a lot of years.

I think Mr. Diggs is direct. I think the only answer, with all respect to the court, is, "Please review the jury

instructions."

THE COURT: Well, I was going to be somewhat more aggressive than that. In the 3:45 p.m. question, I was thinking of something to the effect of, "Questions of fact are for the jury. Answers to legal questions need to come from the jury instructions you have." And then add what I know from prior Ninth Circuit cases I'm permitted to say, which is, "In jury instructions, each word has its standard English meaning." They seem to be struggling with the concept of do the words, because they're used in a jury instruction, have some kind of different meaning?

And in regards to, "Is there any reason the firearm was not disassembled," to say, "You must rely on the testimony and the exhibits that you've got."

MR. BROWNE: I agree with both of those.

MR. DIGGS: I agree, and I like your responses better than mine.

THE COURT: All right.

MR. BROWNE: Would you be responding with one note or two?

THE COURT: The form that we have has a space for a response on the second page, actually.

MR. BROWNE: Oh, okay.

THE COURT: So, yes, each will go back with a separate response.

You'd be happy to know that, in the First Circuit, I would have a free hand. "'Alter' in this statute is not some highly obscure or special-purpose term that cries out for elaboration. This, then, is an instance in which the district judge may choose to elaborate but is not required to do so." *United States v. Adams*. It's out of circuit.

The answers that I'm going to give to these questions are, in regards to the 3:45 question, "Questions of fact are for the jury. Answers to legal questions must come from the jury instructions you have. In jury instructions, each word has its ordinary, common meaning," which is the term that this circuit uses, as opposed to "standard."

And in regards to the other question, the 3:50 question, "Is there a reason," I'm going to say, "The jury should rely on the testimony and exhibits from the trial."

Is that acceptable to the government?

MR. DIGGS: Yes, Your Honor.

THE COURT: Mr. Browne, is that acceptable to Mr. Veletanlic?

MR. BROWNE: Yes, Your Honor.

What was the last one? The jury should rely on what?

THE COURT: The jury should rely on the testimony and exhibits from the trial.

MR. BROWNE: Okay. Thank you.

THE COURT: All right, counsel. We'll be back in

recess.

MR. BROWNE: Thank you, Your Honor.

(Court in recess 3:34 to 4:24 p.m.)

THE COURT: Ladies and gentlemen, please be seated.

As all of you know, we, apparently, have a verdict from the jury.

Before that, though, Mr. Browne, I wanted to make sure you had the record that you need.

Yesterday, you indicated you were making a motion at the end of the government's case in regards to production of the receiver, and I took that under advisement, and today you indicated you were filing a motion in regards to the question of the grand jury. I didn't set a date for either of those, but I consider them made as a matter of the record.

MR. BROWNE: Thank you, Your Honor.

And I think your idea was definitely the right one, which was, let's just see what happens, and then we'll brief the issues, because it is a unique and interesting issue to me.

THE COURT: All right. But I want to make sure it's clear, on the record, that you have made those motions before the government rested.

MR. BROWNE: I appreciate it.

THE COURT: Are there any matters to take up before we bring the jury in?

MR. DIGGS: Not from the government.

MR. BROWNE: Not from the defendant.

THE COURT: All right. Please bring the jury in.

THE FOLLOWING PROCEEDINGS WERE HELD
IN THE PRESENCE OF THE JURY:

THE COURT: Ladies and gentlemen of the jury, I have been told that you have reached a verdict in this matter; is that correct?

THE FOREPERSON: Yes, Your Honor.

THE COURT: All right. Would you please hand the verdict form to the in-court deputy?

Ladies and gentlemen, I'm going to read your verdict form, and I'm going to ask you to pay attention as I do so, for the reason that any party has a right to ask the jury to be polled.

Polling the jury just simply consists of, "Is this the verdict of the jury," and you have to verbally respond. To do that, you have to pay attention that I read it correctly.

"We, the jury, have reached the following verdict:

"As to the charge of the violation of the Arms Export Control Act, as charged in Count 1, we find the defendant guilty.

"As to the charge of possession of an unregistered firearm on or about July 25, 2017, as charged in Count 2, we unanimously find the defendant guilty.

"As to the charge of possession of an unregistered firearm

on or about August 1, 2017, as charged in Count 3, we find, unanimously, the defendant guilty.

"As to the charge of possession of a firearm with an obliterated serial number on or about May 3, 2018, as charged in Count 4, we, the jury, unanimously find the defendant guilty."

Dated the 27th of February 2019 and signed by the foreperson.

Counsel, do either of the parties wish to have the jury polled?

MR. BROWNE: I do not.

MR. DIGGS: No, Your Honor, we do not.

THE COURT: All right. Then, ladies and gentlemen, at this time you are released from jury duty with the sincere thanks of the court.

The rule in federal court is, the lawyers are not supposed to contact you, unlike state court, where that is more common. If you would do me the honor of waiting a few minutes, I'll be back to individually thank you in the jury room.

Ladies and gentlemen, please rise for the jury. You are released.

THE FOLLOWING PROCEEDINGS WERE HELD
OUTSIDE THE PRESENCE OF THE JURY:

THE COURT: Counsel, in order to assign you a

sentencing date, I'm going to need my in-court deputy back, but are there any matters the parties wish to take up at this time?

MR. DIGGS: Yes, Your Honor. We have a motion.

THE COURT: All right.

MR. DIGGS: Your Honor, at this time, the government seeks to remand the defendant in this case. Let me explain why.

Under Title 18, Section 3143, after conviction there is a presumption of detention where the court finds that, by clear and convincing evidence, the defendant is either a danger to himself or others, or a flight risk.

In this case, the defendant is now facing a substantial sentence. Beyond that, he's facing immigration consequences after he gets out. There's very little, we believe, to keep him here and to keep people safe.

I would point to some specific evidence in this case. The text messages, which have been in evidence and some that were not in evidence, as recent as May of last year -- this is one of the defense exhibits for trial. It's May 2nd of last year. There are a number of similar text messages from the defendant to the agents, expressing his outrage, expressing his -- expressing his frustration and outrage at the federal government. "And your kind," meaning the agents, in this case this was to Special Agent Grigore, "and how your kind

works." Your Honor, this is before Mr. Veletanlic showed up to that last meeting with a concealed firearm in his belt.

We are concerned about firearms. There was testimony about ghost guns, which don't have serial numbers, which the defendant can make, which cannot be traced.

I can represent to the court that Mr. Kunkel has told our agents this morning that he is concerned about the defendant, if he were to not be remanded after convictions.

And perhaps most importantly, Your Honor, Ms. Dalton and I, just this afternoon, received an email from Lisa Combs at the probation office, notifying us that late last week they learned that Mr. Veletanlic's computer was not sending data to the computer monitoring company. He is required, pursuant to his bond, to be on computer monitoring.

Officer Combs notes that she checked over the weekend and the data had not been sent since February 14th. I assume that's 2019.

She spoke with Mr. Veletanlic and spoke to Mr. Veletanlic. He stopped using his monitored devices and was instead using unmonitored devices. He claimed the monitoring software made it difficult or impossible for him to do his job because the software is crap, and the probation office is currently working on a summons for Mr. Veletanlic.

This was before he was convicted of these counts, which, obviously, shifts the burden to Mr. Veletanlic to prove that

he is not -- by clear and convincing evidence, to prove that he is not a danger to the community or a flight risk. We are concerned that he is both of those things.

The evidence, the charges here that he's now been convicted of, and this most recent violation of his bond, for those reasons, Your Honor, we are asking that the defendant be remanded to custody at this time.

THE COURT: Mr. Browne, will you continue to represent Mr. Veletanlic in this matter?

MR. BROWNE: Yes, Your Honor. I was with him this afternoon at the probation office.

THE COURT: All right. I'm going to remand Mr. Veletanlic, but I want to set a date for a hearing on that question.

MR. BROWNE: On the remand?

THE COURT: On the release, and I need to know how long it's going to take you to prepare your pleadings.

MR. BROWNE: Excuse me, Your Honor. Were you setting a hearing on whether he should be remanded continuously or -- could I respond briefly?

THE COURT: Yes, you can respond, but one of the things I want to know -- first off, I want to know if you're going to continue to represent him.

MR. BROWNE: Yes.

THE COURT: Secondly, if I grant the motion to remand

at this time, I want to do so with a return date where it can be fully heard on the record.

MR. BROWNE: The remand issue?

THE COURT: Yes. So remand now, but be put back on supervised release, and I want both sides to be able to fully present their case.

MR. BROWNE: Sure. If I could respond briefly to the government's position?

THE COURT: Yes.

MR. BROWNE: First of all, I think you know from the pretrial hearing in this matter, Your Honor, the last thing in the world that Mr. Veletanlic wants to do is leave the United States of America, his primary motive, basically, for cooperating with the government.

The emails you were shown, I've seen some of them. They're out of context, because he, later on, responded and apologized for his temper outburst.

And he's complied with all the conditions. As a matter of fact, Judge Tsuchida released -- relaxed his conditions of supervised release and took him off monitoring, and he's been a model supervisee, if that's a word.

This problem with the computer, I talked to the probation officer about it, who was very kind and friendly today. His old computer, basically, just crashed, and the software made it crash.

He did buy another one, and we should have -- I should have or Ms. Scanlan should have come to the court and asked for that condition to be relaxed, or, at least, that they reimpose his conditions of monitoring on the computer.

I'm a little concerned because I email him all the time and get text messages from him all the time, so to the extent that it's been monitored, that concerns me a little bit.

But I don't believe he's a flight risk. He does not ever want to leave the United States. He doesn't have a passport of any kind.

He owns his house. He has lots of community ties.

And so I would ask, humbly, that he be released now and that we set a date soon, where we can address this issue more in depth.

Just to let you know, I had three trials set for this Monday, and yours took precedence, of course. And I'm in the process of trying to clean that up, and I've already postponed a vacation one week because of matters. So I will be here next week, but after that, I'm hoping to have a vacation that I've been putting off for almost a year now.

THE COURT: Will you be able to be fully prepared to discuss this issue?

I consider this, Mr. Veletanlic, to be extraordinary important, and I don't like to put people in jail.

MR. BROWNE: I know.

THE COURT: The government is correct that the presumption does switch after the conviction. So I want to be fair to the government, and I want to be fair to you.

It seems to me the best way to do that is set it for probably next week, maybe on Thursday.

I'm going to set a hearing on the terms of supervised release. I would like Probation to be here. I'm always a little distrustful when either side says "do what Probation thinks," because they usually show up and have something different to say. So I'm going to give you a sentencing date, but, more importantly, a date for a hearing on supervised release.

THE CLERK: For sentencing, Monday, May 20th, at 11:00 a.m.

And then for the remand issue --

THE COURT: Does anyone know their schedule for next Thursday?

THE CLERK: March 7th.

MS. DALTON: We're available all day.

THE COURT: Mr. Browne, what works for you?

MR. BROWNE: Well, I do need to go to the Eastern District to take care of one of those other cases that I mentioned, but I can fly over there and come back.

It would be -- let's see.

THE COURT: So late afternoon.

MR. BROWNE: So Thursday. You just pick the time, and I'll make it work.

THE COURT: Ten o'clock.

MR. BROWNE: Okay.

THE COURT: And I will grant the government's motion for remand, with the understanding that we'll have a fuller hearing next week on Thursday at 10:00 a.m.

Mr. Browne, would you have your client self-report to the marshals office?

MR. BROWNE: Yes. Do we want me to take him down?

THE COURT: I guess they'll come visit us.

Anything further from the parties?

MR. DIGGS: No, Your Honor.

THE COURT: Okay. May I have your briefing on the question of supervised release by, say, Wednesday noon?

MR. BROWNE: Sorry, Your Honor. I was talking to my client.

THE COURT: Wednesday noon on your briefing for supervised release.

MR. BROWNE: Yes. I'll have Ms. Scanlan do that. And then as far as the other legal issues, they may have to wait a week or two, because I'm hoping to take my vacation, and I think I want to be involved in that research myself.

THE COURT: That's fine. I think you have 14 days from the verdict.

MR. BROWNE: Yes.

THE COURT: So that's a time limit to remember.

MR. BROWNE: That's fine, Your Honor. And I may ask for an extension of that because of a vacation I've been putting off because of two other trials.

THE COURT: I don't know that I can extend that or not. I've never been asked to do that. The Supreme Court just came down, saying appellate deadlines are carved in stone and the courts don't have a authority to change them. You'll want to make sure that's okay.

MR. BROWNE: Thank you, Your Honor.

THE COURT: We'll be in recess.

(The proceedings concluded at 4:41 p.m.)

C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 10th day of May 2019.

/S/ Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter