UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) CASE NO. CR18-162JLR |
| Plaintiff, | ) |
| | ) SEATTLE, WASHINGTON |
| v. | ) March 7, 2019 |
| | ) |
| HANY VELETANLIC, | ) 10:00 a.m. |
| | ) |
| Defendant. | ) MOTION HEARING |
| | ) |

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES L. ROBART
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: MATTHEW DIGGS
MARIE DALTON
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101

For the Defendant: JOHN HENRY BROWNE
Law Offices of John Henry Browne
801 Second Avenue, Suite 800
Seattle WA 98104

Reported by: NANCY L. BAUER, CCR, RPR
Federal Court Reporter
700 Stewart Street, Suite 17205
Seattle, WA 98101
(206) 370-8506
nancy_bauer@wawd.uscourts.gov

THE CLERK: Case No. CR18-162, United States v. Hany Veletanlic.

Counsel, please make your appearances for the record.

MR. DIGGS: Good morning, Your Honor. Matthew Diggs and Marie Dalton for the United States. With us at counsel table is Probation Officer Lisa Combs.

THE COURT: Thank you.

MR. BROWNE: Good morning, Your Honor. John Henry Browne on behalf of Mr. Veletanlic, who is here.

THE COURT: Mr. Browne; Mr. Veletanlic.

Counsel, we are here on the hearing on what are, in effect, cross-motions. In the docket at 139 is the government's motion to detain defendant pending sentencing, and in the docket at 144 is a motion for release pending sentencing by the defendant.

I can tell you that in preparation for this hearing, I have reviewed the motion to detain pleadings filed by both sides. Attached to the government's was an appendix of some email messages.

Following Mr. Browne's submission, I sat down and spent some time looking at the mental diagnoses that are applicable, according to the defendant, to Mr. Veletanlic, and to do that, I also have read the diagnostic criteria that are found in the Physicians' Desk Book.

So between hearing the suppression motion hearing, which

included testimony, preparation for and presiding over the multiday trial, I've heard extensive evidence from both sides regarding Mr. Veletanlic's credibility. I have heard what I'm going to describe as an offer about Mr. Veletanlic's actions while on supervised release.

I've reviewed the probation department's material in regards to the status of supervised release that were filed, more or less, contemporaneously with trial. I think I have a fairly good factual handle on this case.

With that said, does the government wish to present any live testimony at the hearing?

MR. DIGGS: No, Your Honor.

THE COURT: Mr. Browne?

MR. BROWNE: Your Honor, the doctor was on his way, but he's late, so we could probably proceed.

THE COURT: All right. Then I'll hear from the government first, please.

Ms. Combs, I'd like to hear from probation as part of this also, so you be prepared.

MR. DIGGS: Thank you, Your Honor. May it please the court.

I appreciate the court setting out what it has reviewed in this matter, because it is quite voluminous.

As the court is aware, we are seeking detention pending sentencing in this matter.

This is a defendant who was, last week, convicted of all four counts and is now facing a lengthy sentence.

There is a suggestion here that the government -- a suggestion put forth in the defendant's papers that we've changed our position on detention simply because of the convictions. But, Your Honor, that is not true.

The government has fought to have Mr. Veletanlic detained since his initial arrest in this matter. We moved for detention in front of Magistrate Judge Tsuchida at the time of the initial arrest, and we have always taken the position that Mr. Veletanlic is a flight risk and a danger to the community.

Now with his convictions, as the court is aware, the burden has now shifted, and it's the defendant's burden to show, by clear and convincing evidence, that he is neither a flight risk nor a danger to the community.

But more than just the burden, Your Honor, has shifted after the convictions. Mr. Veletanlic's situation and the stress of that situation have markedly changed. He is now convicted of four felony counts and is facing a lengthy sentence. He's also facing a higher likelihood of deportation, having been convicted at trial.

All of these are aggravating to what were already concerning factors regarding risk of flight and danger to the community.

I'm going to talk specifically about the danger to the community.

As the court heard, there was significant evidence at trial regarding Mr. Veletanlic's possession of firearms, but there was also evidence at trial regarding his credibility. And I submit to the court that credibility is something that's very important when the court considers whether somebody like Mr. Veletanlic can be out on bond.

As the court remarked after the suppression hearing, Mr. Veletanlic's credibility at that point was in question. It was not good. There was also evidence during the trial that he falsified records related to foreign shipments. There was evidence during the trial that he didn't disclose numerous things to the law enforcement agents. Perhaps most notably, the fact that he possessed the silencers, and then arriving at the meeting with a firearm with an obliterated serial number. So beyond just the facts of the conviction, Mr. Veletanlic's credibility raises significant concerns to the government in terms of the safety of the community.

There's also the recent evidence, Your Honor, from Mr. Kunkel, who was called as a witness in this case, who's not -- we're not talking about somebody who is afraid of the defendant. We're talking about somebody who provided information.

THE COURT: Hold it. He did not testify --

MR. DIGGS: No, he did not testify --

THE COURT: -- he was listed on a witness list.

MR. DIGGS: Yes, he was listed on a witness list.

THE COURT: There is a difference, Mr. Diggs.

MR. DIGGS: I did not mean that he testified. He provided information to the law enforcement agents after the trial, and we submit that that information is relevant to Mr. Veletanlic's danger to the community. It relates to his possession of firearms, it relates to firearms that may be stashed somewhere without the knowledge of the probation office. And it relates to the use of a possible hallucinogenic to deal with the mental health issues, which I'm going to touch on.

But all of those things, Your Honor, play in this danger to the community.

There is a huge number of firearms out there that were turned over to a third party. The probation office will not tell the government, because it's still a pretrial case, who has those firearms. So we can't fully evaluate how that plays out. But there certainly are concerns that there are other firearms out there that are unaccounted for.

The mental health issues, which are really outlined in the defendant's filings, while certainly, I think, possibly relevant to sentencing, are a concern at this point related to risk of flight and related to danger to the community.

We have an individual who has some significant mental health issues, facing the recent increased stress of a lengthy prison term and four convictions. That is relevant to risk of flight.

There's also a suggestion in the defendant's papers that the recent probation violation was somehow coordinated with the U.S. Attorney's Office to come down, you know, during the trial. I can assure the court that that was not the case. We had no knowledge of that violation. In fact, I wish we would have known about it, but we had no knowledge of that violation until the time the jury was actually deliberating in this case.

So separately, the U.S. Attorney's Office and the probation office, on their own separate tracks, had come to their own conclusions, based on their own standards, that this is an individual who shouldn't be on bond but who should be detained.

Of course, that's another changed circumstance, because originally at the defendant's initial appearance and every step along the way, the probation office has been in favor of release on bond. They've now switched their position and are in favor of detention pending sentencing. I think that's a relevant consideration for the court.

So for those reasons, Your Honor, and those in our papers, unless Your Honor has any further questions, we would submit

that the defendant has not met his burden to show, by clear and convincing evidence, that he's neither a flight risk nor a danger to the community.

THE COURT: Well, I have one question for the government, which is attached as -- in the docket at 139-2 are a series of emails, some of which are dated with a date and time stamp, but missing is any year.

I think -- and I want to have confirmed -- that they're 2018, since any number of them deal with emails exchanged between the BATF agent and Mr. Veletanlic; is that correct?

MR. DIGGS: Yes, Your Honor. They are 2018, but one point on that: There was a suggestion that these emails were not brought up at the initial detention hearing. That's not correct.

THE COURT: That's not correct.

MR. DIGGS: And they're text messages. They were brought up, and actually, that was part of the basis for the government's initial position that he should have been detained.

THE COURT: I'm aware of that.

All right. That's what I wanted to know. Thank you.

Mr. Browne?

MR. BROWNE: Good morning, Your Honor. Thank you for this opportunity.

Of course, just for the record, as you've pointed out,

this situation is controlled by Federal Rule of Criminal Procedure 46(c) and Title 18 United States Code, 3143(a), and that imposes the burden on us, which we accept.

Did you want to ask me a question, Your Honor? It looks like maybe you did.

THE COURT: No.

MR. BROWNE: Your Honor, let me deal, first, with the government's presentation this morning.

There's no question in this case -- and I think you have a good handle on what occurred in this case.

Mr. Veletanlic became the focus of a government inquiry because of information that came from Sweden. And the agents went to the last person, Mr. Nguyen, who had purchased the part that was sent to Sweden. Mr. Nguyen called my client. My client immediately called the government and immediately began cooperating.

And you see, because it sounds like you spent a lot of time looking at this, through the exchange of emails, that there was full cooperation --

THE COURT: Mr. Browne, you might want to send your legal assistant out there. Somebody is wandering around.

MR. BROWNE: It's probably the doctor.

THE COURT: Thank you.

MR. BROWNE: Thank you, Your Honor. I don't think he's used to being in federal court, Dr. Reichler.

Do you want me to go ahead?

THE COURT: Yes.

MR. BROWNE: So it's undisputed that my client cooperated. The emails present that to the court and to the world that my client was attempting to cooperate with the government.

He, indeed, at some point, Your Honor -- I'm not sure you are aware, but I think you are because you picked up on it after a previous hearing, that my client turned in guns to the ATF that were, indeed, stolen, that came from -- I guess we're using his name now, but I'll just say "RK" -- the guns that came from RK, my client gave those to the government, and they turned out to be stolen.

Nothing has been done about that. Well, why? Because RK is a manipulative, government informant, who I, coincidentally, had as an informant in another case in front of Judge Coughenour.

RK is a seasoned informant for the government, who is in an illegal business, in federal court, which is 10 to 15 marijuana stores. He's a multimillionaire. And now the government has the nerve to use Mr. Kunkel, who solicited my client to commit a murder, which was communicated to the government, and they did nothing about it. And then the government says Mr. Kunkel, "RK," is afraid of my client.

Now, RK never expressed any fear at the prior hearings in

this matter and recently talked to my investigator, Mr. Walsh, and stated to Mr. Walsh, who is here, that he was mad at Mr. Veletanlic because Mr. Veletanlic informed the government of the contract-murder plan that he was trying to get my client involved in.

This case, in essence -- and I use this term advisedly, Your Honor -- is really about betrayal.

The government turned on my client when Mr. RK was in the crosshairs of the government, because of my client's operation, and that information -- the fears that RK supposedly has was never previously brought forth.

The emails that were used last week, before Your Honor and attached to the government's brief now, are selective, out of context. The one -- but if you read those, and I think you probably did because I pointed it out -- the agent says in one of those, in response to a question from my client, "What's going on? What can I expect?" And the agent, she says, "Just live your life as you normally do." This was during the government's stepping back from cooperation with my client.

My client's past behavior in the probation office has been exemplary.

The matter of the computer issue right now, Your Honor, I was with my client, we went down to Probation after the verdict -- excuse me -- during the deliberation process, and

we went down. He has a new probation officer. His previous probation officer and my associate, Emma Scanlan, had spoken about the problem with the computer software that the government utilizes to look at your stuff on a computer, and that that software was creating significant problems for my client running his normal business.

And there were discussions between my client and his previous probation officer about that. There were discussions with my client and Ms. Scanlan about that, and this was known to the probation office.

THE COURT: Mr. Browne, it can be known to the probation office, but when your client is in this court for using his computer to facilitate the illegal sale of gun parts to countries that restrict them, to then just decide, "I don't care what they want, I'm going to use a new computer," causes me deep alarm. So let's try and stay on point.

I mean, Sweden calls. They talk to your client. I'm not sure that Sweden knows anything about who RK even is when they contact and they say, "We have someone shipping gun parts into Sweden." And your client finds out that he's now under investigation, and he runs down and says, "Let me cooperate."

Now you're here telling me, well, because the government installed a restriction on his computer, that justifies your

client directly violating the terms of his supervised release.

And I have no idea what happened in that -- I gather it's a week, a week and a half, but I do know that that is directly contrary to the supervised release terms that were entered in this case.

So how do I address that?

MR. BROWNE: As a matter of fact, Your Honor was anticipating my next remark, which was, there's no question that he violated the terms on that issue. That was what I was going to say. There's no question about that.

But the problems he was having -- and I've heard this from other clients when they attach this software, that it, basically, makes your computers unusable.

I did not know this was an issue, otherwise -- Ms. Scanlan did, apparently, but I did not bring that to the attention of the court or probation. So that's kind of my explanation for that.

I certainly understand your concern. As a matter of fact, I was going to agree that he violated the terms. And I think you need to take that in context. And he immediately -- the minute he heard that there was a problem with his new probation officer, he went down to the probation office with myself and spoke to them about it. I think it was later on that afternoon when Probation filed the violation report.

As far as the location of the entirely legal weapons that my client possessed after turning in the ones that he did are in possession of a gentleman who is in court today and would be happy to talk to the ATF about it or whatever. They're not being hidden. There's no stash.

The government has not only betrayed my client, they've exaggerated everything in this case.

THE COURT: That kind of language doesn't help you. "Betrayed your client"?

MR. BROWNE: Well --

THE COURT: Let's stay within the record, counsel.

MR. BROWNE: Fine, Your Honor, but I think I'm allowed to make my presentation, based on my own concerns, and I believe the record is clear to support what I just said.

So I'll go to the facts of Mr. Veletanlic.

He is not a person who snuck across the border to better his life or kill somebody. Mr. Veletanlic is a refugee from the Yugoslavian war.

You read our brief, I assume, I know you did, about his young life, when he was nine, ten, and eleven years old abandoned, by himself, more or less, in Croatia, where there were mass executions on a daily basis, and he would see people being taken to mass graves and executed. He would find ammunition and explosives that weren't detonated, and

learned how to deal with them to the extent so he could get food where other people weren't going.

During that process, he got severe lead poisoning, which is undisputed, which shortens one's life considerably. It's treatable to a certain extent, but not entirely. He was getting intravenous treatment for that. And he, actually -- Dr. Reichler -- he saw Dr. Reichler, after the original hearing in this matter, on a weekly basis for over a year and a half. Dr. Reichler --

THE COURT: By "the original hearing," do you mean the arraignment?

MR. BROWNE: Yes. I meant the initial appearance.

THE COURT: You said "initial hearing," and I don't know what that means. Original hearings in front of me occur at the suppression hearing.

MR. BROWNE: No, no. When he was detained to begin with, and then there was a hearing before the magistrate --

THE COURT: Okay.

MR. BROWNE: -- it was after that.

Well, my client had seen Dr. Reichler before. But after he went to the detention hearing in front of the magistrate, he continued to see Dr. Reichler and did see Dr. Reichler on a weekly basis for over a year and a half.

Dr. Reichler, I don't know if you know, was the previous head of the University of Washington young people's

psychiatric unit.

THE COURT: Well, Mr. Browne, let me ask you the question that you're ultimately going to have to deal with.

MR. BROWNE: Sure.

THE COURT: In your brief, I understand that Mr. Veletanlic's childhood is -- I think even the government describes it as feral. That's, if anything, perhaps not strong enough.

But you say he suffers from post-traumatic stress disorder, major depressive disorder, attention deficit hyperactivity disorder, intermittent explosive disorder, and severe situational anxiety. I would have expected the government to be telling me that as part of their support for the notion that this is not someone who is not a danger to the community.

I've read the materials that are in those emails, and I now know they're from 2018, but it says, "I will never stare down the barrel of any gun or sit in a courtroom of someone who plays God," and then talks about how he's going to burn everything up.

Those cause me great alarm because they really seem to impact the community. I don't know what "burn it all down" means, but I'm going to take it as the assumption he's going to burn down his house and his gun collection because he didn't want to have the government benefit from it.

None of that, with your listing of those disorders, you know, gives me any sense of security that this isn't someone who I need to protect the community from.

MR. BROWNE: I don't want to interrupt you.

THE COURT: I'm done.

MR. BROWNE: Your Honor didn't read the next part of that sentence, after what you read, which is the letter related to this prosecution.

Mr. Veletanlic was under a great deal of stress and anxiety because of his being the focus of the investigation, and then became more stressed and anxious after the government, basically, turned on him. So there is no question that that's what we call "situational," those two things.

And as you know, he's made every court appearance. He hasn't done anything to demonstrate it. You see the members of the community that are here today in support of him.

And also the text messages that you read, I hope you read the ones that followed the ones that you just read.

THE COURT: I've read the whole group, counsel.

MR. BROWNE: The ones that follow the ones you just read were from my client saying, "I'm sorry. I had an outburst. I really apologize. I'm just feeling like I have no idea what's going to happen to me, what's going on." That's what follows those.

So those were taken out of the context by the government. If you read them all, it says, yeah, I was having a bad day. For goodness sakes. He knows the agents are going to make copies of everything he sends them.

THE COURT: Not the ones on the computer that I'm not seeing.

MR. BROWNE: I'm sorry, Your Honor?

THE COURT: Not the emails on the computer that I've never seen, because he just stopped using the one that was monitored.

MR. BROWNE: Well, no. I think you were referencing emails that were even before he was charged.

THE COURT: Counsel, what you've just said is "you've seen all the emails." The point I'm making is, when your client discontinues use of the monitored computer and goes to an unmonitored computer, I don't know what those say.

I do know that if I were to choose between being presumed innocent and I had a prominent criminal defense lawyer who's going to do a brilliant job, and having been convicted of violation of the Arms Export Contral Act, possession of a silencer, possession of a silencer, and possession of a firearm with an obliterated serial number, I would feel some stress from the fact that the government, in its briefing, says we're going to try to send you to jail for what's in excess of ten years.

MR. BROWNE: I'm not sure if there is a question.

THE COURT: My question is, when you say, "Oh, don't worry about any of that, it was pretrial," I want you to address why I should not be concerned about it now. If your client has this long list of intermittent disorders and this is the situation that he's in, there's nothing in your briefing, other than, you know, this terrible childhood that I find appalling that we would ever put anyone in that situation. But it offers no evidence or suggestion that you don't need to worry about this now for the welfare of the community, the safety of the community, or the potential to flee.

MR. BROWNE: Okay. Your Honor, I'm sorry that Dr. Reichler is not here, because he could address that.

THE COURT: He's here. He's sitting out there.

MR. BROWNE: Oh, there he is. Thank you.

My understanding, and perhaps it would be appropriate to hear from Dr. Reichler, is that if my client continues his treatment and takes his medications, the doctor does not think he is a danger to the community. I think he's demonstrated that he hasn't been -- he's tried to cooperate with the government.

I should also point out, Your Honor, because I'm not sure you're aware, he didn't have a passport of any kind.

THE COURT: I'm aware of that. It's in your

briefing. But having a passport and fleeing are two different issues. I'm not suggesting he's going to go back to -- I believe it's now Croatia. Yugoslavia doesn't exist anymore.

But the fact that you can disappear into a community where he might be very well accepted, given the exercise of his Second Amendment constitutional rights, is something that I think have to take some awareness of; not a lot, but some.

MR. BROWNE: Thank you. Would you like to hear from the doctor?

THE COURT: Yes.

MR. BROWNE: Doctor, if you could identify yourself for the record, and spell your last name.

DR. REICHLER: Good morning, Your Honor. My name is Dr. Robert J. Reichler, R-e-i-c-h-l-e-r.

THE COURT: Welcome. Do you have something to say, sir?

MR. BROWNE: I think the judge is most concerned about my client's and your patient's future dangerousness in the community. If you could speak to that.

DR. REICHLER: Yes.

THE COURT: Let me be more precise.

Dr. Reichler, after a conviction, the burden is on the defendant -- it switches from when he was just accused -- by clear and convincing evidence that shows he is neither a

flight risk nor a danger to the safety of any other person or the community. There's sort of three prongs to that.

DR. REICHLER: Well, there's some confusion in psychiatrist diagnoses that are more descriptive than they are from the mental, scientific basis. And I think all his problems related to the post-traumatic stress from his early childhood experiences, and all the other symptoms are very commonly associated with post-traumatic stress.

I've seen him over a long period of time. I've never been concerned about violence. He's certainly talked about anger, but I never thought he was going to act out in any way.

And as I became aware of his involvement with the court and the issues with the government, again, it was more depression and anxiety associated with that than anything else.

He did respond to medications. He was reliable and appropriate in treatment. And so I never had any concerns. If I had serious concerns about violence, I, actually, have a duty to report as well, so that was never an issue with me.

THE COURT: So you would not be concerned over the fact that he attended every meeting -- at least I believe this was the testimony -- that he attended every meeting with two federal agents with a loaded pistol tucked under his belt in a concealed fashion?

DR. REICHLER: Well, I know, and I have my own issues

with guns. I don't allow them in my office. But I think it comes out of his sense of insecurity and fear, and that, for him, is a sense of his own security. I never heard from him any intent to use any weapons or that sort.

THE COURT: Well, an intent -- you have to understand the position I'm in. If I've got someone wandering around Downtown Seattle with a concealed, loaded weapon, and I'm relying on the fact that they're not going to decide to use it, why do you bring that kind of a weapon to a meeting with two federal agents? And why do you have a trunkload of guns and boxes of ammunition? I'm not going to give that any credit because maybe he was coming from the firing range. But it evidences to me a concern that I have about what -- I'm not sure I even know what this is, other than I've read the desk book on it -- an intermittent explosive disorder, situational anxiety.

If you've got situational anxiety, and you bring a gun to a meeting with two federal agents who you think are betraying you, that creates a dangerous situation, for me.

DR. REICHLER: I'm sorry. I can't speak to that specific situation. It's just in my experience with him, I never saw any inclination towards that kind of violence.

And the anxiety, we're melding two diagnoses. The Intermittent Explosive Disorder really is a description of anger, and really comes, again, out of a PTSD --

THE COURT: I thought only the law gave funny names to everything.

DR. REICHLER: Yeah. But it was anxiety. What really drove things and what was most prominent during the time I saw him was the anxiety. And "situational" describes the fact that it was in response to a particular situation he was in with the court.

THE COURT: Well, that's gone from a potential to a fact, and I'm now asked to evaluate someone who is facing, at least in the minds of the government, a very, very long prison term, and who writes in his emails about "no one is ever going to make me do this. You know, this is like the country that I fled." How am I supposed to reconcile those with your position that he's not a danger to anyone in the community, he's not a danger to himself, or he's not a flight risk?

DR. REICHLER: Yeah. Well, I'm sorry. I cannot -- my crystal ball is no better than anybody else's, and I can only speak from my experience of seeing him over a period of time and the way he presented himself and his concerns.

I've never saw him as an acute, serious risk to anybody else. That's the most I can say about that. I never heard of threats of violence against anybody.

I think he was very, very scared. He also seemed to resign to the fact that there was going to be some cost to

him in terms of maybe some time incarcerated and so forth, but he was very, very worried about where his life was going. He had struggled so hard to bring himself to some kind of stable situation, working and coming to some comfort in his life that now is acutely disrupted.

THE COURT: What, if anything, can you say about the repeated instances of lack of credibility that I found during the course of this litigation?

I mean using false addresses, going to different post offices, sending things to people that don't exist by name, attempting to mislead people as to where they came from and who they were going to? And all of which are against the backdrop of, apparently, knowing that at least firearms couldn't go to Sweden, but operating on some self-created myth that, well, a barrel to a firearm and a stock to a firearm, sending two packages that aren't a firearm? Do you have any insight into that credibility issue?

DR. REICHLER: I'm not sure I should address all those specifics. What I can say is, I think a lot of his behavior, much of that behavior, it mirrors the kind of behavior he had coping when he was, essentially, on his own in Yugoslavia during the war. I mean, these are his coping mechanisms for dealing with overwhelming anxiety and trying to survive in what he perceives are very threatening situations.

THE COURT: Well, he was under your care during this time, right?

DR. REICHLER: Right.

THE COURT: So what I hear you saying is, "I can't vouch for his credibility, and I can't tell you if that mind-set has at all changed," unless whatever medication you have him on makes him a more credible person.

MR. BROWNE: Your Honor, just to correct --

THE COURT: Let's have the doctor answer.

MR. BROWNE: Well, you have a fact wrong --

DR. REICHLER: Yeah, I'm not sure -- I'm hearing something about the time situation you're referring to, and I'm not sure I'm aware of the time frame to address it.

THE COURT: Well, it was 2017, so when did you first see him?

DR. REICHLER: I'm sorry. I should have checked my record. I'm not sure. I'd have to go back and look at my record, but I think it was after that.

THE COURT: Thank you, Doctor.

Mr. Browne, now you can talk.

MR. BROWNE: Thank you, Your Honor.

I was just going to say that my understanding is, at the time of what you referenced right there, the mailing of the packages that went to Sweden, my client was not with Dr. Reichler, but he had been before that. And then he was

immediately after the detention hearing, once a week, for over a year and a half.

And so to talk about the fact that we were the ones that put it in our brief about his mental health issues, because I think the court needs to know everything, and particularly at this stage.

So the other part of that is, my client is not only not getting the treatment for his lead poisoning, which will, clearly, shorten his life considerably, but he's not getting his the medications for the diagnosis that the doctor has made.

I think we've all learned, including doctors and lawyers agree on one thing, probably, and that's all, in that we can't predict future dangerousness, but we can look the past. And the things you pointed out are clearly true, as far as sending things and using false addresses and everything like that.

But the task also was, was our client compliant with probation; the fact that the magistrate, actually, lessened his restrictions in January; and then I know your concern, as are we and as is my client, with the unilateral getting of a new computer. But that could all be taken care of.

I suggested release with electronic monitoring, which he had to begin with, and then was released from that by the magistrate, and other conditions that you would impose,

including computer conditions.

So unless you have any questions, that's my presentation.

THE COURT: Well, I'm going to ask your opinion or your advice on the last question, which is, in the course of the suppression hearing, it came out that your client lied repeatedly to these two agents that he's trying to cooperate with. "I destroyed the silencers," "I don't have the silencers," "I buried one of the silencers in the backyard. I really didn't destroy it."

That's a credibility issue that's of concern to me. When you're dealing -- and he's not under oath, but when you're dealing with two federal agents, and you're sworn to try and help them, because that's going to help your client, and then gives them this series of false information, that's very much affecting my decision on this particular motion.

MR. BROWNE: Are you finished?

THE COURT: Yes.

MR. BROWNE: Okay. I just don't want to interrupt you.

Your Honor, first of all, the second silencer that you talk about being buried in the backyard, I believe, was buried in the backyard. There was never any testimony that it wasn't. He did turn it in. He called them --

THE COURT: He said he destroyed it, and he handed the agents a bag of parts.

MR. BROWNE: That was for the second one. The third one, he called in August -- he called and said, "I suppose you would like another silencer, if I have one in my possession?" He called them and said that. You've seen that in the text messages, and that's what led to the provision of the third one. The second one was the bag of parts.

So I don't know that you can single that out for lack of candor. Certainly putting down false addresses and false names on mailing labels, that would not be honest.

And the government seems to -- and they've been playing this for a while, and that is, because he tells the agents when he's first cooperating with them -- and there's a cooperation agreement in this case, which I think needs to be on the record and in the record -- but once he starts cooperating with them, they, at some point, say, "How many guns do you have now," or "weapons," I think, and he says, "Eight," and then they say when they went to his house on June 25th, they found a bunch in his safe, which he opened voluntarily and said, "Look in it." And not one -- even though the agent, who is supposed to be an expert, took some of the weapons and said she was concerned about whether they were legal or not, it turned out that everything in that safe was legal. So --

THE COURT: Well, the silencer that was in the safe was legal?

MR. BROWNE: Only if it was registered. So that was not.

THE COURT: Counsel, your command of the record in this case betrays you on occasion, either that or you're intentionally omitting facts. So why don't you go ahead and wrap up?

MR. BROWNE: What you said was true. If you also remember, my client says to them, "There's a silencer in the safe." I mean, If you want to talk about mens rea, he opens the safe, and he lets them look through it. Okay? And he says, during that process, "See that bag on the top shelf behind the box? That's a silencer." So that's the facts, and that's what was said.

THE COURT: Okay. Thank you, counsel. Is there anything further you'd like to say?

MR. BROWNE: No.

THE COURT: Does your client wish to address the court?

MR. BROWNE: Do you want to address the court?

THE COURT: It's up to you. I draw no implications from it, one way or the other. We do this all the time. You don't. You can just slide the microphone over.

THE DEFENDANT: If you don't mind, I hear -- I hear some --

THE COURT: Sure. This is your chance.

THE DEFENDANT: Maybe I can speak freely?

THE COURT: Yes, speak directly from right there.

THE DEFENDANT: When I hear John and everybody else talk about the case, it's hard for them -- for everybody to grasp a few years of what's been mental torture for me.

And, yes, during the course of dealing with Glenn and Claudia, it didn't work out between us. And I lost trust in the agents, and they lost trust in me. So there has been -- so during our interactions, we would have this on-the-surface -- just this -- we all knew that no one really trusted each other.

So, yes, I did own those two suppressors. I did give them those two suppressors.

And as far as shipping --

THE COURT: Mr. Veletanlic, you might want to talk to Mr. Browne for a moment. When you say on the record, "I gave them those suppressors," that could be taken as an admission that, I think, is contrary to the position your counsel has taken in some of his briefing.

THE DEFENDANT: Okay.

THE COURT: So you want to be careful about doing that sort of thing.

THE DEFENDANT: Okay. Thank you.

And the thing is, I've never -- I've never had a history of -- a pattern of this kind of behavior. So it's --

And the computer issues only became a problem on February 14th. That's when we were getting ready for the trial. And I communicated with the lawyers as the computer was becoming more ill, which was over the months. And as I was supposed to help Craig with facts of -- briefs for that trial, that's when the computer was completely unusable. So I informed them, "I'm offline, and I've gotten back online."

THE COURT: When you say "him," you know who it is, but I assume it's Craig?

THE DEFENDANT: Sorry. Craig and Emma. Craig and Emma, I would always cc them, so they've known -- they were informed that the computer has died. The phone was giving me the same issues as well. So as I changed one, I changed both.

So I haven't done anything, nor have I had time to do anything illegal, because the only reason -- the only motivation for me to change a computer in the 11 days prior to the trial was so I can sustain my work. My business is an online business. I have four eBay stores. And so I can -- so I prepare for trial, because we had to meet all sorts of deadlines that the lawyers were throwing at me, so I had to be on top.

And I have no place to go. I have no place to flee. The reason why I'm doing all this is so I can work, so I can care for my animals. I don't have kids, but I have my animals.

They are my kids. And if I can work, then I can make the money so I can pay for my legal -- because this has become an absolute forefront of everything I do now. I have no -- essentially, no life. But I have to beat this, because if I don't, then everything that I've built for myself -- because I've lived in this country most of my life, that's -- as the government has said, I'm going to get deported, and that's -- where am I going to -- that's a whole other thing. So everything I have to do --

THE COURT: Don't give up hope on the deportation question. I mean, the current administration has one view. You're going to get some jail time out of this. I don't know who is going to be President at that point. And, you know, there are new attorney generals, there are a lot of things that can change over time. So I don't want you to go away thinking it's hopeless. It's never hopeless.

THE DEFENDANT: I appreciate that. Thank you.

And I just want to say, though, all I want to do is work so I can continue the fight, the legal fight, because intent to continue keep fighting this case. That's all I have to do.

And I want to say again, there hasn't been a pattern of this. I'm not a career individual who -- I rub shoulders now in the penitentiary with -- I'm sorry it sounds --

THE COURT: No, it's true.

THE DEFENDANT: So this is the one and only thing, and there hasn't been any prior.

And had I known, I really -- I really hadn't -- I really didn't think this could have been something so -- so -- so big for me to deal with now.

So I appreciate Dr. Reichler coming in here. And I think this was -- the opportunity you're giving me to speak directly to you, instead of having to channel it through lawyers, it's -- there's a human side here, and all I want to do is, like I said, work so I can fight the legal fight and care for my animals. That's all.

Oh, can I just --

THE COURT: Sure.

THE DEFENDANT: And as far as the gun that I had, I did not have the gun all the time on me. I want to -- and I did not carry my gun until -- I've never carried my gun, and that's something that everyone can testify to. It's something that's become -- when I became under enormous amount of stress, when I realized that I was pretty much abandoned by the federal government, by the agents after telling them about an individual who is insane enough and wealthy enough to contract a murder. So now I find myself being someone who knows somebody's dirtiest secret and who is capable, with enough money, and yet I'm a nobody. And I've even used these words to the agents, and they've just brushed

it off.

So that's where you could see how the anxiety starts to build up. Because it's not something that I can just go to the local police. It's not something that I can talk about. Who is going to help me now? So that's what it is.

I'm not someone who would go out and carry a gun. You used the example as Downtown Seattle. Because I wouldn't want to use a gun in a way that I -- it's -- I couldn't do something to somebody.

It's the same way how I can't see an animal -- any animal that comes my way, well, it's not that animal's fault that it was born. And I can't save them all, but I can save the ones that come to me. So that's my approach.

And the thing is, I -- I -- as far as the gun that I've had, it wasn't -- it was a tiny, little six-shooter. I felt it was -- God forbid, worst-case scenario, and Dr. Reichler was right on point. It's that self- -- it's a little false sense of security. In reality, it is, because, you know, anyone that I would have to go up against -- God forbid -- would be armed with more than that. So, in reality, it was just a -- what would you call it?

MR. BROWNE: A security blanket.

THE DEFENDANT: Just something for peace of mind that -- and it wasn't even chambered. That's -- that's how it was.

And if there's anything else you would like to ask me, I mean, please do.

I know you've addressed these concerns, and you asked my attorney, you asked the government, well, how would I feel? And all I'm saying is -- is nobody can quite channel it to you. And you're still sitting there having the same concerns, "Well, how do I know this guy isn't going to snap?" Quite frankly, if I were you, I would ask myself the same thing, because hearing what the government has to say and hearing what my lawyer has to say, it's still -- if I was a juror, I would think, "Well, there's still a chance that that guy might do something."

So that's -- that's why I want to take this opportunity now so I can talk to you, so you can see a human side, like I said. So that way, if you do --

I promised Judge Tsuchida that there would be no disappointments, and because he has put trust in me, and from what I've seen, the kind of people that come into his courtroom, a lot of people betray his trust. So I had to be exemplary throughout the whole ten months that I was on pretrial. I had to do it because I couldn't betray his trust.

So if you give me a chance, if you give me a chance --

THE COURT: I just have to make notes. When you get to my age, you do that.

THE DEFENDANT: Yeah. Sorry.

And that's all I have to ask. If I'm on the outside, I'll be able to mount a better legal fight, and I'll be able to fight for my animals.

Judge Tsuchida had to put a big burden on me because he really had to see whether or not is this guy crazy. So I expect, if you do give me a chance, you can most certainly give me a big burden and test me and see whether I am the crazy guy or not.

And I do appreciate -- just this talk here, I really appreciate what you've done, that you've let me address you here.

THE COURT: Well, it's not only the right thing to do, it's your right to do it. I mean, it would drive me crazy if I were in your position, and I was always referred to in the third person, "the defendant this," "he did that."

You know, your humanity to me is absolute, and, if anything, it was bolstered by the fact that you refer to your cat as Miss Kitty. I'm the first one to acknowledge all of those things.

It's not going to be easy to take advice from someone who is going to, ultimately, send you to jail. But one bit of advice that I gave to a lot of my clients when I was in private practice was, sit down and write those emails, turn your computer off and then turn it on the next morning, and

see if you really want to send this. Because you've left a really damning record of stuff that, probably in hindsight, you're sorry you said.

I don't know if there's any way to control that. I mean, I, periodically, do the same thing. I just get unhappy at something, or I know it's a misstatement of what my intentions were, but I always try and follow that advice of at least stand up and go have a cup of coffee, do something, and then come back and see if it's the right thing. Like I say, taking advice from someone who is sitting four feet above you and is telling you how to live your life is not easy, but it's something that you might want to consider.

And also remember that the emails that you send out from the Federal Detention Center are also all monitored, as are your phone calls.

So a lot of what you've said today is probably better directed to your sentencing memorandum, because in that part of this, the first one is the nature and circumstances of the offense, but the second one is the history and characteristics of the defendant, and that's really where I think you want to put your effort.

Can I help you in terms of leaving you out to earn more money to pay these people? That's difficult, because I have a legal standard to comply with.

You say you didn't want to disappoint Judge Tsuchida.

When you turned off your old computer and you started using an unmonitored computer, given the nature of the crimes that you were accused of, which was, you know, Count 1 was sending these guns off to Sweden, I know that involves your business, but it also was what you were using your computer for. And if your lawyers -- you know, what they needed to do was to immediately come back and say, "Hey, we've got this computer problem. We can't allow our client to use a new computer. We need to get it adjusted and get the new one signed up," whatever they technologically are going to do.

So don't throw yourself under the bus, but recognize, from the court's point of view, your lawyers are an extension of you. They're there to help you, and if you've got those kinds of problems -- you were right. The first thing you needed to do is say to them, "Hey, I've got this problem"; otherwise, you're going to be between a rock and a hard place, which is where I am right now, with a standard that's very high, and, frankly, a lot of facts that go in the other direction.

So you 're going to get another chance to talk to me, which is at sentencing. A lot of people write out letters, and then they come in here and they read their letter. For some people, that's all they can do because they're not good at public speaking or they're not self-confident, and they're convinced this whole system is rigged against them.

I would much rather have someone say, "Judge, can we talk?" and have this, and have this dialogue in front of people who care about you so that they know that you had a fair chance and you got to express what you think. Know you're going to get a sentencing date, I don't know when, but probably about three months out, but think about it between now and then.

And secondly, I read everything that comes before me. I read a lot of letters from people who are supportive of the defendant, and they make a difference to me. The two things that I think are really important about what happens after someone comes out of jail are, one, do they have some employment skill, and secondly, do they have some family support, friends and family support. Because I don't see those people again. The people I see are the folks who come out and just go back to doing exactly the same thing. And I've read some of your opinions about what you think of them, and it's not my job to comment on that. But it is an interesting group that's down there, and, you know, you need to be different from them. A lot of them don't read and write very well.

For not being an original English speaker, you have complete command of the language. I've read a lot of the stuff that you've written, and you're a smart guy. You have a tendency to not want to pay attention to the rules, and

that's, unfortunately, what got you in here in the first place.

Anything else you'd like to say, sir?

THE DEFENDANT: Just one last thing that I feel is very important that I want to cover.

It's not having access to dealing with my medication and with Dr. Reichler. That is one thing that is incredibly difficult, just -- just now, just for the past eight days, and just being in that kind of an environment.

If I could have the chance to go back to Dr. Reichler, that would be -- that would be incredible. You know, as they say, a lifesaver. So that is, again, one of the most important things, because I haven't had any access to my medications or the treatment that I've been getting, which has been for the first time in my life that I've found someone who truly cares, a doctor that would come here.

THE COURT: Two responses to that: He can visit you. It's tougher for you to visit him because you're in jail, and I don't know what his policies or availability is.

THE DEFENDANT: The medications, too. They're not allowing us to have medications in the --

THE COURT: Well, so in terms of personal visits, that's one thing.

In terms of medication, before the marshals escort you out of here, I'm going to say grab Mr. Browne, but not

physically; get his attention to that fact. Dr. Reichler is welcome to come up to the barrier there. Figure out what medications you want to take. The Federal Detention Center is part of the Bureau of Prisons. The Bureau of Prisons has this pharmacy list that says, you know, we'll give you aspirin. But they also have got a lot of things that are the generic version of drugs that you may well be taking. And your lawyers can just say, "Hey, look, we've got a problem here, and we need to deal with it."

I've never found probation to be uncooperative on that. They're not part of the Bureau of Prisons. But there is an assistant warden out there. There's a bunch of things. You need to make some noise about that, and get your lawyers involved.

Before I read your materials that came in yesterday, this is all new information to me, and, you know, that's -- ultimately, I don't have any control over the Bureau of Prisons, but they're forced to be nice to me.

So you were going to say something, sir?

THE DEFENDANT: Well, I mean, I would be just repeating.

It's just that -- it's a whole bundle of what I'm -- so that -- while waiting for the sentencing, I'm not -- if I could have access to my doctor, which I would try to do tomorrow, literally tomorrow, and the -- going back to the

medication, it's just that what I've been experiencing now without any medication, you know, with the constant, enormous ringing in my ears that's caused by the lead, and, you know, spending all the time in the jail, which is incredible; not being able to sleep at night because of the anxiety, like I didn't sleep last night, for example. So it's just -- if I could just ask you to consider that. I'm not going anywhere. Between now and sentencing, I'm not going anywhere. And if I can prepare myself for that sentencing with the better health care --

THE COURT: I'll call it mental clarity.

THE DEFENDANT: Yes, mental clarity. That would help me enormously.

But I understand that what seems on paper, yes, it seems that help is provided, but in reality, it's not. I've experienced it now. It's not the kind of help that really -- that really helps. It's not as -- like I said, it's help on paper, but it is not what really works for everyone, and most certainly didn't work for me.

So I guess this is all I can -- all I can ask for.

THE COURT: Well, what I'm going to ask you to do is, at the end of this, before the marshals escort you out of here, I'm going to ask probation to come over there, sit down, Dr. Reichler can write out the drugs, if you don't know them yourself, what it is he would prescribe. Probation is

the one who can help you with that, at least as the first step. I mean, they have more people at the Bureau of Prisons than I do. All they want from me is to put you in a car and send you back out there. So let's start with that as a place to begin. I hear what you're saying, and we're going to try and help. My hands are somewhat tied in regards to it, but let's, at least, start that process.

If you're saying, for example, the person who is running your wing, you know, "Hey, I need the following drugs," they're just going to laugh because, you know, that's so far out of their pay grade, but we need to get you started inside that system.

Mr. Diggs, you get the last word. Since there's been some new argument, if you would like to say anything.

MR. DIGGS: Before I do, would Your Honor like to hear from the probation officer?

THE COURT: I think, at this point, we have gotten past it.

THE PROBATION OFFICER: Yes, Your Honor, I can tell by your comments that you had the same concerns regarding the violation as we did. And I'd be happy to be in contact with the psychiatrist at the FDC and facilitate that, get the medication.

THE COURT: All right.

MR. DIGGS: Your Honor, from your comments, it's

evident that the court shares the government's concerns regarding at least three things: The increased stress the defendant is under; the defendant's lack of credibility throughout these proceedings. I mean, I understand that there are times where he did tell the truth, where he did try to cooperate with the agents. But there's an overlay, both -- all the way from the first time he met with the agents, through his testimony at the suppression hearing, that goes against that. And I think the court is right to consider that.

And then, finally, the unpredictability of the situation. Even Dr. Reichler, who I appreciate being here, recognized that the defendant often talked about anger and that some of the credibility may have been a mirroring behavior that allowed him to cope with his situation.

He's now in another stressful situation, and so mirroring behavior to allow him to cope is, by nature, unpredictable, and it is concerning.

So based on those three concerns that really came out during this hearing, we stand by our position, seeking detention pending the sentencing hearing.

THE COURT: Thank you, counsel.

After conviction, the burden of proof switches in our system, and is then directly placed as a presumption that the defendant should be retained.

The standard that I'm asked to judge that against is clear and convincing, one of the higher standards in terms of proof, and the test is that, is Mr. Veletanlic either a flight risk, a danger to the safety of other persons, or the community?

Repeating myself, to some extent, after a trial that I presided over, Mr. Veletanlic was convicted of an Arms Export Control Act violation for possession of a silencer, violation for the possession of a second silencer, possession of a firearm with an obliterated serial number.

As counsel and the court are well aware, and Mr. Veletanlic, I've had an extended exposure to this case, in many ways much more than I normally would. I heard a suppression motion. I prepared for and presided over a multi-day trial. I formed opinions about Mr. Veletanlic's credibility, based on evidence that I heard. I was informed about what happened with the new computer, and now I have the advantage of briefing from both sides on the motion to detain.

What I'd like to say first is to everyone who's sitting on my left-hand side of the courtroom, thank you for being here. You can't imagine the number of hearings or sentencings that we come out here -- "we" being the court staff and my legal law clerks -- and the place is empty, and it just breaks my heart, because, as I was discussing with Mr. Veletanlic,

employment and support are the two things that prevent people from doing the same things over and over. So thank you for coming.

Secondly, Dr. Reichler, thank you for coming. It's, obviously, important to you, and it's important to me.

The last three things that I'm going to say are things that are of absolutely no interest or relevance to me.

Implicit in this case, from the beginning, has been views, on both sides, regarding gun ownership. Views on gun ownership are irrelevant to me. The Second Amendment is a constitutional right given to everyone, and so the fact that there was a trunkload of weapons, which is prominently displayed in the government's briefing, I simply will say I don't care.

What was and is of concern to me is the carrying of the loaded pistol. Mr. Browne and I, I think, have a difference of recollection. I recall that there is a statement somewhere, in the voluminous record in this matter, that Mr. Veletanlic carried it other than to the last meeting with the federal agents.

But it's a matter of fact in this case that, at the point that he's meeting two federal agents and turning over to them a silencer, which he has lied about, he chooses to come armed.

Mr. Veletanlic, that was a gene I didn't get, but I

understand that to some people it is important. I'll tell you what is troublesome to me, and it has nothing to do with you, is having a bunch of 15-, 16-year-old kids walking around with loaded weapons and feel disrespected and proceed to shoot at each other. I'm not suggesting you're going to do that, but I think, given some of the stresses that you're under, the fact that you were carrying a loaded pistol is of concern to me.

The last thing that is of no relevance to me is, basically, the information that the government produced from RK. I read it. I view it with the greatest of skepticism, and it, basically, has no impact on my decision today.

So what am I asked to do here?

The standard, as I mentioned, is clear and convincing evidence, on the part of the defendant, that he is neither a flight risk nor a danger to the safety of any other person or the community. I find that Mr. Veletanlic has not met that standard.

We've talked about the loaded firearm. The jury convicted him of having a gun with an obliterated serial number. The context or the background of that, from much earlier in the case, is a series of text messages to, interestingly, the government's BATF agent about the illegitimacy in law enforcement and the justice system. I guess the one that got my attention was "I will not allow anyone to force me to live

on my knees." That's a mind-set that people can hold, but they cannot act out on if it involves illegal activities.

We've talked about changing the computer. That's a clear violation of the supervised release violations. Unlike some supervised release conditions, this one was directly implicated in the charges brought against Mr. Veletanlic.

And I would note that there was, during the course of the trial, a fair amount of testimony about encrypted messaging, which is a concern that we now face in regards to electronic evidence.

Is Mr. Veletanlic a flight risk? I truly believe that he's probably not going back to Croatia. He came to this country and has made a life here. He is, however, in my mind, a potential flight risk in that, given his situation, given the potential of the sentence that he faces and the ease with which one can slip into the dark side of the Internet, which he's had some, probably, limited exposure to, I believe that Mr. Veletanlic has already shown a disregard for law enforcement and the bond conditions, and it seems to me that the more commonsense view is that it's unlikely he would change his ways for better now that he's facing a significant jail sentence and the not altogether hopeless view that he can avoid deportation.

I, therefore, find that, notwithstanding Dr. Reichler's view, that by the time we finished, it was clear that neither

of us can predict the future with sufficient accuracy to allow me to release Mr. Veletanlic back into the community pending sentencing.

Therefore, I am going to grant the government's motion to detain defendant pending sentencing, and I'm going to deny Mr. Veletanlic's motion for release pending sentencing.

Do we have a sentencing date that has already been set?

THE CLERK: Yes. May 20th at 11:00 a.m.

THE COURT: May 20th?

THE CLERK: Yes. That's a Monday.

THE COURT: Mr. Veletanlic, there is an extended process that goes on now.

Your lawyer's contributed information. Probation will ask to interview you. You don't have to talk to them. It is a wonderful way for you to tell them your side of the story, but it's up to you if you want to do that or not.

They submit a presentence report, which I read carefully. Your lawyers are going to submit a sentencing memorandum. Many times it has medical records attached it to. Many times it has letters of support from your family or your community. I pay attention to those. And the government is going to put in a sentencing memorandum.

So until I see you in May, I guess, I've enjoyed speaking with you today.

Counsel, thank you for your presentations.

We will be in recess.

(The proceedings concluded at 11:20 a.m.)

C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 10th day of May 2019.

/S/ Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter