UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | CASE NO. CR18-162-JLR |
| v. | SEATTLE, WASHINGTON January 31, 2019 |
| HANY VELETANLIC, Defendant. | EVIDENTIARY HEARING RULING BY THE COURT |

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES L. ROBART
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: MATTHEW D. DIGGS
MARIE M. DALTON
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101

For the Defendant: JOHN HENRY BROWNE
CRAIG DAVID SUFFIAN
Law Offices of John Henry Browne
801 Second Avenue, Suite 800
Seattle, WA 98104

Reported by: NANCY L. BAUER, CCR, RPR
Federal Court Reporter
700 Stewart Street, Suite 17205
Seattle, WA 98101
(206) 370-8506
nancy_bauer@wawd.uscourts.gov

January 31, 2019 2:10 p.m.

RULING BY THE COURT

THE COURT: The question in these proceedings is always, where do you start, and I am asked to look at the totality of the circumstances. The government, clearly, has the burden in this matter, and the question is, have they met that burden.

It is relatively common in these cases that involve citizens who are lawfully -- or individuals who are lawfully in the country to be very concerned about the impact of a criminal conviction on their status.

I do not have before me anything in the record which would address if Mr. Veletanlic was concerned about that, other than the passing references that have been made here in court.

But, clearly, there was a reason why Mr. Veletanlic, on May 31st, was as eager to cooperate, and, in effect, immediately suggested that he could provide information or, at least, insight into other individuals who may have been involved in some activity that was felt to be improper. And I feel quite comfortable in saying that, having seen all of the material that's been submitted on the period between May 31st and, say, June 15th.

At that time, Mr. Veletanlic appears to have engaged in activity which could constitute crimes and would be, in most

instances, aware of the immigration consequences that go with that. Clearly, since they are included in his cooperation agreement, there's something that would be known to him.

So the question, then, becomes next, to me, one of credibility. I have available to me the following: I have testimony from the two agents; I have the testimony from Mr. Veletanlic; I have the documents that were provided primarily but not exclusively by the government; and I have the advantage of the pleadings that were submitted by both sides.

I have attached, as you have heard, some significance to Mr. Veletanlic's declaration, for the reason that he was not under pressure when he was preparing it, and it was, obviously, significant for the result that was going to come out of this hearing, and, therefore, I have credited it as a document which I can look at and take some contribution to the resolution of this case.

As to the testimony here in court, I've already, in effect, told you where this is going. There is just several instances where Mr. Veletanlic didn't tell the truth. I'm sure he regrets that today, but he just didn't tell the truth.

The number of firearms in the house; a statement, beginning around May 31st but continuing, at least, until June 15th, that he only sent packages to Sweden. I'm not

going to wade into the question of the number of packages because, frankly, I found that testimony to be not terribly helpful.

But on July 25th, the two agents go to Mr. Veletanlic's home, and, in short order, they find that he has not been truthful; that, in addition to Sweden, we have packages going to Germany, Russia, and Brazil, and then that there have been packages being returned, including one from Bruno, who is in France, sending him two suppressors.

Then, for reasons that are not really explained terribly well in his declaration, he says, "I informed the two agents that I had destroyed them," and offers an explanation that, "Well, they were out of control and I was afraid of them," and something that I just, frankly, am unable to factually credit.

The precise wording of the discussion regarding the safe, I think, was more accurately portrayed by Mr. Diggs. One agent said that they asked him to open the safe. The other agent said she didn't think that she asked him to open the safe but lacked a clear memory on that issue. We do know that Mr. Veletanlic opened the safe.

And the defense has presented this interesting argument that that was all due to his cooperation agreement, which the court is rejecting. If that were a reason to explain all of your activity from anyone who is a confidential source, then

my workload in the last 15 years would be substantially less.

I've tried to engage in some colloquy with counsel in regards to what a police officer would do when a confidential informant, who has recently been shown to have lied to them, in, at least, three material regards, reaches in and pulls out a gun, coupled with Mr. Veletanlic's very forthright statement, "Every gun should be treated as loaded at all times," and the fact that they asked him not to continue to pull guns out of the safe but instead to step a short distance away, and, basically, continued to participate in the process, seems to me to be prudent in terms of officer safety. He wasn't handcuffed. He was involved in this process. The agents' testimony was he didn't object to being asked to step aside.

The firearms were removed from the safe one at a time. They recorded the serial numbers, and then put them on the floor, apparently not to Mr. Veletanlic's satisfaction. And as you are unloading a shelf, which contains pistols, there is one package up there that contains a suppressor, which the agent testified she immediately recognized, offering one more fact which would be an indication that the statement that he had destroyed the suppressors was not accurate.

The other thing that I've looked at with some care is the exhibit put in by the government, which is found as Exhibit 4, which are the series of text messages that are

exchanged back and forth. The reason that I've looked at those with the care that I have is that I thought they would offer some clue into the state of mind of the parties around this time period of July 25.

And what is clear from looking at those is that, starting with the remnants of the meeting on that date, that there is a great deal of tension on the part of the defendant, and it manifested itself in the fact that he's now offering even more information in regards to what it is that he's done in the gun business, and it starts with, basically, everything that occurs on July 25, starting at 7:04 p.m.

It's at this point that there enters this notion of, "Well, you could arrest me at any time," which has been implied in the hearing today as going back to much before this. I can't find any record of it occurring before the blowup, or "disaster," as it was called, in these meetings that came on the 25th.

And it doesn't surprise me, then, to see the government say, "Let's move forward. I hope you understand what is expected of you, and that both Glenn and I displayed the kind of transparency and professionalism we expect from you."

Then we're back to this question of suppressors, and we're told that, "Well, you know, you have one, and I've cut the other one up. It's all okay now." That's just not accurate. So, apparently, at that point, the defendant has recovered

from having his will, allegedly, overcome, and he's back to the same behavior.

Then we get to this one, still, I think on the 25th, where, "I'd tell you all the bad stuff that I've done, but it's hard to say anything when you two may turn on a dime and arrest me. This is where all my half-assed billshitting" -- I'm going to assume that was supposed to be "bullshitting" -- "comes from. As you can see, I'm not very good at lying. Okay. Don't -- let's talk later. I'm upset." That's the end of the 25th.

And then on the 26th, in this interview, we have the disclosure of, "Well, there is another suppressor, but it's buried, and I need to go find it and bring it to you."

I've already indicated the government has the burden and that they need to show consent. Consent can be both verbal or by conduct.

The Ninth Circuit tells me that I am to look at five articulated factors in determining a defendant's consent as either being voluntary or involuntary.

First, whether the defendant was in custody. That's a little bit inapplicable here. Clearly, the defendant was not in custody. But when I've read the cases on this, it was more had they been removed from their home, were they in handcuffs, the true concept of having been arrested.

But if I were forced to look at number one, whether the

defendant was in custody, I would say, no, he wasn't, witness the fact that he remained at home.

Number two, whether the arresting officers had their guns drawn. And much emphasis is put on the word "drawn," not simply that they were armed. Seemingly everyone involved in this had an interest in guns or, at least, a familiarity with them.

Number three, whether Miranda warnings were given. As Mr. Browne has made a point of, there was an equivalent of a Miranda warning, but it happened in May. There was not a Miranda warning given on the 25th. However, it's my understanding, in regards to Miranda, that there needs to be some reason for giving them, and meeting with your confidential informant to discuss turning over some additional weapons would not, in my mind, constitute a situation where a Miranda warning was likely to be given. I'll say that one is closer than some of the other ones.

Number four is really the one that most of this battle has been over, and that is whether the defendant was told or notified that he had a right not to consent. I don't think that literally those words were spoken here. But looking at it in the framework of a totality of the factors, the defendant's conduct, which I find was voluntary, was to get up and go and open this safe, for whatever reason, and I can offer, at least, two or three of them.

And then, lastly, whether the defendant had been told a search warrant could be obtained. Once again, that's somewhat inapplicable to the situation. I thought that Mr. Suffian did a nice job of arguing that that would have been a better way to do this, and, truly, in almost all of these cases, yes, it would have been a better way to do this, but I don't believe, when I examine the five factors set forth, that it tips the balance in favor of the defendant.

So I find that the version of events put forth by the two agents is more credible and that some of the arguments made by the defense, frankly, are inapplicable to the factual situation that is before me, and that the documents that are produced in this case by both sides, including the grand jury testimony, seems to be more consistent with the government's version of what happened than the defense's version, which consists of Mr. Veletanlic's declaration. And I'm proud of him for testifying today, because, it seems to me, that's the right thing to do, particularly if one feels that this motion should be granted.

So in regards to Docket 52, the motion to suppress evidence obtained during illegal, warrantless search is denied. I find that the two silences are not to be suppressed, as well as any statements made subsequent to the agents' search of his safe.

Because of my decision, I don't think I need to reach if

there is an independent grounds for the second suppressor, but if I did so, I would find that it was not capable of being suppressed on the basis of being fruits of the poisonous tree, given the fact that it is the defendant who had initiated that discussion.

Is there anything further that the court can do for you today?

MR. DIGGS: Not from the government, Your Honor.

MR. BROWNE: No, Your Honor. Thank you very much.

MR. SUFFIAN: Thank you, Your Honor.

THE COURT: All right. Then we will be in recess. Thank you, counsel.

(The proceedings concluded at 2:30 p.m.)

C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 28th day of May 2019.

/S/ Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter