UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>HANY VELETANLIC,<br>Defendant. | CASE NO. CR18-162-JLR<br>SEATTLE, WASHINGTON<br>January 27, 2020<br>9:46 a.m.<br>SENTENCING |

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES L. ROBART
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: THOMAS WOODS
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101

For the Defendant: GILBERT H. LEVY
Law Office of Gilbert H. Levy
2125 Western Avenue, Suite 330
Seattle, WA 98121

Reported by: NANCY L. BAUER, CCR, RPR
Federal Court Reporter
700 Stewart Street, Suite 17205
Seattle, WA 98101
(206) 370-8506
nancy_bauer@wawd.uscourts.gov

PROCEEDINGS

THE CLERK: Case CR18-162, United States versus Hany Veletanlic.

Counsel, please make your appearances for the record.

MR. WOODS: Good morning, Your Honor. Tom Woods on behalf of the United States.

THE COURT: Mr. Woods.

MR. LEVY: Good morning, Your Honor. Gilbert Levy on behalf of Mr. Veletanlic, who is present and seated to my right, and also my paralegal, Sarah Johnson, who is seated on the other side of Mr. Veletanlic, and, with the court's permission, I would like her to sit at counsel table.

THE COURT: That's more than fine.

MR. LEVY: Thank you.

THE COURT: Counsel, I'd like to make some introductory remarks, and then ask you how you would like to proceed.

This case has occupied a substantial amount of the court's time since it was filed relatively early in 2018.

In preparation for today, I have read everything that you have submitted, and that includes a lot of transcripts of telephone calls and other communications.

It is my conclusion that the circumstances that occurred at the Federal Detention Center are a consideration for the

court, but I will tell you that, having spent a lot of time looking at telephone-call transcripts and assorted other items, I really consider it to be more of a sideshow than important for the sentence in this matter.

As Mr. Veletanlic knows, I find the underlying conduct in this matter to be very serious, and I am faced with a wide range in recommendations as to his sentence.

So just know that you're welcome to do what you want in terms of witnesses. I'm just not sure that they're going to contribute much to the court's ultimate conclusion.

Mr. Levy, with that, do you wish to present any testimony?

MR. LEVY: Your Honor, before I do -- I don't want to waste the court's time.

THE COURT: That would be a first.

MR. LEVY: I don't want to waste the court's time. Would the court find the testimony of Mr. Grasser, the former roommate of the individual known as CS1, to be helpful? That's the issue. I mean, if the court is going to find that Mr. Veletanlic was the instigator of a conspiracy to assassinate a person connected with this case, perhaps it would be helpful. I just don't want to waste the court's time.

THE COURT: Well, I'm certainly aware of it, because both of you have made an issue out of it, and the rather bizarre relationship, which has taken numerous forms in the

course of this trial, in regards to your client and the alleged victim, is something that I, obviously, know a lot about and impacts what I'm going to do here today. But in terms of was there a plot in this particular instance? No. I do put a lot of faith into what people said on the telephone, and that would be, principally, Mr. Veletanlic.

So it's up to you, sir. I have no problem with you calling someone, if you want to call them.

MR. LEVY: Your Honor, I anticipate that the testimony will be relatively brief, so with the court's indulgence, I would like to call Mr. Grasser.

THE COURT: That's fine.

BRADLEY GRASSER, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

THE CLERK: Please state your name for the record, and spell it for the court reporter.

THE WITNESS: Bradley Payton Grasser; B-r-a-d-l-e-y, P-a-y-t-o-n, G-r-a-s-s-e-r.

THE COURT: You may inquire.

DIRECT EXAMINATION

BY MR. LEVY:

Q Good morning.
A Good morning.
Q Mr. Grasser, where do you reside at present, sir?
A In SeaTac.

Q You're a prisoner at the Federal Detention Center at SeaTac?
A Yes, sir.
Q And you have been sentenced by the District Court in Alaska?
A Yes.
Q And that was on a drug case?
A Yes.
Q And you're awaiting transfer, hopefully soon, to another institution?
A Yes.
Q Mr. Grasser, we're going to try and avoid last names here, for various reasons, but were you previously the cellmate of an individual who we'll refer to as "Shawn"?
A Yes.
Q Do you know who I'm talking about?
A Yes.
Q And for how long were you the cellmate of that individual?
A Three, four months.
Q And I take it you are not his cellmate any longer?
A No.
Q Do you know my client, Hany Veletanlic?
A I know of him.
Q Okay.
A Yeah.

Q At some point, did Shawn, your former cellmate, approach you in regard to doing something with Mr. Veletanlic?
A Yes.
Q Okay. Tell us what he said.
A He wanted to know if I wanted to be involved in setting this individual up to get time knocked off my time.
Q As best as you can recall, what did he say specifically?
A He said he was involved with another inmate named Fisher, and they were trying to set this guy up on a gun case, and something about a murder case, and they wanted to know if I wanted to get involved in it to get some time knocked off my time.
Q And did you agree to get involved in it?
A No, I didn't.
Q Did Shawn approach you about this on more than one occasion?
A Yes.
Q About how many times?
A Well, he talked to me off and on, you know, several times.
Q Did Shawn tell you what he wanted you to do?
A Yeah. He wanted me to go and -- him and this other guy, Fisher, was going over to Hany's cell, and they were doing whatever they were doing over there, and he wanted me to, you know, verify everything that they were trying to do to this guy, this guy, Hany, and I never did go over there, no.

Q So he wanted you to go to Hany's cell and listen to what they were saying?
A Yes.
Q Did you ever see them go over to Hany's cell?
A Yes.
Q How often did they do that?
A They were over there, like, every day, it seemed like. I mean, Hany's room was right straight across from where I was, and it seemed like Shawn and Fisher was in there every day.
Q Did Shawn tell you anything about his receiving money?
A Yes.
Q What did he tell you?
A He said he was getting -- a federal agent by the name of Benny was putting money on his books.
Q Did he tell you anything about a transfer of money to a group known as Irish Pride?
A Yes.
Q What did he say?
A He said that he got Mr. Hany to send money out, and a guy on the street -- an Irish Pride guy named Benny was supposed to pick it up.
Q Mr. Grasser, have you received any benefits in connection with giving this testimony here today?
A No, none.
Q Are you a friend of Mr. Veletanlic?

A No.
Q Has anyone put any money on your books?
A No.
Q Has anyone offered to do anything for you?
A No.
MR. LEVY: Thank you. No further questions.
THE COURT: Counsel?
MR. WOODS: May I briefly, Your Honor?
THE COURT: Yes.
MR. WOODS: Thank you.

CROSS-EXAMINATION

BY MR. WOODS:
Q Sir, so what was the nature of this gun/murder plot, as you understood it?
A What I just stated. That's all I know about it, just from what my celly was telling me and trying to get me involved in what they were doing.
Q And was that already in motion by the time Shawn approached you?
A Well, he was my celly. He was just starting it when they were trying to do whatever they were doing to this guy.
Q Do you know whether this plot originated from Hany, from Shawn, or someone else?
A I don't quite understand what you're trying to say.
Q Do you know whose idea this plot was?

A It was my -- I figured it was my celly's, or Shawn's.
Q And why do you figure that?
A Just the way he came across, wanting me to get involved in it.
Q But the idea of whatever this plot was, like the --
A I don't know. I didn't sit in on any of their discussions or any of that.
Q Did you ever talk to Hany himself about this plot?
A No, I didn't.
MR. WOODS: No further questions, Your Honor.
THE COURT: Redirect?
MR. LEVY: None, Your Honor.
THE COURT: All right. Sir, you may step down. Thank you.

Counsel, the normal place where we'd begin this discussion is my telling you what I've had an opportunity to review, which amounts to about six inches' worth of pleadings and transcripts in this matter from multiple attorneys.

The material that was submitted by the government, which is in that six-inch pile; information submitted by Mr. Veletanlic's former counsel, which contain a number of attachments, and Mr. Levy, as Mr. Veletanlic's current counsel; and, finally, the presentence report, and I don't believe that this has ever been updated, but the one that I've used is dated May 22, 2019. Is that still the most

current?

THE PROBATION OFFICER: Yes, Your Honor.

THE COURT: All right. So that's the presentence investigation report that I've reviewed.

Because this matter was tried, there is no impact of a plea agreement because there isn't one.

And, lastly, I believe that everyone is of the view that this is a total offense level of 28, a criminal history category one, and that would give rise to a guideline range of 78 to 97 months.

Mr. Woods, I'll hear from you first, please.

MR. WOODS: Thank you, Your Honor.

Your Honor, I think it was Donald Rumsfeld who talked about the known unknowns, and I share the court's view at the outset of the case, at least to this extent, which is, it's not a productive exercise to try and piece together all of the details as to what happened. They're not known. And we, hence, in part, because we decided not to call the two inmates in this case, and instead to do what the court announced at the outset, which is to focus instead on the phone calls from the defendant, his own declaration, his explanation about what happened, and his letters that he has admitted he wrote.

And when you focus on those three sets of materials, you are left with some troubling conclusions. Number one, that

this defendant had control over guns. I mean, that almost gets lost in, sort of, this discussion, but that is a very troubling fact. I mean, this defendant repeatedly represented to the court in bail hearings that he had relinquished control over guns, and that turned out not to be true. I mean, he's talking about retrieving guns out of a couch cushion on a place that he frequents. Two, what's also clear from his own words and not disputed in his explanation as to what happened, is he was directing that these guns be transferred to people who he thought were violent.

Now, the defendant's explanation for that is, "Well, you know, I alerted my attorney at the first available opportunity." That's not true. It's just not true. The communication from Ms. Scanlan occurred on May 21st. The first time the defendant is caught on audio -- so it's not in dispute -- talking about getting home addresses for this informant is May 2nd. That's a long period of time.

And as we noted in our papers -- it's not been disputed by the defense -- he met with the defense investigator on the 15th, in between this period of time.

And it's also troubling, when you look at what the defendant said happened. This is not a case in which we have, well, here's what we've put forward, and now let's look at whatever other possible, conceivable explanation of what happened. Let's balance those two. No, the defendant has

said this is what happened, and what he said is that he was collecting these home addresses, initially, to write a book on the informant. That's not plausible. It's not plausible because when the court saw the transcripts, there's no reason to talk in code. There's no reason to avoid the informant's name if this was some legitimate exercise of, you know, wanting to publish some expose or something as implausible as that, but you don't talk in code, and you certainly don't do it when it's followed by the events. The events that follow tell you everything you need to know about what was happening.

And it was also his explanation that he was trying to signal to his friends "do not transfer these guns." Also wholly implausible. I mean, he goes into an utter panic -- the court saw it in the calls -- when he's not able to get these guns transferred.

And, Your Honor, we focus, in part, on this conduct. I agree with the court's conclusion; that the way to look at this conduct is not a free-standing set of events that should be looked at in isolation. Instead, they are the culmination of a pattern of conduct that has existed throughout this investigation and through this trial.

Mr. Veletanlic was convicted -- convicted -- for sending guns overseas to people he described as being dangerous. That's the beginning of this case, and that is the end of

this case.

While he's under investigation, while he's openly working with agents, while he knows the potential and possibility that he's going to get charged, and the incredibly serious consequences that can flow from that, when he has every incentive to cooperate, to be law-abiding, to do whatever he can to avoid the prospect of prosecution, what does he do? Well, number one, he continues to possess silencers, which are illegal in and of itself, he lies about it to agents when they first confronted. And then what I think should give the court most pause and concern is that, when he is said to meet the agents on that day when they arrest him, he doesn't know he's being taken into custody -- the agents have set this up because they're concerned about his stability -- he shows up ready for a firefight.

I mean, there is no good-faith, plausible explanation why you show up with a car chockful of ammunition, a gun in your waistband that itself is illegal and that itself is the type of illegal weapon that he sent overseas. I mean, it's outrageous.

And then before this trial, the court saw the evidence that he was tampering with his computer monitoring.

Your Honor, one of the 3553 factors is what sentence should be imposed to deter this defendant from committing future crimes, and, Your Honor, that has to weigh heavily in

the balance of what the court should do here, because you see a pattern of behavior that stretches back years, years.

We're not talking about somebody who is using meth or engaged in petty shoplifting. You're talking about conduct that any law enforcement officer would look at and be extremely concerned for the safety of the community.

You see somebody who has repeatedly made the wrong decision. You know, I have a lot of sympathy for defendants who, in that rash moment, the heat of the moment, make that one bad decision that totally alters the course of their life and lands them sitting at the defense table. That's not what happened here.

This was a long pattern of separate yet, nonetheless, connected conduct, and that is why we think a sentence at the high end of the range, 97 months, in appropriate.

I'm happy to answer any of the court's questions.

THE COURT: I think I have a good understanding of this. Thank you.

MR. WOODS: Thank you, Your Honor.

THE COURT: Mr. Levy?

MR. LEVY: Let me begin by saying that we adopt the remarks that Mr. Brown said in his sentencing memorandum, we adopt his sentencing recommendation, and we adopt his objection to the guidelines. I understand that the court has already ruled on that. I won't belabor that issue.

I did come into the case fairly late, but I have read the transcript of the trial, and I have gotten to know the facts of the case, and I've gotten to know Mr. Veletanlic.

I don't want to belabor the point about his involvement in the post-sentencing conduct. I did read the declaration that was drafted by Mr. Brown's office and that Mr. Veletanlic signed, and the one point that he made, which bears mentioning, in that affidavit is that he said that he got involved in this situation under duress.

Mr. Veletanlic did start out in the case by attempting to cooperate. And he mentioned, in his affidavit or his declaration, that if that information were to become generally known amongst the other residents of the Federal Detention Center or other federal penal institutions, things would not go well for him.

And his statement, in his declaration, is that CS1 and CS2 told him that if he didn't go along with the scheme, that they would make that information generally known throughout the Federal Detention Center, and so what Mr. Veletanlic said is that he did this under duress, and that does not seem, to me, to be implausible.

And as I pointed out in my memorandum, the fact of this nature, which is a weighty fact, certainly, which, hopefully, will not weigh heavily on the court's sentencing decision, the government has to prove it by clear, cogent, and

convincing evidence, and whatever else has happened in this case. The government, with respect to that one fact, the nature and the extent of Mr. Veletanlic's involvement in this scheme, the government has not sustained its burden of proof.

THE COURT: Well, let me stop you there.

Will you point out to me where in the record there's some connection between Confidential Source 1 and Confidential Source 2, the Irish Pride gang, and R.K., the informant?

MR. LEVY: I'm sorry?

THE COURT: It seems to me the linchpin to your argument is that somehow these two people want to use Mr. Veletanlic in some manner or coerce him in some manner in order to deal with someone who either they know or don't know, and as best I can tell, there's nothing in the record to suggest they have any knowledge of R.K., unless it comes from your client.

MR. LEVY: I believe that what happened is that Mr. Veletanlic was talking about his case. The cardinal rule of life in federal penal institutions, and all institutions, is you don't discuss your business. I believe that Mr. Veletanlic unwittingly or wittingly was talking about his case to other inmates. He may or may not have issues with R.K. I don't know that, although I don't see why he would want to have R.K. killed, since R.K. was, by no means, a central figure in this case.

I think what happened here, and I think it's, at least, plausible, that he was shooting his mouth off at the Federal Detention Center, CS1 and CS2 picked up on it, were listening to his complaints, and based upon what he was telling them, cooked up the scheme.

THE COURT: So what you're asking the court to accept is that he's shooting his mouth off at the Federal Detention Center, and these two people then threaten him to disclose his cooperation unless they kill R.K.? Does that make any sense to you?

MR. LEVY: Well, it does to me. I mean, I think that's what jailhouse informants do. I mean, Mr. CS1, in his initial overture to the U.S. Attorney's Office, describes his previous successes in informing on people. And, basically, based upon my experience in the criminal justice system, that's the whole problem with jailhouse informants and why they're generally treated by the courts with a certain amount of skepticism, you know. I think they listen to people, if people are foolish enough to discuss their cases. They take the narrative that the defendant is giving them and turn them into something else. I think that's plausible.

I mean, we don't have a lot of evidence either way, as counsel mentions, but we do have the phone calls. And you've seen the phone calls, and I heard, in what Mr. Veletanlic was saying on the phone, some things to

indicate that he was acting -- he felt that his life was in danger and that he was acting under duress.

So did this happen? Could it happen? I think it's not unreasonable to think that this could have happened. I guess that's my position.

THE COURT: Why don't you concentrate on the underlying offense? I think I've heard enough about this.

MR. LEVY: This was bad conduct. I mean, I'm not going to sit here and say this wasn't bad conduct. But I think, as the 22 -- 3353 factors, you have to look at the whole picture here.

Mr. Veletanlic --

THE COURT: It's 3553.

MR. LEVY: -- this is a gentleman with a long history of shooting himself in the foot. He tries to cooperate. He takes the initial step, goes to the agents after he hears that he's under suspicion, tries to cooperate. The cooperation is successful.

According to the agents, the reason that they decided to end the cooperation agreement is they felt that Mr. Veletanlic was unstable, recognizing, apparently, that he had mental health problems.

He tries to cooperate. That doesn't work out. He goes to trial. He's convicted.

So the narrative of the offense is well known to the

court. While he's on pretrial release, he makes mistakes. He uses a computer when he shouldn't have used a computer. These are all things that, basically, are self-destructive, I won't say "silly things," but they're stupid things, and Mr. Veletanlic just is an individual that engages in self-destructive behavior.

He has, as recognized by Probation, a horrible background. Apparently he has mental health issues. Apparently he has serious health issues. The lead poisoning is mentioned, I think, in the presentence report and in the sentencing memorandum of Mr. Browne. There's a question of whether or not he's being adequately medicated for the lead poisoning.

He's a guy with a lot of problems, in addition to which he's facing deportation upon release from custody. He doesn't know where he's going to go. He's an individual, like a lot of individuals, who's totally aculturated in American culture, and he faces the prospect of being sent back to a country, either Saudi Arabia or Bosnia, which are countries that he has no connection with. In addition to which, as a noncitizen while in the institution, he can't take advantage of a number of programs that would otherwise be available to citizens: First Step, things like that, RDAP, all that stuff.

So the conduct's not good, but there is a lot of mitigation, I think, in the case. I think that's recognized

in the sentencing recommendation of Probation, which apparently, has not changed its recommendation for a variance. They're recommending, as I understand it, 48 months.

So we would ask the court to disregard the uncharged, post-offense misconduct, because the government has failed to meet its burden of proof. Sentence Mr. Veletanlic based upon the record, which the court is certainly familiar with. Take account of the mitigating factors in this case, which are substantial. And based upon that, sentence Mr. Veletanlic, as recommended by Mr. Brown, to a term of 36 months.

Unless the court has questions, I'm done.

THE COURT: I don't have many questions, but you should simply credit the fact that there's a lot of material that I've had a chance to read.

MR. LEVY: Yeah, and we appreciate that. I tried to not reinvent the wheel.

THE COURT: Does your client wish to address the court?

THE DEFENDANT: I don't think I'm in a position to address the court.

MR. LEVY: No?

THE DEFENDANT: Uh-uh.

MR. LEVY: No, Your Honor.

THE DEFENDANT: I don't think it will help.

THE COURT: All right.

The sentencing regime in the Ninth Circuit teaches me, at this point, that I'm to state my conclusion regarding total offense level, criminal history category, and guideline range. I believe that those are uncontroverted that it is a total offense level of 28, a criminal history category of one, and a guideline range of 78 to 97 months.

I read Mr. Brown's objection to the sentencing range, and, basically, he chooses to do his calculation of the range based on his view of what's the right way to do the guidelines.

Starting with, he believes that Mr. Veletanlic's eligible for a downward adjustment for acceptance of responsibility, notwithstanding the fact that he went to trial, and he has provided no verbal statement admitting the conduct. He offers a number of explanations for why he did what he did, but it's excuses for what you do is different than acceptance of responsibility.

The second objection has to do with the grouping that Probation did, because they're all part of a common scheme. That is completely inconsistent with the testimony that I heard at trial, which was Mr. Veletanlic was in the business of illegally exporting firearms for profit.

So I didn't feel that those objections were well taken, and as I said, I believe that this is appropriately a total

offense level of 28. I take that as creating my starting point for the sentence in this matter, and I am to remain cognizant of it throughout the process.

To get from a range of 78 to 97 months, given the facts in this matter, would require a whole series of assumptions that I don't think are present.

Having said that, I'm asked to look at 18 U.S.C., 3553(a), and I am asked to develop a sentence which is sufficient but not greater than necessary to acknowledge the considerations found in that statute, the first of which is what is the conduct here?

The charges in Count 1 was Arms Export Control Act; two, possession of unregistered firearms; three, possession of unregistered firearms; and four, possession of firearms with obliterated serial numbers.

Largely, at trial, the argument was Mr. Veletanlic is a gun nut -- we heard that over and over and over -- and that hiding behind or using the Second Amendment, being a gun nut, is not a criminal offense.

What I heard during the trial, before the trial, and after the trial is that it was uncontroverted that Mr. Veletanlic was illegally exporting firearms and parts, and he had no explanation for it, other than it was a really lucrative business.

And he took quite sophisticated steps in order to cover

his tracks: Going to multiple post offices, calling these things bicycle parts and assorted other things in order to camouflage them from detection. It was a sophisticated scheme.

Secondly, there was a lot of testimony about illegal silencers. Mr. Veletanlic lied and was not very good at lying. We heard and established that there was a loaded gun with an obliterated serial number. That was defended as, "Well, he's just a gun nut," apparently on the assumption that all gun nuts have obliterated serial numbers on their weapons.

And, lastly, what I'm going to describe as his sideshow regarding the post-trial developments regarding R.K. as I indicated, I put no credibility in the two individuals who came forward and said there was some conspiracy, or some arrangement.

I, however, have to give credit to the phone calls, which are completely inconsistent with Mr. Veletanlic's story that he's decided to write a book about someone who he can't find the address for.

Mr. Veletanlic, I was around when you were muttering about R.K. at the end of trial. You don't get to erase the court's memory of those statements and how violently you felt about him and that it was all his fault.

The declaration I find to be riddled with what appear to

be fabrications. And as I indicated, I did credit anything that was a contemporaneous transcript or recorded recollection.

So in terms of the nature and circumstances of the offense, there are four counts. Mr. Veletanlic was easily guilty of each of them.

That, then, causes me to turn to number two, which is the history and characteristics of the defendant. I'm the first to agree with Mr. Brown and Mr. Levy that Mr. Veletanlic has suffered early childhood trauma. After that, it becomes more of a mixed bag. He has a fondness for animals. He was living in a house of modest means, running an illegal business out of it, and, by his account, has serious medical issues. And I went back and looked at the medical records again, and I will credit the medical records that he has medical issues.

In terms of the history and characteristics of the defendant, what is troublesome to me is that, from the pretrial, the trial, and the post-trial behavior, Mr. Veletanlic is very secretive and very untruthful, and the untruths, lies that he's told in this court are extensive. They started with the suppression hearing, and they've lasted through the entire course of this proceeding.

Secondly, he blames others for his own conduct, something that Mr. Levy commented on. The BATF agents were somehow

responsible for what he did. I can't tell if he decided to cooperate because he was trying to help his own situation, knowing he had been directly detected, or if he really wanted to help, but the assistance that he was able to provide was limited, in part, because of the BATF's conclusion that he was unstable to be an informant and they wouldn't be able to put him on the stand at a trial. And, ultimately, as we got deeper into this world of firing ranges and guns, it was all R.K.'s fault, that he'd been set up by R.K., and that he needed to get even with R.K.

Thirdly, Mr. Veletanlic has an excuse for everything. My favorite example was removing the computer limitations that were a condition of his supervised release, and then testifying to the court that it was necessary for reasons of his business. That only came out after it was detected that he had removed these limitations, and we have no idea what he was doing shortly before the time the trial was to take place.

So my ultimate conclusion, Mr. Veletanlic, is I don't believe anything you say because you've just lied to me and you blame others for your conduct. That's a tough spot to be in because I'm asked to make determinations about your future, and one of the things that I try to follow is to give you the benefit of the doubt.

The third 3553(a) factor is the seriousness of the

offense, to promote respect for the law, and to provide just punishment.

Seriousness of the offense, sending guns to countries that have laws against guns, profiting by breaking down blocks and sending the barrel and sending whatever else to what came out in the trial as neo-Nazi movements in Scandinavian countries, sales to other European countries. I take that to be very serious.

The silencers are something that the court does not have much experience with but is obviously a hot button with the BATF. We have unusually stringent rules in regards to silencers, and Mr. Veletanlic had them, at least some of the testimony dealt with building them, and then he lied to the BATF about having them. So in terms of the seriousness of the offense, I believe it's very serious.

Respect for the law, there was none. There was a deliberate and conscientious effort to avoid the law, the multiple post offices, the lying on the export forms, and the serious of falsehoods that have been told in connection with his trial, so I don't find he has any respect for the law.

And then this question of providing just punishment. That's, obviously, in the eye of the beholder, which we have the defense at 36 months, Probation at 48 months, and the government at 97 months.

The next consideration is deterrents to this type of

criminal conduct. It was a fascinating peek into the gun world, frightening to the court that there are people that simply amass huge quantities of weapons and ammunition. I can still close my eyes and see the photograph of the trunk filled with -- I think there were milk cartons of ammunition, being brought to a supposedly friendly meeting with the BATF. That's serious, and to the extent that it offers some deterrents to that type of criminal conduct, I think it applies in this case.

Next, to protect the public from further crimes by this defendant. I would like to think that that's not a consideration in cases that I handle, in that after people have had a chance to see the error in their ways, that they will not engage in criminal conduct in the future.

The whole sideshow in regards to R.K. causes me to question that. I don't think that Mr. Veletanlic has forgiven and forgotten this. He certainly reached out to fellow of his people sharing his interests and asked them to do various things, including retrieving guns that he had assured the court, or, at least, assured Probation and the BATF that he did not have any longer.

I'm not going to credit the notion that the use of the word "insurance" was nefarious, but the whole written transcript just makes absolutely no sense, and it's certainly possible of being interpreted as further plans to commit

criminal acts.

Mr. Veletanlic, what's very hard for me is, I think you're 36, 37 right now. Most of the time people have figured this out by the time you get to that age -- actually, it could be 37 or 38 -- and somehow that just hasn't happened here.

And then, finally, the last consideration is the need to provide services and correctional treatment in the most efficient and beneficial way possible, and something that I'm going to credit in Mr. Veletanlic's favor is the status of his immigration situation and the treatment of non-citizens in our prison system, both of which will inflict on Mr. Veletanlic at least more intensive, if not more severe, treatment in the federal prison system.

Having gone through all of those considerations, I tried to come up with what I thought was the appropriate sentence. The government is at 97 months, which is the absolute top of that guideline range. That seems to me to be a possible but probably not the appropriate sentence here. I reject the 36 months as unrealistic, and I reject the 48 months as not being reflective of the conduct involved in this.

That doesn't leave me with a lot of choices because of that wide variance, but having considered this at length, I believe that it is appropriate as follows:

The defendant is sentenced to a total term of imprisonment of 85 months. I have attempted to follow Probation's

calculations, which is that, as to Counts 1, 2, 3, and 4, that generates a sentence of 85 months. The sentences shall run concurrently with one another.

Upon release from imprisonment, the defendant shall serve a term of supervised release of three years, subject to the standard conditions as well as the special conditions. Those are set out in the sentencing recommendation that has been made to the court, and I'm going to incorporate it.

I did not see, in those special conditions, a restriction on gun ownership; however, I believe that that is covered in the judgment as one of the conditions that's applicable to felons, but I would certainly direct Mr. Veletanlic and Mr. Veletanlic's lawyer to engage in a discussion of why that prohibition is there and the importance of it.

I would also note that Special Condition 7 sets up a urinalysis-testing program, but I don't believe there has ever been any discussion of drugs in this case.

MR. WOODS: Your Honor, I'll say two things. First, there was a pill bottle that was recovered from the defendant's car. He was placed on drug testing through his period of probation. He consistently tested clean, and I believe Probation ultimately removed that condition.

THE COURT: Well, if they didn't, I just did.

MR. WOODS: Very good, Your Honor.

THE COURT: I'm going to find that the defendant

needs to pay the special assessment in the amount of $400, which is due as a condition of being a defendant who has been convicted, and, lastly, I find the defendant does not have the ability to pay a fine, and no fine is imposed.

The last thing that I would note: While all conditions are equally important and need to be obeyed, what is listed as No. 9 in the sentencing recommendation is the notation that if deported, the defendant shall not reenter the United States without permission of the Secretary of the Department of Homeland Security, and if granted permission to reenter, the defendant shall contact the nearest U.S. Probation Office within 72 hours of entry.

I'm going to ask each side if they have anything further that they wish to argue before I confirm sentence.

Mr. Woods?

MR. WOODS: I do not, Your Honor. Thank you.

THE COURT: Mr. Levy?

MR. LEVY: Would the court recommend Sheridan as the place of confinement?

THE COURT: I would be happy to recommend Sheridan.

MR. LEVY: Thank you.

THE COURT: Mr. Veletanlic, you need to understand. I can recommend to the Bureau of Prisons, but it's up to them. It's something I don't have control over.

MR. LEVY: I understand.

THE COURT: All right. Having heard from counsel, the judgment, as announced by the court, is the judgment which is imposed.

Mr. Woods, when you get your judgment ready, you can approach.

MR. WOODS: Thank you, Your Honor.

THE COURT: Mr. Veletanlic, you went to trial in this matter. You have a right to appeal, including the right to appeal the sentence that I've just given you. If you do so, you would have a right to apply for leave to file in forma pauperis, and the clerk of the court would prepare and file a notice of appeal at your request.

You should be aware that, with few exceptions, any notice of appeal must be filed within 14 days of the entry of the judgment.

Lastly, I direct that a full copy of the judgment and pretrial investigative report be provided to the Bureau of Prisons and also to the U.S. Sentencing Commission.

Do you have a judgment, counsel?

MR. WOODS: Yes, Your Honor. May I confer with Ms. Porter for a moment?

THE COURT: Yes.

MR. WOODS: Your Honor, Ms. Porter pointed out what I should have remembered, which is Count 4 has a statutory maximum of 60 months. So what I would suggest that the

judgment read is for Counts 1, 2, and 3, a term of imprisonment of 85 months on each count; Count 4, a term of imprisonment of 60 months; all four counts to run concurrent, for a total term of 85 months.

THE COURT: That would be fine.

Mr. Levy, do you wish to be heard?

MR. LEVY: That's fine, Your Honor.

I've reviewed the judgment, Your Honor. It conforms to the court's order.

THE COURT: You may approach.

I've signed the judgment in the criminal case, dated it 27 January 2020, and I'm returning it to the clerk for filing at this time.

Mr. Woods, anything further?

MR. WOODS: No, Your Honor.

THE COURT: Mr. Levy, anything further?

MR. LEVY: No, Your Honor.

THE COURT: Mr. Veletanlic, I know it's hard to take advice, so you're free to ignore it.

While you're in custody, please work on your anger management. You get yourself into trouble you don't need to get in trouble for, and I think a lot of it is just sort of emotional outbursts. I've seen you be angry, and I think it makes you make bad decisions. So for what it's worth, that's something that would be constructive to come out of this.

We'll be in recess.

(The proceedings concluded at 10:46 a.m.)

C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 12th day of March 2020.

/S/ Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter